Jeffrey W. Dulberg (CA Bar No. 181200)
John W. Lucas (CA Bar No. 271038)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Telephone: 310-277-6910
Facsimile: 310-201-0760
Email: jdulberg@pszjlaw.com
jlucas@pszjlaw.com

*Counsel to Bradley D. Sharp, Liquidation Trustee of the Klein Creditors' Liquidation Trust*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>LESLIE KLEIN,<br><br>Debtor. | Case No. 2:23-bk-10990-NB<br><br>Chapter 11 |
| BRADLEY D. SHARP, Liquidation Trustee,<br><br>Plaintiff,<br><br>v.<br><br>LESLIE KLEIN and EKLK FOUNDATION,<br><br>Defendants. | Adv. Case No.: 2:26-ap- (NB)<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF REGARDING EKLK FOUNDATION AND THE RETAINED DEATH BENEFIT UNDER THE KIRZNER LIFE INSURANCE POLICY** |

Bradley D. Sharp, in his capacity as liquidation trustee (the "**Liquidation Trustee**") of the Klein Creditors' Liquidation Trust (the "**Liquidation Trust**"), and plaintiff in the above-captioned adversary proceeding (the "**Adversary Proceeding**"), brings this complaint (the "**Complaint**") against Leslie Klein (the "**Debtor**") and EKLK Foundation ("**EKLK**" and, together with the Debtor, the "**Defendants**") seeking (a) a declaratory judgment that (i) EKLK is the alter ego of the Debtor or that there is no distinction between EKLK and the Debtor and the assets of the EKLK are assets of the Debtor, (ii) the Retained Death Benefit (as defined below) held in EKLK's name under the Retained Death Benefit Agreement (as defined below) is property of the Liquidation Trust, and (iii) as property of the Liquidation Trust, the plan injunction as described herein,



PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

prohibits any transfer or change of the Liquidation Trust's rights in the Retained Death Benefit Agreement, the Retained Death Benefit, or the proceeds therefrom, and (b) an injunction against the Defendants enjoining them from receiving, assigning, transferring, or otherwise disposing of Retained Death Benefit Agreement, the Retained Death Benefit, or proceeds therefrom absent further order of the Court.

## I.

## INTRODUCTION

1. The Liquidation Trustee commenced this Adversary Proceeding for a determination that EKLK is the Debtor's alter ego or that there is no distinction between EKLK and the Debtor and the assets of the EKLK are assets of the Debtor, that the Retained Death Benefit Agreement, the Retained Death Benefit, and the proceeds therefrom are property of the Debtor's estate, which then became property of the Liquidation Trust upon the effective date of the plan, and that any such proceeds arising from the Retained Death Benefit Agreement be paid to the Liquidation Trust.

2. The Debtor uses EKLK, a purported charitable foundation, to conduct the affairs of his life, for his benefit, and as a means of preventing assets from becoming part of his bankruptcy estate and ultimately part of the Liquidation Trust. The Debtor is EKLK's president, chief executive officer, and secretary, "board member," and describes himself to EKLK's bank as its "owner." The Debtor funds EKLK with money from his law firm, Les Klein & Associates,[1] and uses EKLK's cash for meals, clothing, travel, and other personal expenses. And during this chapter 11 case, he twice used EKLK to try to take control of property of the Estate (as defined below): first by transferring title to his former home (the "**June St. Property**") to EKLK, and then by causing EKLK to sue on claims belonging to the Estate. Each time, this Court found that the conduct violated the automatic stay.

3. In 2020, EKLK, acting through the Debtor as its "Authorized Signatory," transferred its interest in a life insurance policy insuring the life of Isaac Kirzner but retained the right to

[1] The Debtor is the sole owner and beneficiary of Les Klein & Associates. Like EKLK, the Debtor uses Les Klein & Associates to divert assets from his bankruptcy estate and the Liquidation Trust.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

receive $750,000 upon Mr. Kirzner's death. Because there is no distinction between EKLK and the Debtor, the $750,000 Retained Death Benefit (as defined below) is the Debtor's property, which became property of the Estate on the petition date and was ultimately transferred to the Liquidation Trust under the Plan. Thus, it is essential for the Court to determine the Liquidation Trust's rights in the Retained Death Benefit Agreement, the Retained Death Benefit, and the proceeds therefrom, and to enjoin the Defendants from receiving, assigning, or dissipating any of the foregoing.

4. The relief requested herein is necessary to safeguard, and avoid irreparable harm to, the Liquidation Trust and the creditor beneficiaries thereof. The relief requested herein will help ensure that the integrity and purpose of the Plan injunction is preserved and enable the Liquidation Trustee to administer the Liquidation Trust and distribute available assets, inclusive of the Retained Death Benefit, to the holders of beneficial interests in the Liquidation Trust.

## II.

## JURISDICTION AND VENUE

5. This Adversary Proceeding arises in and relates to the Debtor's above-captioned case pending before this Court under chapter 11 of the Bankruptcy Code.

6. The Court has jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. § 1334.

7. The Court has a broad grant of subject matter jurisdiction over the claims against the Defendants pursuant to 28 U.S.C. § 1334. The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all property, wherever located, of the Debtor as of the commencement of this case, and of property of the Liquidation Trust. 28 U.S.C. § 1334(e).

8. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (O) and the Liquidation Trustee consents to the entry of a final order by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

9. Venue for this matter is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## BASIS FOR RELIEF

10. The statutory bases for the relief requested herein are sections 105 and 541 of the Bankruptcy Code, Bankruptcy Rules 7001(g), 7001(i), and 7065, Sections 8, 11, and 12.3 of the *Chapter 11 Trustee's Third Amended Plan of Liquidation of the Estate of Leslie Klein* [Docket No. 1350] (the "**Plan**") , and section 2201(a) of title 28 of the United States Code.

11. The Liquidation Trustee has made no prior request for the relief requested herein to this or any other court.

## IV.

## THE PARTIES

12. Plaintiff, Bradley D. Sharp, was formerly the chapter 11 trustee (the "**Chapter 11 Trustee**") for the bankruptcy estate of the Debtor and was appointed Liquidation Trustee pursuant to the terms of the Plan that was confirmed by order [Docket No. 1366] of the Court entered on April 28, 2026. The Plan became effective on May 1, 2026.

13. The Debtor, Leslie Klein, is an individual who resides in Los Angeles, California and is the debtor in the above-captioned chapter 11 case.

14. Defendant EKLK Foundation is an entity that is organized under the laws of the State of Delaware and is not in good standing. In litigation it filed in 2025, EKLK described itself as "a federally recognized private charitable foundation, registered by the State of Delaware with its principal place of business in the State of California." *See* [Docket No. 969], Ex. G ¶ 1.

## V.

## FACTUAL BACKGROUND

### A. The Debtor, the Bankruptcy Filing, and the Appointment of the Trustee

15. The Debtor, as an attorney and an accountant, both individually and as a trustee or fiduciary, acquired and maintained life insurance policies that are commonly referred to as "death benefit policies." Upon the death of a named insured, such policies provided a pay out of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

policy benefits to designated beneficiaries. Given the face value of the death benefit policies, and any other investment benefits under the life insurance policy, the costs of the associated premiums were framed by the Debtor as investment opportunities.

16. The Debtor typically retained these policies for his benefit and, at times, held the policies through various trusts or companies that he owned and controlled. In other instances, the Debtor solicited investors to whom he would sell or transfer some or all of the interests in death benefit policies so that the related death benefits would be allocated between the Debtor and such investors.

17. On February 22, 2023, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Upon the filing of the petition, an estate (the "**Estate**") was created that included all the Debtor's assets, affirmative claims, and defenses thereto.

18. On May 17, 2023, in response to a motion to dismiss the Debtor's chapter 11 case, the Court ruled that the appointment of a chapter 11 trustee, and not dismissal of the case, was in the best interests of the Estate. On May 23, 2023, the Office of the United States Trustee ("**UST**") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No. 151], appointing Bradley D. Sharp to serve as Chapter 11 Trustee. On May 24, 2023, the UST Filed an *Application for Order Approving Appointment of Trustee and Fixing Bond* [Docket No. 154], which was approved by order entered the same day [Docket No. 155]. On that same day, the Chapter 11 Trustee accepted his appointment [Docket No. 156] and administered the Estate through the Effective Date.

19. Section 11 of the Plan preserved the Estate's interest in all "Causes of Action." The claims asserted in this Complaint, including the Estate's interest in the Retained Death Benefit, are among the various Causes of Action that were preserved under the Plan and transferred to the Liquidation Trust under Section 8 of the Plan for the benefit of holders of beneficial interests in the Liquidation Trust.

**B. The Retained Death Benefit Agreement**

20. American General Life Insurance Company issued a life insurance policy, no. US US0024230L (the "**Policy**"), insuring the life of Isaac Kirzner (the "**Insured**"). The Policy was

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

originally owned by the Isaac Kirzner Irrevocable Life Insurance Trust. EKLK acquired ownership of the Policy.

21. On or about August 20, 2020, EKLK, Fahimeh Javaheripour, and the Isaac Kirzner Life West Family Trust (the "**Kirzner Trust**") entered into that certain *Retained Death Benefit & Waiver of Interest Agreement*, dated as of August 3, 2020 (the "**Retained Death Benefit Agreement**"). A copy of the Retained Death Benefit Agreement is attached hereto as **Exhibit "1"**.

22. The Debtor signed the Retained Death Benefit Agreement on EKLK's behalf as its "Authorized Signatory." The Retained Death Benefit Agreement calls EKLK the "Klein EKLK Foundation" (with handwritten changes to correct what appear to be typos of the entity's name in certain places), and also refers to EKLK simply as "Klein." It lists EKLK's address as "14245 [Ventura Blvd.], 3rd floor Sherman Oaks, CA 91423," which is the same address the Debtor used for himself in the operating agreement of Life Capital Group, LLC. *See* [Docket No. 969], Ex. D, Ex. A § 13.11.

23. Under the Retained Death Benefit Agreement, EKLK and Ms. Javaheripour, as "Transferors," sold and transferred all of their rights, title, and interest in the Policy to the Kirzner Trust, subject to each Transferor's retention of a "Retained Death Benefit." Retained Death Benefit Agreement §§ 2.01 and 4.01. The Retained Death Benefit Agreement provides that the Debtor is no longer required to pay premiums on the Policy. *Id.* § 3.01.

24. Specifically, EKLK retained the right to receive $750,000 in connection with the Policy upon the Insured's death (the "**Retained Death Benefit**"). *Id.* § 4.01. The Retained Death Benefit Agreement also permits the Debtor to assign its Retained Death Benefit by giving notice to the Kirzner Trust provided that he is not in default. *Id.* § 4.02.

25. On March 8, March 31, and April 10, 2023, the Debtor filed his schedules of assets and liabilities and statement of financial affairs [Docket Nos. 34, 62, 70] (the "**Schedules**"). The Debtor did not explicitly disclose the Retained Death Benefit Agreement or any interest in the Retained Death Benefit in the Schedules but did include a claim that the "Debtor entered into an agreement with Isaac Kirzner whereby he paid the insurance premiums for Mr. Kirzner, and upon Mr. Kirzner's passing, the Debtor would receive $1 Million." [Docket No. 34], at p. 12; [Docket

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

No. 62], at p. 10; [Docket No. 70], at p. 10. Thus, it is unclear whether or not the Debtor scheduled the Retained Death Benefit or something else. It is clear, however, that the Debtor has claimed an interest in the Policy, which the Debtor memorialized pursuant to the Retained Death Benefit—making it property of the Estate.

**C. EKLK Foundation**

26. EKLK holds itself out as a charitable foundation. The Debtor testified under oath that "EKLK Foundation is a foundation that I set up with my first wife. EK is Erica Klein and LK is Leslie Klein."[2] The Debtor has also characterized EKLK as his own foundation.[3] The Debtor also personally moved EKLK's policies, "I transferred from EKLK Foundation $17 million in policies."[4]

27. Public records maintained by the Delaware Division of Corporations reflect that EKLK was formed on December 15, 2010, that the Debtor is an officer and director of EKLK, and that EKLK has not been in good standing since August 11, 2015.[5]

28. The Debtor controls EKLK's bank accounts and holds himself out as the owner of EKLK. For example:

a. on January 4, 2011, the Debtor executed a business signature card for EKLK's Bank of America account ending in 8397 identifying himself as EKLK's "Ceo/Sec";[6]

b. on August 30, 2021, the Debtor executed a business signature card for EKLK's Bank of America account ending in 2172 identifying himself as EKLK's "Owner" and "CEO";[7] and

---

[2] Transcript of Bankruptcy Rule 2004 Oral Examination of Leslie Klein, dated November 16, 2023, 114:19-21 (the "**Nov. 16 Transcript**"). A copy of the Nov. 16 Transcript is annexed hereto as **Exhibit "2"**.

[3] Transcript of Bankruptcy Rule 2004 Oral Examination of Leslie Klein, dated December 19, 2023, 275:8–13 (the "**Dec. 19 Transcript**"). A copy of the Dec. 19 Transcript is annexed hereto as **Exhibit "3"**.

[4] **Exhibit "3",** Dec. 19 Transcript, 298:6-8.

[5] Copies of the above-reference public records are annexed hereto as **Exhibit "4"**.

[6] A copy of the January 4, 2011 signature card is annexed hereto as **Exhibit "5"**.

[7] A copy of the August 30, 2021 signature card is annexed hereto as **Exhibit "6"**.



PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

c. on July 3, 2024, more than a year after he commenced this chapter 11 case, the Debtor executed a business signature card for EKLK's Bank of America account ending in 7501 identifying himself as EKLK's "President."[8]

29. When he was examined under oath in this chapter 11 case, the Debtor claimed to know almost nothing about how EKLK is organized or operated. Among other things, the Debtor testified that he:

a. did not know whether EKLK has officers or directors;[9]

b. was "not sure" when EKLK was established and did not know what document would show it;[10]

c. did not know whether EKLK has business records;[11]

d. did not know what document would show whether LKA (as defined below) had a legal relationship with EKLK;[12]

e. did not remember why EKLK paid LKA $3,750 in February 2019 and knew of no document that would explain the payment;[13] and

f. had "no clue" why LKA transferred $2,000 from its operating account to EKLK in August 2019.[14]

---

[8] A copy of the July 3, 2024 signature card is annexed hereto as **Exhibit "7".**
[9] Exhibit 3, Klein 2004 Exam. Tr. 291:7–9 (Dec 19, 2023).
[10] *id.* 289:17–21.
[11] *id.* 290:17–18.
[12] *id.* 292:15–18.
[13] *id.* 291:15–292:10.
[14] *id.* 296:15–297:5.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

30. In March 2025, counsel for EKLK told the Chapter 11 Trustee's counsel that EKLK "is a registered corporate entity with independent directors." *See* [Docket No. 969], Ex. J at 2. The Debtor's own statements to EKLK's bank say otherwise.

31. EKLK has no apparent source of funding independent of the Debtor. According to the Debtor, EKLK holds no assets aside from three life insurance policies.[15] Bank records reflect that, from January 1, 2016 through August 31, 2025, approximately $545,250 of the approximately $674,372 deposited into EKLK's accounts came from Les Klein & Associates, Inc. ("**LKA**"), the Debtor's law firm. Most of the remaining identified deposits came from Bay Area Development Co., another company owned by the Debtor, and from the Debtor, his late wife, and the Debtor's living trust.

32. While this chapter 11 case was pending, the Debtor used EKLK's bank account as a personal spending account. From July 1, 2024 through August 31, 2025, EKLK received approximately $63,790 from LKA in 108 separate transfers and disbursed approximately $64,927. Those disbursements include approximately $24,622 for travel (airfare, hotels, and taxis), $11,139 for food and beverages, $10,362 for merchandise and supplies, $7,000 relating to real property in Israel, $5,300 in cash, $3,301 for clothing, $1,999 for automobile insurance, and $1,174 for medical expenses. None of the disbursements in that period are identified as charitable donations.

**D. The Debtor's Use of EKLK to Take Control of Estate Property**

33. The Debtor treats EKLK's claims and his own as interchangeable. In June 2022, the Debtor sued Life Capital Group, LLC ("**LCG**") and its other member, Shlomo Rechnitz, in Los Angeles Superior Court "individually and as a Member of the EKLK Foundation." Among other things, he alleged that Mr. Rechnitz diverted the proceeds of a policy insuring the life of Barbara Holtzman, which the Debtor said he had contributed to LCG. *See* [Docket No. 969], Ex. D at 1 & ¶¶ 1, 14.

34. On February 25, 2025, the Debtor, acting as trustee of the Credit Trust of the Second Amended Klein Living Trust, executed and recorded a grant deed purporting to transfer his

[15] Exhibit 3, Klein 2004 Exam. Tr. 285:11–13 (Dec 19, 2023).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

residence at 322 N. June St., Los Angeles, California (the "**June St. Property**") to EKLK. He did so even though this Court had already determined that the June St. Property is property of the Estate. *See* [Docket No. 1128] at 2-4. On June 18, 2025, the Court entered an order finding that the grant deed violated sections 362(a)(3) and (6) of the Bankruptcy Code and is void ab initio. [Docket No. 1147] ¶¶ 1-2.

35. On March 6, 2025, the Debtor caused EKLK to file an action in Los Angeles Superior Court, Case No. 25STCV06306. In that action, EKLK claimed that it, rather than the Debtor, was the beneficiary of the same Holtzman policy, and it sought $4,000,000 in damages. *See* [Docket No. 969], Ex. G ¶¶ 11-17 & Prayer ¶ 1. The Chapter 11 Trustee had commenced an adversary proceeding against LCG and Mr. Rechnitz to recover value for the Estate (Adv. No. 2:25-ap-01020-NB) about six weeks earlier. On the same day, the Debtor caused LKA to file a parallel action. [Docket No. 969] at 4–5.

36. This Court found that the state court actions brought in the names of EKLK and LKA violated the automatic stay. [Docket No. 1033]. It then entered judgment for $62,664.50, jointly and severally, against the Debtor, EKLK, LKA, and their counsel. [Docket No. 1178] ¶ 1.

37. In each instance, the Debtor used EKLK not for any charitable purpose, but as a vehicle to take control of assets that belonged to the Estate for his own benefit and to the exclusion of his creditors.

## VI.

## THE NEED FOR THE REQUESTED RELIEF

### A. The Substantial Risk Imposed to the Liquidation Trust

38. Absent this Court's intervention, there is a substantial risk that the Retained Death Benefit, which the Liquidation Trustee contends is property of the Liquidation Trust, will be paid to EKLK and dissipated by the Debtor, or that the Debtor will cause EKLK to assign the Retained Death Benefit to a third party under section 4.02 of the Retained Death Benefit Agreement, when it should be paid to the Liquidation Trust for the benefit of the holders of beneficial interests in the Liquidation Trust.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

39. Prior to commencing the underlying chapter 11 case, the Debtor refused to comply with various state court orders with respect to disclosures of his financial investments and dealings. The record of the refusal of the Debtor to cooperate with the Liquidation Trustee is well documented.

40. In connection with the Debtor's *Motion to Convert* [Docket No. 596] and *Motion to Abandon* [Docket No. 594], and the Chapter 11 Trustee's successful oppositions thereto [Docket Nos. 656 and 657], the Court previously determined that the Debtor uses other companies that he controls, as well as his law firm, to pay for his living expenses and to shield assets that should be property of the Estate. *See* [Docket No. 684].

41. This Court also determined that the Debtor's living trust is "self-settled" and, as a result, the property of such trust is property of the Liquidation Trust. *See*, Adv. Case No. 24-01140, Adv. Docket Nos. 62 and 92.

42. Given the Debtor's demonstrated willingness to use EKLK to take control of Estate property and his unwillingness to provide information as part of his fiduciary duty to his creditors, a substantial risk of harm to the Liquidation Trust and ultimately to creditors exists if the Retained Death Benefit is paid to EKLK or assigned to another party.

**VII.**

**PRELIMINARY INJUNCTION**

43. To guard against the irreparable harm that the Liquidation Trust would suffer if the Retained Death Benefit is paid or assigned, the Liquidation Trustee will separately seek entry of an order enjoining the Defendants from receiving, assigning, transferring, or otherwise disposing of the Retained Death Benefit or its proceeds pending the Court's determination of the relief requested herein.

**FIRST CAUSE OF ACTION**

**DECLARATORY JUDGMENT THAT EKLK IS THE ALTER EGO OF THE DEBTOR**

**(Against the Debtor and EKLK)**

44. The Liquidation Trustee incorporates by reference all preceding paragraphs as if fully set forth herein.



PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

45. There is no separate existence between EKLK and the Debtor, and, as a result, the Liquidation Trust risks being harmed if EKLK as an entity is not disregarded and treated as the alter ego of the Debtor (*i.e.*, the individual who controls and benefits from it), because (a) there is such a unity of interest and ownership between the Debtor and EKLK that their separate identities do not in reality exist, and (b) an inequitable result will follow if the acts in question are treated as those of the entity alone.

46. There is no meaningful separate existence between EKLK and the Debtor. Instead, the Debtor's ownership and control over EKLK shows there is an inseparable unity of interest that any legal formalities reflecting they are separate should not be recognized or enforced.

47. For example:

a. the Debtor is EKLK's president, chief executive officer, and secretary, has held himself out as EKLK's "owner," and is the individual who controls EKLK's accounts, affirmative claims, and other affairs;

b. EKLK is funded by the Debtor, LKA, and other Debtor-controlled entities, and the Debtor uses EKLK's funds to pay his personal expenses;

c. According to the corporate registries in Delaware and California, EKLK is not an active entity and appears to be legally defunct;

d. EKLK shares the Debtor's business address, and the Retained Death Benefit Agreement that the Debtor signed for EKLK refers to EKLK simply as "Klein";

e. the Debtor has asserted the same claims interchangeably in his own name and in EKLK's name;

f. the Debtor has used EKLK as a vehicle to hold, and to attempt to take control of, property of the Estate, including the June St. Property and the Estate's claims against LCG;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

g. EKLK does not observe corporate formalities: EKLK is not in good standing in its state of organization; its own president does not know whether it has officers, directors, or business records; and it disposed of its interests in multimillion-dollar life insurance policies on a handshake, without any written agreement; and

h. the Debtor moves funds back and forth between EKLK and LKA without explanation or documentation.

48. An inequitable result would follow if EKLK were treated as an entity separate from the Debtor. Recognizing EKLK's separate existence would let the Debtor shield assets that are rightfully property of the Estate, including the Retained Death Benefit, from the Liquidation Trust and the Debtor's creditors, and would frustrate the Plan.

49. Accordingly, the Liquidation Trustee seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), Bankruptcy Rule 7001(i), and Sections 8 and 11 of the Plan, that EKLK is the alter ego of the Debtor or that there is no distinction between EKLK and the Debtor and the Retained Death Benefit Agreement, the Retained Death Benefit, and the proceeds therefrom are assets are assets of the Debtor, and that the assets of EKLK are assets of the Debtor, and ultimately the Liquidation Trust.

50. The Liquidation Trustee reserves all rights to amend this cause of action to include other parties for the purpose of determining the Liquidation Trust's interest in EKLK's assets.

## SECOND CAUSE OF ACTION

## DECLARATORY JUDGMENT THAT THE RETAINED DEATH BENEFIT IS PROPERTY OF THE LIQUIDATION TRUST AND SUBJECT TO THE PLAN INJUNCTION

**(Against the Debtor and EKLK)**

51. The Liquidation Trustee incorporates by reference all preceding paragraphs as if fully set forth herein.

52. Under the Retained Death Benefit Agreement, EKLK holds the right to receive the $750,000 Retained Death Benefit upon the Insured's death.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

53. Because EKLK is the alter ego of the Debtor or there is no distinction between EKLK and the Debtor and the assets of the EKLK are assets of the Debtor, EKLK's interest in the Retained Death Benefit was, as of February 22, 2023 (i.e., the petition date), a legal or equitable interest of the Debtor in property and became property of the Estate.

54. Section 541 of the Bankruptcy Code provides that the filing of a chapter 11 petition "creates an estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

55. The Estate's interest in the Retained Death Benefit was preserved under Section 11 of the Plan and transferred to the Liquidation Trust under Section 8 of the Plan.

56. Section 12.3 of the Plan operates as a permanent injunction from and after the Effective Date enjoining all persons from taking any actions against the Liquidation Trust Assets (as defined in the Plan), which includes the "Causes of Action" and the Retained Death Benefit.

57. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

58. Over the course of the past decade there is a history of inappropriate conduct committed by the Debtor in establishing and diverting policies of insurance involving death benefits, diverting policy proceeds, creating fictitious entities to divert policy proceeds, misrepresenting the existence of interests and fraudulently distributing assets of the Estate to family and friends. By virtue of his position in establishing these investments and positioning himself in a manner not subject to oversight, a high degree of risk exists. The failure of the Debtor to explicitly identify in his bankruptcy schedules any interest in the Retained Death Benefit Agreement or the Retained Death Benefit, together with his continued use of EKLK to hold the Retained Death Benefit, constitutes an act to control property of the Estate, which is part of the Liquidation Trust and expressly prohibited by Section 12.3 of the Plan.

59. Upon the determination that the Liquidation Trust owns the Retained Death Benefit and the proceeds therefrom, it is the Liquidation Trustee's duty to preserve and ultimately

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

liquidate any such asset for the purpose of administering the Liquidation Trust and the benefit of creditors holding allowed claims.

60. The Debtor's use of EKLK to hold the Retained Death Benefit, and the risk that the Retained Death Benefit will be paid to, or assigned by, EKLK, threaten to negatively impact the Liquidation Trustee's administration of the Liquidation Trust and the allowed claims held by creditors.

61. Accordingly, the Liquidation Trustee seeks a declaratory judgment, pursuant to section 541 of the Bankruptcy Code, Bankruptcy Rule 7001(i), and Sections 8, 11, and 12.3 of the Plan, that the Retained Death Benefit Agreement, the Retained Death Benefit, and any proceeds thereof are property of the Liquidation Trust, are payable to the Liquidation Trust, and are subject to Section 12.3 of the Plan.

**THIRD CAUSE OF ACTION**

**INJUNCTIVE RELIEF**

**(Against All Defendants)**

62. The Liquidation Trustee incorporates by reference all preceding paragraphs as if fully set forth herein.

63. An order enjoining the Defendants from receiving, assigning, transferring, or otherwise disposing of the Retained Death Benefit Agreement, the Retained Death Benefit, and the any proceeds therefor is essential to the Liquidation Trustee's administration of the Liquidation Trust.

64. The injunctive relief sought herein serves the congressional purpose behind the automatic stay. Injunctive relief would support the Liquidation Trustee's efforts to account for assets and for a proper administration of the Debtor's assets and liabilities. Allowing for the injunctive relief serves the public interest by promoting the orderly and effective administration of the Estate and its limited assets.

65. The Liquidation Trustee seeks an order, pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rule 7065, and Section 12.3 of the Plan, (a) enjoining the Defendants, and any person acting in concert with them, from receiving, assigning, transferring,

encumbering, or otherwise disposing of the Retained Death Benefit Agreement, the Retained Death Benefit, or the proceeds therefrom, and (b) directing that any portion of the Retained Death Benefit received by either Defendant be turned over to the Liquidation Trustee.

WHEREFORE, for the foregoing reasons, the Liquidation Trustee respectfully requests entry of (i) a judgment declaring that (a) EKLK is the alter ego of the Debtor or that there is no distinction between EKLK and the Debtor and the assets of the EKLK are assets of the Debtor, and (b) the Retained Death Benefit and any proceeds thereof are property of the Liquidation Trust and are subject to Sections 8, 11, and 12.3 of the Plan; (ii) an order, pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rule 7065, and Section 12.3 of the Plan, enjoining the Defendants from receiving, assigning, transferring, or otherwise disposing of the Retained Death Benefit and directing that any portion of the Retained Death Benefit received by either Defendant be turned over to the Liquidation Trustee; and (iii) such other and further relief as the Court deems just and proper.

Dated: November 13, 2026 PACHULSKI STANG ZIEHL & JONES LLP

By *<u>/s/ John W. Lucas</u>*
John W. Lucas

*Attorneys for Bradley D. Sharp,*
*Liquidation Trustee*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT 1

# RETAINED DEATH BENEFIT

&

# WAIVER OF INTEREST AGREEMENT

This Retained Death Benefit & Waiver of Interest Agreement (the "**Agreement**") is hereby entered into as of August 3, 2020, by and between **KLEIN FKLK FOUNDATION**, having an address at 14245 3rd floor Sherman Oaks, CA 91423 (sometimes hereinafter referred to "**Klein**"), **FAHIMEH JAVAHERIPOUR**, having an address at 808 Fourth St. Apt.#318 Santa Monica, CA 90403 (sometimes hereinafter referred to as "**Javaheripour**") and **ISAAC KIRZNER LIFE WEST FAMILY TRUST** (EIN: 85-6413245) U/A/D 7/23/2020 (sometime hereinafter referred to as the "**Trust**").

(At times throughout this Agreement, Klein and Javaheripour may be each referred to as "**Transferor**" and collectively referred to as the "**Transferors**", and the Trust may be referred to as the "**Transferee**". Additionally, each of the parties to this Agreement may at times be referred to individually as a "**party**" or "**Party**" and collectively as "**parties**" or "**Parties**").

The "**Effective Date**" of this Agreement shall be that date upon which the last party hereto executes such party's signature to the signature page of this Agreement.

## WITNESSETH:

**WHEREAS**, on or about May 5, 2006, the Parties (or their predecessors in interest) entered into an agreement (the in connection with the ownership of that certain life insurance policy issued by **AMERICAN GENERAL LIFE INSURANCE COMPANY** (the "**Insurer**") with policy number US 0024230L (the "**Policy**") insuring the life of **ISAAC KIRZNER** (the "**Insured**"), which ownership vested in the **ISAAC KIRZNER IRREVOCABLE LIFE INSURANCE TRUST** (hereinafter the "**IKRLT**"); and

**WHEREAS**, Transferors desire to sell, assign, convey and transfer all their rights, title, interest and incidence of ownership of the Policy, including, without limitation, the beneficiary(s) right to receive payment of the death and all other benefits payable under (collectively the **"Policy Interest"**) the Policy to Transferee in consideration of a Retained Death Benefit (as same is hereinafter delineated) and Transferee desires to purchase ownership of the Policy Interest, subject to the terms and conditions of this Agreement; and

**WHEREAS**, this Agreement has come about through mutual negotiation of all the terms and provisions of this agreement between the parties and therefore no presumption exists with regard to any ambiguous term which may exist in this agreement; and

**WHEREAS**, the Parties hereto each warrant and represent to the other that they each fully understand all the terms, covenants, conditions, provisions and obligations incumbent upon each of

them by virtue of this Agreement to be performed or contemplated by each of them hereunder, and each believe the same to be fair, just, equitable, reasonable and to each Party.

**NOW, THEREFORE,** in consideration of the mutual covenants, representations and warranties contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Transferor and Transferee agree as follows:

## ARTICLE I: SUPERSEDER

It is the express intent of the Parties that this Agreement shall, to the extent that it is inconsistent with any other instrument or understanding (whether verbal or written) among the Parties in connection with the Policy, shall supersede such instrument or understanding (collectively hereinafter the "**Prior Understandings**") to the fullest extent permitted by law.

## ARTICLE II: TRANSFER OF POLICY INTEREST

2.01.: Subject to the retention of the Retained Death Benefit, as same is more fully delineated and outlined hereinbelow, each Transferor does, as of the Effective Date of this Agreement, hereby sells, assigns, conveys and transfers all its rights, title, interest and incidence of ownership of the Policy, including, without limitation, the beneficiary(s) right to receive payment of the death and all other benefits payable under to the Transferee.

2.02.: Transferor does hereby irrevocably and unconditionally agree to take all such action that is reasonably necessary, including executing and delivering all such documents and instruments as may be required by the Insurer and Transferee, to complete the proper transfer of the Policy Interest as contemplated by this Agreement (such acts shall hereinafter be cumulatively referred to as "**Cooperation**"). A Transferor's failure to provide Cooperation shall be deemed a material default of this Agreement.

2.03.: It is expressly understood and agreed to by and between the Parties this Agreement shall serve as the sole and exclusive agreement between the Parties in connection with the transfer of Policy Interest and the Retained Death Benefit.

## ARTICLE III: NO FURTHER PAYMENTS BY TRANSFEROR

3.01.: Upon the latter of the Effective Date of this Agreement or the date that the transfer of the Policy Interest is consummated in accordance with and pursuant to the terms of this Agreement, Transferor shall no longer be obligated or required to make any future premium payments in connection with the maintenance of the Policy, same being the sole responsibility of the Transferee.

3.02.: Notwithstanding anything to the contrary, the Transferee agrees not to lapse the Policy without giving the Transferors notice of their intention to lapse (the "**Notice to Lapse**"), which Notice to Lapse shall not be less than 30 days' prior to any Policy lapse date. Nothing contained herein shall obligate the Transferee to maintain the Policy if the Transferee, in its sole and absolute discretion, deems it financially onerous or impractical to maintain the Policy.

## ARTICLE IV: RETAINED DEATH BENEFIT

4.01.: In consideration of each Transferor's sale, assignment, conveyance and transfer of all its rights, title, interest and incidence of ownership of the Policy, including, without limitation, the and beneficiary(s) right to receive payment of the death and all other benefits payable under to the Transferee, the Transferors shall retain the following Retained Death Benefit in connection with Policy in the amount set forth next to each Transferor, below.

| TRANSFEROR | | RETAIN DEATH BENEFIT |
|---|---|---|
| KLEIN K. 6KLK FOUNDATION | --- | $750,000.00 |
| FAHIMEH JAVAHERIPOUR | --- | $300,000.00 |

4.02.: Provided that a Transferor is not in default of any terms of this Agreement, each Transferor shall have the right to assign its Retained Death Benefit by giving notice of its election to assign its interest to the Transferee.

## ARTICLE V: REPRESENTATIONS AND WARRANTIES

5.01.: Each Transferor hereby represents and warrants the following to the Transferee that, to the best of his or her knowledge and belief, as of the Effective Date:

a) Transferor has at no time presented or allowed any claims, liens, pledges, security interests and encumbrances of any kind in connection with the Policy;

b) Transferor is solvent and has no outstanding liens, suits, claims, garnishments, bankruptcies, or other court judgments which could render Transferor insolvent or bankrupt, and no bankruptcy or insolvency proceedings are pending or contemplated to be commenced by or against Transferor;

c) Transferor is competent and has the full legal capacity to enter and perform the transaction contemplated under this Agreement.

d) Transferor had the opportunity to consult with and obtain advice and assistance from its legal, financial, insurance and/or tax professionals, and to be represented by counsel in the execution of this Agreement and has entered this Agreement freely and voluntarily and without any coercion, duress or undue influence.

e) There is no decree, judgment, order, litigation at law or in equity, arbitration proceeding or proceeding before or by any commission, agency or other administrative or regulatory body or authority pending, or to Transferor's knowledge threatened, to which Transferor is a party or to which and which could have an adverse effect on the Policy, and there is no basis for any other claim, litigation or proceeding. There is no investigation by any commission, agency or other administrative or regulatory body or authority pending, or to Life Settlor's knowledge threatened, which is related to the Policy, nor is there any basis for any such investigation.

5.02.: To the extent available, whether by law or statute, Transferor does hereby irrevocably and unconditionally waive any right or privilege to rescind this Agreement, whether in whole or in part.

## ARTICLE VI: ARBITRATION & CONFORMANCE WITH JEWISH LAW

6.01.: The Parties do hereby irrevocably and unconditionally covenant and agree that all disputes and controversies of every kind and natures between the Parties arising out of or in connection with the Agreements, including, without limitation, as the existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance or termination thereof (collectively hereinafter the "**Dispute or Controversy**") shall be submitted for final, binding and non-appealable arbitration before the **Rabbinical Council of California** (the "**Arbitrator**").

6.02: The provisions of this Article VI shall be a complete defense and bar to any suit, action, or proceeding instituted in any federal, state, or local court or before any administrative tribunal with respect to any Dispute or Controversy. **Each Party does hereby acknowledge and covenants that it does irrevocably and unconditionally waive any and all rights to bring or present a Dispute or Controversy before any federal, state, or local court or before any administrative tribunals, provided, that nothing contained herein shall prohibit any party from bringing any Dispute or Controversy before any federal, state or local court or before any administrative tribunal to (i) enforce the arbitration provisions set forth in the Agreements and herein and to compel a party to resolve a Dispute or Controversy through arbitration, (ii) to enforce any arbitration award issued by the Arbitrator or through any other arbitration as set forth in this Agreement, (iii) to enjoin a party from taking any**

**action which may irrevocably affect the rights of either party hereto so long as the actual Dispute or Controversy is not heard in such court or administrative tribunal, or (iv) to defend any matter brought by a third party in such court or administrative tribunal.**

6.03: The judgment of the Arbitrator shall be final, binding and non-appealable on all the Parties and said judgment and award (if any) may be entered in the highest court, state or federal, having jurisdiction over the subject matter of the particular Dispute or Controversy. Each Party does hereby agree to execute or cause to be executed any and all stipulations or agreements as may be directed by the Arbitrator to affectuate the terms of this Arbitration Agreement. Each Party shall pay its own costs and expenses in connection with arbitration process.

6.04: The Parties hereby admit and confess that this Agreement was effected and finalized concurrently herewith according to Jewish Law by formal Kinyan Agav Sudar, and were stated and intended to be effective immediately, all in full accordance with all requisite procedures set out in the Code of Jewish Law (the "Code") and with use of a valid sudar. The kinyan was made in a duly constituted Jewish Court of Law in accordance with each of the varying procedures required by all of the various Jewish Halachic authorities, so that all Jewish Halachic authorities deem the covenants, waivers, and acquisitions valid, without any Asmachta (as defined in the Code) claim of invalidation and without any other claim of invalidation. In addition, the conditions referred to in this Agreement are and were all set in the manner used by Bnei Gad and Bnei Reuven and in accordance with all other requirements that are set out in the Code for the valid and binding setting of conditions. The Parties accept as conclusive and binding the position of any Jewish Halachic authority, even if in the minority or otherwise not generally accepted, that most broadly supports the validity and enforceability of this Agreement and its implied intent. This Agreement is intended to be, and is, binding, consistent with the binding nature of all agreements, documents, obligations, and acquisitions that are properly effected in a Jewish Court of Law in accordance with the laws and rules established by Rabbinical authorities. THIS IS ALL VALID AND IN GOOD STANDING.

## ARTICLE 7: MISCELLANEOUS

7.01.: This Agreement shall be construed and interpreted according to the laws of the State of California, without regard to the conflict of law principles thereof. Each of the parties hereto hereby irrevocably agrees that any action, suit or proceedings with respect to this Agreement shall be brought before the exclusive jurisdiction of the federal and state courts located in the State of California. Each of the parties hereto hereby submits to such exclusive jurisdiction.

7.02: All notices and other communications required or permitted to be given hereunder must be in writing and shall be deemed effectively given (i) upon delivery, when delivered personally against receipt therefore, (ii) upon delivery when sent by certified mail, postage

prepaid and return receipt requested to the respective addresses of the parties hereto set forth below their signature hereto, (iii) upon transmission, when transmitted by tele copier, facsimile, telex or other electronic transmission method, provided that receipt is confirmed and notice is sent by certified mail, postage prepaid and return receipt requested, or (iv) upon delivery, when sent by Federal Express or other nationally recognized overnight delivery service to the respective addresses of the parties hereto set forth below their signature hereto, or any subsequent address provided by parties.

7.03.: This Agreement shall inure to the benefit of and be binding upon each of the successors and permitted assigns of the parties hereto.

7.04.: This Agreement may be executed in counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement. The Section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

**IN WITNESS WHEREOF**, the Parties signed this Agreement as of the date first written above.

**TRANSFEROR(S):**

**KLEIN EKLK FOUNDATION**

BY: ______________________
LESLIE KLEIN, AUTHORIZED SIGNATORY

______________________
**FAHIMEH JAVAHERIPOUR**

**TRANSFEREE:**

**ISAAC KIRZNER LIFE WEST FAMILY TRUST**

**BY:** ______________________
SOL MAJER, TRUSTEE

**BY:** ______________________
WILLIAM MOSKOVITS, TRUSTEE

prepaid and return receipt requested to the respective addresses of the parties hereto set forth below their signature hereto, (iii) upon transmission, when transmitted by tele copier, facsimile, telex or other electronic transmission method, provided that receipt is confirmed and notice is sent by certified mail, postage prepaid and return receipt requested, or (iv) upon delivery, when sent by Federal Express or other nationally recognized overnight delivery service to the respective addresses of the parties hereto set forth below their signature hereto, or any subsequent address provided by parties.

7.03.: This Agreement shall inure to the benefit of and be binding upon each of the successors and permitted assigns of the parties hereto.

7.04.: This Agreement may be executed in counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement. The Section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

**IN WITNESS WHEREOF**, the Parties signed this Agreement as of the date first written above.

**TRANSFEROR(S):**

**KLEIN BKLK FOUNDATION**

BY:______________________________
LESLIE KLEIN, AUTHORIZED SIGNATORY

______________________________
**FAHIMEH JAVAHERIPOUR**

**TRANSFEREE:**

**ISAAC KIRZNER LIFE WEST FAMILY TRUST**

**BY:** ______________________________
SOL MAJER, TRUSTEE

**BY:** ______________________________
WILLIAM MOSKOVITS, TRUSTEE

prepaid and return receipt requested to the respective addresses of the parties hereto set forth below their signature hereto, (iii) upon transmission, when transmitted by tele copier, facsimile, telex or other electronic transmission method, provided that receipt is confirmed and notice is sent by certified mail, postage prepaid and return receipt requested, or (iv) upon delivery, when sent by Federal Express or other nationally recognized overnight delivery service to the respective addresses of the parties hereto set forth below their signature hereto, or any subsequent address provided by parties.

7.03.: This Agreement shall inure to the benefit of and be binding upon each of the successors and permitted assigns of the parties hereto.

7.04.: This Agreement may be executed in counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement. The Section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

**IN WITNESS WHEREOF**, the Parties signed this Agreement as of the date first written above.

**TRANSFEROR(S):**

**KLEIN BKLK FOUNDATION**

BY:______________________________
LESLIE KLEIN, AUTHORIZED SIGNATORY

______________________________
**FAHIMEH JAVAHERIPOUR**

**TRANSFEREE:**

**ISAAC KIRZNER LIFE WEST FAMILY TRUST**

**BY:** ______________________________
SOL MAJER, TRUSTEE

BY: ______________________________
WILLIAM MOSKOVITS, TRUSTEE

ACKNOWLEDGMENT

State of California

County of Los Angeles

On 08/18/2020 before me, Seung H. Kim (notary public)
(insert name and title of the officer)

personally appeared LESLIE KLEIN, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature____________________ (Seal)

SEUNG H. KIM
Notary Public – California
Los Angeles County
Commission # 2191919
My Comm. Expires Apr 15, 2021

ACKNOWLEDGMENT

State of California

County of )

On ____________________ before me, ____________________
(insert name and title of the officer)

personally appeared FAHIMEH JAVAHERIPOUR, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature____________________ (Seal)

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles )

On AUGUST 20, 2020 before me, ERIKA PENALOZA, NOTARY PUBLIC
(insert name and title of the officer)

personally appeared FAHIMEH JAVAHERIPOUR,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature] (Seal)

ERIKA PENALOZA
COMM. #2227048
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Jan. 27, 2022

RE: RETAINED DEATH BENEFIT + WAIVER OF INTEREST AGREEMENT

ACKNOWLEDGMENT

State of California

County of Los Angeles)

On August 4, 2020 before me, Jacob Mayerfeld, notary public
(insert name and title of the officer)

personally appeared WILLIAM MOSKOVITS, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(~~ies~~), and that by his/~~her/their~~ signature(~~s~~) on the instrument the person(~~s~~), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature________________ (Seal)

JACOB MAYERFELD
COMM. # 2314552
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES JAN 1, 2024
MGC1

ACKNOWLEDGMENT

State of California

County of Los Angeles

On August 4, 2020 before me, Jacob Mayerfeld
(insert name and title of the officer)

personally appeared SOL MAJER, who proved to me on the basis of satisfactory evidence to be the person(~~s~~) whose name(~~s~~) is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(~~ies~~), and that by his/her/their signature(~~s~~) on the instrument the person(s), or the entity upon behalf of which the person(~~s~~) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature________________ (Seal)

JACOB MAYERFELD
COMM. # 2314552
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES JAN 1, 2024
MGC1

# EXHIBIT 2

Deposition of

**Leslie Klein**

November 16, 2023

In re Leslie Klein

COURT REPORTING
www.aptusCR.com | 866.999.8310

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re )
)
Leslie Klein ) No: 2:23-bk-10990-SK
)
Debtor. )
)
)
)
)
_________________________________)

RULE 2004 EXAMINATION OF

LESLIE KLEIN

LOS ANGELES, CALIFORNIA

NOVEMBER 16, 2023

Reported by:
Susan Myong
CSR 13365

Job No. 10130772

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re )
)
Leslie Klein ) No: 2:23-bk-10990-SK
)
Debtor. )
)
)
)
)
________________________________)

RULE 2004 EXAMINATION OF LESLIE KLEIN, taken on behalf of Chapter 11 Trustee, at 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California, beginning at 10:13 a.m., and ending at 4:12 p.m., on Thursday, November 16, 2023, before Susan Myong, Certified Shorthand Reporter No. 13365.

APPEARANCES OF COUNSEL:

For Leslie Klein:

FLP LAW GROUP LLP
BY: MARC LIEBERMAN, ESQ.
SAFA SALEEM, PARALEGAL
1875 Century Park East
Suite 2230
Los Angeles, California 90067
(310)284-7350
ml@flpllp.com

For Bradley D. Sharp, Chapter 11 Trustee:

PACHULSKI STANG ZIEHL & JONES LLP
BY: JEFFREY P. NOLAN, ESQ.
10100 Santa Monica Boulevard
13th Floor
Los Angeles, California 90067
(310)277-6910
jnolan@pszjlaw.com

For Menlo Family Trust:

CHORA YOUNG & MANASSERIAN
BY: PAUL P. YOUNG, ESQ.
650 Sierra Madre Villa Avenue
Suite 304
Pasadena, California 91107
(626)744-1838
Paul@cym.law

Also Present: Nicholas R. Troszak, Development Specialists, Inc.

# I N D E X

WITNESS: LESLIE KLEIN


| EXAMINATION BY | PAGE |
|---|---|
| MR. NOLAN | 7 |


## EXHIBITS


| NUMBER | | PAGE |
|---|---|---|
| EXHIBIT 1 | Notice | 7 |
| EXHIBIT 2 | Subpoena | 10 |
| EXHIBIT 3 | Bank statement 12/16 for 9404 | 80 |
| EXHIBIT 4 | Bank statement 9/16 for 6978 | 81 |
| EXHIBIT 5 | Bank statement 1/16 for 9405 | 83 |
| EXHIBIT 6 | Insurance policy declaration | 110 |
| EXHIBIT 7 | Bank statement 1/16 for 8122 | 139 |
| EXHIBIT 8 | Bank statement 10/16 for 9404 | 140 |
| EXHIBIT 9 | Holley check 36416 | 156 |
| EXHIBIT 10 | Chase statement 1/17/19 | 174 |
| EXHIBIT 11 | Bank statement 1/23 for 4099 | 178 |
| EXHIBIT 12 | B of A statement 1/08/19 | 188 |
| EXHIBIT 13 | Bank statement 4/18 for 0382 | 190 |

EXHIBITS (Continued)


| NUMBER | | PAGE |
|---|---|---|
| EXHIBIT 14 | Bank statement 5/1/17 for 3371 | 192 |
| EXHIBIT 15 | Chase statement 11/17/18 | 194 |
| EXHIBIT 16 | Chase statement 1/18/19 | 197 |
| EXHIBIT 17 | B of A signature card | 197 |
| EXHIBIT 18 | Bank statement 1/16 for 9404 | 211 |
| EXHIBIT 19 | Form 410 | 216 |

Los Angeles, California; Thursday, November 16, 2023
10:13 a.m. - 4:12 p.m.

THE REPORTER: Pursuant to the Federal Rules of Civil Procedure, I am required to state the following: My name is Susan Myong. My business address is 21143 Hawthorne Boulevard, Number 323, Torrance, California 90503. This is the deposition of Leslie Klein in the matter of in re Leslie Klein, beginning at 10:13 a.m., on Thursday, November 16, 2023.

Counsels, will you please state your appearances for the record.

MR. NOLAN: Yeah, I'm the noticing party. My name is Jeff Nolan. I represent Bradley D. Sharp, the Chapter 11 trustee. And I'm the party taking the deposition today.

MR. LIEBERMAN: Mark Lieberman, FLP Law Group LLP, appearing on behalf of the witness, Les Klein, who is appearing on behalf of the entity Les Klein & Associates.

One correction, Madam Court Reporter, this is not a deposition. It is a Rule 2004 exam. And there's subtle differences.

THE REPORTER: Okay.

MR. YOUNG: Paul Young for the Menlo Trust.

MR. NOLAN: Let's mark for the record Exhibit 1, which is the notice of continuance of the 2004 examination of the designated person of Les Klein & Associates. There's a copy for you.

(Exhibit 1 was marked for identification and attached hereto.)

MR. LIEBERMAN: Thank you.

LESLIE KLEIN,

produced as a witness by and on behalf of the trustee, and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. NOLAN:

**Q Good morning, Mr. Klein.**

A Good morning.

**Q Am I pronouncing your name correctly, Leslie Klein?**

A Yes.

**Q Okay. Mr. Klein, you were -- court reporter put you under oath.**

**Do you understand what the oath means for the proceedings today?**

A Yes.

Q Okay. And you're an attorney as well?
A Yes.
Q All right. Are you the individual who has been designated by the law firm to testify today?
A Yes.
Q Okay. Have you had your deposition taken before?
A Yes.
Q How many -- how many occasions in, say, the last five years?
A Well, on one case there were I think --
MR. LIEBERMAN: Just a number, Les.
THE WITNESS: Just a number? Okay. Twenty times.
BY MR. NOLAN:
Q Okay. I'm asking only because I want to make sure you're comfortable with the proceedings here today.
You've been placed under oath. It's the same oath that you would have in a court of law.
Do you understand that?
A Yes.
Q Okay. I'm going to give you the abbreviated version, since I think you are comfortable with what a deposition is; is that acceptable?
A Yes.

Q Okay. Everything that's going to be said today is going to be taken down by the court reporter sitting to your left. And at the end of the day, she will prepare a transcript, which will be sent to you at a later time. And you'll have an opportunity to review it and read it and make any corrections that you deem are appropriate.
Do you understand that?
A Yes.
Q Okay. So for the purposes of today, it's important that all of your responses be audible. No hand gestures, if that's possible. And I also instruct the witnesses that if you change your testimony at all in a substantive form, anyone in this room, if we go to trial, can comment upon that at the time of trial to affect your credibility.
Do you understand that?
A Yes.
Q Okay. So for that reason, I'd like to get your best testimony here today.
Is there any reason I can't get your best testimony today?
A No.
Q Are you under any type of medication, anything that would inhibit your ability to recall facts

**accurately?**
A No.
**Q Okay. Some of my questions are going to go back further in time than the last couple of years. If you understand it, I'd appreciate you to answer the question. If you don't understand my question, I'd like you to just ask me to rephrase it.**
**Do you understand that?**
A Yes.
**Q If you answer the question, I'm going to assume that you understood it; is that fair?**
A Yes.
**Q Okay. Did you review any documents in preparation for your deposition today?**
A No.
MR. NOLAN: Okay. I'll mark as Exhibit 2 the subpoena for the Rule 2004 exam.
(Exhibit 2 was marked for identification and attached hereto.)
THE WITNESS: Do I need this?
MR. LIEBERMAN: No.
BY MR. NOLAN:
**Q First question: Do you recognize Exhibit 2?**
A I recognize it, yes.
**Q Okay. Did you receive Exhibit 2?**

A Yes.
Q Okay. So, for the record, Exhibit 2 is a subpoena for Rule 2004 Examination addressed to Les Klein & Associates, Incorporated.
Do you see that?
A Yes.
Q And you're familiar with that entity?
A Yes.
Q Okay. And for the purposes of today, if I refer to Les Klein & Associates, Inc. as "law firm," is that -- will you understand, or do you want to use a different type of abbreviation for Les Klein & Associates?
A I understand.
Q You understand. Okay.
So the law firm bears your name.
Is that you, Les Klein?
A Yes.
Q Do you commonly go by the name Les Klein or Leslie Klein?
A Commonly, I go by Les Klein.
Q Okay. Les Klein & Associates, Inc. is an entity you incorporated?
A Yes.
Q Okay. And you're a licensed attorney at law?

A Yes.
**Q And what jurisdictions are you licensed in?**
A I'm licensed in California.
**Q Any other jurisdiction?**
A No.
**Q On Exhibit 2, do you also see it has an Exhibit A that's attached to it?**
A Yes, I see Exhibit A.
**Q Okay. And on page 5, it had a list of documents to be produced under heading three.**
**Do you see that?**
A Yes.
**Q Okay. Does that document look familiar to you?**
A I think I've seen it before, yes.
**Q Yeah.**
**Did you have an opportunity as the -- strike that.**
**Do you know what it means to be the person designated on behalf of the law firm to testify?**
A No. I don't know what that means.
**Q So when this document came in, Exhibit 2, were you given that document by somebody at the law firm?**
A I was maybe given it by my attorney.
**Q Okay. Is there anyone else licensed to practice law at the law firm presently?**

A Yes.
**Q Who is that?**
A Name is Owen Podell.
**Q And what's Mr. Podell's title at the law firm?**
A Associate.
**Q And what's your title at the law firm?**
A Partner.
**Q You're the founding partner?**
A Yes.
**Q Are there any other partners?**
A No.
**Q How did the law firm determine that you should be the designated person to testify today?**
A I'm not sure.
**Q What do you mean you're not sure?**
A I'm not sure on what basis they determined I should testify today.
**Q Well, you made the determination that you should be the person to testify today; isn't that accurate?**
A Yes.
**Q There was no discussion about Mr. Podell appearing today; was there?**
A No.
**Q Okay. Did you understand when you received**

**Exhibit 2, you were to search for the documents that were requested in the subpoena?**
A Yes.
**Q And did you, in fact, search for the documents in the subpoena?**
A Yes.
**Q Where's the law firm's offices located?**
A We're in the process of moving.
**Q Presently, where is the law firm located?**
A 14245 Ventura Boulevard.
**Q Has the law firm always been located at the 14245 Ventura Boulevard location?**
A Yes.
**Q Did the law firm ever have any other offices in addition to 14245 Ventura Boulevard?**
A Yes.
**Q And where was that?**
A We had an office at 9920 La Cienega Boulevard in Inglewood.
**Q And for what years was the law firm having offices at the Inglewood location?**
A I don't remember.
**Q Was it in the last ten years?**
A No.
**Q Mr. Klein, if you would look at the last page**

of Exhibit 2, it's the examination topics to be discussed today.
Do you see that?
A Page 9?
Q Yes, sir.
A Yes.
Q Do you have an opportunity to review the examination topics when you were given the -- given the subpoena, which is Exhibit 2?
A Yes.
Q And did you review that?
A Yes.
Q And based on your review, was it your conclusion that you're the individual that's...
MR. LIEBERMAN: Most knowledgeable.
BY MR. NOLAN:
Q ...properly directed to answer or the most knowledgeable with regard to the topics that are listed on page 9?
A Yes.
Q And that basis was based upon you're being the partner at the law firm; correct?
A That is correct.
Q Has there ever been any other partners at the law firm?

A Yes.
**Q Was that when the law firm was under the name of Klein & Cutler?**
A I think the name was originally Mackey & Klein, then Klein & Cutler. Yes.
**Q Can you spell that for the record.**
A Cutler?
**Q No, Mackey.**
A Mackey?
**Q Yes.**
A M-a-c-k-e-y.
**Q So originally it was Mackey, Klein & Cutler?**
A Yes.
**Q And when, approximately, was Mackey, Klein & Cutler in existence?**
A 1973.
**Q And Klein would be you; correct?**
A Yes.
**Q Okay. And after Mackey, Klein & Cutler, it became Klein & Cutler?**
A Yes.
Actually, I think it became Klein & Cutler and Dus (Phonetic). I'm not sure. I mean, this was back a long time. I'm not really sure.
**Q Does it sound about right, Klein & Cutler began**

**into existence in 1994?**
A I think that sounds about right.
**Q And after Klein & Cutler, was it dissolved?**
A Cutler retired, so I guess it was dissolved. Or maybe the name was changed. I'm not really sure.
**Q When did Mr. Cutler retire, approximately?**
A I don't remember. A long time ago.
**Q Before the turn of the century?**
A I'm not sure.
**Q Okay. So after Mr. Cutler retires, you change the name of the firm or you incorporate a new entity called Les Klein & Associates.**
A Well, I didn't do it. It was done by an attorney. But -- I think we did an amendment, but I'm not sure.
**Q An amendment to the existing Klein & Cutler?**
(Reporter asks for clarification.)
THE WITNESS: Articles of incorporation.
MR. LIEBERMAN: You have to wait until --
THE WITNESS: I'm sorry.
MR. LIEBERMAN: -- until Mr. Nolan finishes his question.
THE WITNESS: I'm sorry.
BY MR. NOLAN:
**Q Are there any remnants of Klein & Cutler still**

**in existence still, like bank accounts?**
A I don't think so, no.
**Q Is it a fair statement if there were bank accounts or other remnants of Klein & Cutler in existence, you would know about it?**
A Yes.
**Q Have you ever been convicted of a felony?**
A No.
**Q Have you ever been suspended by the California bar?**
A I mean, there was an incident back in the 1970s that --
MR. LIEBERMAN: It's a yes-or-no question.
THE WITNESS: Yes.
BY MR. NOLAN:
**Q And were you reinstated by the bar?**
A Yes.
**Q So other than that instance in 1970s with the suspension, have there been any other suspensions?**
A No.
**Q Is there any current investigation of the law firm Les Klein & Associates?**
A No.
MR. LIEBERMAN: By whom, Counsel? By anybody?
MR. NOLAN: No, by the State Bar.

THE WITNESS: No.
BY MR. NOLAN:
**Q Okay. Are there any lawsuits pending against the law firm?**
A Yes.
**Q What -- if you could tell me what lawsuits those are, I'd appreciate it.**
A Well, there's a lawsuit filed by Frank Menlo.
**Q And that's against the law firm as opposed to you individually, Mr. Klein?**
A Well, there was actually mediation. The law firm was dismissed, but the lawsuit is against the law firm also. Yes.
**Q The lawsuit against the law firm was dismissed?**
A That is correct.
**Q Okay. So there's no lawsuit currently pending against the law firm by the Menlos.**
A That is correct.
**Q Okay. Any other lawsuits that are currently pending against the law firm?**
A Well, there is the Vago lawsuit. That the Vagos sued the law firm.
**Q And they received a judgment; correct?**
A That is correct.
**Q Okay. Any other lawsuits other than the Menlo**

or the Vago lawsuit against the law firm?
A No.
Q Other than the Vago judgment, are there any other judgments in existence against the law firm?
A No.
Q And you're -- we're clear, we're on the same page, when I'm asking you these questions, I'm asking you about the law firm, not you individually.
A Yeah, I understand.
Q Okay. Just want to make sure.
A Yeah.
Q When did the law firm come into existence?
A Well, the original law firm, Mackey & Klein, came into existence in 1973.
Q Right.
But the law firm of Les Klein & Associates, by virtue of the amendment of the articles of incorporation, when was that approximately?
A I don't remember the exact date, but before 2000.
Q Okay. And that firm was at the 14245 Ventura Boulevard property.
A That is correct.
Q Okay. At the time the law firm came into existence before 2000, did the law firm own the Ventura

**Boulevard property?**
A No.
**Q Did any individual associated with the law firm own the building?**
A No.
**Q And the law firm leased the Ventura Boulevard property at the time?**
A That is correct.
**Q Was the law firm capitalized?**
A I don't remember. It was back a long time.
**Q Right.**
**But you understand what I mean by the term "capitalized"?**
A Yes. Like, put money in there when Mr. Cutler left. I don't remember.
**Q So it may have been capitalized or it may not have been capitalized?**
A Yeah. The answer is I don't remember.
**Q If you would be so kind to look at Exhibit 2, on page 5 of the documents to be produced today.**
**Actually, let me have you go to page 8, number -- Category Number 8. Request number 8 asks for the articles of incorporations and bylaws for the establishment and operations of the law firm, including any amendments.**

**Did you search for those records?**
A Yes.
**Q Okay. The subpoena also asked for policies of insurance, malpractice errors or omissions for officers, directors, or lawyers in the law firm.**
**Do you see that Category Number 9?**
A Yes.
**Q Did you search for those records as well?**
A I searched for them, but I have an insurance agent who really has all those records. So I don't have it.
**Q So you believe you have documents that were responsive to number 9, but they're in the custody or control of your broker?**
A That is correct.
**Q Did you ask your broker to produce those to you?**
A No, I didn't.
**Q Why not?**
A Because I think as far as my policies are concerned, my malpractice are concerned, we have had the same insurance company for a number of years.
**Q I understand that.**
**But you understood, when you received the subpoena, that the trustee was requesting documents be**

**searched for and produced by you; did you not?**

A Yes.

**Q And malpractice errors or omissions coverage for the law firm exist; is that --**

A Yes.

**Q And you didn't produce that; correct?**

A That's correct.

MR. LIEBERMAN: Counsel, we will contact the broker at a break during this meeting and see if they can e-mail or fax over copies of any policies that they have in their possession.

And at any time if you want to take a break in the questioning, we will do that right away.

MR. NOLAN: I appreciate that.

BY MR. NOLAN:

**Q Did you understand, Mr. Klein, that when you received the subpoena, that you were obligated under the law to produce documents, not only that were in your possession but were in your control?**

A Well, the insurance policies are not under my control.

**Q You mean you can't call the broker up and ask the broker to send you a copy of the policy?**

A Well, I could do that. But, as I said, as my attorney said, I will call the broker and get the

policy. It's not a problem.
**Q Who's your broker?**
A His name is John Ernst, Chatsworth Insurance Company. I've had the same broker for 20 years.
MR. LIEBERMAN: Just answer the question.
THE WITNESS: Okay.
BY MR. NOLAN:
**Q And where is he located?**
A I don't know.
**Q Is he in New York City?**
A No. He's in the Valley.
**Q So he's in California.**
A I think he's in Chatsworth.
**Q And does he practice with a company? It's just called Chatsworth Insurance?**
A Yes.
**Q What are the pertinent coverage -- I mean, what's the amount of coverage that you maintain or the law firm maintains for malpractice insurance?**
A I think it's $1,000,000.
**Q And does it have an aggregate?**
A I think the aggregate is $1,000,000.
**Q So it's a 1,000,000 per claim and a 1,000,000 aggregate.**
A I think so, yes. I'm not sure. But I think

so, yes.
**Q And has that policy always been in coverage since you have been the partner operating the law firm?**
A Yes, we always had insurance. We might have switched companies over the years, over the last 30 years. But the answer is we always had insurance. Yes, malpractice insurance.
**Q Is it a burning policy?**
A Is it a what?
MR. LIEBERMAN: Do you understand burning policy?
THE WITNESS: No. I don't understand what burning policy is.
BY MR. NOLAN:
**Q Well, a burning policy is that the cost to defend the law firm comes out of the aggregate amount of the policy in addition to whatever has to be paid out to resolve the claim.**
A I don't know.
**Q Other than the Chatsworth insurance policy, was there any type of umbrella policy that was maintained by the law firm?**
A No.
**Q Let's go to Category Number 1, if you could, please. On page 5 of Exhibit 2.**

**The subpoena requested that the law firm produce documents with respect to these various entities that are listed under Category 1.**

**Do you see that?**

A Yes.

**Q Are you familiar with the entity Archstone?**

A No.

**Q Never heard of it before?**

A I think the law firm has nothing to do with Archstone.

**Q But that wasn't my question.**

**My question was: Does the entity Archstone -- is that familiar to you?**

A Yes.

**Q And what is Archstone?**

A Archstone owns real estate properties.

MR. LIEBERMAN: Bookmark it.

BY MR. NOLAN:

**Q And where are the real estate properties located?**

A I'm not sure.

**Q Is Archstone incorporated?**

A I don't know.

MR. LIEBERMAN: Excuse me, Counsel. Did you ask whether Archstone is or was a client of Mr. Klein?

MR. NOLAN: Not yet.
MR. LIEBERMAN: Okay.
MR. NOLAN: My last question was: Is Archstone incorporated.
BY MR. NOLAN:
**Q And your answer --**
A I don't know.
**Q -- is I don't know. Okay.**
**Is Archstone, is that the correct name or is there a full name for Archstone?**
A As far as I know, that's the full name, Archstone.
**Q Did the law firm ever perform any services for Archstone?**
A Maybe. I think they had some units here in California.
MR. LIEBERMAN: At this point I want to caution Mr. Klein not to disclose any attorney-client communications with Archstone -- it's had with Archstone.
MR. NOLAN: Well, I don't think we've determined yet if there's an attorney-client relationship.
MR. LIEBERMAN: Maybe not. I just preemptively wanted to make sure.

BY MR. NOLAN:
**Q So your answer, as far as the law firm performing services for Archstone, is maybe. Can you give me an idea when, maybe, the law firm performed services for Archstone.**
A Long time ago.
**Q And what type of services would the law firm have performed for Archstone?**
A Evicting tenants, I think. I don't remember.
**Q Did the law firm execute a client retainer agreement with Archstone?**
A I don't know.
**Q Did you search for an Archstone client file at the law firm?**
A Yes.
**Q And did you find one?**
A No.
**Q If an attorney-client relationship existed by virtue of a retainer agreement, would you expect to have found that at your law firm?**
A Not if it happened 40 years ago, no.
**Q We'd be talking about 20 years; right?**
**We're talking about the law firm of Les Klein & Associates that came into existence somewhere around 2000. I thought you testified just before 2000?**

A I don't remember when Archstone was a client. And I don't know if it was before 2000 or after 2000. But even if it was 2000, that's 30 years ago.

**Q Yeah.**

**Who was their client contact at Archstone; do you recall?**

A No.

**Q Would it have been you?**

A No.

**Q So other than being the -- can I call you managing partner? Were there any -- there were no other partners at the law firm.**

A Yeah. You can call me managing partner, yes.

**Q So -- well, as the founding partner, is it a fair statement that you managed the affairs of the law firm?**

A Well, the answer is yes.

**Q Yeah. Mr. Podell didn't make any decisions. He's an associate; right? I mean, as far as the operations and the well-being of the law firm.**

A Well, I just don't remember if it was Mr. Podell. It could have been many other lawyers. There's a time where we had Dawson, we had Cutler, we had Mackey. I don't know whose client Archstone was.

**Q But I'm going to -- apologize for the question.**

**I'm only focusing now when the law firm was in existence, which is somewhere around 2000.**

**Is that a fair statement?**

MR. LIEBERMAN: I'm going to say that misstates his testimony. He was unclear whether the law firm changed its name or it became -- it was a -- a new entity was formed. I don't think that was established. And I think he testified that he was uncertain about that.

BY MR. NOLAN:

**Q Okay. Well, at some point in time, Les Klein & Associates comes into existence; correct?**

A Yes.

**Q And when's your best estimate of when the law firm of Les Klein & Associates comes into existence?**

A I don't remember exactly when it came into existence. That's what I testified to.

**Q Right. But I thought you gave me an estimate that you thought it was around the year 2000 or slightly before.**

A Again, I think you're right, but I'm not sure.

**Q Okay. Since Les Klein & Associates, Inc. has been in existence, you've been the managing partner, and there's been no one other than you as the managing partner.**

A That is correct.
**Q And Mr. Podell, while he may work on cases, he's an associate under your supervision; correct?**
A Yes.
**Q And has the law firm had any other lawyers besides Mr. Podell, who worked underneath your supervision?**
A No.
**Q Did the law firm have any paralegals?**
A No.
**Q Did the law firm ever have any secretaries?**
A Yes.
**Q How many secretaries?**
A One.
**Q And who was that?**
A Her name is Mary Ann Newman.
**Q Is she still with the law firm?**
A Yes.
**Q And is Mr. Podell still with the law firm?**
A Yes.
**Q What is Mr. Podell's duties?**
A He handles cases.
**Q As far as the documents that would evidence what the capitalization was of the law firm, would those documents be in someone else's control that you retain?**

A No.
**Q So if the law firm was capitalized, those records should be in the law firm's possession; correct?**
A I mean, if it goes back 20 years, then it's not in the law firm's possession.
**Q You -- strike that.**
**Your testimony here today is that it is irrelevant, that the law firm was capitalized or has records to evidence that it was a properly capitalized corporation?**
MR. LIEBERMAN: Misstates his prior testimony. Objection.
BY MR. NOLAN:
**Q You can answer.**
MR. LIEBERMAN: You can answer.
THE WITNESS: The law firm basically took in fees, and it was properly capitalized. It always paid its bills.
BY MR. NOLAN:
**Q But that's not my -- I'm not asking you about paying its bills. I'm asking you what the initial capital contribution was to start the law firm.**
**You have no records and you've searched the law firms account -- the law firm itself for evidence of what the initial capitalization was of the law firm;**

**correct?**
A That is correct.
**Q And you produced no records in response to the subpoena.**
A That is correct.
**Q And you don't believe anyone under your possession, custody, or control has those records.**
**Is that a fair statement?**
A Yes.
**Q Les Klein & Associates is a corporation; is that --**
A That is correct. A C corporation, yes.
**Q Okay. And are you the only shareholder?**
A Yes.
**Q And is it an accurate statement that since its incorporation, you've always been the only shareholder of the law firm?**
A Well, when it was other partners, they were the owners too. But once they all retired, I was the only owner of the law firm, yes.
**Q Since the existence of the law firm, you have only been the only shareholder or only member of the law firm.**
MR. LIEBERMAN: Objection. Misstates his testimony.

BY MR. NOLAN:
**Q Is that an accurate statement?**
A I'm not sure if I understand the question.
**Q Sure.**
**Since Les Klein & Associates was incorporated or came into existence, has anyone else had an ownership interest in the law firm?**
A No.
**Q Is it a fair statement to call you a director of the law firm as well?**
A Yes.
**Q Okay. As a director, is it a fair statement that you managed and controlled the law firm?**
MR. LIEBERMAN: As a director?
MR. NOLAN: As a director.
THE WITNESS: It's a fair statement that I managed the law firm, yes.
BY MR. NOLAN:
**Q But do you understand the difference between a director and a manager?**
A No.
**Q Director has fiduciary duties, absolute fiduciary duties. Manager sometimes can have them.**
**Do you understand what it is to be a director of a corporation?**

A Well, the answer is I was a director.
**Q Okay.**
MR. LIEBERMAN: So just listen to the question, though. It was: Do you understand? And so you need to answer that question.
BY MR. NOLAN:
**Q So as of -- I'll try to back up and make it easy.**
**So as a director, is it a fair statement that you controlled and managed the business of the law firm?**
A Yes.
**Q And it would also be accurate that you were the sole director and you solely controlled and managed the business of the law firm.**
A Yes.
**Q Were you also the individual who brought clients into the law firm?**
A Yes.
**Q Did Mr. Podell ever originate any business?**
A Yes.
**Q What business did Mr. Podell originate?**
A Probate, tax, whatever business he brought in.
**Q And what area did Mr. Podell practice in?**
A Probate.
**Q And tax as well?**

A I don't think he did taxes, no.
**Q Is he an accountant?**
A No.
**Q He has a jurist doctorate?**
A Yes.
**Q Do you know what year he is? I mean, year, how many years he's been a practicing lawyer.**
A More than 20 years.
**Q Okay. The law firm has a business license with Los Angeles; correct?**
A Yes.
**Q Has the business license ever been suspended?**
A No.
**Q Did the law firm have shareholder meetings?**
A Yes.
**Q How often?**
A Once a year.
**Q Did the law firm maintain minutes?**
A Yes.
**Q Did you search for the minutes?**
A No.
**Q Why not?**
A I didn't search for the minutes because I didn't know I was supposed to search for the minutes.
**Q Okay. Who would maintain the minutes of the**

**law firm?**

A The law firm.

**Q But who on behalf of the law firm would maintain the minutes? Would that be you?**

A Well, there's a minute book and the minutes are in the minute book.

**Q Are you the custodian of the records on behalf of the law firm?**

A Yes.

**Q How about shareholder resolution, did the law firm maintain shareholder resolutions?**

A I don't remember shareholder resolutions.

**Q How about bylaws?**

A Yes. The law firm had bylaws.

**Q The law firm has bylaws.**

**Is that what you said?**

A Yes.

**Q Did you search for the bylaws?**

A I don't recall.

**Q You don't recall if you walked in your office and looked to see whether or not you had bylaws or not?**

A Sure we had bylaws. But I don't know if the bylaws were set up originally when it was Mackey & Klein.

**Q Okay. But I'm not asking about Mackey & Klein.**

**I asked you a question, if the law firm maintains bylaws, and you answered yes.**

A Yes. Because the bylaws were set up when the law firm was set up as Mackey & Klein. The only thing that happened, when Les Klein & Associates became in existence, was there were amendments to articles of incorporation. I don't remember if there were new bylaws prepared. I don't think so, but I don't know.

**Q Do you have the amendments to the articles of incorporation at the law firm?**

A Yes.

**Q Is there a reason you didn't produce those today?**

A I think we produced them today.

**Q I'm sorry?**

A I thought it was produced.

**Q Okay. So you think they were produced.**

MR. LIEBERMAN: Take a note so we can produce them, if we have them.

BY MR. NOLAN:

**Q How would you characterize the business of Les Klein & Associates, Inc.?**

A Attorneys.

**Q Right. And what's the area of practice?**

A Probate, primarily.

**Q And what other areas other than probate?**
A Estate planning.
**Q Any others?**
A That's basically it.
**Q And what do you mean by "estate planning"?**
A Basically plan a person's estate to avoid taxes, to avoid probate.
**Q Did you and Mr. Podell work on the same case or do you have separate caseloads?**
A We worked on the same cases too and we have separate cases too, both.
**Q And how about probate?**
A Probate --
**Q Can you explain to me --**
A Yes.
**Q -- what the law firm does?**
A If we petition for probate and if it's contested, then somebody files an objection to that petition and they file their petition.
If it's uncontested, then you publish notice to the world that this person has passed away. And they have a right to come to court and object to the petition.
If nobody objects, the court appoints an executor and an administrator. If there's a will,

there's an executor. If there's no will, they appoint an administrator. Then the court issues letters, testamentary, for this person to handle the estate. Then you have to publish notice to creditors for a period of time, four months. Then you have to file tax return 706. Then you close out the estate.

Those are the steps, basically.

**Q And in a typical probate matter, if you filed a petition for probate, would you request that your firm be the administrator?**

A No.

**Q Would you request that you be the administrator?**

A No.

**Q So the court would just appoint an administrator from a panel or something of that nature?**

A No. The court appoints an administrator from the heirs, like a child --

**Q Okay.**

A -- or a wife or a relative. Or if there's no relatives, the money, let's say, goes to the State of California, the public administrator.

**Q So in various matters that I've seen in this case so far, you've been appointed as a trustee for certain estates; is that accurate?**

A Well, usually, I'm not appointed as trustee. But it's accurate to say that in some cases, the client will appoint me as the trustee. Yes, that's correct.

**Q Okay. Would the client appoint you, Mr. Klein, or would the client be appointing the law firm?**

A Me, Mr. Klein. Not the law firm. The law firm is never the trustee.

**Q And where Les Klein was personally appointed a trustee of an estate -- is that correct? It would be of an estate?**

A No. I was never appointed as trustee of an estate. That's not correct.

**Q Of a trust.**

A Of a trust.

**Q So when you're personally appointed as trustee of a trust, would you typically retain the law firm?**

A Depends.

**Q So on occasions you would retain the law firm and on occasions you wouldn't.**

A Usually, the answer to --

MR. LIEBERMAN: It's yes or no.

THE WITNESS: No.

MR. LIEBERMAN: Could you repeat the question so that the record can be clear and he can give a yes-or-no answer before.

MR. NOLAN: I don't know. I thought he was answering before you interrupted him.
MR. LIEBERMAN: My bad.
BY MR. NOLAN:
**Q On what occasions would -- or strike that.**
**When you're appointed the trustee of a trust, you have the opportunity to appoint the law firm to represent you; is that fair?**
A No.
**Q Do the beneficiaries appoint the law firm?**
A No. If there's a trust, there's no probate.
**Q Okay.**
A The reason for the trust is to avoid probate so there's no law firm involved.
**Q All right. But you can avoid probate and still have legal issues that might require legal representation; correct?**
A If there's objections to the trust or what have you, yes, that's correct.
**Q So if a matter is actually probated, is your testimony there would be occasions where if you are involved, you would retain the law firm?**
A No.
**Q Okay.**
A I would never retain the law firm.

**Q And if you're trustee and the matter is not probated, would there be occasions where you would retain the law firm?**

A Again, if there is -- I'm the trustee and there is no litigation, there's no probate. So I wouldn't retain the law firm.

**Q In what situation, if ever, would the law firm be retained where you acted either as the trustee or in some capacity on behalf of a client?**

A Answer is never.

**Q In the Menlo case, was the law firm retained to represent any party in the litigation?**

A No.

**Q At one point in time, there was an issue with the law firm being entitled to insurance proceeds or a fee or something associated with life insurance policies that were going to be -- at least in which the Menlos were beneficiary.**

**Do you remember that?**

A Yes.

**Q What was the basis that the law firm would have any right to compensation?**

A It wasn't my law firm. It was Buchalter. It was Parker Milliken. In other words, there was $30 million worth of life insurance that I purchased. And

there were some outstanding legal fees for Parker Milliken and Buchalter, not my law firm.

**Q Right. But so there -- any discussions that were being had about whether or not a fee was earned would have been a fee earned by the trustee and not have -- wouldn't have anything to do with the law firm.**

A Well, I wouldn't say that. No, that's not correct. Because the fee the trustee earned, because I spent so much time on Menlo from all these years, would be partly earned by me and partly earned by the law firm.

**Q I thought you just indicated that the law firm was not retained at all in the Menlo litigation.**

A Right. But because I was the trustee for Menlo, I couldn't do legal work. So the law firm basically didn't bring in money because of Menlo.

**Q So how does that result in the law firm being entitled to some type of fee?**

A Well, the trustee's fee -- they owe me trustee's fee, so they are $5 million.

**Q The Menlos owe you that.**

A That is correct.

**Q Okay.**

A And the Menlos are willing to pay $4 million. The Winters actually, not the Menlos. But be that as it

may, if that money would come to me, that $4 million, that would not be fair to the law firm.

(Reporter asks for clarification.)

THE WITNESS: Fair, fair to the law firm.

BY MR. NOLAN:

**Q And why would that not be fair to the law firm?**

A Because Leslie Klein worked for Menlos, Sam Menlo, full-time. And he couldn't work for the law firm, which basically really affected the law firm.

**Q Okay. Is it a fair statement then, at least with respect to the example you're giving me with the Menlos --**

A Right.

**Q -- there was never a retainer agreement executed between the law firm and anyone else regarding the law firm -- regarding the Menlos?**

A Well, that's not true either. Because I'm the trustee for one of the beneficiaries, for Judith Franco.

(Reporter asks for clarification.)

THE WITNESS: Judith Franco.

Sam Menlo wanted to give all his assets to his five children.

MR. LIEBERMAN: Right. But just answer the question.

THE WITNESS: I'm sorry.

BY MR. NOLAN:
**Q I'm sorry. I'm just focusing on the law firm.**
A Right.
**Q You're a representative here today of the law firm.**
A Right.
**Q And I'm trying to understand, was there an agreement to retain the law firm in the Menlo matters?**
A No.
**Q Okay. So there's no retainer agreement in your office, that being the law firm's office.**
A Nevertheless --
MR. LIEBERMAN: Let him finish.
THE WITNESS: Okay. Fine.
BY MR. NOLAN:
**Q I'll let you explain yourself, but I just want to be at this logically.**
A No problem.
**Q I asked you, when I issued the subpoena, which is Exhibit 2, to search for certain records; correct?**
A Yes.
**Q All right. And you're telling me here today there's no reason to search because there would never be a retention agreement or an agreement in the Menlo matters to retain the law firm; is that fair?**

A Well, it's not fair. Because the retention agreement with the Menlo case was with Parker Milliken and Buchalter. But on the other hand, the law firm was sued by Frank Menlo. Not Leslie Klein was only sued, Les Klein & Associates was sued by Frank Menlo. Lesley Klein & Associates hired Hahn & Hahn to defend them. And Leslie Klein & Associates won because --

**Q I understand that. And I'm sure you're going to connect the dots for me.**

A Okay.

**Q But I want to make share -- because I looked through the binder of documents you produced, and there weren't any retention agreements.**

A Well, there weren't any retention agreements, but Frank Menlo sued.

**Q I understand that. He's going to do whatever --**

A Right.

**Q -- they're -- he's not here today.**

A Right.

**Q And I don't know him and I don't know what they were doing. But I want to understand the relationship between the law firm and work that's done when you're appointed as a trustee or you're designated as a trustee.**

**You personally are the trustee, you testified to; correct?**
A Well, it's very rare that I was the trustee.
**Q Is that correct?**
A That is correct.
But the answer to your question is: I usually am never the trustee. It's a very unusual situation, Menlo.
**Q Okay. How about with the Vagos? Were you a trustee of any of the Vago entities?**
A No.
**Q Did you render estate planning services for the Vagos?**
A No.
**Q Did you render probate services on behalf of the Vagos?**
A Yes.
**Q And what did you render for the Vagos as far as probate services?**
A The Vagos' brother, Mr. Schweitzer, passed away in California. And the Vagos came and they told me that they had a foreign account. It was a Swiss bank. And so I filed a petition for probate for Mrs. Vago to be appointed executor for the estate of her brother.
**Q Okay. So in that example that you've given,**

**the law firm was retained to file the petition?**
A Yes.
**Q Did the law firm execute a retainer agreement with the Vagos?**
A No. Because under probate, your retainer or your fee is set by statute. And the Vagos was a very, very complicated case in that the money was a foreign account. And -- it was sitting in a Swiss bank account. And we didn't do a retainer agreement.
**Q That last thing you said is you did not do a retainer agreement.**
A No. We did a petition for probate. Because Mrs. Vago filed the petition in New York. She was the executor for her uncle. And so for her to be an executor in New York, she had to be appointed executor in California.
So we were asked by the lawyers in New York to file a petition for probate in California.
**Q Does the law firm maintain a list of clients?**
A No. Basically the list of clients are really between me and Mr. Podell. We know all the clients that we have. We have represented the same clients for 50 years.
**Q Understood.**
**But do you run -- like, when you get a new**

**case, do you run a conflicts check?**
A Yes.
**Q So -- and what do you run that on?**
A We see if we have represented this client or some -- if the client wants to sue somebody or they want to object to something, if we have a conflict.
**Q Right. So do you run that on your computer at the 1425 Ventura Boulevard location?**
A No. We basically run it when we discuss it, do we take the case or we don't take the case.
MR. NOLAN: Let me just finish this line of questioning.
MR. LIEBERMAN: Yeah, I was just saying when you finish this line of questioning, can we take a five-minute break?
MR. NOLAN: Yeah, absolutely.
BY MR. NOLAN:
**Q So the conflict check that is run at the law firm between yourself and Mr. Podell -- like, at our firm, we put it into a computer and it cross-references against former clients of the firm.**
A Right.
**Q Do you have something similar to that, that you utilize at the law firm?**
A Well, we know -- I mean, basically our

clientele is the Jewish community here in LA. And we know all the people here. I have lived here all my life. I've been a practicing attorney for 53 years. So we know our clients. We only handle people that we know.

**Q So when you run a conflicts check at the law firm, it's just you and Mr. Podell talking?**

A Yes.

**Q There's nothing -- there's no run against a computer, or a list of clients, anything of that nature.**

A That is correct.

MR. NOLAN: Okay. This a good time. We can take a break.

MR. LIEBERMAN: Okay.

(Recess from 11:14 a.m. to 11:35 a.m.)

BY MR. NOLAN:

**Q All right. Mr. Klein, we're back on the record.**

A Okay.

**Q Again, this is the same oath that you would have if you're in a court of law.**

**Do you understand that?**

A Yes.

**Q Okay. When we took a break, we were talking about retainer agreements.**

**Does the law firm maintain any retainer agreements for the retention of its services?**

A No.

**Q And by "retainer agreements," I mean an agreement that would designate how much the law firm -- what the scope of services are that the law firm is performing, you know, what the compensation is, who is the client, what the document retention policy is, et cetera.**

**Do you understand that?**

A Yes.

**Q Okay. And the law firm maintains no records of that nature.**

A That is correct.

**Q Does the law firm execute agreements of that type and just not keep the retainer agreements, or only keeps them for a certain period of time, or is that just not a document that's utilized by the law firm?**

A It is utilized by the law firm. But the law firm just doesn't keep it, unless there is a problem. Then we would try to, you know, work it out with our client. But we really have had clients for the last 50 years, that we know these people.

**Q Okay. So simply because you know someone doesn't mean, if I understand you correctly, that you**

**don't execute a retainer agreement; is that correct?**

A Well, since we know them for a long time and since we have never been sued, until recently, we never had problems.

**Q Okay. So if it's a client that's been -- that you're -- that you know from synagogue or from the neighborhood --**

A Right.

**Q -- your custom and practice, or the law firm's custom and practice, is to not execute a retainer agreement?**

A That is correct. If we know them from a synagogue or from the neighborhood or they knew my parents or whatever, we handle their case and we don't execute a retainer agreement.

**Q And everything is just oral?**

A Well, all the fees are set by the probate court. Our practice primarily is trust. And they're a flat fee. Or probate -- and probate, there's a schedule by the probate court, 4 percent on the first certain amount, then 3 percent, then 2 percent, and 1 percent. So we tell them what the fee is. And the fee is approved by the court. We never charge more than what the court approves, unless there's extraordinary work. But, again, that has to be approved by the court. So,

client is protected by the judge.
**Q Okay. But you said other than probate, you also do estate planning.**
**That's another part of the law firm's practice; correct?**
A Right. Yes.
**Q Would the law firm execute retainer agreements for estate planing?**
A Well, again, for estate planning, it depends if it's a small estate or a large estate. If it's a small estate, we would have a flat fee. If it's a large estate, we would refer them to other attorneys that -- like a Paul Frimmer of Loeb & Loeb or Terri Nunan of Parker Milliken, who are the big experts. And we would basically refer them to the big experts. And they basically would handle the estate planning for them.
**Q Okay. So the law firm would render estate planning, but only for clients where it was operating under a flat fee?**
A Most of our clients -- we also had credit unions that we -- like, represented all the employees of First Credit Savings of Northrop.
And, again, we would have a flat fee for estate planning. I would give a lecture to all the employees. And they, in turn, would get a reduced fee. Because

they're a member of the credit union.
**Q Okay. Was there situations where the law firm on the estate planning side of the business would execute or would enter into a -- strike that.**
**On the estate planning side of the business of the law firm, does the law firm ever perform services for a client where it was on an hourly retention?**
A I don't -- I mean, the bigger cases that we referred out, let's say for Paul Frimmer, I don't think so. I don't think we ever billed on an hourly basis.
**Q Okay. On the matters that the law firm would refer out to the bigger firms, was there a referral agreement executed by the law firm?**
A No. There wasn't.
**Q Did the law firm ever collect monies on behalf of referring those cases out to the larger law firms?**
A No.
**Q So there's no referral fee?**
A There's no referral fee.
**Q So once the bigger matters are referred out, the law firm would generate no income.**
A That is correct. It was a service that the law firm provided for VIP clients.
**Q So on the estate planning side of the business of the law firm, would there be records of the law**

**firm's retainer agreements for the flat fee and its -- with respect to its clients?**

A No. I don't think so. Basically, the flat fee was set with the client, and there would be no retainer agreement. It was told to the client at the initial interview.

**Q And did you have a typical flat fee that the law firm charged?**

A Yes.

**Q And what's that?**

A Simple trust, where it was only husband and wife and children with a house and nothing else, $600. If there was more real estate, let's say five deeds, it was $800. And if it was a marital deduction trust, it was $1,000.

**Q So in those instances where you're referencing a simple trust or a more complex trust, you're referring to creating the trust documents itself for the estate.**

A That is correct. It would be a trust, it would be a will, a pour-over will that ties into the trust, a durable power of health, durable power of attorney, and a grant deed and assessor form. That was the package.

**Q And would the law firm maintain a list of those clients that it was performing those services for, for each year?**

A I mean, it was on our computer, who the clients were for each year. And we kept the records on the computer for, I would say, five years, maybe eight years.

But the answer is, yes, we would know which client we wrote in let's say 2020 or -- I mean, with the coronavirus, we closed up the law firm from April of '20 till '22, whereby we were actually closed.

But let's say on '19, it would say that -- we did Mr. Jones on 2019. We had the date that the trust was signed.

**Q And the trust would have to be certified or authenticated?**

A Notarized.

**Q Notarized.**

A The trust had to be notarized and the will needs three witness.

**Q Right. So you'd have records -- the law firm would maintain records that all of those formalities were followed?**

A Not necessarily. Because sometimes the individuals would be saying that they wanted to take care of the notary. They don't want to come back. They're -- they live in Orange County. They don't want to come back to the law firm to notarize it and to

witness it. So they said they will take care of it.
And they always kept the originals. Our policy was that we never kept the originals. They always kept the originals.
**Q And would you keep a copy? I mean, you give the originals to the clients. Would you keep a copy of them?**
A We have copy on the computer, yes. But we would have a hard copy. All we would have was an unsigned copy, which is really worthless.
**Q So is this the type of work that Mr. Podell does, the simple trust?**
A Yes.
**Q And do you perform that work as well?**
A Yes.
**Q Okay. Other than estate planning and probate, does the law firm generate revenue in any other areas?**
A No.
**Q So if I understand you correctly, the law firm doesn't bill clients or generate monthly, quarterly, or annual statements to a client?**
A That is correct.
**Q Does the law firm maintain a general ledger that tracks the revenue that is -- it receives?**
A Well, the law firm knows all the time how its

revenue is received, yes.

**Q My question is a little different. I asked, does the law firm maintain a general ledger that tracks the revenue of the law firm for each particular year?**

MR. LIEBERMAN: Do you understand what "general ledger" means?

THE WITNESS: Yes.

MR. LIEBERMAN: Okay.

THE WITNESS: No. The law firm doesn't have a general ledger.

BY MR. NOLAN:

**Q The law firm does not maintain a general ledger?**

A No. The law firm basically has an accountant who the law firm tells to -- basically how much money came in. And that's all we do.

And we have a tremendous amount of losses. Because we had quite a few insurance policies, which are about to lapse. And the law firm has some of these policies that were owned by the law firm that has losses.

**Q And when you're saying the insurance policies, are you referring to death benefit policies?**

A That is correct, on third people. Right, third parties.

**Q So the law firm -- in addition to providing the services that you testified this morning, the law firm also invests in insurance policies.**

A It did. Not anymore. Basically, the law firm got out of the insurance business in 2011.

**Q So in 2011, the law firm stopped purchasing investment interests in --**

A That is correct. In 2011 --

MR. LIEBERMAN: Let him finish.

THE WITNESS: Okay. Fine. Yes.

BY MR. NOLAN:

**Q In death -- insurance policies for death benefits.**

A That is correct.

**Q Okay.**

A Sorry.

**Q No. That's okay.**

A I thought you were finished. Sorry.

**Q Happens all the time.**

**What about policies, life insurance policies, that were in existence after 2011? Were not being acquired, but were already in existence. Would the law firm continue to make policy premium payments until whatever contingency was reached?**

A No.

**Q So when you say it got out of the business in 2011, you mean it didn't either, A, acquire anymore policies or, B, didn't invest in those policies any longer?**

A Well, basically all the policies that the law firm owned were transferred to an LLC that was owned by Shlomo Rachnitz, 50 percent.

THE REPORTER: I need that name again.

THE WITNESS: Shlomo, S-h-l-o-m-o. Rachnitz, R-a-c-h-n-i-t-z. And Leslie Klein, 50 percent.

So after 2011, the law firm made no payments on any policies.

BY MR. NOLAN:

**Q Did the law firm execute any type of an agreement with Life Capital Group?**

A Well, the law firm did not execute the agreement, but Leslie Klein did. I executed an agreement with Life Capital Group. And so the policies -- the law firm had few policies. I had a lot of policies. I had policies in all these entities, like BKR Life Settlements, BW Life Settlements, BK Life Settlements.

MR. LIEBERMAN: Let --

THE WITNESS: Okay. Sorry.

MR. LIEBERMAN: Let Mr. Nolan ask his question.

THE WITNESS: Fine.
MR. LIEBERMAN: Focus on his question.
THE WITNESS: Sorry.
MR. LIEBERMAN: And just answer his question.
THE WITNESS: You got it. Thank you. Fine.
BY MR. NOLAN:
**Q Do you have any approximation in 2011 -- strike that.**
**It sounds like you had -- you, individually, had more life insurance policies than the law firm had -- was investing in --**
A That is correct.
**Q -- 2011; that's correct?**
A Yes.
**Q And when 2011 comes along, both the law firm and you, individually, transfer your interest in these life insurance policies to Life Capital Group.**
A Okay. The bulk of them, yes. There were a few policies that I kept myself that were -- had very low life expectancies. And I didn't transfer to Life Capital Group but the law firm didn't keep anything.
**Q Okay. Were there any other third-party entities that the life insurance policies or interest in life insurance policies were transferred to other than Life Capital?**

A Yes. That's what I answered before. So I jumped the gun. Yes.
**Q Okay. What entities was that?**
A Okay. It's BK Life Settlements LLC, BKR Life Settlements LLC, BW Life Settlements LLC. I mean, the law firm had nothing to do with these entities, but these were different entities. And GMR Life Settlements LLC. The Klein Charitable Remainder Annuity Trust. The Klein Charitable Remainder Unitrust. That's it.
**Q And those entities that you're referencing, you're reading from the bottom of page 5 on Exhibit 2?**
A Yes.
**Q Okay. Are those entities that you've referenced, like BK Life Settlements LLC, are those entities that were incorporated by you individually?**
A I'm not sure if they're incorporated by me or by an attorney representing the LLC. The LLC they own with Rachnitz. I'm not sure.
But all these entities never owned -- I mean, the law firm never owned any of these entities. But all these entities, after 2011, didn't own any more policies.
**Q You mean the law firm, after 2011, didn't own any more policies.**
A Right. And neither did any of these entities.

After 2011, they didn't own any more policies.
**Q So these entities that you mentioned -- BK Life Settlements, BKR Life Settlements LLC -- they all ceased to do business in life insurance policies after 2011?**
A Well, didn't buy any new policies and they didn't make payments, premium payments, after 2011. But they all had investors. And the investors were expecting their money when the people died.
In other words, there was policies transferred and these entities had investors like, for example -- that's it. Okay.
**Q Okay. So those entities then, in addition to the law firm --**
A Right.
**Q -- if I understand you correctly --**
A Right.
**Q --they transfer their interest in the life insurance policies to Life Capital Group?**
A That is correct.
**Q So Life Capital Group, in 2011, is set up as this new entity between yourself, individually --**
A Right.
**Q -- and Mr. Rachnitz.**
A Right.

**Q And the law firm's interest, select interest of life insurance policies from you and from all these different entities that you were kind enough to mention on page 5, they transfer their policies all to LCG.**

A Right.

**Q And I'm going to refer to LCG as Life Capital Group.**

**Is that convenient?**

A That's convenient.

**Q You'll understand what I mean?**

A Yes.

**Q Is there a Life Capital Group 1?**

A Well, there were two agreements. One was prepared, I think, by Buchalter, my attorneys. And then the second one was prepared by the attorney for Shlomo Rachnitz. I don't remember who his attorney was but -- and so there's two agreements. But, I mean, the final deal is the document that is dated June 1 of 2011.

**Q Okay. So there's not -- that's Life Capital Group LLC.**

A Right. That is correct.

**Q Are you aware of an entity called Life Capital Group 1 LLC?**

A No. No. I mean, there is two other entities, which I'm aware of, which could be -- I mean, I don't

know. But I'm aware of Longevity Fund of Michigan, which owns some policies, and also Longevity Fund of New York, which also owns some policies. And I think I'm part owner of these -- I'm not really sure. But there is two other entities which is probably what you're talking about. I don't know.

**Q Yeah. It's just they have the same name pretty close --**

A So it could be somebody else. It could be -- I mean, it's not -- the name, I don't think, is -- I don't know. I don't think -- I think other people can use it, too. I don't know.

**Q Okay.**

A I have no idea.

**Q But you know --**

A I am not involved at all --

MR. LIEBERMAN: Stop. Stop.

THE WITNESS: Yeah. Fine.

MR. LIEBERMAN: Let Mr. Nolan ask his question and then just give your best answer.

THE WITNESS: No problem. Got it.

BY MR. NOLAN:

**Q Well, you just answered it.**

**You're not involved in Life Capital Group 1 or Life Capital Group 2.**

A Or anything. You know, in any of these either. I don't know.
**Q Well, I thought you told me you were involved with Longevity Fund of Michigan.**
A No. Not involved in Longevity -- I'm not involved in any of these.
**Q So Longevity Fund of New York, do you recognize that name?**
A Yeah, I do. But I'm not involved there either. It's run by a fellow by -- yeah. I mean, it's all run by Rachnitz.
**Q So Longevity Fund of New York is run by Mr. Rachnitz, and do you have an interest in it?**
A I think I do. But I'm not sure. I mean, I definitely have an interest in LCG. I don't know what interest I have in these, but...
MR. LIEBERMAN: Can you be clear when you say these?
THE WITNESS: Longevity Fund of Michigan. Longevity Fund of New York.
BY MR. NOLAN:
**Q Okay. So they're both the same response.**
A Yes.
**Q Do you get a K-1 from those entities?**
A No. But I get a K-1 from LCG which is very

strange. I mean, whatever.
**Q Does the law firm have any interest in either the Longevity Fund of Michigan or Longevity Fund of New York?**
A I don't know.
**Q So it could have an interest, but you just don't know.**
A I mean, to answer your question, the best I could, is we really need LCG to give an accounting. I mean, a lot of people have died. They collected a lot of money. I mean accounting, which I think you're doing.
**Q Under Category Number 1, are there -- other than the ones that you've mentioned, are there any other entities that rolled over their interest in life insurance policies to LCG other than what you've mentioned?**
A Let me look very carefully.
BK, BKR, BW I mentioned. Okay, EKLK Foundation had three policies, which it transferred to Rachnitz. So that I didn't say before. Okay. The Klein Charitable Remainder Unitrust of 1996 had policies. And also the Klein Living Trust of 1990 which is --
(Reporter asks for clarification.)
THE WITNESS: The Klein Living Trust dated

April 8, 1990. And I don't know what The Klein Trust is. Doesn't have a date. So I don't know about The Klein Trust.

BY MR. NOLAN:

**Q And these entities that we've mentioned, BKR Life Settlements, BW Life Settlements?**

A Right.

**Q Longevity Fund of Michigan, after they transferred their policies to LCG, did they stay in existence? Did they hold other assets?**

A No. All their assets were life insurance policies. And once Rachnitz and I made a deal, all the investors basically were relying to get the money when the people died.

**Q Did the individuals who had an interest in the policies that were transferred to LCG, did they have to sign off on the transfer?**

A I don't think so. I mean, basically, on all these LLCs, the investors agreed that -- to the big Rachnitz deal. I mean, the Rachnitz deal basically was that all these policies would transfer to Rachnitz $75 million worth of policies.

So deal was after June of 2011, he's going to make all the payments. Then when people start dying, he will, first, get the premiums he paid. Because he paid

them later than me and the investor. So he's going to get all the premiums from 2011 to -- let's say the first person died 2018, $8 million policy. So he would get all the premium payments from 2011 to 2018. Once he gets his money, then me and the investors would get their money that we paid from 2007 to 2011 and 12 percent interest. And then after that, we'll split the profits 50/50.

**Q So when you said $75 million in policies, do you mean $75 million in death benefits?**

A That's correct.

**Q So the total pot, at the end of the rainbow, was $75 million.**

A $75 million. That's correct.

**Q And the way you had it set up with LCG is none of these entities would pay, including law firm. Would not pay premiums any longer. That was all -- responsibility was shifted to LCG.**

A Right. Except some policies that I kept, I had the responsibility to make the payments. But as far as the investors were concerned, they never had to make any more payments, period.

**Q All right. And after this time, 2011, no further policies exist where the law firm is making the premiums or as an -- or as an investor.**

A That is correct.
(Reporter admonishes witness.)
THE WITNESS: Sure. Sorry. Sorry.
MR. LIEBERMAN: It's okay. You're doing good.
BY MR. NOLAN:
**Q So any other -- did the law firm maintain any other source of revenue after 2011 other than what you've testified to, which is the estate services and probate matters?**
A Well, we also got -- the trustee got the trustee's fees. For example in 2005, Sam Menlo paid trustee's fee of $750,000, trustee's fees. So the law firm got part of those trustee's fees.
**Q So those would be -- that's an example of an instance where you personally are appointed as a trustee?**
A Yes.
**Q And you're a trustee overseeing a trust?**
A Well, it's a little more complicated than that. Until 2005, I was the trustee. But Sam Menlo was really the trustee. Because it was his money and he want to do what he want to do with the money. And so basically I just met with him and I did what he wanted me to do.
**Q Right. But are there instances where you provide -- the law firm provides estate planning**

**services and there's instances where the law firm is appointed a trustee of a trust?**

A Yeah. But, like, after Sam Menlo, after 2005, he had a massive stroke, and he was totally out of it. And his wife really, you know, wasn't capable of doing what he was doing. He was, you know, running the business and everything.

So me as the trustee invested the money of the trust in various mutual funds, various stocks, and what have you. And I spent a lot of time doing that and made a lot of money for the Menlo family.

**Q Right.**

**But for the Menlos, were you -- or strike that.**

**Was the law firm retained by the Menlos or were you personally?**

A Well, again, I was retained personally. But the Menlos was a full-time job. I mean, there was 97 trusts.

**Q Right. So you --**

A And, also, the law firm prepared trust -- whenever there's a new grandchild born, new great grandchild born, the law firm prepared a trust for all these children and grandchildren.

**Q Right. Would you get the permission of the**

**Menlos to do that?**
A Of course. They would call. Mrs. Menlo would call. Mr. Menlo, after 2005, was really incompetent. So Mrs. Menlo would call and say prepare a new trust for this grandson who was born today or a great grandchild.
Or also Mr. Menlo, while he was around, never, never used the money of any of these trusts. He never made distributions. And once he had his stroke, Mrs. Menlo was buying houses and all kinds of things for the children and the grandchildren. So she would call also to do that.
**Q And that is to get services from you personally?**
A Well, I mean...
**Q Because you're the trust.**
A I am the trustee.
**Q You're the trustee of the trust.**
A I mean, you know, Menlo is a very unique case because that's the only case that I was the trustee. Other cases I really wasn't that involved. I would prepare an estate plan and it was finished, done. But Menlo was an ongoing thing from 1996 till 2023.
And also I purchased insurance policies, which is the $30 million, that we talked before. The insurance policies that I purchased, Frank Menlo was

supposed to pay the premiums, but he never paid a penny of premiums. So I was busy figuring out how to pay the premiums from the varies trusts, 24 trusts that were the beneficiaries.

**Q Right. But I think you've testified, and I'm going to ask you one more time.**

A Okay.

**Q There's not going to be an agreement that -- in the law firm's possession, a retainer agreement, between the Menlos and the law firm for the law firm, even you as the managing partner, to perform services for the Menlos; correct?**

A Well, I'm not sure about that. I mean, it could be that when we did trusts for all the various children and grandchildren, there was some kind of agreement that we're going to charge X number of dollars for that.

**Q Okay. Would there be an agreement from you personally as the trust -- to occupy the role as the trustee with the Menlos identifying what your role was, as far as providing estate planning, buying real property, things of that nature?**

A Well, when Sam Menlos was around -- I was the trustee from '96 to 2005. It's nine years --

**Q Is there an agreement?**

A -- we're talking about -- it was really a meeting.

MR. LIEBERMAN: Let me just stop you for a second. Just focusing on Mr. Nolan's question.

THE WITNESS: Fine.

MR. LIEBERMAN: And see if you can answer just that question directly.

THE WITNESS: Fine.

MR. LIEBERMAN: And then give whatever explanation you want.

THE WITNESS: Okay. I'm not sure if there was an agreement. But we met three, four times a year, Mr. Menlo and his controller and me, to discuss what we were doing.

BY MR. NOLAN:

**Q Okay. Was the law firm ever in the business of collecting royalties?**

A No.

**Q How about selling assets?**

A No.

**Q Trading securities?**

A The law firm never traded securities.

**Q So the law firm never traded securities, never collected royalties, never sold --**

A Right.

**Q -- assets on behalf of clients.**
A That's correct.
Well, actually, I take that back. If we had a probate case and a property was sold, a real property was sold, it had to be sold through the court.
**Q Uh-huh.**
A So we would have to get court confirmation of the sale. But we were not selling the asset. It was done by a broker. But we had to go to court to confirm it.
**Q So in matters where there could be a petition of probate and it was under the court's oversight --**
A Right.
**Q -- there could be instances where the law firm was paid for selling assets.**
A That would be an extra attorney fee. Yes. That is correct.
**Q Does the law firm maintain any accounts overseas?**
A No.
**Q Bank accounts?**
A No.
**Q Any bank accounts outside of California?**
A No.
**Q What are the bank accounts that the law firm**

**currently maintains?**

A It has bank account -- general account, a trust account, a cost account.

**Q A what account?**

A Cost. Cost.

**Q Cost.**

A Court cost. That's it.

**Q What about a payroll account?**

A Yes. It has a payroll account. Yes.

**Q So that's four accounts I have.**

A That's correct.

**Q General account, trust account, cost account, payroll account.**

A That's correct.

**Q And what's the purpose of the payroll account?**

A To pay payroll.

**Q Payroll for the law firm?**

A Payroll for the employees of the law firm, yes.

**Q Any other reason?**

A No.

**Q How about the cost account? What's the purpose of the cost account?**

A Pay court costs.

**Q To pay court costs.**

A Yes.

**Q So that would only be for probate matters.**
A That is correct.
**Q How about the general account? What's the purpose of the general account?**
A General account pays bills.
**Q It pays the bills of the law firm?**
A Yes.
**Q And, like, what type of bills would that typically be associated with?**
A Be associated with phone bills, rent bills.
**Q Anything that had to do with the operations of the law firm?**
A What do you mean by the operations of the law firm.
**Q Well, operations of the law firm might be the phones, like you said.**
A Yeah, phones.
**Q Occupying --**
A Carrier service.
**Q Occupying the premises that you're leasing.**
A Yes. Yes.
**Q What are, I guess, as designated as the operations of the law firm.**
A That is correct.
**Q Okay.**

A Advertising.
MR. LIEBERMAN: Insurance.
THE WITNESS: Insurance.
BY MR. NOLAN:
**Q What about the trust account? What's the purpose of the trust account?**
A Basically, the trust account purpose is to use that money for the clients. If somebody, let's say, wants to make an offer on the house and they want to make a down payment. So they have to make a down payment to go to court. So they would put money into the trust account of 10 percent deposit. So that would be the client's money.
**Q So the monies in the trust account are the clients' monies.**
A That is correct. It's an IOLTA account.
**Q Does the law firm maintain a general trust account and also an IOLTA account or was there just one account based on your recollection?**
A There's just one IOLTA account.
**Q Right. But is there a trust account in addition to the IOLTA account?**
A No. There's only one trust account. That trust account is really a general account.
**Q Because some firms maintain an IOLTA account**

**for smaller denominations and have a trust account for larger denominations. That distinction doesn't make any --**

A We don't have any distinction. We only have one IOLTA account.

MR. NOLAN: I'll show the witness Exhibit 3.

(Exhibit 3 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q So for the record, Exhibit 3 is Bank of America. Looks like a banking statement, an account statement. The last four digits are on the right side. It says 9404.**

A Okay.

**Q Does that document look familiar to you? I mean, as far as the format.**

A This goes back to 2-16.

**Q All right. Do you recall if these accounts that you were referencing -- the general account, the trust account, the cost account, the payroll account -- were they all at the same bank?**

A Yes. They were all at the same bank.

**Q And was that account with Bank of America?**

A Yes.

**Q And Exhibit 3 is Bank of America and it says**

**Les Klein & Associates trust account.**
A Yes.
**Q And it has the last four digits of 9404.**
**Does that sound familiar?**
A I'm not sure this is a trust account. The IOLTA account is a different number. This, I think, may be a general account. I think in 2016 -- I don't remember if it's separate IOLTA account or not. But, again, I don't -- I mean, this goes back seven years. I'm not sure.
MR. NOLAN: I'm going to show the witness Exhibit 4.
(Exhibit 4 was marked for identification and attached hereto.)
THE WITNESS: Okay.
BY MR. NOLAN:
**Q So for the record, while you look at it, Mr. Klein.**
A Yes.
**Q Exhibit 4 is Bank of America. It's Bates stamp number 2004 B of A 00019.**
A Okay.
**Q And it has a designation of 6978. It says checking account.**
A Yes.

**Q What account is this of the four that you were mentioning? Do you think this is one particular account?**

A This is the general account. The operations account.

**Q Okay. So 6978, the digit 6978, are the general or operating account.**

A That's correct.

**Q All right. If you look at Exhibit 3 now. That's 9404. That says Les Klein & Associates Trust Account DBA Family Legal Services.**

A That was back to when we were -- Family Legal Services goes back to when we were partner with Klein & Cutler. So this is an old account that was opened long time ago.

**Q 2016; right?**

A Well, it was open in '16. But it was opened much earlier than that.

**Q But up at the top it says Les Klein & Associates trust account.**

**Do you see that on Exhibit 3?**

A Yes.

**Q Was Klein & Cutler still in existence?**

A No.

**Q So did Les Klein & Associates, or the law firm,**

**just take over that account?**
A Yes.
**Q And you would have been the individual who oversaw the changing of that account over to Les Klein & Associates?**
A Well, I don't remember if this account was a trust account or a general account at the time when Les Klein & Associates took it over. Because there definitely was a point in time when an IOLTA account was opened. I'm not sure when that happened.
**Q Okay. But we can look at Exhibit 3 and Exhibit 4, which are relatively similar in time frame. They're both 2016. And one of them says trust account. One of them says -- where you believe is the operating account or general account; right?**
A Yes.
**Q Okay. Let me show you another document. Mark this as Exhibit 5.**
(Exhibit 5 was marked for identification and attached hereto.)
BY MR. NOLAN:
**Q For the record Exhibit 5 is on Bank of America letterhead. It's Bates stamped 006493-6497. This one is designated payroll account.**
**Do you see that, Mr. Klein?**

A Yes.
**Q Okay. So now I'm showing you three consecutive documents. One says trust account. Another one just says business economy checking. And this one says payroll account.**
**Does this appear -- Exhibit 5 appear to be the payroll account for your law firm?**
A Yeah. I mean, it does. But, again, this goes back 2-16. So it does. It looks like payroll account. Yes.
**Q Okay. None of these would be the accounts for the cost account you referenced; is that accurate?**
A There's a cost account, but I don't see it here. No.
**Q Okay. So of the four accounts you mentioned, we hit the general account, we hit the trust account, we hit the payroll account?**
A Yes.
**Q And there may be a cost account out there.**
A Yes.
**Q Okay. Any other bank accounts that Les Klein & Associates maintained in 2016 other than the B of A accounts?**
A I don't know. It looks like that these were the only accounts.

**Q I mean, did the law firm maintain a relationship with other banks such as like, you know, Chase?**
A No.
**Q Did the law firm have a relationship with somebody like Wells Fargo?**
A No.
**Q So the law firm, as -- you as the director, you had the law firms banking at one bank which is Bank of America.**
A Right. We've been at Bank of America for 40 years.
**Q For fees that were earned by the law firm, for example, in 2016, what account would they be deposited into?**
A Well, some would be deposited into 6978 and some would be deposited into 9404.
**Q So if your firm earned fees for drafting, you know, a trust agreement or a will, you would deposit it either into the 6978, which is the general account, or the 9404, which is the trust account.**
A That is correct.
**Q Would you maintain a ledger that would track those amounts?**
A Well, I mean, I would -- I controlled where the

money went. And they also made deposits to the payroll account. So, actually, they were depositing all three accounts.

**Q I get and understand why money is deposited into the operating account for fees earned by the law firm.**

A Right.

**Q Why would monies be deposited into the client trust account in 2016 for fees earned by the law firm?**

A Because some of the monies were fees and some of the monies were client's money.

**Q Well, some of the -- when you say fees, some of the fees are monies that the law firm's entitled to; correct?**

A That is correct.

**Q So you would take money that was the law firms and you would deposit them into the client trust account?**

A Well, I'm not sure if we did in '16. I mean, '16 I just don't know how I did it. But the answer is that the law firm, let's say, took in $70,000. So they deposit it into the general account $48,000. They deposit into the 9405 account, which is the payroll account, $6,000. And so that is a total of $55,000.

The other $15,000 is maybe going to come out

from a client trust account. And so -- that we deposited here. And it wouldn't be used until the money was earned.

**Q Right. But the example you're giving me is you would transfer monies from the client trust account after it was earned --**

A Right.

**Q -- to the operating account or the payroll account; right?**

A That is correct.

**Q But would there be instances where you would deposit fees that were earned by the law firm into the client trust account?**

A No. No. We would only deposit monies into client trust account if there were, like, a contingency case. We would take a probate case in a contingency. And the case could take six months, it could take nine months till we settle it or whatever. And we don't earn the fees until the case is settled.

**Q Right.**

A So the client would -- the money would sit in this account. But then when we settled the case, and let's say there's a fee of $50,000, that had to be transferred to the general account or payroll account.

MR. LIEBERMAN: For clarity, Counsel.

THE WITNESS: Yeah.

MR. LIEBERMAN: When Mr. Klein says would be transferred into this account, he pointed to a particular statement. And that statement was the 9404 account, which is denominated a trust account.

BY MR. NOLAN:

**Q So I think the point you're making, Mr. Klein, is that the monies that are in the client trust account are the client's monies. And they remain the clients monies until they're earned by the law firm. At which time they would be transferred out from the 9404 account to the general account or the payroll account.**

A That is correct.

Also, there was a point in time when this account, 9404, was a general account and we opened an IOLTA account because the rules changed. The State Bar changed the rules that you have to have a separate IOLTA account. I don't remember when that was. It could have been after '16. I don't know.

**Q So somewhere after the State Bar changed the rules, you set up an IOLTA account?**

A That's correct.

**Q And that might change how the law firm -- where the law firm transferred money?**

A Yes.

**Q That wouldn't change the nature of the client trust account; would it?**
A Well, this account, this 9404 account, at a certain point in time became a general account.
**Q Will I be able to tell when that occurred because the bank statements will change and it'll say general account?**
A No. I think we never took off this -- title of this account. This account DBA Family Legal Services has been in existence since we started the law firm.
**Q Right. But do you understand what a trust account is?**
A Yes.
**Q When you go into a bank to establish a trust account, you have to execute paperwork that's unique to setting up a trust account.**
A Right.
**Q Is that correct?**
A When you set up an IOLTA account, you do. I mean, this account was set up -- this trust account DBA Family Legal Services was set up in the '70s.
**Q I understand that. But it's still a trust account. When it was set up, it was established as a trust account; is that correct?**
A That is correct.

**Q Even though it might be in the '70s, it was established as a trust account; right?**

A Yes.

**Q Okay. And is your testimony at some date later, you changed the trust account into an operating account?**

A That is correct.

**Q Did that operating account then replace what we looked at, which was Exhibit 4, which was the general account/operating account 6978?**

A No. 6978 was always an operating account. That was also set up originally as operating account and that always stayed as an operating account. That was never changed.

**Q Okay. At some point in time, did you change the operating account into a trust account?**

A No.

**Q So you had two operating accounts at a certain period in time?**

A Yes.

**Q And when was that?**

A I don't remember the date. But there was a certain point in time where 9404 became an operating account.

**Q And you can't tell me if that's in 2013? 2016?**

**2020?**
A Well, if I would look at statements, I would be able to tell you. But not from this '16 account.
**Q Okay. And what on the statements would tell us that it was no longer a trust account?**
A I would have to look and maybe go to the bank and check out when that happened. I don't remember when it happened.
**Q Okay. So did -- you would have to go to the bank and check to see when you executed the paperwork that would reflect that it was turned into an operating account?**
A That is correct.
**Q And what bank would you have gone into?**
A Bank of America.
**Q Right. But I noticed you've gone -- I mean, is there a particular branch that you used to walk into a lot?**
A Yeah, the Larchmont bank.
**Q Larchmont.**
**So that would have been the branch that we would be able to see, if it happened, evidence that the trust account was converted into an operating account.**
A I assume it was there. I mean, it could be that there is a branch close to the office, a Bank of

America close to the office. It could have been there, too. I don't remember, you know, when it was done and where it was done. But I assume it was done at the Larchmont branch.

**Q Well, you quite frequently walked into the Larchmont branch; right?**

A That is correct.

**Q Do you know everybody there by name?**

A Yes.

MR. LIEBERMAN: It's good.

BY MR. NOLAN:

**Q Would there be any corporate formalities you would execute on behalf of the law firm in changing a bank account?**

A I don't remember.

**Q It would be you; correct, Mr. Klein? It wouldn't be Mr. Podell.**

A That is correct.

**Q Are you the only individual at the law firm who had signatory authority on the banks -- on the accounts of the law firm?**

A Yes.

MR. LIEBERMAN: Counsel, when you're finished with this line, I'd like to take a brief restroom break.

MR. NOLAN: Okay. It's fine now.

(Recess from 12:31 p.m. to 12:44 p.m.)
BY MR. NOLAN:
**Q We're back on the record.**
**Mr. Klein, you're under oath. Do you understand that?**
A Yes.
**Q Is there another entity called -- is there a difference between Les Klein & Associates and Leslie Klein & Associates, Inc.?**
A No.
**Q Same entity?**
A There's no other -- there's only Les Klein & Associates.
**Q If you would grab Exhibit 2 and put it in front of you.**
A Yes.
**Q You've produced documents in this case. You gave those documents to your lawyer; is that accurate?**
A Yes.
**Q Did you forward any documents to me directly?**
A I don't think so.
**Q I don't think so either. I just want to make sure.**
A Yeah. I don't think so.
**Q So the documents that have been produced by the**

**law firm in this case to date have come through your lawyer.**

A That is correct.

**Q Okay. Anybody else other than your lawyer?**

A No.

**Q You didn't give any documents to a third party to produce to me?**

A I mean, I had, you know, a different lawyer. But not for the law firm. Michael Cogan was my lawyer. And, I mean, he wasn't representing the law firm.

**Q Correct. And I'm only referring to the subpoena that went to the law firm.**

A So I don't think so. I mean, I don't think so.

**Q For the record I'm going to represent to you that your lawyer was very diligent about Bates stamping the documents that were produced by the law firm and I have that as LKA000001 to 1474.**

MR. LIEBERMAN: Does that sound right?

MS. SALEEM: That sounds about right.

BY MR. NOLAN:

**Q And I have all of those documents here if you want to refer to any of them in the binder, with the exception of the last production on November 10th, which is the bank accounts only.**

MR. LIEBERMAN: Yes.

MR. NOLAN: Okay.
BY MR. NOLAN:
**Q Mr. Klein, if you'd look at Exhibit 2. For all those entities that are listed under Category 1 for documents, I call those the Klein entities.**
**Do you see that?**
A Let me see where it is.
MS. SALEEM: Page 5.
THE WITNESS: Exhibit.
MR. LIEBERMAN: Which page?
BY MR. NOLAN:
**Q Page 5 under documents to be produced.**
A Okay. I got it.
**Q I define those entities Archstone, Bay Area Development Company, Big Boys Legal, BK Life Settlements LLC, BKR Life Settlements LLC as Klein entities.**
**Do you see that?**
A No.
MR. NOLAN: (Indicating.)
THE WITNESS: Okay. All documents -- okay. I see it now. Yes.
BY MR. NOLAN:
**Q Right.**
**Are any of those entities from Archstone going all the way through to The Klein Trust, are any of those**

**entities, entities that you don't have any association with or the law firm doesn't have any association with?**
A Bay Area has no association with.
MR. LIEBERMAN: See if you can answer yes or no first.
THE WITNESS: Okay. Yes.
BY MR. NOLAN:
**Q So which entities, under Category Number 1, are entities that you personally or the law firm don't have any association with?**
MR. LIEBERMAN: These are two separate questions, Counsel?
MR. NOLAN: I know It's compound, but he can answer it.
MR. LIEBERMAN: Okay.
MR. NOLAN: Smart guy.
THE WITNESS: Well, this BK Life Settlements LLC, I mean, these are all...
BY MR. NOLAN:
**Q BK Life Settlements LLC, you did produce the articles of incorporation for.**
**Did you know that?**
A Yeah.
**Q And that's with -- an entity with David Berger that you have an interest in?**

A That is correct.
**Q Okay.**
A Okay. I mean, Bay Area Development Company, the law firm has no interest in.
**Q Okay. How about you individually? Do you have an interest in the Bay Area Development Company?**
A Well, I did. But right now Bay Area Development has no assets at all, nothing. Bay Area Development Company owned the building on Ventura that was foreclosed upon.
**Q Right.**
**But as far as my question with reference to all the entities under Category Number 1, is there any entity under there which is not an entity that you can tell me you don't have an interest in or the law firm did not have an interest in?**
A Well, so I have to split up. And there was the law firm and me have to be split up. Like, Bay Area Development Company, the law firm has no -- nothing to do with.
**Q The law firm has nothing to do with Bay Area Development Company?**
A Bay Area Development Company was the landlord that the law firm leased the Ventura firm from. That's all it had to do with Bay Area Development Company.

**Q Is it an accurate statement that Bay Area Development Company maintained its offices at the law firm?**

A Well, the Bay Area Development Company maintained their offices there. But Bay Area Development Company was the landlord. It owned the building.

**Q Right.**

**But you designated -- or the law firm designated its offices as the business offices for Bay Area Development Company; isn't that true?**

A Well, Bay Area Development Company basically had an office there. But it had nothing to do with the law firm.

**Q Besides sharing the same offices, isn't it accurate that the law firm also designated Bay Area Development Company and that address for its bank statements?**

A That is correct. That Bay Area Development Company bank statements came to that address. But the law firm had nothing to do with Bay Area bank statements.

**Q Who owns Bay Area Development Company?**

A Well, Bay Area Development Company filed bankruptcy and --

MR. LIEBERMAN: Listen to his question.
THE WITNESS: Who owns Bay Area Development Company? Bay Area Development Company is a C-corporation and Bay Area Development Company has no assets.
MR. LIEBERMAN: Listen to the question.
BY MR. NOLAN:
**Q Still waiting for an answer to my original question.**
A Okay. At the present time Bay Area Development Company is owned by me.
**Q Okay. And when it was incorporated, it was incorporated by you; correct?**
A Yes.
**Q And you've been the sole shareholder or member of Bay Area Development Company since its inception; correct?**
A Yes.
**Q Back to my original question.**
**Is there any entity under Category Number 1 that's not associated with you?**
A Well, I mean, there's a lot.
BK Life Settlements is right now dormant. There's nothing happening there. BK Life Settlements is not -- is dormant. Nothing to do with me.

MR. LIEBERMAN: Leslie --
THE WITNESS: Yeah.
MR. LIEBERMAN: -- just -- his question is whether you have anything to do with these particular entities. Just do your best to answer the particular question.
THE WITNESS: Fine. So, I mean, that's what I'm doing.
MR. LIEBERMAN: Okay.
THE WITNESS: Okay?
BY MR. NOLAN:
**Q You incorporated BK Life Settlements; isn't that correct?**
A Yes.
**Q You've been the member/owner, in addition to David Berger, since the formation of BK Life Settlements; is that correct?**
A Yeah. But BK Life Settlements was closed in 2011.
**Q I know. But I'm not limiting my question to right now. My question is much broader than that.**
**I'm asking are there any entities under Category Number 1 that aren't associated with you? I don't want to spend time on something or ask you questions about something if it's -- like, Life Capital**

**1, and you have no recollection of it.**
A Well, so the answer is BK Life Settlements LLC has nothing to do with me today. Has nothing to ask me about.
**Q You mean there's nothing to ask the law firm about.**
A That's right.
**Q Okay. But that's different than you though; right?**
A Me also. Me, there's nothing to ask either.
**Q Other than BK Life Settlements, are any of the other entities under Category Number 1 entities that were not associated with you? Meaning you owned it or you incorporated it or it operates at the law firm offices.**
A BK Life Settlements has nothing to do with me.
**Q Is that it?**
A BW Life Settlements LLC has nothing to do with me.
**Q Did I misunderstand -- is that the end of your -- I'm sorry. Are you finished?**
A Yeah.
**Q Any other entities?**
MR. LIEBERMAN: You've got those and those.
THE WITNESS: Oh, so you want me to continue?

BY MR. NOLAN:
**Q I want you to cover all the entities under Category Number 1.**
A Okay. Doctors Marketing Group has nothing to do with the law firm or with me.
Doctors Marketing Network has nothing to do with the law firm or with me.
Doctors Referal Service has nothing to do with the law firm or me.
Doctors Marketing Nationwide has nothing to do with the law firm or me.
The Patient Referral Network has nothing to do with me or the law firm.
Family Legal Services has nothing to do with me or the law firm.
GMR Life Settlements has nothing to do with me and the law.
Klein & Cutler has nothing to do with the law firm, except it was originally set up in 1973. But it stopped functioning.
The Klein Charitable Remainder --
**Q But I want you to understand. My question isn't limited to a specific period of time. I asked you a question, and I think you understood me, that I was asking for those entities, under Category Number 1, if**

**there were any that weren't associated with or didn't involve you at all.**

A Well, there are documents to be produced that you've served on Klein law firm. And there's no documents for any of these.

MR. LIEBERMAN: That's not his question.

THE WITNESS: Okay. What is his question?

MR. LIEBERMAN: Listen to his question.

THE WITNESS: Okay. Fine.

MR. LIEBERMAN: Counsel, would you repeat your question.

THE WITNESS: What is the question?

BY MR. NOLAN:

**Q It's the same question, Mr. Klein, as I'm asking you understand Category Number 1 on Exhibit 2.**

A Yeah.

**Q Any of those entities that are identified do not involve you or the law firm.**

A Okay.

MR. LIEBERMAN: At any time.

BY MR. NOLAN:

**Q At any time.**

A Okay. So I'm going to change my answer.

Klein & Cutler, there was a time where I was involved with Klein & Cutler.

**Q But your answer remains the same. You had nothing to with -- or the law firm had nothing to do with Bay Area Development Company, BK Life Settlements LLC, BRK Life Settlements LLC, BW Life Settlements LLC GMR Life Settlements LLC.**

**Anything else?**

A Well, we set it up. But in 2011, they were all closed.

MR. LIEBERMAN: No one has asked about 2011.

THE WITNESS: Fine. So they were set up.

MR. LIEBERMAN: They're just asking about all times --

THE WITNESS: Fine.

MR. LIEBERMAN: -- what was the relationship, if any, between you and/or the law firm and these entities.

THE WITNESS: Okay. The law firm had no relationship with any of these entities. Any relationship with these entities was by me.

MR. LIEBERMAN: And then -- okay.

THE WITNESS: The Klein & Cutler, Klein Charitable Trust, the law firm had no relationship there.

Klein Charitable Remainder Unitrust, the law firm had no relationship there.

Leslie Klein, obviously I was an employee. Leslie Klein & Associates is the law firm. Leslie Klein -- or Les Klein & Associates. And Leslie Klein is the same thing.

Litigation Financing never it was activated. It never did anything.

Longevity Fund of Michigan, we talked about.

Longevity Fund New York, we talked about.

The Klein Charitable Remainder Trust of '96, the law firm had nothing to do with that.

Time Square Media was something that we did in China, which didn't work out.

BY MR. NOLAN:

**Q Who's "we"?**

A Leslie Klein and some other partners. We were doing LTDs in China. But it turned out that we weren't dealing with Chinese individuals. We're dealing with the Chinese government. And they basically decided to kick us out of China.

**Q Okay. So for some of these other entities that you and I -- you had testified earlier, which you said you had no familiarity or no involvement in, you changed your testimony to say you set it up?**

A That is correct.

**Q Okay. For all these entities under Category**

**Number 1, you either had or the law firm had an interest in them or you set them up; correct?**

A Well, the law firm had no interest and the law firm had nothing to do with them. As far as setting them up, I am not sure if I was the lawyer who set them up or I hired some other law firm to set them up.

But I was one of the people that owned some of these entities or was part of all these entities for a period of time.

**Q Okay. So you're personally familiar with all these entities under Category Number 1.**

A Yes. Well, I wouldn't say that. I don't know at all what Doctors Marketing Group LLC, Doctors Marketing Network LLC, Doctors Referral Service LLC, Doctor Marketing Nationwide, Inc., Patient Referral Network LLC, the law firm has nothing to -- and I don't know anything about these entities.

**Q So you never heard of these entities: Doctors Marketing Group LLC, Doctors Network LLC and the other ones you just testified about?**

A Well, I heard of these groups. But I have no interest in any of these groups. And all these groups are nonexistent today.

**Q So you never had any interest in any of those groups: Doctors Marketing, Doctors Marketing Network,**

**Doctors Referral Service, Doctors Marketing Nationwide, or the Patient Referral Network?**
A That is correct.
**Q Did you ever operate -- have any management role of any of those entities?**
A No.
**Q Did the law firm ever perform any services for any of those entities?**
A No.
**Q So there'd be no reason for the law firm to be receiving any moneys on behalf of any of those entities.**
A That is correct.
**Q Do you have any idea who is running Doctors -- these Doctors Marketing entities?**
A Well, these Doctors Marketing are corporations and whatever. And as far as I know --
**Q I know their corporations. But --**
A -- all these entities --
**Q -- my question is -- the question was --**
MR. LIEBERMAN: Leslie, stop. Listen. Leslie, let Mr. Nolan finish.
THE WITNESS: Fine. Okay. Fine.
MR. LIEBERMAN: And then just focus on his question.
THE WITNESS: Fine. Sorry.

BY MR. NOLAN:
**Q I want to just understand you.**
**Were these entities: Doctors Marketing Group, Doctors Marketing Network, Doctors Referral Service, you have no idea what those entities are; is that accurate?**
A Well, some of these entities, I know what they are. Some of these entities, I have no idea what they are. That is correct.
**Q Which ones are you familiar with?**
A I think the only one that I am familiar with is Doctors Marketing Group LLC.
**Q Okay. So as to the other three doctors entities under Category Number 1, on Exhibit 2, and the Patient Referral Network, you have no earthly idea what those entities did or what they do.**
A That is correct.
**Q And to confirm your testimony, you're 100 percent sure that the law firm never performed any services on behalf of any of these Doctors Marketing Group entities, et cetera.**
A That is correct.
MR. NOLAN: All right. Why don't we break here. It's 1:02.
MR. LIEBERMAN: All right. Thanks.
(Lunch recess 1:02 p.m.)

Los Angeles, California; Thursday, November 16, 2023
1:39 p.m.

MR. LIEBERMAN: Could I say something while we're on the record?

MR. NOLAN: Sure. Okay.

MR. LIEBERMAN: This is Mr. Lieberman.

Just before the commencement of this portion of the deposition, we were able to obtain and I handed to counsel a copy of the Les Klein & Associates insurance policy.

And I also spoke with Mr. Klein at lunch. Apparently he was a little hungry just before the -- we stopped our proceeding. And he'd like to, with your permission, Mr. Nolan, go over that Category 1 list of entities and be very clear about what his relationship is and what he knows about the entities for the record so that there's no misunderstanding and you don't have to pull teeth about getting information about each one. If you'd like.

MR. NOLAN: Okay. So back on the record?

THE REPORTER: We've been.

BY MR. NOLAN:

**Q I'm just going to renew my admonition. Mr. Klein, we're back here after your break for**

**deposition for lunch.**
A Yes.
**Q The court reporter -- you're still under oath.**
**Do you understand that?**
A Yes.
**Q Okay. Counsel for you handed me a group of documents. I'm going to copy those documents.**
**My understanding is those documents are responsive to the subpoena with respect to Category Number 9, policies of insurance providing malpractice errors or omission; is that accurate?**
A Yes.
**Q All right. I'm going to hand you back the original.**
A Okay. Thank you.
**Q I'm going to mark as Exhibit 6 the documents that are produced.**
(Exhibit 6 was marked for identification and attached hereto.)
MR. TROSZAK: Do you need a copy?
MR. NOLAN: I don't need it.
And I'll leave it to you, Mark, whether or not -- I'll Bates stamp them.
MR. LIEBERMAN: Thank you.
MR. NOLAN: You know, they'll be sequentially

in order from where I left off in the binders.
MR. LIEBERMAN: That's fine. I assume they'll be exhibits to the deposition, if you so choose.
MR. NOLAN: Yup. Yeah.
BY MR. NOLAN:
**Q Mr. Klein, your counsel made a statement that after the break you talked and you wanted to clarify, I guess, with respect to my questions about Exhibit 2 and then Category Number 1 in the documents that were listed?**
A Right.
**Q I mean, I'm sorry, the entities that are listed.**
A Right. So Doctors Marketing Group --
MR. LIEBERMAN: Let's start with Archstone.
THE WITNESS: Okay. Archstone we discussed. I mean...
MR. LIEBERMAN: Let's have it all in one place on the transcript. Just go through each one.
THE WITNESS: Okay. Fine.
Archstone is basically somebody who the law firm did some work for. And I really had nothing to do with Archstone.
Bay Area Development company is the landlord for the law firm.

Big Boyz Legal is a law firm that Klein law opened up in Maryland to try to get some cases in Maryland and Washington D.C., and hired local attorneys. And then the coronavirus came, and they were closed for 2 1/2 years. So, basically, Big Boyz Legal is part of the Leslie Klein & Associates.

BK Life Settlements is -- was set up. I was part of it. And I think there were other investors. And it was -- those parts were taken over by the LLC with Rachnitz. The same thing with BKR Life Settlements. The same thing with BW Life Settlements.

Doctors Marketing Group is a group that my wife owns 20 percent of. They are in Maryland. And I don't know. They might have other names. Like, Doctors Marketing Network, Doctors Referral Service, I don't know. Doctor Marketing Nationwide, I don't know either. But it could be these things exist and the Patient Referral Network is --

BY MR. NOLAN:

**Q Can I just get a point of clarification?**

A Sure.

**Q On Doctors Marketing Group, are you saying the only -- and Doctors Network and the Doctors Referal Service and Doctors Marketing Nationwide, is your testimony the only association you or the law firm have**

**with those entities is your wife has a 20 percent interest in it?**
A That is correct.
**Q So the law firm didn't do any -- perform any work for them?**
A The law firm did not -- they got the attorneys in Maryland to do all the legal work. The law firm never did any work for any of these entities.
**Q And as far as you personally, you don't own an interest or have any management role of any of the Doctor --**
A That is correct.
MR. LIEBERMAN: Let him --
BY MR. NOLAN:
**Q Doctors Marketing Group --**
A Yes.
**Q -- Doctors Marketing Network, Doctors Referral Service, or Doctors Marketing Nationwide?**
A That is correct.
**Q You don't control --**
A No.
**Q -- those entities.**
A That is correct.
**Q Do you actually recognize those entities or just not --**

A I recognize the name, Doctors Marketing Group, and -- I recognize maybe Doctors Marketing Network. I don't know Doctors Marketing Nationwide. I don't think such a thing exists. But I don't -- Doctors Referral Service, I don't know either. And Patient Referral Network, again, I don't know.

The last two, it looks like are Maryland entities. So, again, I don't know.

**Q When you say your wife has a 20 percent interest, is that just an ownership interest?**

A That is correct.

**Q Does she have any management role or any involvement running those entities?**

A No.

**Q Just an ownership interest?**

A That is correct.

**Q Okay.**

MR. LIEBERMAN: Continue.

THE WITNESS: EKLK Foundation is a foundation that I set up with my first wife. EK is Erica Klein and LK is Leslie Klein. And EKLK Foundation had a number of insurance policies, which were transferred to Mr. Rachnitz's foundation. He also had a foundation. And policies in this foundation were transferred to his foundation.

Family Legal Services was a name that we used when we were doing group legal with Cutler. And, basically, Family Legal Services the law of divorces and group legal. And Family Legal Services really was never used by Leslie Klein & Associates.

GMR Life Settlements, again, the same thing as BK Life Settlements.

Klein & Cutler is when I first started out. It was Klein & Mackey and then became Klein & Cutler and then it became Les Klein & Associates.

The Klein Charitable Remainder Trust had some insurance policies --

MR. LIEBERMAN: Slow down a little bit so the court reporter can take down what you're saying.

THE WITNESS: Sorry. Sorry.

The Klein Charitable Remainder Unitrust also had insurance policies.

Leslie Klein is me. Les Klein & Associates and Leslie Klein is the same entity.

MR. LIEBERMAN: No, no, no. Lesley Klein & Associates and Les Klein & Associates.

THE WITNESS: Klein & Associates.

MR. LIEBERMAN: Same --

THE WITNESS: I'm sorry.

Les Klein & Associates and Leslie Klein &

Associates is the same. There's no two entities.
BY MR. NOLAN:
**Q Right. And on the Klein Charitable Remainder Annuity and Remainder Unitrust --**
A Right.
**Q -- are you the trustee?**
A No. I'm not the trustee.
**Q Do you control those two entities?**
A No.
**Q Who's the trustee or who manages those two entities?**
A Basically, it's nothing happening with those entities because --
MR. LIEBERMAN: Listen to his question.
BY MR. NOLAN:
**Q Yeah. I'm not asking about presently. I'm asking about when it was set up.**
**Who -- were they set up by you or were you the trustee?**
A It was set up by, I think, Sheppard, Mullin, Richter & Hampton. And the beneficiaries are my children.
**Q Right. So you had Sheppard, Mullin set up those trusts?**
A That is correct.

**Q And you set it up for the benefit of your children.**

A That is correct.

**Q You understand the difference what I'm saying? When I mean "you," you directed someone. I'm not saying you necessarily had to draft the trust yourself.**

A I didn't. Yeah, right.

**Q Even though you probably could.**

A Right. Not a good idea to do your own trust.

**Q Your own.**

A I mean, the --

MR. LIEBERMAN: Wait for a question and then answer it.

BY MR. NOLAN:

**Q That's okay.**

A It's fine. Go ahead.

**Q So now --**

A So now we're moving on to Leslie Klein, which I don't know what the question is.

**Q We talked about Leslie Klein & Associates.**

A Fine. Leslie Klein & Associates or Les Klein & Associates.

Litigation Financing was an idea that we were going to do in Maryland to finance litigation. But we never did that. It was an idea that never happened.

**Q And who's "we"?**
A I'm not really sure who the "we" is. But it never happened. I mean, Litigation Financing was an idea. But it never happened.
**Q Did the law firm ever perform any services for Litigation Financing?**
A No. No. No.
**Q Okay.**
A Longevity Fund of Michigan is Rachnitz's entity which I think owns some policies. I'm not sure.
Longevity Fund of New York I think also owned some policies. But, again, I'm not sure.
**Q So did you ever own or incorporate or have any involvement at all in the Longevity Fund of Michigan or the Longevity Fund of New York?**
A No. My law firm never did any work on these. These were incorporated by lawyers in Michigan and lawyers in New York.
**Q Okay. So your law firm didn't perform any work for it and you didn't have any ownership interest or control of the Longevity Fund of Michigan or the Longevity Fund of New York.**
A I never had control. That's correct.
I think I have a 50 percent ownership of these. But I don't know. I mean, I really don't know. Maybe

25 percent. I think I own something here, but I don't know what exactly.
I mean, some insurance policies went into these two things, Longevity Fund of Michigan and Longevity Fund of New York.
**Q Did you ever get a K-1?**
A I don't remember getting a K-1 from either one of them. But it could be that I did. I mean, I just don't know. This was done in, I think, 2011. And I just don't know.
If I did get a K-1, it should be on my tax return. Because my accountant looked at the IRS records for all the years. So it should be on my tax return. On my personal tax return. This is all Leslie Klein, not the law firm.
**Q Right. But you haven't produced any tax returns for the law firm.**
**Why is that?**
A Well, there's no -- you guys subpoenaed all the tax returns for the law firm.
**Q I subpoenaed -- I issued a subpoena to the law firm for the tax returns.**
A Right. So you got them from the accountant, from Polina.
**Q I do not have the law firm's tax --**

MR. LIEBERMAN: We will produce the tax returns.
THE WITNESS: I mean, I thought she sent them to you.
MR. LIEBERMAN: Mr. Nolan, we will provide tax returns. When I say "we" Les Klein & Associates will provide tax returns.
MR. NOLAN: No. I understand that.
BY MR. NOLAN:
**Q They exist; right?**
A Yeah, they exist. Absolutely.
**Q And who is your accountant?**
A The accountant is Goldfinger Tsikman. And the Goldfinger retired. So Polina Tsikman is the accountant.
**Q Can you spell the last name?**
A Sure. T-s-i-k-m-a-n.
**Q And are they in L.A.?**
A They're in L.A. They're on Wilshire Boulevard.
**Q Okay. All right. So you're on to the Klein Charitable remainder Unitrust now, under Category 1.**
A Yeah, '96.
**Q You testified before that you -- it was an entity that you had formed and you transferred the policies to Rachnitz.**

A Yeah. There was probably one or two policies in that. And the policies in 2011 went to Rachnitz. There's nothing in there.
MR. LIEBERMAN: That's all he asked.
THE WITNESS: That's it. Fine.
BY MR. NOLAN:
**Q Does the Klein Charitable Remainder Unitrust dated 2/20/1996 have any assets currently?**
A I don't -- I don't know.
**Q What would you have to look at to know that?**
A Well, I would have to get an accounting from Rachnitz to finds out what monies came in and -- yeah, I really would have to meet with Rachnitz or his managers as to, you know, what is still, you know, alive. I mean, there is -- yeah, I really would have to meet with Rachnitz.
**Q Right. But other than the issue of what Mr. Rachnitz has for those policies, are there any other assets in the Klein Charitable Remainder Unitrust?**
A No.
**Q Okay. Times Square Media?**
A Okay. Times Square Media was a great idea that four, five of us had that we're going to do LEDs in China.
**Q All right.**

A And we put a lot of money in there. And we were going to go public. And we got great locations. The tallest building in Shenzhen. The airport in Beijing. The airport in -- two other airports.

**Q So did you incorporate Times Square Media, Inc.?**

A No, somebody else did.

**Q Did somebody else do it at your request?**

A I think maybe we bought a shell. I don't remember. This goes back a long time, but...

MR. LIEBERMAN: You've answered the question.

THE WITNESS: I was --

MR. LIEBERMAN: There's more?

THE WITNESS: No. I mean, basically, we lost all our -- whatever. It's fine.

BY MR. NOLAN:

**Q But you said you were part owner in Times Square Media?**

A That is correct.

**Q And who are the other owners?**

A Alan Genauer, Zeff Wallmark (Phonetic), Jacob Genauer. There might have been one or two more. But those were the main movers and shakers.

**Q And Genauer is G-e-n-a-u-e-r?**

A G-e-n-a-u-e-r.

**Q Okay. And Menachem Klein, is that a name that you go by?**
A It's my Hebrew name. I don't use it. But I donated some buildings in town. And that's the name that's on the buildings. This building was donated -- local schools, local, synagogues. The name that's on those buildings is Menachem Klein, my Hebrew name, not Leslie Klein.
**Q Okay. And what about Lutzy Klein?**
A Lutzy Klein is my Hungarian name. I was born in Hungary. I came here when I was eight years old. And Leslie in Hungarian is Lutzy.
MR. LIEBERMAN: Oh.
BY MR. NOLAN:
**Q Have you ever opened up a bank account in either the names Menachem Klein on Lutzy Klein?**
A No.
**Q Have you ever held any real property in either name?**
A No.
**Q Have you held personal property in either name, Menachem Klein or Lutzy Klein?**
A No.
**Q That's a no?**
A No. That's a no.

**Q Klein Living Trust, dated April 8, 1990. I think you testified before you set that up and it held policies that were transferred to Rachnitz?**

A No. The Klein Living Trust, I didn't set up. It was done by Sheppard, Mullin, Richter & Hampton.

**Q Again, at your direction?**

A Yeah. It went into estate planning. And, yeah, at my direction. Yes.

**Q Okay. And it held life insurance policies?**

A It held much more than life insurance policies. It held real estate. It held a lot -- they were my assets at the time to avoid probate.

**Q And all the life insurance policies in 2011 were transferred to the Rachnitz and LCG?**

A Maybe not all. I really don't know if all were transferred. But the bulk of them were transferred to LCG.

**Q And what would you have to see for a document that would be able to tell you what remained and what was transferred?**

A Well, in my petition for bankruptcy, I listed some policies that I kept and I didn't transfer.

**Q And who's paying the premiums on those policies?**

A I sold them. Sold them to hedge funds or

individuals.

Q So when the event or the contingency occurs, you're supposed to get a certain amount of money out of that?

A That is correct.

MR. LIEBERMAN: You need to wait for him to finish his sentence.

THE WITNESS: Sure.

BY MR. NOLAN:

Q The Klein Trust is the last entity.

A I don't know what The Klein Trust is. There's only one Klein Trust. It's a marital deduction trust. I don't know what The Klein Trust is.

Q Does it currently hold any assets?

A Well, if it's the marital deduction trust, it does. Yes.

Q And it holds the June property?

A Yes.

Q Any other property?

A It holds the two Israeli properties.

Q And who is the trustee of the trust?

A I'm not sure. One of my children. The beneficiary side -- I have four children. I assume it's the Klein -- I mean, it says Klein Trust, but I don't know. I think -- this goes back a long time, 40 years

ago. I think this refers to the Klein marital deduction trust, which I think was done in '96 by Sheppard, Mullin. But I don't know what The Klein Trust is. I think it's the marital deduction -- I don't know.

**Q How long have you lived in the 322 June property?**

A 40 years.

**Q 40 years? Okay.**

**And which child is the trustee for The Klein Trust?**

A It might be one or two. I'm not sure.

**Q Okay. So of the documents that were produced for your deposition before your deposition in Category 1, the only document I noticed was the BK Life Settlements articles of incorporation.**

**Are there documents that exist for these entities that are maintained at the law firm?**

A No.

**Q Well, various of these entities had their mail directed to the law firm; is that accurate?**

A Well, the mail for these entities was the same as the law firm, 14245 Ventura. It wasn't -- all the mails were directed to BK Life Settlements, not to the law firm. The law firm had nothing to do with all these LLCs.

**Q You mean the law firm performed no services for the --**
A That is correct.
**Q Other than what you testified to. I think you said Archstone.**
A Right. That is correct. That's correct. That is correct.
**Q But the mail was delivered for certain number of these entities, a large number of these entities, to the law firm.**
A Because these entities --
MR. LIEBERMAN: That was a --
THE WITNESS: Yes. The answer is yes.
BY MR. NOLAN:
**Q Right. And why is that?**
A Because these entities were not active. After 2011, all these entities were let go. They were basically stopped. Well, I paid the State of California every year franchise taxes but there's nothing happening.
**Q So those entities ceased to do business.**
A That is correct.
**Q And when they were in business and there were -- statements were coming to the law firm, is that because you were the -- that's because of your**

**association with these entities?**
A Well, I was associated with all these entities. And the investors, really, were not active. So if statements came to the law firm, it probably came to my attention.
**Q Right.**
**Is there a reason then that the documents with regards to these entities were not produced by the law firm?**
A The law firm doesn't have any documents.
**Q Do you have documents on these entities?**
A Nope.
**Q So for all these entities and the work that they performed and the investments they were involved in and the statements that they received, you didn't retain those?**
A No. I didn't retain any statements. Because I know exactly what --
MR. LIEBERMAN: He just asked you --
THE WITNESS: Yes. I didn't retain those.
BY MR. NOLAN:
**Q And is the reason you didn't retain them because you incorporated the information to something else?**
MR. LIEBERMAN: Could you repeat your question,

Counsel? I didn't quite understand.
MR. NOLAN: Yeah.
BY MR. NOLAN:
**Q Various of these entities did business in the state of California or in the United States and they held bank accounts. Some of them did other types of business. And they had business records. And you had those business records mailed or distributed to the address where the law firm occupies; correct?**
A They had no other business other --
MR. LIEBERMAN: It's a yes or no.
THE WITNESS: Okay.
BY MR. NOLAN:
**Q That's a yes?**
A There is...
MR. LIEBERMAN: Answer and then explain.
THE WITNESS: Okay. Fine.
Okay. So the business records -- basically, there were no records because all these entities had was life insurance policies. So when the deal was made with Rachnitz, there was nothing to keep. These businesses had nothing else, just the insurance policies. They didn't do any other business.
BY MR. NOLAN:
**Q Okay. So for the entities under Category**

**Number 1, these were for life insurance policies. And once the policies were transferred to Life Capital, these entities basically didn't perform any more business.**

A That is correct. They were just waiting for the money.

**Q And you would know that. Because you're the individual that was receiving these statements for these entities.**

A If they would get money, I would know it. But they never got any money from Mr. Rachnitz.

**Q I know. But it's not Mr. Podell or anybody else at the law firm. It's you. Because you were running the law firm out of that location.**

A Right. It wasn't Mr. Podell or anybody else. That's correct.

**Q Category 2 and 3, we asked for documents regarding various life insurance policies that my understanding the law firm invested in.**

**Do you see Categories 2 and 3 under Exhibit 2?**

A Yes.

**Q Other than with respect to -- I think her name was Zoë, I didn't see any documents produced regarding Ann Radow Trust, the Genevieve Page Trust, the Stuart Yorkshire Trust, the Rosalia Feldman Trust.**

**Did you look for those documents?**

A Yes. But, basically, Stuart Yorkshire --

MR. LIEBERMAN: The question is whether you looked for documents.

THE WITNESS: Yes.

BY MR. NOLAN:

**Q And you were unsuccessful locating any records?**

A That is correct.

**Q Were premiums paid out of the law firm on these policies in Category 2?**

A Yes.

**Q Would the trust accounts reflect the amounts that were invested?**

A I would have to go back all the way till 2007. But the answer, yes.

**Q But it should be out of the trust account?**

A Trust account. Yes.

**Q It wouldn't be out of the operating account; right?**

A That is correct.

**Q And it wouldn't be out of the payroll account.**

A That's correct.

**Q It would be out of the trust account or the IOLTA account?**

A Probably out of the trust account. Out of the

9404 account.
**Q What about under Category 4 on Exhibit 2? Oh, there it is, Rozy Pearl Zimmerman.**
**You did produce four pages with regards to Ms. Zimmerman.**
A Okay.
**Q What about these other carriers and policies? Did you search for those records?**
A I don't have them. They are with Rachnitz. Zimmerman is our biggest policy.
**Q So when you transferred the policies over to Mr. Rachnitz, you didn't maintain a copy?**
A That is correct.
**Q And you personally don't have a copy of any of these policies?**
A No. I don't have copies of these policies. But today, all these policies are available through electronics. So if I would need a policy, I could get it. But there's no reason to have the policy. American General has it.
**Q And how would you access those policies?**
A Well, I know Rozy Zimmerman is a return of premium policy. Originally, it was 8 million --
MR. LIEBERMAN: Stop, stop. Listen to the question.

THE WITNESS: Right.
MR. LIEBERMAN: How would you access the policies?
THE WITNESS: I would call up Jonathan Poulter, who is the manager of the LLC, and ask him. That was the Zimmerman policy.
BY MR. NOLAN:
**Q But you're not -- are you on speaking terms with Mr. Poulter anymore?**
A No.
**Q But can you access the Zimmerman policy directly from American General?**
A I don't know if American General will talk to me. Because originally --
MR. LIEBERMAN: Just yes or no.
THE WITNESS: I have to explain it.
The answer is no.
MR. LIEBERMAN: He will ask you to explain it afterwards.
THE WITNESS: Okay. Fine.
BY MR. NOLAN:
**Q Right. So there's no way you can contact American General or go on their website, put the policy number in, and find out the status --**
A That is correct.

**Q -- of it?**
A They would not allow me to access it. Because --
MR. LIEBERMAN: That's it.
THE WITNESS: Yeah. Fine.
BY MR. NOLAN:
**Q It's all right. Go ahead.**
A Because the ownership was transferred from Leslie Klein as trustee of the Rozy Zimmerman Trust to the LLC.
**Q So these insurance companies will not divulge any information on the policies, except to the trustee or the --**
A Not the trustee.
**Q Or the stated owner.**
A That's correct.
**Q I mean --**
A And the stated owner is the LLC and the manager of the LLC is Poulter.
**Q Right. But if you're a trustee, can you also get -- I mean, even though you're not the owner, but if you're the trustee of the Rozy Pearl Zimmerman life insurance policy, can you also get access to the information?**
A No. Because I transferred that right when I

sold or when I gave it to Rachnitz. I didn't sell it but when I gave it to Rachnitz on this deal, I basically was removed by American General as a trustee.

**Q Right. But when you were the trustee, would you have access?**

A Yes. When I was the trustee before 2011, I could call American General any time, and say I want a copy of the Rozy Zimmerman policy, I would pay $25, and they would have it to me in a week or two weeks.

**Q Okay. What about if a beneficiary wanted a copy of a life insurance policy that you were the trustee? Could the beneficiary get the policy or would they have to go to the trustee?**

A Beneficiary was the person paying the premium. So, like, in this Rozy Zimmerman policy, the beneficiary would be the LLC.

**Q Right. I'm not talking about LCG. I'm just stating when you're a trustee of a life insurance policy with death benefits --**

A Right.

**Q -- can -- you have access to the policy. The owner has access to the policy.**

**What about the beneficiary? If I'm one of ten kids who are a beneficiary in the policy, would they give me the policy?**

A Yes. Maybe. I mean, I don't know. It depends what your ownership is. But all of these policies that the LLC owns, the children or the beneficiaries own 10 percent. So if they would contact American General, I don't know what they would do.

**Q Okay. Do the law firm perform any services for any of the entities that are identified under Category Number 4 where there was a death policy in effect?**

A No. The law firm wasn't involved here at all, unless --

MR. LIEBERMAN: Just answer his question.

THE WITNESS: The answer is no.

Fine. Trying to speed it up.

(Reporter asks for clarification.)

MR. LIEBERMAN: Mr. Klein said he's trying to be helpful to speed it up. And I said it's not going to speed it up. We have to let counsel ask his question.

THE WITNESS: Fine.

BY MR. NOLAN:

**Q Category Number 5, did you search for any of the documents with respect to Category Number 5?**

A Yes, I did.

**Q And you produced no documents?**

A There's no documents.

**Q Did the law firm perform any services for any**

**of the entities listed under Category Number 5?**

A No.

**Q Did you have any association with any of the entities for Category Number 5?**

A Did I -- well, I pray in the synagogue Beth Chaim. I learned in this Kollel Yechiel Yehuda. This is a place of higher education. My kids learned in Ner Israel Rabbinical College. My kids went to Yeshiva Gedolah. It's a high school here in L.A. It used to be the only high school. So all my kids and grandchildren went there.

So, basically, I have no relationship with them except either I pray there, I learned there, or my kids and grandchildren learned there.

**Q And at some time there were -- did you personally make donations to one or more of these entities?**

A At some time, yes.

**Q And if donations were made, that would be from you personally as opposed to on behalf of the law firm?**

A Yeah, the law firm never made any donations.

**Q I assume you had no documents responsive to Category Number 6? You searched and looked and there was no documents?**

A I have no -- that is correct.

**Q Category Number 7 sought credit cards issued to the law firm.**
**Did you search for any of those records?**
A Law firm has no credit cards.
**Q So the law firm never had a credit card where it was the card member or the cardholder.**
A Well, that's very -- I mean, the law firm has been in existence since the '70s. So the law firm might have had a credit card '70s, '80s, '90s. I don't know. But I was always against the law firm having credit cards.
MR. LIEBERMAN: That's not the question. The question is did the law firm have credit cards?
BY MR. NOLAN:
**Q Right. And the law firm is Les Klein & Associates, Inc.**
A I don't know.
**Q You have no recollection, as you sit here today, of ever having a credit card with Les Klein & Associates?**
A I just don't know. I mean, I --
MR. LIEBERMAN: That's fine.
THE WITNESS: Don't know.
BY MR. NOLAN:
**Q Is it a fair statement that you alone would**

**control whether or not the law firm would issue a credit card?**

A Yes. That is correct. Under Les Klein & Associates, yes.

**Q Category Number 10, you are going to get me the tax records; correct?**

A Yes.

**Q Okay. I'd like to show you Exhibit 7.**

(Exhibit 7 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q So when you're ready, I'm going to identify for the record Exhibit 7 is a Bank of America statement. It says January 1, 2016, to January 31, 2016. And it says California IOLTA trust account Les Klein & Associates, Inc., and the last four digits are 8122.**

**Mr. Klein, should I add that onto the bank accounts that the law firm maintained in addition to the general account, the trust account, the cost account, and the payroll account?**

A Yes. This is the IOLTA account. And it was open -- yes. I mean, I don't know when it started, but it definitely was open.

MR. LIEBERMAN: Just listen to the question.

THE WITNESS: Yeah. No.

MR. LIEBERMAN: And just answer if it's one of your accounts.
THE WITNESS: Yes.
BY MR. NOLAN:
**Q And that account is 8122?**
A Yes.
**Q And what was the purpose of the IOLTA account?**
A The money in the IOLTA account, basically, is a trust account.
**Q So it's another account that you would use the monies for the clients or it was the clients' monies?**
A That is correct.
**Q I'm going to show you Exhibit 8.**
(Exhibit 8 was marked for identification and attached hereto.)
BY MR. NOLAN:
**Q It's from 2016. And it's dated October 1, 2016, to October 31, 2016. And it's 12 pages. There we go.**
**Okay. So this looks -- for the record, this document is on Bank of America. Does it look familiar?**
A Goes back to '16. I don't remember it. But the format is familiar. Yes.
**Q And this document is marked trust account. And if you would move over to the second page or the**

**third -- page 3 of 12 on Exhibit 8.**

A Okay.

**Q So there's a number of transactions on October 13th. It says agent assisted transfer from checking 9401. 9401 account, is that the -- that's the general operating account? No. What's the 9401 account?**

A 9401?

**Q Yeah. It says checking 9401.**

A My personal account.

**Q Okay. So this document shows a transfer from the law firm trust account into your personal account.**

A That is correct.

**Q Is that correct?**

A Yes.

**Q And it says agent assisted.**

**Do you know what that means?**

A It was done by an agent of Bank of America.

**Q So you would physically walk into the bank and they would -- the teller would do it?**

A Yes.

**Q Is that kind of how you did things? You walked -- physically walked in or would you actually call as well and do things over the phone?**

A Probably would call in as well too or go in,

yes.
**Q Do you have any recollection why this $100,000 was transferred back in October 2016?**
A No. I have no recollection why it was transferred.
**Q So this is showing monies going from the trust account into your personal account.**
A No. This is not a trust account. This is a general account.
**Q It says trust account on it; is that wrong, Exhibit 8?**
A That is wrong, yes. Because you showed me before. I don't remember what the exhibit was. The IOLTA account. That's the trust account. This is not a trust account.
**Q Okay. So whenever -- from now on after October 1, 2016, going forward, whenever I see trust account, that's really just an operating account for the law firm of Les Klein & Associates?**
A That is correct.
**Q And that means that the law firm of Les Klein & Associates owns all those monies?**
A That's correct.
**Q And the monies that are in the trust account after October 1, 2016, those are all monies that the law**

**firm has title to?**
A You're talking about 9404?
**Q No. I'm talking about 94 -- yeah, 9404.**
A Yes.
**Q So if you look further down, it says October 26, 2016. There's 22,230. Looks like it's a payout on a life insurance policy investment? Do you see that?**
A Not a payout. It's -- something, a wire, that came in to make a premium payment on the insurance policy.
**Q It's a deposit into the trust account; correct?**
A Well, it's a premium payment and it's deposited -- they wire it into this 9404 account which is -- they should wire it to the trust account. But they didn't. And so when I paid the premium, this is on the Feldman policy, I paid that out, 22,230.
**Q So the Feldman policy paid money into the law firm's general operating account which is 9404.**
A That is correct.
**Q For the earlier payments that are the $100,000 that went into your personal account, what document would the law firm maintain that would evidence why monies from the 9404 account were being distributed to you directly?**

MR. LIEBERMAN: Counsel, I think there is a -- this is a deposit.
MR. NOLAN: Oh, I'm sorry. I misspoke.
MR. LIEBERMAN: This is from Mr. Klein to the law firm.
MR. NOLAN: Okay. I apologize.
**Q It's a transfer from 9404.**
MR. LIEBERMAN: Right.
BY MR. NOLAN:
**Q So you're depositing money directly into the --**
A 9404 account.
**Q -- 9404 account.**
**And you don't recall why you were doing that?**
A No. I mean, I would -- no. I'm not going to guess. I don't know.
MR. LIEBERMAN: Don't guess.
BY MR. NOLAN:
**Q Do you have a document that you would keep at the law firm that would be the custom and practice that would explain why monies were being distributed -- I mean was being put directly from you into a trust fund account?**
A Well, I wouldn't put in money, unless the money was necessary to pay premiums. That's what I was going to say before.

**Q So you --**

A I see here that somebody wired in funds to the Feldman policy. So chances are if they wired in money, I must have wired in money to pay the Feldman premiums in October of 2-16.

**Q So it's your belief that Exhibit A would show us the 100,000 came into the law firm operating account from you, because you were going to pay premiums on a policy of insurance?**

A That is correct.

**Q And, I mean, by "you," you personally or you the law firm?**

A Well, me personally was going to pay the premium. But the law firm was going to send out the check to whoever the insurance company was from this 9404 account.

**Q Right. But the law firm wasn't investing in any policies at this time; right?**

A No. It wasn't the law firm who was investing the money. It was whoever sent in this $22,000 premium. And I was sending in -- it could be different policies. I have no idea.

**Q Right.**

A I mean, this goes back seven years.

**Q I understand. But I'm just trying to**

**understand.**

**I think you told me that the law firm wasn't involved in investing in any insurance policies after 2011; correct?**

A That is correct.

**Q Right.**

A The law firm did not invest in any policies after 2011. That is correct.

**Q But after this time, after 2011, you were still investing in insurance policy premiums; correct?**

A Well, there were a few policies, which I was trying to sell on my own.

**Q It's either a yes -- it's just a yes or no.**

A Fine. The answer is yes. The answer is yes.

MR. LIEBERMAN: Thank you, Counsel.

BY MR. NOLAN:

**Q There's another reference to counter credit.**

**Do you see that, Mr. Klein? $341,063.39?**

MR. LIEBERMAN: Where are you, Counsel?

MR. NOLAN: I'm on Exhibit 8.

MR. LIEBERMAN: Page?

MR. NOLAN: Page 3.

MR. LIEBERMAN: Oh.

MR. TROSZAK: Last deposit.

MR. NOLAN: It's a deposit.

THE WITNESS: This is a deposit of $341,000.
BY MR. NOLAN:
**Q Right. Is that a -- does that counter credit represent the fact that you would walk into the -- does that memorialize that you actually walked into the branch and deposited that amount?**
A No. I don't know what counter credit means. I mean, I haven't -- this is the first time I've seen this. This goes back --
MR. LIEBERMAN: Stop. Let him ask a question.
THE WITNESS: Okay. Fine.
MR. LIEBERMAN: And then you can answer.
BY MR. NOLAN:
**Q You can answer.**
A I don't know.
**Q Because we're going to see a lot of counter credits. I mean, there's just one month here and there's three.**
**Do you see that?**
A One.
MR. LIEBERMAN: One, two, three.
THE WITNESS: Okay.
BY MR. NOLAN:
**Q Yeah. Was that your custom and practice to walk into the bank, if you were going to deposit, say,**

**over $300,000 as opposed to, you know, mailing it in? Is that -- or you don't have a custom and practice?**

A I don't have a custom and practice. And this goes back seven years ago.

**Q Okay. The next page has withdrawals. Let's go over and just look at the withdrawals now.**

MR. LIEBERMAN: They start -- it starts here.

THE WITNESS: Okay.

MR. LIEBERMAN: And it goes to here.

THE WITNESS: Fine.

BY MR. NOLAN:

**Q Now, the 6978 is the general operating account?**

A Right.

**Q And so what's this -- what are the reference to overdraft protection?**

A That if there were checks written on 6978 and there wasn't enough money there, then this account 9404 would be used by the bank to make sure that no check bounced.

**Q So the bank would -- almost like mechanically would just pull money out of the trust account to cover the operating account?**

A Yes.

MR. LIEBERMAN: Counsel, you've called it the trust account. I understand why you call it the trust

account because it says trust account on the statement. But Mr. Klein has testified that it was not in fact a trust account at this time.

MR. NOLAN: The 9404 account.

MR. LIEBERMAN: The 9404 --

THE WITNESS: Account.

MR. LIEBERMAN: Correct.

BY MR. NOLAN:

**Q So what Exhibit 8 shows is that monies were being pulled out of the 9404 account to cover shortages that are in the law firm general operating account; correct?**

A Yes.

**Q Was that fairly -- I mean, was that set up from the inception of the law firm to have overdraft protection between these two accounts?**

A Yes.

**Q Is there a reason you did that?**

A Because sometimes there wasn't -- there was a big premium due. Like I see here, there's a premium due of $34,000, and there wasn't enough money in this account to pay that. And if you don't pay the premiums, the policy lapses. So we had to make sure that no check bounced and no policy lapsed.

**Q Right. But I would expect to see overdraft**

**maybe once a month or once a year. I mean, your -- I mean, it's at least over 15 times.**

**I mean, is that just how the law firm operated? That they just used the overdraft protection safety mechanism to basically balance the two accounts?**

A Well, the overdraft protection is a very little $20, $46. Very small amounts. $50. There's only two big items here. All the rest are nothing.

**Q So --**

A And the crucial thing here is, is when the premium is due, you've got to pay it on that day, or you're going to lose the policy.

**Q Well, does that mean that the operating account had, you know, less than 40 or $100 that it would pull off of the 9404 account to pull 20 or $40?**

A Yes. Basically, what that meant there was a check written out for let's say $100 and there's only $50 in the account so they pulled out $46. This was done by the bank. It wasn't done by us.

**Q Right. But you, as the representative of the -- director of the law firm, you desired to have this mechanism. I mean, it assured you that you didn't bounce checks; right?**

A Right. I mean, I wasn't that concerned about $100 checks but I was concerned about the premium

checks.
**Q Well, going into the 9404 account, did you have client trust fund accounts going into the 9404 account?**
A No.
**Q So there were never any client trust funds going into the 9404 account?**
A As far as I know, as of January of 2016, they went to the other account, the IOLTA account. I think ending 133.
MR. LIEBERMAN: "They" meaning the trust funds? You said they went to the IOLTA account.
THE WITNESS: Yeah, the trust funds. Yes.
MR. LIEBERMAN: Okay.
BY MR. NOLAN:
**Q And they would need be kept separately from your general operating account funds or the law firm's, quote/unquote, trust account that you believe is the operating account; right?**
A That is correct.
**Q Now, out of the 9404 account, would you pay clients of the law firm? Meaning would you pay the Vagos or Menlos or other entities that you were the trustee managing their money? Would you pay that out of the trust account or would you pay that out of the IOLTA account?**

A I'm not sure. I don't know if I made payments to the Menlos or the Vagos at all.

**Q Well, did you receive money from the Vagos or the Menlos to hold in trust for them?**

A I never received a penny from the Vagos.

**Q Okay. What about the Menlos?**

A Well, the Menlos -- basically, I had a Menlo account, the Menlo children trust. And I wrote checks from that account to them. I didn't write checks from the law firm to the Menlos.

**Q And other than the Menlos, did you have any other bank accounts that you set up in the name of the client or a beneficiary that you were managing the money for?**

A I think only the Menlos had their own account. They were the only ones.

**Q So for all your other clients that you managed the money, what account was it deposited in to?**

A I didn't manage anybody's money.

**Q You didn't manage anybody else's estate planning?**

A No. I mean, estate planning I did. But I didn't manage anybody's money.

**Q So other than the Menlos or the Vagos, you didn't receive any other money of clients that you took**

**in trust?**
A Well, I don't know about that. But I didn't manage anybody else's money. I could have taken money in for a trust on sale of real property on a probate matter. But I don't remember taking money in for clients to --
(Reporter asks for clarification.)
THE WITNESS: I never took in client's money to manage their money, ever.
BY MR. NOLAN:
**Q So if you liquidated real estate on behalf of a client, either in probate or outside probate, which account at the law firm would it go into?**
A I didn't liquidate real estate for clients.
**Q Oh, I thought you just said you may have had probate you may have liquidated. Piece of real property as a part of probate.**
A No. I said I could take a deposit to open escrow for the property. But the actual escrow would close, they would send the money to the client. I wouldn't get the money.
**Q Okay. And what account would the escrow money come out of or go to at the law firm?**
A What do you mean? The escrow money would go to escrow.

**Q I thought you just said there were times when you would have to sell real property and you may have to either take money out or put money in for the liquidation of real property.**

**Did I misunderstand you?**

A Yes.

**Q Okay.**

MR. LIEBERMAN: Now I'm not clear. What did your "yes" pertain to?

THE WITNESS: Basically, I did not send money to escrow for clients, ever. The client send the money into escrow.

The only thing that I would get is the deposit. Let's say they're selling a property for a million dollars. The buyer would put up a deposit of $25,000. That money, sometimes, I would put into my trust account. But --

BY MR. NOLAN:

**Q Which one --**

A The IOLTA account.

**Q The IOLTA account.**

**You would not put that into the 9404 account.**

A That is correct.

**Q Okay. What about a contingency fee? Were you ever given contingency fees?**

A Yes.
**Q What account would that go into?**
A Well, contingency fee would go into the IOLTA account. And I would break out my portion of it and put into 9404 account.
**Q So when you earned money, when the law firm earned money, you would take it out of the IOLTA account, and then you would transfer it to the 9404 account where you could do with it as you please.**
A That is correct.
**Q Right?**
**Because once it goes into the 9404 account, it's the law firm's money.**
A That is correct.
MR. LIEBERMAN: Okay. Now I understand.
BY MR. NOLAN:
**Q If the client gave you client trust funds, I think you testified that would go into the IOLTA account; right?**
A Yes.
**Q Did you have any reporting requirements on behalf of the law firm for handling client trust accounts?**
A I think so, yes.
**Q And what were they?**

A They basically we filed with the State Bar every year. I mean, the laws kept on changing. But if we're holding the funds separate, if you have an IOLTA account and all that.

**Q What about trust accounts though? What about trusts accounts where trust funds are inserted? Would you have to report to the Bar about trust accounts?**

A I'm not really sure. I don't remember what had to be reported.

**Q Let me show you Exhibit 9.**

(Exhibit 9 was marked for identification and attached hereto.)

MR. LIEBERMAN: I have an extra one, Counsel. I'll donate it.

BY MR. NOLAN:

**Q Who -- when you get a chance, Exhibit 9 for the record is a check --**

A Yes.

**Q -- front and back.**

**Who were the Wendrigers?**

A It's two brothers. There's Ali Wendriger and Yakov Wendriger. And their parents died. And they had a number of apartment houses here in L.A. And they hired Holley, H-o-l-l-e-y, to manage their properties who sent a check to me to basically distribute the

money. Because the boys lived in Israel. Ali and Yakov live in Israel.

So they sent the money to me, I deposited the money, and I sent them their money.

**Q Okay. So this is a check -- so are -- the Wendrigers then were your clients?**

A Yes.

**Q The law firm's clients or you personally --**

A The law firm's client.

**Q -- as the trustee? Law firm's clients.**

A Well, actually -- I mean, this is dated 2016. So I was really representing both Wendrigers and the law firm really wasn't involved here. This was basically -- I got the check and would send them -- it was a $20,000 check. I would send them both $10,000.

**Q Okay. So these are client trust funds.**

A I mean, basically, we got a check every month. Yes.

**Q Okay. These funds would have been deposited into the IOLTA accounts?**

A I will take a look. They were deposited into the general account, the 9404 account.

**Q And how do you know that?**

A Well, it says here for deposit only, 09404.

**Q And why were they deposited into the operating**

**account for the law firm?**
A Because the checks were going to be distributed to the two brothers immediately. We weren't going to hold these funds.
**Q Right. But once you put them into the law firm operating account, title passes to the law firm; correct?**
A I don't think so. No. It's not correct.
This is something -- just a passthrough. In other words, they have their real estate. They're getting rental income. And the law firm just passes the money through.
**Q You mean the law firm -- the money goes into your law firm where the law firm takes control of it and then you issue the check out of the law firm --**
A Yes.
**Q -- with a law firm bank account to the clients; correct?**
A That is correct.
**Q Right?**
A It's a passthrough. I mean --
**Q I understand that.**
A -- the money is not held.
**Q If there was a creditor to the law firm and they wanted to levy execution on the bank accounts of**

**the law firm, they would have levied against the law firm bank account; right?**

MR. LIEBERMAN: Objection. Calls for a legal conclusion by a witness who, although is a lawyer, is a probate lawyer and is not a commercial lawyer.

So if you can answer the question, you can answer it. But if you can't, that's okay too.

THE WITNESS: The law firm was never sued, ever until...

BY MR. NOLAN:

**Q You understand the difference between a bank account in my name and a bank account in your name; right? Yes?**

MR. LIEBERMAN: Just answer yes or no if you --

THE WITNESS: I understand the difference between your name and my name, yes.

BY MR. NOLAN:

**Q Okay. So is this Exhibit 9 just kind of a one-off? Was it just -- I mean, was that your custom and practice, to take client funds and put it into your operating account or was that just, like, maybe an isolated incident?**

A This is an isolated incident. This is the only client that had this problem that they were in Israel and this was an isolated incident.

**Q Okay. So would it be harder to write a check out of the IOLTA account and send it to Israel than to send it out of the operating account?**

A The problem with IOLTA --

MR. LIEBERMAN: Just answer --

THE WITNESS: Yes. The answer is yes.

BY MR. NOLAN:

**Q What's the problem with the IOLTA account?**

A The problem with the IOLTA account was that the IOLTA account didn't have a lot of money in it. They would hold for ten days -- the bank, or 15 days. By putting it into the 9404 account, you could send them a check in a day or two.

**Q Okay. So by design, then, you wanted for convenience to put those client trust funds into the operating account because you could access that money quicker.**

A Not me. The clients. The clients wanted the money right away.

**Q Right. But me is me. Me. Me is you.**

A Right.

**Q And you're the one who's writing the checks and you're the one who's running these accounts; right?**

A Right. But I'm trying to help the clients.

MR. LIEBERMAN: Just --

THE WITNESS: Yes.
MR. LIEBERMAN: -- wait for a question.
THE WITNESS: No problem.
BY MR. NOLAN:
**Q Now, when you would take a client's trust account funds, just because that's what this check says, it's off of a general client trust account, would you make any internal recordation within the law firm's books and records that would track the monies and that the monies were being distributed with respect to that one client?**
A Yes.
**Q Is it a correct statement that you had more than one client's monies going in and out of the 9404 account?**
A Well, depends what time frame you're talking about.
**Q Well, you were depositing a lot of client funds into the 9404 account; correct?**
A In what year?
**Q In 2016.**
A I don't know. I don't remember.
**Q Well, you can look at Exhibit 8 and you can see the Feldman policy; right?**
A Yes.

**Q And you can see -- who's Rivka Parker? October 19, 2016, her Social Security check is deposited into the law firm 9404 account.**

A Her husband passed away and she got a Social Security check. And we got a check and we gave it to her.

**Q Right. So that's her separate money; correct?**

A I'm not sure if some of it was hers and some of it was her children. I'm not really sure. I mean, this goes back seven years. Maybe that 1,500 includes a thousand bucks for her and 500 bucks for her children. I don't know.

**Q Well, she -- was the law firm rendering any services on behalf of Ms. Parker?**

A No.

**Q Were you overseeing her estate or her probate or anything of that nature?**

A Yes. I was the one who prepared the trust for her deceased husband. And there was no probate court. And there was a wife and there were three children. And before the husband died, he didn't want the wife to take --

MR. LIEBERMAN: Do you know what the question is?

THE WITNESS: Fine. The answer is I wasn't

doing anything. I was just getting the money from Social Security and distributing it. That's it.
BY MR. NOLAN:
**Q All right. And those are client trust funds; right?**
A Yes.
**Q Right. They're being issued to you, the law firm, not for services but on account of there being given to the law firm to hold in trust to provide it to Ms. Parker; correct?**
A That is correct.
**Q So this Exhibit 8 then shows Ms. Parker, shows the Feldman policy, and it shows the Wendrigers all putting money into the law firm general operating account; is that accurate?**
A I don't see Wendriger here.
**Q Well, the Wendriger was the deposit, Exhibit 9.**
A I mean, I don't see the Wendriger on the list here.
**Q Well, it's -- you said Exhibit 9 was for the 9404 account. So maybe it was the 26th. 27th is the check. Maybe it cleared after.**
**But here's three clients that have monies that are being given for client trust funds and they're being deposited into what you say is the law firm operating**

**account; right?**
A Yes.
**Q And my question was: Did the law firm maintain any type of a ledger or any accounting to track client funds?**
A Yes.
**Q And what document is that?**
A There was a ledger that showed that we got $150 and that went out.
**Q A general ledger?**
A Yes.
MR. LIEBERMAN: Well, you said ledger and you've used the term general ledger earlier in this examination. And it hasn't been ascertained that the ledger that he's referring to is the general ledger.
MR. NOLAN: Well, that's where I'm going.
MR. LIEBERMAN: Okay.
BY MR. NOLAN:
**Q What document at the law firm are you referring to when you say ledger?**
A 2016 we had a ledger, a sheet of paper that showed that the money came in for Parker on what date, and the money went out to Parker on what date.
**Q So you maintained a ledger for each client.**
A That is correct.

**Q Is there any reason why you haven't produced those documents here today?**

A Because we don't have those documents from '16 anymore.

**Q Do you have those documents from 2020?**

A We stopped doing this in 2020. We basically stopped doing this for Parker in '16. There was no reason for us to get the money for her. We arranged that she got the money straight.

**Q Right. But these general ledgers allow you to -- since you're taking client funds and you're depositing them into a single account, they're all commingled; right?**

A Well, we know exactly whose money it is in this one account. It's not a problem.

**Q Right. Just answer my immediate question.**

A Right. Okay.

**Q These monies are going into one bank account, the 9404, and they're all commingled in this one account; right?**

A Right.

**Q And you're putting your personal money into the 9404 account as well; right?**

A Well, I'm putting money in to pay premiums. That's correct.

**Q Well, just answer my question. You're putting money into the 9404 account; right?**
A Right.
**Q So into the 9404 account goes your personal money, your client's money, and do fees that the law firm earns, do those also get deposited into the 9404 account?**
A No.
**Q Where do those go?**
A Those go into the general account.
**Q The six --**
A 78.
**Q 6978 account. So whenever the law firm would earn fees, it would go into the 6978 account.**
A That's correct.
**Q It would never go into the 9404 account.**
A That's correct.
**Q And was that the case from the 2016, 2017 as well as in 2020?**
A Well, I would have to look at the checks of 2020. But, I mean, '16 and '17 looks that way. Yes. I mean, '16 looks that way. I mean, you only showed me '16. You didn't show me '17.
**Q So for every client that you had that you received client trust funds for, the law firm would**

**maintain a ledger.**
A That is correct.
**Q And even if the law firm didn't perform any services and you were designated as the trustee, you would still maintain a ledger; is that right?**
A Well, if the law firm didn't do services and all I would do is take in the money, like, on the $23,000 premium, there would be no ledger. Because the money would go right out to the insurance company.
**Q Well, the money would come in. It would have to clear the 9404 account; right?**
A Well, it basically is a wire. So if it's a wire, I could mail out the same day, the check, to the insurance company. There was no reason to have a ledger. There was $24,000, 24,070 that came in on a wire. That wire was good. So you could send that check that date to the insurance company. There was no reason to do a ledger.
**Q So --**
A On a Wendriger --
MR. LIEBERMAN: Let him ask his question.
THE WITNESS: Fine.
BY MR. NOLAN:
**Q So if I understand you, when you have wires come into the 9404 account --**

A Right.

**Q -- on behalf of a particular client --**

A Right.

**Q -- you would not reflect that in the client ledger for the client funds. Because, under your rationale, you would be sending a check the same day or the next day and it wasn't necessary to record that.**

A That is correct. And on the Wendriger, I was going to explain also, since we knew that Holley Mann, this is a good check, we would send them out the money to Israel the same day also. So they would get the money in Israel. Because they needed the money.

**Q Well, what would happen if the client wanted an accounting?**

A We gave the client an accounting.

**Q Yeah. But under this practice, the client wouldn't see the wire come in and the wire go out on the same day.**

A What do you mean? We gave the client an accounting that the wire came in and the check went out. They would see the accounting.

**Q Oh, so you would record then. The law firm would record -- with client trust funds, the law firm would record in a ledger when the monies were received and the corresponding check that went out.**

A That's right.
**Q Right? Because you have to account for all the money.**
A Right.
**Q Not just the money that you distribute to the clients.**
A Right.
**Q All right. So where is that ledger for your clients? Where does the law firm maintain the ledgers for their clients?**
A Well, I mean, we basically had ledgers. But today we don't do ledgers anymore. Because we're not making premium payments. We only had ledgers when we were making premium payments. Once we stopped making premium payments, we didn't need the ledgers.
**Q Well, if you sold the piece of property or liquidated something for the benefit of a client, you're saying you wouldn't record that in the ledger for the client trust fund account?**
A We didn't sell any properties for clients.
**Q You or the law firm.**
A Me or the law firm did not sell anything for clients. Starting in 2019, we did not sell any properties for clients at all. We didn't take deposits. We didn't do anything. We just send them to an escrow

and the escrow handled everything.

**Q Were there client agreements between yourself -- strike that.**

**Were there client agreements or, like, agreements for the rendering of services between the law firm and any of those entities under Category 1 that we were talking about, such as Bay Area Development Company, Big Boyz?**

MR. LIEBERMAN: Let me grab.

So the question is whether or not there were any written fee agreements or written retainer agreements for any of the entities listed in Category 1? Is that the question, Counsel?

MR. NOLAN: Yeah. For any of the entities listed in Category 1.

THE WITNESS: No.

MR. LIEBERMAN: It goes on on the second page. So take a look at the second page.

THE WITNESS: No. The law firm didn't do any legal work for any of these entities.

MR. LIEBERMAN: No, no, the question is whether or not there's a written retainer --

THE WITNESS: No. There isn't.

MR. LIEBERMAN: Okay.

MR. NOLAN: Okay. Want to take a break?

MR. LIEBERMAN: Yeah.
MR. NOLAN: Okay.
(Recess from 2:54 p.m. to 3:03 p.m.)
BY MR. NOLAN:
**Q Mr. Klein, you're back on the record.**
A Okay.
**Q You understand you're under oath still?**
A Yes.
**Q We took a break. So you feel better?**
A Yes.
**Q Excellent.**
**Bay Area Development Company, your prior testimony was the law firm did no work for them.**
A That is correct.
**Q And they stopped doing business when?**
A They stopped doing business 2022.
**Q So up until 2022, they were doing business. And did you arrange for Bay Area Development to be incorporated?**
A No. It was done by another attorney.
**Q You were the shareholder and member?**
A No. When Bay Area was incorporated, there were three individuals who were the shareholders and members. One was a Mr. Angel. One was Mr. Ganahl, G-a-n-a-h-l. And I don't remember the name of the third one.

**Q Okay. And what was the purpose of Bay Area Development?**
A To own real estate.
**Q And did it own the real estate where the law firm was operating?**
A Yes. It owned the building at 14245 Ventura. Yes.
**Q For what period of time?**
A Long period of time. For sure more than 20 years.
**Q And was that -- did they sell that real property?**
A No. It was foreclosed.
**Q When was it foreclosed on?**
A The foreclosure took place, I think, 2023.
**Q Okay. And was there a certain point in time you became the sole shareholder or member of Bay Area Development?**
A Yes. Me and Ted Mackey bought out the other three shareholders while it was Mackey & Klein. And Mackey owned it with -- me and Mackey were the owners for quite a while.
**Q Okay. And did --**
A Then Mackey moved to Mississippi and I bought him out.

**Q What year was that approximately?**
A Before 2000.
**Q So after two --**
A I don't know the exact -- I don't know the exact date, but he moved to Mississippi some time.
**Q So after 2000, you were the sole member or shareholder of Bay Area Development Company through to its conclusion in 2023.**
A That is correct.
**Q Did the Bay Area Development own any other properties than the Ventura Boulevard property?**
A Yes.
**Q What other properties?**
A It owned the property on 417 Highland.
**Q Okay. Any other properties?**
A 507 Mansfield.
**Q Anywhere else?**
A No. That's it.
**Q So Bay Area Development had title to the Ventura Boulevard property where the law firm operated.**
A Right.
**Q The Highland property, 417 Highland and 507 Mansfield.**
A I'm not sure if it's 417 or 419 Highland.
**Q 419 Highland.**

A 419 Highland. Okay.
**Q Okay. Got it.**
**And did you run Bay Area Development out of the law firm?**
A No. The law firm had nothing to do with Bay Area Development Company. I mean --
MR. LIEBERMAN: So the answer is no?
THE WITNESS: The answer is no.
MR. NOLAN: I'm going to show you Exhibit 10.
(Exhibit 10 was marked for identification and attached hereto.)
MR. LIEBERMAN: This is 10?
MR. NOLAN: Yeah.
BY MR. NOLAN:
**Q So for the record, Exhibit 10 has a Bates stamp in the right corner. It says 382, 383, all the way to 385. Looks like it's a Chase rewards summary account statement.**
**Do you see that?**
A Which page you want me to look, 382?
**Q The first page first.**
A Okay.
**Q So that says Leslie Klein, Bay Area Development Company, 14245 Ventura Boulevard.**
**Do you see that?**

A Yes.
**Q And that's you; right, sir?**
A Right.
**Q And that's where mail was delivered or this account was set up reflecting the law firm address?**
A Well, 14245 Ventura was the only address used for the area. Yes.
**Q Well...**
A Bay Area owned the building.
**Q I get that. But there's not any other location, other than the law firm, that Bay Area Development Company was operating. Meaning they weren't in the basement of 14245 and the law firm was on the third floor.**
A No. They weren't in the basement, no.
**Q Okay. So it's all coming to the same place, the law firm; right?**
A Right. Well, the mail came to Bay Area, not to the law firm. In other words, when the mailman delivered the mail, there was there a pile for the law firm. There was a pile for Bay Area.
**Q Okay. And you would get the mail for Bay Area Development?**
A Yes.
**Q Okay. Did you take a credit card out in the**

**name of Bay Area Development from Chase?**
A I don't remember but I don't know.
**Q Well, do you read Exhibit 10 any differently than that. That there's a credit card in existence in the name of Bay Area Development Company in your name?**
A Look that's way.
**Q It's certainly not for the law firm. Is that --**
A No.
**Q -- a fair statement?**
A It's not for the law firm. No, it's Leslie Klein Bay Area Company.
**Q All right.**
A I don't remember.
**Q Okay. Would you have controlled the use of this credit card?**
A I don't remember this credit card. I don't know.
**Q If you would go to page 384.**
A Okay.
**Q And there's some payments that appear to be charges for Les Klein & Associates.**
**Do you see those?**
A Yes.
**Q It's about $16,000 worth of charges to the law**

**firm.**

**Do you recall that?**

A To the law firm?

**Q Correct.**

A No. I don't think so.

**Q Well, maybe you look at the account activity for 384 and just explain to me what you think that --**

MR. LIEBERMAN: Counsel, can you give him a moment just to digest the document.

MR. NOLAN: Yeah, yeah. Absolutely.

THE WITNESS: This is the --

MR. LIEBERMAN: Just look at it --

THE WITNESS: Okay.

MR. LIEBERMAN: -- and see if you recognize it and see if any of it jogs your memory about anything.

THE WITNESS: I don't remember any of this.

BY MR. NOLAN:

**Q Do you recall, in January of 2019, if you were visiting Israel?**

A Yes, I was.

**Q Okay. Have you utilized credit cards to make payments to the law firm in the past?**

A No. I don't think so.

**Q Meaning irrespective of Exhibit 10, have you used any other credit cards to make payments to Les**

**Klein & Associates?**
A No. The answer is, no.
**Q So you have no explanation for the charges that appear on Exhibit 10.**
A Maybe Bay Area was --
MR. LIEBERMAN: You don't need to speculate.
THE WITNESS: I don't know.
BY MR. NOLAN:
**Q Okay.**
A I don't know.
**Q All right. I'm going to show you next is Exhibit 11.**
**As the managing partner, did the law firm accept credit cards for payments of its fees?**
A Yes.
**Q So the law firm was set up to be able to accept credit card payments.**
A That is correct.
(Exhibit 11 was marked for identification and attached hereto.)
MR. NOLAN: This is Exhibit 11.
BY MR. NOLAN:
**Q Does the law firm have a merchant services account set up to receive credit payments facilitated by credit cards?**

A What is the question again?
**Q Yeah. Does the law firm have a merchant services account for facilitating payments for credit cards companies?**
A Yes.
**Q Okay. If you could look at Exhibit 11. I'm sorry. I wrote on that.**
**Sorry. Before I ask you about Exhibit 11, what is the company that the law firm uses for merchant services?**
A Bank of America. I don't know. It's set up by Bank of America.
**Q You think it's Bank of America because that's where the law firm had its accounts?**
A Yes.
**Q And I think you've already testified you don't believe the law firm had any other bank accounts other than bank account?**
A That is correct.
**Q Exhibit 11 is six pages. Bay Area Development Company, does that look familiar in the upper left-hand corner?**
A Yes.
**Q Again, that's the law firm address Suite 301?**
A Yes.

**Q And that's the correct address Sherman Oaks? Yes?**

A Yes.

**Q Okay. Do you recall establishing a bank account for Bay Area Development Company at Bank of America?**

A Yes. Bay Area always had a bank account. Yes.

**Q And you were the sole signatory on that bank account?**

A Yes.

**Q The law firm was not a signatory on that bank account?**

A That is correct.

**Q If you go to page 3.**

MR. LIEBERMAN: This is Exhibit 11, Counsel?

MR. NOLAN: Yes, sir.

BY MR. NOLAN:

**Q At the top of the page, it says agent assisted transfer from checking 9404. And there's two payments that cumulatively are $9,000.**

**Do you see that?**

A Oh, deposits, yes.

**Q So if I read that correctly, the law firm, out of the 9404 account, is depositing $9,000 into Bay Area Development Company; correct?**

A Yes.
**Q And the law firm didn't provide any services for Bay Area Development Company; correct?**
A I don't know that. January of '23, I think the law firm did provide services for Bay Area Development Company.
**Q Well, that's not what you told me earlier. So are you changing your testimony?**
A Well, you didn't ask me if January -- last time you were asking about a different time period. Now we're talking about January of 2023. This is a fresh question.
**Q Okay. So is there a retainer agreement for the law firm services to Bay Area Development Company?**
A Well, I know the law firm, in '23, provided services for Bay Area Development Company.
MR. LIEBERMAN: That wasn't the question though, Les.
THE WITNESS: Yeah.
MR. LIEBERMAN: Listen to the question.
THE WITNESS: Is there a retainer agreement? No, there's no retainer agreement.
BY MR. NOLAN:
**Q Did you do the work for Bay Area Development Company or was it Mr. Podell?**

A I think I did some of the work and Mr. Podell did some of the work.
**Q Mr. Podell set up a trust or a probate for the Bay Area Development Company?**
A No. Bay Area Development Company had problems with two tenants on Highland and Mansfield. They weren't paying any rents. And they haven't been paying rents for a while. And we were trying to figure out what to do.
**Q So does the law offices of Les Klein & Associates provide landlord tenant services?**
A No. But we would provide landlord tenant services for Bay Area. We had to figure out if we're going to sue the tenants, we're going to evict the tenants, or what we're going to do.
**Q Would there be an invoice issued from the law firm?**
A I'm not sure if there was an invoice issued. But there was quite a bit of work that was done by the law firm for Bay Area Development Company, especially on 507 Mansfield. Because the tenant hasn't paid rent in 2 1/2 years or 3 years.
**Q Okay. I went through the document production.**
A Okay.
**Q Would you agree with me that I asked for all**

**documents with respect to Bay Area Development Company?**
MR. LIEBERMAN: Can you -- where would you have asked for that? Because it's not --
MR. NOLAN: Category 1.
MR. LIEBERMAN: All documents concerning.
MR. NOLAN: Any of the entities set forth below. Collectively the Klein entities. The articles of incorporation, operating membership agreements including electronically stored information, recording sums deposited in, maintained, or transferred out of basically bank accounts held by the law firm.
MR. LIEBERMAN: Yes. Counsel, I read this as all articles concerning any of the entities set forth below of the type listed in the interrogatory or the category. So while certainly articles of incorporation, operating agreements, membership agreements, electronically stored information, recording sums deposited, et cetera --
MR. NOLAN: I understand you're going to construe it differently. It is what it is at this point.
MR. LIEBERMAN: Okay.
MR. NOLAN: I don't construe it that way at all. But I'm not here to argue with you.
///

BY MR. NOLAN:
**Q I want to know -- I thought you said, on multiple occasions today, that there are no retainer agreements, there are no agreements for retention of any of these entities for services by the law firm, and I understand now you're saying it's -- this has refreshed your recollection, I guess. This exhibit.**
**I want to know is there a file in your office for Bay Area Development Company reflecting the work that was just recently performed?**
A Well, I don't understand your question. There was an 80,000 --
MR. LIEBERMAN: No, no.
THE WITNESS: What?
MR. LIEBERMAN: Answer his question about whether there's any documents in your office reflecting work recently performed for Bay Area Development Company.
THE WITNESS: No.
BY MR. NOLAN:
**Q Right. And this work that you got paid for was this year.**
A That's correct.
**Q And there's no file for Bay Area Development at the law firm?**

A Well, there's litigation that has been started on this. But I don't think there's anything that the law firm has kept. Whatever information, whatever we had, we turned it over to our attorney.

**Q Turned over to your attorney for who?**

A For Bay Area Development Company.

**Q And who's that?**

A His name is Eric Olson.

**Q Eric Olson.**

**So Eric Olson was retained by the law firm?**

A No. Eric Olson was retained by Bay Area Development Company.

**Q Okay. By Bay Area Development Company.**

A Bay Area Development Company transferred the law firm. So that is an offset.

MR. LIEBERMAN: Okay. You'll get a chance to explain that.

BY MR. NOLAN:

**Q Okay. You want to talk about the 80,000. Go ahead and tell me what that represents to you.**

A I don't know. It says here that Bay Area gave the law firm $80,000.

**Q That's what -- that's how you read Exhibit 11, is that checking account 9404, which is the trust account --**

A Right.
**Q -- deposited or paid to Bay Area Development $80,000.**
MR. TROSZAK: No. The other way.
MR. NOLAN: I'm sorry. I got it mixed up.
THE WITNESS: No. The other way around.
BY MR. NOLAN:
**Q Right. 80,000 --**
A Bay Area paid $80,000 to -- was a withdrawal by Bay Area for $80,000.
**Q Right.**
A And that was transferred to the law firm.
**Q To the law firm.**
**And what was the purpose of that?**
A I have no idea.
**Q Mr. Klein, you can't do any -- want to take a couple minutes and explain? This is this year.**
A I know. Lot has happened this year.
**Q Uh-huh. Want to take a second?**
A For sure --
MR. LIEBERMAN: Leslie, if you want to think about it by yourself rather than out loud, it would be helpful.
THE WITNESS: Fine. I don't know.
///

BY MR. NOLAN:
**Q So Bay Area, an entity that you control --**
A Yes.
**Q -- is paying $80,000 to the law firm, which you're the director and shareholder of, for legal services or is it for some other reason?**
A I don't know.
**Q Is there a document that the law firm would maintain that would explain the reason for the transfer?**
A I don't know.
**Q Is it pretty clear that you would have been the one, the individual, who would have transferred the money on behalf of Bay Area Development to the law firm?**
A I don't know. I mean, I don't remember. I mean, you kept asking about the $9,000 from law firm to Bay Area. This certainly explains that.
**Q Right. And then this money goes to the 9404 account; right?**
A That's correct.
**Q That's not a client trust fund account.**
A That is correct.
**Q Right?**
**So that money could be used by the law firm for any purpose that it wanted.**
A That is correct.

**Q Those aren't client trust fund accounts.**
A That is correct.
**Q Would there be a ledger, since Bay Area Development is a client of the law firm?**
A I don't think there would be a ledger between Bay Area and the law firm, no.
**Q You wouldn't track the amount of monies paid and earned by the law firm on behalf of a third party corporation that's a client?**
A I don't think 80,000 was a fee. I just don't think so.
**Q I'll show you Exhibit 12.**
(Exhibit 12 was marked for identification and attached hereto.)
MR. LIEBERMAN: I'm sure counsel is aware it's 3:30.
BY MR. NOLAN:
**Q For the record, Exhibit 12 is a Bank of America -- looks like a business card -- credit card statement for Litigation Financing LLC. And it's dated March of 2019. Or, actually, it's a statement dated January -- or February 2019. I apologize. I misread that.**
**Mr. Klein, your prior testimony was that you didn't think Litigation Financing LLC -- it was created**

**but it never did any business.**
A That is correct.
**Q Okay. Do you recall having a credit card in the name of Litigation Financing?**
A Yes.
**Q And that was in your name personally?**
A It looks like it's Litigation Financing LLC.
**Q Right. So this document, Exhibit 12, if you go to page 3 of 4, it shows two payments made to Les Klein & Associates for $10,000.**
**Do you see that?**
A Yes.
**Q And then there's another charge up farther for $4,000.**
**Do you see that?**
A Yes.
**Q So you would agree with me that Exhibit 12 shows that Litigation Financing was paying Les Klein & Associates $14,000 in this particular month?**
A Yes.
**Q And Litigation -- the law firm did no work on behalf of Litigating Financing; that's correct?**
A Well, Litigation Financing was going to go into business. The law firm was researching how it could go into this business but it never went into it.

**Q So you're saying the law firm did provide services on behalf of Litigation Financing.**
A That is correct.
**Q And you have a retainer agreement with Litigation Financing?**
A No.
**Q Did the law firm issue any billings to Litigation Financing?**
A I don't know.
(Exhibit 13 was marked for identification and attached hereto.)
BY MR. NOLAN:
**Q Let me show you Exhibit 13. For the record, Exhibit 13 is a Bank of America advantage checking statement. Last three digits 0382, and it is April 2018 to April 30, 2018.**
**Does this document look familiar to you?**
A Don't remember it.
**Q Bank of America is the bank that you utilize for the law firm; correct?**
A Yes.
**Q And is it an accurate statement that you set up a business advantage checking account for Litigation Financing at Bank of America?**
A Looks that way.

**Q And if you go to page 3, at the top it says agent assisted transfer from checking 9404, $500.**
**Do you see that?**
A On which page?
**Q Page 3.**
A I got it. Yes.
**Q Right. Does that show -- is that evidence to you that the law firm transferred $500 to Litigation Financing --**
A Yes.
**Q -- in or around April 2018?**
A Yes.
**Q Why would the law firm be sending money to Litigation Financing?**
MR. LIEBERMAN: Counsel, are you asking him a hypothetical question or are you asking him specifically about this $500?
MR. NOLAN: I'm asking him about this $500.
MR. LIEBERMAN: Okay.
THE WITNESS: Don't remember why April of '18 the law firm transferred $500 to Litigation Financing. I have no clue.
BY MR. NOLAN:
**Q And this comes out of the 9404 trust account; correct?**

A Yes.

**Q And in 2018, is that the general operating account for Les Klein & Associates?**

A Yes.

**Q And as you sit here today, under oath, you have no idea why Litigation Financing was forwarding money to the law firm?**

A I mean, this goes back to April of 2018. I have no idea. Don't know.

**Q And we've established that there would not be a client file for Litigation Financing at the law firm; right?**

A Right.

(Exhibit 14 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q This is Exhibit 14. For the record, Exhibit 14 is bank statement dated May 2017, Bates stamp number 2004 B of A 000483 to 491 [sic].**

**And my first question --**

MR. LIEBERMAN: Counsel, before you continue, it looks like there's actually two banks -- at least two bank statements here stapled together, not just one.

MR. NOLAN: It should end at 492.

MR. LIEBERMAN: It does and -- oh, yes. Okay.

I see. They're -- yeah, it's two bank statements. At least two. One is Leslie --

MR. NOLAN: Oh, well, let's go ahead and just peel off Mr. Klein -- well, you know, just leave it for now.

MR. LIEBERMAN: All right.

MR. NOLAN: I've already identified it.

MR. LIEBERMAN: Actually, it's, yeah, two bank statements.

MR. NOLAN: Yeah.

BY MR. NOLAN:

**Q Okay. So I'm going to ask you first, Mr. Klein, on Exhibit 14 about 483 to 486 and that appears to be the statement --**

MR. LIEBERMAN: It's these two pages here.

BY MR. NOLAN:

**Q -- for Doctors Marketing Group.**

**So Bank of America is the same entity that the law firm has its checking account and all of its business accounts; correct?**

A Yes.

**Q Did you establish the bank account for Doctors Marketing Group at Bank of America?**

A No.

**Q Do you know who established that?**

A No, I don't.

**Q You had no control of Doctors Marketing Group; is that correct?**

A This is correct.

**Q Your prior testimony?**

A Yes.

**Q Is that address 14245 Ventura Boulevard, Third Floor, is that the address for the law firm?**

A Yes.

**Q We'll mark this Exhibit 15.**

MR. LIEBERMAN: 15. Okay.

(Exhibit 15 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q First question. Well, first, let me just identify for the record this is a three-page document 246 to 248. And this is for an entity by the name of Doctors Marketing Network.**

**Do you see that?**

A Yes.

**Q Is that an entity that you're familiar with?**

A No.

**Q And it appears to have -- similar to -- it appears to be -- strike that.**

**It appears to be a credit card statement for a**

**credit card issued by Chase in the name of yourself and Doctors Marketing Network.**
**Would you agree with me?**
A I don't remember ever applying for this entity Doctors Marketing Network for a credit card. But it could be that they needed money and --
MR. LIEBERMAN: Please don't speculate.
THE WITNESS: Fine. Okay. I don't know.
MR. LIEBERMAN: It's okay.
BY MR. NOLAN:
**Q Is the purpose for you applying for credit cards was it was another avenue for these entities to borrow money on behalf of, that you could manage?**
A I didn't manage any of this money.
**Q You didn't manage anything for Doctors Marketing Network.**
A No. I didn't.
**Q Did the law firm render services for Doctors Marketing?**
A I don't think so, no.
**Q Okay. If you would go to page 248.**
**Do any of those charges look familiar?**
A No.
**Q Would there be any reason for Doctors Marketing Network to be making payments to the law firm off this**

**credit card?**
A I don't think so.
**Q Is it possible that the law firm was withdrawing money from these different entities that we've mentioned -- Doctors Marketing Network and Bay Area Development Company -- because the law firm needed money?**
A I don't think the law firm needed money.
**Q Would you agree with me that it's a bit unusual to pay legal fees on a credit card?**
A No.
**Q Would you agree with me it would be unusual for a credit card to be used to just forward payments for whatever reasons to a law firm?**
A No. I don't think it's unusual at all.
**Q What percentage of the law firm's income was derived through credit card payments?**
A I have no idea.
**Q Did you offer clients to pay through credit cards?**
A Yes.
**Q What about as a trustee? Would you allow people to pay you for your trustee services with a credit card?**
A No.

**Q Okay. Let's go to Exhibit 16.**
**I'm going to mark another exhibit. Let's mark this Exhibit 17.**
(Exhibits 16 and 17 were marked for identification and attached hereto.)
MR. LIEBERMAN: This not 16, Counsel?
MR. NOLAN: Oh, we've already marked 16. I'm going to mark 17.
MR. LIEBERMAN: Okay.
BY MR. NOLAN:
**Q So, Mr. Klein, I'm going to have you look out of order. I'm going to have you look at Exhibit 17 just because we just recently talked about Doctors Marketing Group.**
A Okay.
**Q So before we jump on, I'm going to ask you questions about Exhibit 17.**
A Okay.
**Q Doctors Marketing Group, which was Exhibit 14 in the bank statements, and you were unsure who established the bank account at Bank of America.**
**Do you recall your testimony?**
A Yes.
**Q Okay. Is that your signature on the bottom right-hand corner of Exhibit 17?**

A Yes, it is.
**Q Okay. And the document, for the record, is a Bank of America business signature card; correct?**
A Yes.
**Q And the account title is Doctors Marketing Group?**
A Yes.
**Q And the date of your signature, is that January 5, 2017? Do you see that?**
A January 5th?
MR. LIEBERMAN: There.
THE WITNESS: Looks like '17. Yes. Yes.
BY MR. NOLAN:
**Q And on page 2, it says that you're the sole owner of Doctors Marketing Group; is that accurate?**
A No. That's not accurate. That sole owner was written in by somebody. That is not accurate at all. That's not my handwriting.
**Q So underneath where it says debit ATM deposit debit card request, where it says, "I hereby request the issuance of such cards to any of the authorized signers on this account," you agree that that's your signature on page 2?**
A Yeah. That is my signature but...
**Q Right. And you agree it's your signature on**

**page 1?**
A It is correct.
**Q But you dispute that that's your signature -- or that's your handwriting that gives the title of the signer as sole owner.**
A That is correct. That is not my signature.
MR. LIEBERMAN: Not your handwriting or not your signature?
THE WITNESS: Not my handwriting and I --
MR. LIEBERMAN: Is that --
THE WITNESS: That is not my signature. This is my signature. But that I didn't write "sole owner."
MR. LIEBERMAN: So Mr. Klein pointed to the signature on page 2 as his signature. But the words "sole owner" that are handwritten next to that, he says that is not his signature. Or not his handwriting. Excuse me.
BY MR. NOLAN:
**Q Right. And is that -- is your testimony that, here today, you were not the sole owner of Doctors Marketing Group?**
A That is my testimony.
**Q Okay. Were you an owner at all of Doctors Marketing Group?**
A No. I was -- I got a loan for Doctors

Marketing Group from a client, but I was never the owner of Doctors Marketing Group.

**Q And who was the client?**

A Her name was Lea Kurzner.

**Q Can you spell that, please.**

A Sure. L-e-a, K-u-r-z-n-e-r.

**Q Do you know what the bottom of page 2, Vicken Gulian?**

A I have no idea who that is. This is 2-17.

**Q And what was the purpose of the loan for Doctors Marketing Group?**

A They needed money to do a portal, a very expensive portal. To get medical records.

**Q Okay. Let's go to Exhibit 16 now. So for the record Exhibit 16 is Bates -- or it's marked, at least, 202 to 205. And it says Les Klein in the lower hand corner -- Leslie Klein and Les Klein & Associates.**

**Do you recognize that address?**

A Yes.

**Q And that's the address for the law firm?**

A Yes.

**Q And that's you?**

A That's me.

**Q Correct? Yeah.**

**And this document appears to evidence an**

**account or a credit card that was set up for you under the name of Les Klein & Associates with Chase.**
**Do you see that?**
A Yes.
**Q Is that accurate? Did you have a credit card with Chase on the law firm?**
A This was in '19. I don't remember.
**Q I thought your earlier testimony was that you didn't like credit cards and the law firm did not maintain credit cards.**
A That is correct.
**Q Okay. So we're just not sure about Exhibit 16. And no recollection of it?**
A No. It guess back to '19.
MR. LIEBERMAN: Okay. That's 2019?
THE WITNESS: 2019, yeah.
MR. LIEBERMAN: Okay.
THE WITNESS: March of 2019.
BY MR. NOLAN:
**Q If you would look in the lower right-hand corner for 204, page -- so it's date of transactions. Can you see those transactions on January 24th, February 6th, February 8th? Those are -- appear to be charges that were incurred by the law firm and paid to the law firm; is that accurate?**

A Yes.
**Q Can you explain what was going on there?**
A There's charges to the law firm when? 1/24?
**Q Yeah.**
A Yeah. And then 2/6 and 2/8.
**Q Yeah, $7,500. You used your credit card with Chase to pay the law firm $7,500; is that accurate?**
A Yes, it's accurate. I mean, I would say it was used to pay premiums.
**Q So you'd be in your office. You'd take out your credit card, your Chase credit card, and then you would run that card or would you call the company and say, "I want to incur a charge"?**
A I would call Chase and tell them I would run a charge. And the reason why I'm running that charge is to pay premiums on insurance policies. That's the purpose.
**Q And what document do you have that shows that that's what the purpose of Exhibit 16 is?**
A Well, it goes back to March of '19. Today it's end of '23. I don't remember all the premiums I paid in '19. So that's my best recollection as I sit here today.
**Q Well, you didn't produce this statement to me, even though I asked for it in the subpoena; is that**

**fair?**

MR. LIEBERMAN: What do you mean is it fair?

BY MR. NOLAN:

**Q Well, it's a fair statement. I asked for statements of credit cards that were issued by the law firm.**

A Well, you didn't ask for any from '19 or '18 or '16.

MR. LIEBERMAN: Hold on.

THE WITNESS: Yeah.

MR. LIEBERMAN: Just hold on.

THE WITNESS: Sorry.

MR. LIEBERMAN: If you produced everything that you had in your possession, custody --

THE WITNESS: Yes.

MR. LIEBERMAN: -- or control, then you did the best you could.

THE WITNESS: Right.

MR. LIEBERMAN: But the question is: Did you have -- do you have these statements? I think --

THE WITNESS: No.

BY MR. NOLAN:

**Q Right.**

A Don't have these statements.

**Q He didn't produce the statements.**

MR. LIEBERMAN: He didn't produce the statement.
BY MR. NOLAN:
**Q That's fair.**
A Yeah.
**Q But now he's telling me what the purpose of these payments were, and he didn't produce those documents either.**
MR. LIEBERMAN: Well, he says he -- you can ask him to confirm. But my recollection is his testimony was I don't recall specifically these payments. It was over six years ago. But in general, I did use the credit card to put money into the firm to make premium payments. But he's not testifying that these -- he doesn't have a specific recollection of these particular payments. So I don't understand what the confusion is.
MR. NOLAN: Okay. Well, let's start with the fact that it's four years ago. It's not six years ago.
THE WITNESS: Four years ago.
MR. LIEBERMAN: Four years, six years.
BY MR. NOLAN:
**Q And I'm asking you what records does the law firm maintain that would evidence what payments -- what the purpose were for payments made on this credit card?**
A Well, it could be one of two things. Okay?

MR. LIEBERMAN: No, no.
BY MR. NOLAN:
**Q No.**
MR. LIEBERMAN: Answer the question.
BY MR. NOLAN:
**Q I'm asking what the documents that the law --**
A Fine.
**Q You're the custodian of records.**
A Fine.
**Q Right? And you're a lawyer as well.**
A Right.
**Q So you are the director of Les Klein & Associates.**
A Fine.
**Q And I want to know what are the documents that the law firm maintains that explains why the law firm is receiving revenue or income.**
A The law firm is not receiving revenue or income, period.
**Q This document, Exhibit 16, would suggest that the law firm was paid these sums.**
**Is that a fair statement?**
A That's a fair statement.
**Q Did the law firm execute a promissory note with a third party that these payments represent?**

A The law firm made a payment to a fellow by name of Andor Gestetner of $18,000 this month, March of 2019. It's probably used for that.

**Q So you think Exhibit 16 in the payments on Exhibit 16 are payments that the law firm took on credit so that those payments could be made to Mr. Gestetner?**

A I would have to look at the statements of March of '19 to give you the right answer. For sure the law firm didn't take these as income to the law firm. Sure not. This is what you call an ambush.

MR. LIEBERMAN: Ambush?

THE WITNESS: Yeah.

MR. LIEBERMAN: No.

THE WITNESS: No? Fine.

MR. LIEBERMAN: Just let him ask his questions.

THE WITNESS: Fine.

MR. LIEBERMAN: Do your best at answering them.

BY MR. NOLAN:

**Q What statements are you referring to you have to look at?**

A I have to see the bank statements of the law firm for March of 2019.

**Q And what would you -- what would the bank statement from March of 2019 of the law firm tell you?**

A It would tell me if I made a payment to Andor

Gestetner from the law firm for $14,000.
**Q And what account would that come out of?**
A 9404.
**Q The operating account.**
A That is correct. And that's an advance to him. Because he lost his money. And the insurance didn't pay off to him. And he needed money desperately. And he's my brother-in-law.
**Q So you feel a special connection to Mr. Gestetner.**
A That is correct. I paid him over $3 million.
MR. LIEBERMAN: Counsel, it is about seven minutes to 4:00 o'clock.
MR. NOLAN: Yeah. I'm just going to finish up on Mr. Gestetner then.
MR. LIEBERMAN: Okay.
MR. NOLAN: I think so. Otherwise, I'll just see if we can knock that out.
BY MR. NOLAN:
**Q I don't mean to get sidetracked. But I just want to put this on the record, and I don't want to forget. Because I'm super forgetful at this age.**
**I sent you an e-mail about getting your property, removing -- remember the property you tagged at the Oxnard property?**

A Yes.
**Q Do you still want that?**
A The what?
**Q The couch, the personal property --**
A Yes.
**Q -- at Oxnard, do you still want that?**
A Yes. Yes. I'm going to send somebody to pick it up.
**Q You did send someone to pick it up.**
A No. I will give me a date when you're --
**Q No. I did. I gave you a deadline.**
A So what date do you want me to pick it up?
MR. NOLAN: I think I gave him three weeks; right? Are we cutting it close?
THE WITNESS: I think --
MR. TROSZAK: It needs to be two weeks from today.
MR. NOLAN: Two weeks from today.
MR. TROSZAK: Well, within that time period. It needs to be picked up within the next two weeks.
THE WITNESS: No. I mean, give me a time and --
MR. LIEBERMAN: Wait, wait. Can he come at any time within the two weeks or does he need to set it up with somebody? If he --

MR. NOLAN: Oh, he'll need to set it up.
MR. TROSZAK: He can set it up.
MR. NOLAN: Just like before.
THE REPORTER: We're still on the record.
MR. NOLAN: Yeah, I know. But this isn't -- it's okay.
Because I sent a letter. It wasn't to you.
MR. LIEBERMAN: Okay.
MR. NOLAN: But I don't want to let it slip through because it's your stuff.
THE WITNESS: Right. Okay. Right. So I want to pick it up.
MR. TROSZAK: Want a date?
THE WITNESS: So what date?
MR. TROSZAK: November 30th, Thursday.
THE WITNESS: November 30th is not good. I have a court appearance on the 30th.
MR. TROSZAK: So need to --
MR. LIEBERMAN: Why don't you give him a date.
MR. TROSZAK: That's what we asked for, for you to gives us dates.
THE WITNESS: Next week, Thanksgiving, the 24th or 25th?
MR. NOLAN: That's a Friday or Saturday?
MR. TROSZAK: No.

THE WITNESS: No? How about the week after December 5th.
MR. TROSZAK: Tuesday?
THE WITNESS: Tuesday.
MR. TROSZAK: Yeah.
THE WITNESS: Okay.
MR. TROSZAK: What time?
THE WITNESS: Let's say noon, high noon.
MR. NOLAN: Okay. Good to get that out of the way.
MR. TROSZAK: So you'll have movers?
THE WITNESS: Yeah. I'll have movers. Yeah. No. I'm not going to move it myself.
MR. TROSZAK: Yup.
THE WITNESS: So December 5th at 12:00. I'm going to write it down. I need a whatchamacallit.
MR. LIEBERMAN: We're going to take care of that and give you --
MR. NOLAN: Yeah. I'll send a confirmation.
THE WITNESS: No. That's fine.
MR. NOLAN: I sent the e-mail before, I hope you received it, and gave you three weeks.
THE WITNESS: Okay. That's fine.
MR. NOLAN: And we're going to get into the holidays and --

THE WITNESS: Okay. All right.
MR. NOLAN: Exhibit 18.
(Exhibit 18 was marked for identification and attached hereto.)
THE WITNESS: Okay. It's for you.
MR. LIEBERMAN: Thank you.
BY MR. NOLAN:
**Q Exhibit 18, for the record, is a bank statement from Bank of America. It's for January 2016.**
A Yes.
**Q So it's not for the time frame that I gave you. But I just want to walk through this.**
**First thing is on page 11 of 18, Bates stamped 6509 --**
A 11?
MR. LIEBERMAN: It's the checks.
BY MR. NOLAN:
**Q There's a check to Andor Gestetner.**
A Okay.
MR. LIEBERMAN: Somewhere in there.
BY MR. NOLAN:
**Q $10,000?**
A Right.
**Q Okay. What's that payment for?**
A Basically, Andor Gestetner invested some money

into insurance policies. And he retired and he's not feeling well. He's sick. And needs money right now from the insurance policies. So I started giving him money every month. And this month, which is January of 2016, I gave him $10,000.

**Q And what insurance policies did he invest in?**

A He basically had an investment in -- I don't know from the top of my head. But whatever policies he invested in, haven't died yet. They're all alive. And then he had a heart attack and -- very serious heart attack. He almost died in maybe '17 or '18. I'm not sure. So I increased his draw from 10,000 to 14,000 a month. So the last thing that you showed me, exhibit -- I forget the number. I -- that month I gave him $14,000.

**Q Okay. Did you borrow money from Mr. Gestetner?**

A No.

**Q You didn't execute a promissory note with Mr. Gestetner or the Gestetner Trust to borrow monies?**

A Well, I borrowed money to invest it in the insurance policies.

**Q Right. You or the law firm borrowed the money?**

A Me.

**Q You personally borrowed the money.**

A Me personally, not the law firm.

**Q Did you give Mr. Gestetner back a note?**
A Yes.
**Q Nonsecured promissory note?**
A That is correct.
**Q So Exhibit 18, page 11, shows a check being written out of the law firm trust account or you call this the operating account; correct?**
A Yes. Correct.
**Q So the law firm is paying Mr. Gestetner for an obligation that you incurred; correct?**
A No. The law firm is not paying Mr. Gestetner for an obligation that I incurred. I'm paying the law firm to pay Mr. Gestetner.
**Q And so you deposited $10,000 before this check was issued?**
A Sent that. Yes.
**Q Okay. Where -- show me on this exhibit where it would show the $10,000 deposited.**
A Well, there's counter credit. Counter credit, all these things. I mean, it's definitely one of these deposits. Yes. It's true. 1/13, there's deposit, counter credit, $10,000.
**Q Right. Would there be a ledger that would explain what was deposited on that month?**
A No. Because there basically -- was given the

same amount every month, $10,000. And I think it was increases to $14,000.
**Q So if I go through your personal account which is -- 9401?**
A Yes.
**Q I would see a deposit of check off 9401 on or about January 10, 2016, in the amount of $10,000?**
A I don't know. I mean, it might have been, you know, a different amount. I mean, I don't -- I just don't know.
**Q Okay.**
A I would have to look through the statements for the year 2016 and figure out exactly how I deposit $120,000 into the law firm's account. But that's what he got in 2016, $120,000.
**Q Well, we should see -- the day before a check is written to Mr. Gestetner, we should see some short period of time before that the deposit of the money from you into the law firm; right? You're using the law firm as a conduit?**
A No. You shouldn't say a few days earlier. It could be that I deposited, you know, different time. You know, it's basically -- I didn't have to deposit it, whatever this date is, January -- I mean, let me look at the check date.

**Q January 4th.**
A January what?
**Q Fourth.**
A Okay. So it -- not to be January 4th or 3rd. It could have been different time, like in December.
**Q Okay. Why not just issue the payment to Mr. Gestetner out of your personal account? Why use the law firm?**
A Because I wanted to have a record on the law firm so that he knows he's going to pay this back. When he's going to get his money from the policy, he's going to have to pay me back all the money that I paid to him. This was not a gift. If I'm issuing from my personal account, he would assume this was a gift to him.
**Q Even though you signed a promissory note.**
A Well, that promissory note is nonrecourse. So that promissory note doesn't mean that I owe him whatever it is $3 million. I think the total amount that he invested in policies was 3.3 million. And he got so far back very close to his money.
**Q You believe Mr. Gestetner's gotten back the -- I thought he invested 9 million.**
A No. He didn't. He invested -- 9 million is some bogus number with interest. He invested -- I think the total -- I mean, I don't know right as I sit here.

But the total amount is like 3.3 million.
**Q Let me just show you one more. Exhibit 19 is his proof of claim.**
A Yeah.
(Exhibit 19 was marked for identification and attached hereto.)
BY MR. NOLAN:
**Q So Exhibit 19 is the proof of claim filed in the bankruptcy. If you would just go one, two, three, four pages back to Exhibit B.**
A Four?
**Q Yeah.**
MR. LIEBERMAN: Which page number is on Exhibit B? Pages are numbered, so...
THE WITNESS: Exhibit B?
MR. LIEBERMAN: Here. Let me find it for you.
MR. YOUNG: Three pages in.
MR. NOLAN: Three pages in is the resource note.
MR. LIEBERMAN: It's the recourse note? Is that what you want?
MR. NOLAN: Yeah. I just want to refresh his memory as to the amount.
THE WITNESS: Okay.
MR. NOLAN: Because I thought he said the

amount that was owed and paid was pretty much even and it was about 3 million or 4 million.

THE WITNESS: Oh, it's 3 million. This is with interest. And, basically, I haven't gotten any interest from Rachnitz. So he's not entitled to any interest. All he's entitled to so far is just his money back.

BY MR. NOLAN:

**Q So Mr. Gestetner is not entitled to his interest until the policy --**

A That is correct. Until people die. And nobody has died on these policies. He thinks every person is his policy, but it's not.

**Q And do you have somewhere identified what policies it is that Mr. Gestetner --**

A Yes, I do.

**Q -- has interest? And where is that?**

A I know exactly who owns which policy.

MR. LIEBERMAN: That wasn't the question. Do you have something in writing?

THE WITNESS: Yes, I do.

BY MR. NOLAN:

**Q And does the law firm maintain that record?**

A No, not the law firm. Leslie Klein maintains the record.

**Q Okay. So the law firm makes the payments,**

**keeps no records on this Gestetner matter, but you know what Mr. Gestetner actually invested in.**

A Yes. I know what he invested in and I know exactly how much money he got.

**Q Okay.**

A I know everything. I know everybody, what they invested in and how much money they got.

**Q Last set of questions on this Exhibit 18 --**

A Fine.

**Q -- for today. Because you're --**

A Yes.

**Q -- going to come back again; correct?**

A Okay. Yes.

**Q I'm going to give you the convenience of terminating this as long as it's not extremely difficult to get you back here.**

A Okay. Fine.

**Q On page 4, there's a number of withdrawals --**

MR. LIEBERMAN: Page 4.

BY MR. NOLAN:

**Q -- from the law firm.**

MR. LIEBERMAN: Which exhibit?

MR. NOLAN: Exhibit 18.

THE WITNESS: Okay.

MR. LIEBERMAN: There's no sticker on that.

Oh, here's the sticker.
THE WITNESS: Okay. All right. Fine. So this is yours. Okay.
BY MR. NOLAN:
**Q Page 4, January 19, 2016, is that 9401 account your personal account?**
A No. 9404 is the whatchamacallit account. The law firm's account.
**Q Right. So Exhibit 18 is a bank statement from the 9404 account --**
A Right.
**Q -- memorializing a payment --**
A Right.
**Q -- to the 9401 account, which is your personal account; right?**
A What page are you looking at?
**Q Page 4.**
A I'm on page 5. Okay. Page 4. Okay.
**Q And there's another one on page 5.**
MR. LIEBERMAN: How many lines down are we? Which one is it, Counsel?
MR. NOLAN: January 19, 2016.
THE WITNESS: January 19th.
MR. LIEBERMAN: Got it. Okay.
THE WITNESS: No. There's no January 19th

here.
MR. LIEBERMAN: Yeah, there it is.
THE WITNESS: Withdrawal?
MR. LIEBERMAN: Let me show you. January 19th.
THE WITNESS: Okay. Overdraft protection.
MR. LIEBERMAN: And January 19th.
THE WITNESS: Okay. I got it. January 19.
BY MR. NOLAN:
**Q Right. So that shows --**
A Yeah, okay. $20.
**Q 4,100.**
A Oh, I got it. 4,100. Yeah. Okay.
**Q Right. So there's no check there; right? It just shows a withdrawal. Does that mean that you walked in the bank and transferred $4,100 from the law firm account to your personal account?**
A No. It says here something CATLR.
**Q What does that mean?**
A I don't know.
**Q And there's another one on January 21st and January 26th.**
MR. LIEBERMAN: January 21st for $8,600?
MR. NOLAN: Yup.
MR. LIEBERMAN: And January 26th for...
THE WITNESS: $1,500.

MR. LIEBERMAN: 1,510?
THE WITNESS: But January 26th, there's a lot of California --
MR. LIEBERMAN: Okay. Don't speak.
THE WITNESS: I don't know. I have no idea.
MR. LIEBERMAN: Hold on. What is the question, Counsel?
BY MR. NOLAN:
**Q Yeah. Does that -- does this -- do those transactions on Exhibit 18 evidence to you that the law firm is transferring money to your personal account? 9401 is your personal account; right?**
A Yes.
**Q At Bank of America?**
A That's correct.
**Q And how would that be effectuated? Would you call Bank of America and tell them to transfer money between the law firm account and your personal account?**
A I don't know what it means CATLR. I have no idea.
**Q It's a withdrawal though from the law firm account; right?**
A It looks that way, yes.
**Q Would you -- is it a custom and practice to call Bank of America and transfer money between your**

**personal account and the law firm trust account, 9404?**

A I mean, this goes back to January.

MR. LIEBERMAN: No, no. Just answer to his -- answer his question. We know when it goes back.

THE WITNESS: Yeah.

MR. LIEBERMAN: What's the answer?

THE WITNESS: The answer is I don't remember.

MR. LIEBERMAN: Okay.

BY MR. NOLAN:

**Q So you don't have to remember about this incident -- this particular incident on January. But I asked you about your custom and practice.**

**Did you -- at the law firm, as the director of the law firm, have a custom and practice where you could transfer money easily by calling Bank of America and moving money between your account and the law firm account?**

A No. I don't think I could call up. I'd have to go in person to do it.

**Q So you'd have to walk into the bank and ask them --**

A That is correct.

**Q -- to move money between the bank --**

A The law firm and personal account and whatever account. Yes.

**Q Okay.**
A I couldn't do it over the phone.
**Q So you don't have a recollection of ever doing it over the phone.**
A No.
**Q Do you have a recollection of doing it in person at the branch?**
A I mean, I don't have a recollection but --
MR. LIEBERMAN: No buts.
THE WITNESS: Fine.
MR. LIEBERMAN: Yes or no. Do you have a recollection?
THE WITNESS: I don't have a recollection.
BY MR. NOLAN:
**Q And you don't have any reason to disagree with what Exhibit 18 shows --**
A No.
**Q -- which is the money --**
A I assume that if the bank --
MR. LIEBERMAN: Don't assume anything.
BY MR. NOLAN:
**Q Wait.**
A Yes. Yes.
MR. LIEBERMAN: Don't assume.
///

BY MR. NOLAN:

**Q So I want to just make sure I got the answer to the question.**

A Yes.

**Q You don't have any reason to disagree with Exhibit 18 that shows money being transferred from the law firm trust account to your personal account.**

A That's correct.

**Q All right. Okay. So we're going to have Mr. -- let Mr. Klein go so you can make your meeting.**

A I hope so.

**Q And I'll talk with your counsel and --**

MR. LIEBERMAN: We'll get another date.

(Whereupon, at 4:12 p.m., the taking of the deposition of LESLIE KLEIN was adjourned.)

--oOo--

REPORTER'S CERTIFICATE

I, SUSAN MYONG, Certified Shorthand Reporter No. 13365 in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing Rule 2004 Examination was by me placed under oath to testify to the truth;

That said Rule 2004 Examination was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting through computer-aided transcription;

That said Rule 2004 Examination is a true, correct, and complete transcript of said proceedings taken to the best of my ability.

I further certify that I am not interested in the event of the action.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

WITNESS MY HAND this 5th day of December, 2023.

SUSAN MYONG, CSR No. 13365

DECLARATION UNDER PENALTY OF PERJURY

Case Name: In re Leslie Klein

Date of Deposition: 11/16/2023

Job No.: 10130772

I, LESLIE KLEIN, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2023, at ____________________.

_________________________________

LESLIE KLEIN

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

DEPOSITION ERRATA SHEET

Case Name: In re Leslie Klein
Name of Witness: Leslie Klein
Date of Deposition: 11/16/2023
Job No.: 10130772
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

DEPOSITION ERRATA SHEET

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

_______ Subject to the above changes, I certify that the transcript is true and correct

_______ No changes have been made. I certify that the transcript is true and correct.

_____________________________________
LESLIE KLEIN

Exhibits

**EX 001 - KLEIN, L** 4:13 7:1,2,5

**EX 002 - KLEIN, L** 4:14 10:16,18,23,25 11:2 12:6,21 14:1 15:1,9 21:19 25:25 46:20 63:11 93:14 95:3 103:15 108:13 111:8 130:20 132:2

**EX 003 - KLEIN, L** 4:15 80:6,7,10,25 82:9,21 83:11

**EX 004 - KLEIN, L** 4:16 81:12,13,20 83:12 90:9

**EX 005 - KLEIN, L** 4:17 83:18,19,22 84:6

**EX 006 - KLEIN, L** 4:18 110:16,18

**EX 007 - KLEIN, L** 4:19 139:8,9,13

**EX 008 - KLEIN, L** 4:20 140:13,14 141:1 142:11 146:20 149:9 161:23 163:12

**EX 009 - KLEIN, L** 4:21 156:10,11,16 159:18 163:17,20

**EX 010 - KLEIN, L** 4:22 174:9,10,15 176:3 177:24 178:4

**EX 011 - KLEIN, L** 4:23 178:12,19,21 179:6,8,20 180:15 185:23

**EX 012 - KLEIN, L** 4:24 188:12,13,18 189:8,17

**EX 013 - KLEIN, L** 4:25 190:10,13,14

**EX 014 - KLEIN, L** 5:3 192:14,17 193:13 197:19

**EX 015 - KLEIN, L** 5:4 194:10,12

**EX 016 - KLEIN, L** 5:5 197:1 200:14,15 201:12 202:19 205:20 206:4,5

**EX 017 - KLEIN, L** 5:6 197:3,12,17,25

**EX 018 - KLEIN, L** 5:7 211:2,3,8 213:5 218:8,23 219:9 221:10 223:16 224:6

**EX 019 - KLEIN, L** 5:8 216:2,5,8

$

**$1,000** 56:15

**$1,000,000** 24:20,22

**$1,500** 220:25

**$10,000** 157:15 189:10 211:22 212:5 213:14,18,22 214:1, 7

**$100** 150:14,17,25

**$100,000** 142:2 143:21

**$120,000** 214:14,15

**$14,000** 189:19 207:1 212:15 214:2

**$15,000** 86:25

**$150** 164:8

**$16,000** 176:25

**$18,000** 206:2

**$20** 150:7 220:10

**$20,000** 157:14

**$22,000** 145:20

**$23,000** 167:8

**$24,000** 167:15

**$25** 135:8

**$25,000** 154:15

**$3** 207:11 215:18

**$30** 43:24 73:24

**$300,000** 148:1

**$34,000** 149:21

**$341,000** 147:1

**$341,063.39** 146:18

**$4** 44:24 45:1

**$4,000** 189:14

**$4,100** 220:15

**$40** 150:15

**$46** 150:7,18

**$48,000** 86:22

**$5** 44:20

**$50** 150:7,18

**$50,000** 87:23

**$500** 191:2,8,17,18, 21

**$55,000** 86:24

**$6,000** 86:24

**$600** 56:12

**$7,500** 202:6,7

**$70,000** 86:21

**$75** 69:21 70:9,10,13, 14

**$750,000** 71:12

**$8** 70:3

**$8,600** 220:22

**$80,000** 185:22 186:3,9,10 187:4

**$800** 56:14

**$9,000** 180:20,24 187:15

-

**--ooo--** 224:17

**--they** 64:18

0

**00019** 81:21

**000483** 192:19

**006493-6497** 83:23

**0382** 190:15

**09404** 157:24

1

**1** 7:2,5 25:24 26:3 53:21 65:12,18,23 66:24 68:13 95:4 96:8 97:13 99:20 100:23 101:1,12 102:3,25 103:15 106:1,11 108:13 109:15 111:9 120:21 126:14 130:1 139:14 140:17 142:17,25 170:6,12,15 183:4 199:1

**1,000,000** 24:23

**1,500** 162:10

**1,510** 221:1

**1/13** 213:21

**1/2** 112:5 182:22

**1/24** 202:3

**10** 79:12 136:3 139:5 174:9,10,12,15 176:3 177:24 178:4 214:7

**10,000** 212:12

**100** 108:17

**100,000** 145:7

**10:13** 6:2,9

**10th** 94:23

**11** 6:15 178:12,19,21 179:6,8,20 180:15 185:23 211:13,15 213:5

**11:14** 51:15

**11:35** 51:15

**12** 70:7 140:18 141:1 188:12,13,18 189:8, 17

**12:00** 210:15

**12:31** 93:1

**12:44** 93:1

**13** 190:10,13,14

**133** 151:9

**13th** 141:4

**14** 192:14,17 193:13 197:19

**14,000** 212:12

**14245** 14:10,12,15 20:21 126:22 172:6 174:24 175:6,13 194:7

**1425** 50:8

**1474** 94:17

**15** 150:2 160:11 194:10,11,12

**16** 6:1,10 82:17 86:19,20 88:19 91:3 109:1 140:22 165:3, 7 166:21,22,23 197:1,4,6,7 200:14, 15 201:12 202:19 203:8 205:20 206:4, 5

**17** 166:21,23 197:3,4, 8,12,17,25 198:12 212:11

**18** 191:20 203:7 211:2,3,8,13 212:11 213:5 218:8,23 219:9 221:10 223:16 224:6

**19** 57:9 162:2 201:7, 14 202:20,22 203:7 206:8 216:2,5,8 219:5,22 220:7

**1970s** 18:11,18

**1973** 16:16 20:14 102:19

**1990** 68:23 69:1 124:1

**1994** 17:1

**1996** 68:22 73:22

**19th** 219:23,25 220:4, 6

**1:02** 108:23,25

**1:39** 109:2

**2**

**2** 10:16,18,23,25 11:2 12:6,21 14:1 15:1,9 21:19 25:25 46:20 53:21 63:11 66:25 93:14 95:3 103:15 108:13 111:8 112:5 130:17,20 131:10 132:2 182:21 198:14,23 199:14 200:7

**2-16** 80:17 84:9 145:5

**2-17** 200:9

**2/20/1996** 121:8

**2/6** 202:5

**2/8** 202:5

**20** 24:4 28:22 32:4 36:8 57:7 112:13 113:1 114:9 150:15 172:9

**2000** 20:20,25 28:25 29:2,3 30:2,19 173:2,6

**2004** 6:22 7:2 10:17 11:3 81:21 192:19

**2005** 71:11,20 72:3 73:3 74:24

**2007** 70:6 131:14

**2011** 60:5,6,8,21 61:2,11 62:7,13,15 63:21,23 64:1,5,7,21 65:18 69:23 70:2,4, 6,23 71:7 100:19 104:7,9 119:9 121:2 124:13 127:17 135:6 146:4,8,9

**2013** 90:25

**2016** 81:7 82:16 83:13 84:22 85:14 86:9 90:25 139:14 140:17,18 142:3,17, 25 143:6 151:7 157:11 161:21 162:2 164:21 166:18 211:9 212:5 214:7,13,15 219:5,22

**2017** 166:18 192:18 198:9

**2018** 70:3,4 190:15, 16 191:11 192:2,8

**2019** 57:10 169:23 177:18 188:21,22 201:15,16,18 206:2, 22,24

**202** 200:16

**2020** 57:6 91:1 165:5, 6 166:19,21

**2022** 171:16,17

**2023** 6:1,10 73:22 109:1 172:15 173:8 181:11

**204** 201:21

**205** 200:16

**21143** 6:6

**21st** 220:20,22

**22** 57:8

**22,230** 143:6,17

**23** 181:4,15 202:21

**24** 74:3

**24,070** 167:15

**246** 194:17

**248** 194:17 195:21

**24th** 201:22 209:22

**25** 119:1

**25th** 209:23

**26** 143:6

**26th** 163:21 220:21, 24 221:2

**27th** 163:21

**2:54** 171:3

3

**3** 53:21 80:6,7,10,25 82:9,21 83:11 130:17,20 141:1 146:22 180:14 182:22 189:9 191:1, 5 217:2,3

**3.3** 215:19 216:1

**30** 25:5 29:3 190:16

**301** 179:24

**30th** 209:15,16,17

**31** 139:14 140:18

**322** 126:5

**323** 6:7

**382** 174:16,20

**383** 174:16

**384** 176:19 177:7

**385** 174:17

**3:03** 171:3

**3:30** 188:16

**3rd** 215:4

4

**4** 53:20 81:12,13,20 83:12 90:9 132:2 136:8 189:9 217:2 218:18,19 219:5,17, 18

**4,100** 220:11,12

**40** 28:21 85:11 125:25 126:7,8 150:14

**417** 173:14,22,24

**419** 173:24,25 174:1

**483** 193:13

**486** 193:13

**491** 192:19

**492** 192:24

**4:00** 207:13

**4:12** 6:2 224:14

**4th** 215:1,4

5

**5** 12:9 21:20 25:25 63:11 65:4 83:18,19, 22 84:6 95:8,12 136:20,21 137:1,4 198:9 219:18,19

**50** 49:22 52:22 61:7, 10 118:24

**50/50** 70:8

**500** 162:11

**507** 173:16,22 182:21

**53** 51:3

**5th** 198:10 210:2,15

6

**6** 110:16,18 137:23

**6509** 211:14

**6978** 81:23 82:6 85:16,20 90:10,11 148:12,16 166:13,14

**6th** 201:23

7

**7** 138:1 139:8,9,13

**706** 40:6

**70s** 89:21 90:1 138:8, 9

**78** 166:12

8

**8** 21:21,22 69:1 124:1 132:23 140:13,14 141:1 142:11 146:20 149:9 161:23 163:12

**80,000** 184:12 185:19 186:8 188:10

**80s** 138:9

**8122** 139:16 140:5

**8th** 201:23

9

**9** 15:4,19 22:6,13 110:10 156:10,11,16 159:18 163:17,20 215:22,23

**90503** 6:8

**90s** 138:9

**94** 143:3

**9401** 141:5,6,8,9 214:4,6 219:5,14 221:12

**9404** 80:13 81:3 82:10 85:17,21 88:4, 11,15 89:3 90:23 132:1 143:2,3,14,19, 24 144:7,11,12 145:16 148:17 149:4,5,10 150:15 151:2,3,6,20 154:22 155:5,8,12 157:22 160:12 161:14,19 162:3 163:21 165:19,23 166:2,4,6, 16 167:11,25 180:19,24 185:24 187:17 191:2,24 207:3 219:7,10 222:1

**9405** 86:23

**96** 74:24 105:9 120:22 126:2

**97** 72:18

**9920** 14:18

A

**a.m.** 6:2,9 51:15

**abbreviated** 8:22

**abbreviation** 11:12

**ability** 9:25

**absolute** 34:22

**absolutely** 50:16 120:11 177:10

**accept** 178:14,16

**acceptable** 8:24

**access** 132:21 133:2, 11 134:2,23 135:5, 21,22 160:16

**account** 32:24 48:22 49:8 77:2,3,4,8,9,12, 13,15,21,22 78:3,4,5 79:5,6,7,12,14,16, 18,19,20,21,22,23, 24,25 80:1,5,11,19, 20,23 81:1,5,6,7,8, 24 82:1,3,4,5,7,11, 14,20 83:1,4,6,7,9, 13,15,24 84:3,5,7,9, 12,13,16,17,19 85:14,20,21 86:2,5, 9,18,22,23,24 87:1, 5,8,9,13,15,22,24 88:3,5,8,11,12,15,

16,18,21 89:2,3,4,7, 9,12,15,16,19,20,23, 24 90:2,5,6,8,10,11, 12,13,16,24 91:3,5, 12,23 92:14 123:15 131:16,17,18,21,23, 24,25 132:1 139:15, 19,20,21 140:5,7,8, 9,10,24 141:5,6,7, 10,12 142:7,8,9,10, 14,15,18,24 143:12, 14,15,19,22,24 144:11,12,22 145:7, 16 148:12,17,21,22, 25 149:1,3,4,6,10, 11,22 150:13,15,18 151:2,3,6,8,11,16, 17,18,20,24,25 152:8,9,15,18 153:13,22 154:17, 20,21,22 155:2,4,5, 8,9,12,19 156:4 157:22 158:1,6,17 159:2,12,21 160:2,3, 8,9,10,12,16 161:6, 7,15,19 162:3 163:8, 15,21 164:1 165:12, 15,18,20,23 166:2,4, 7,10,13,14,16 167:11,25 169:2,19 174:17 175:5 177:6 178:24 179:3,18 180:5,7,9,12,24 185:24,25 187:18,20 190:23 191:24 192:3 193:19,22 197:21 198:5,22 201:1 207:2,4 213:6,7 214:3,14 215:7,14 219:5,6,7,8,10,14,15 220:16 221:11,12, 18,22 222:1,16,17, 24,25 224:7

**account/operating** 90:10

**accountant** 36:2 59:14 119:12,23 120:12,13,15

**accounting** 68:9,11 121:11 164:4 168:14,15,20,21

**accounts** 18:1,4 76:18,21,23,25 77:10 80:18 84:11, 15,21,23,25 86:3 90:18 92:20 94:24 129:6 131:12 139:18 140:2 149:16 150:5 151:3 152:12 155:23 156:5,6,7 157:20 158:25 160:23 179:14,17 183:11 188:1 193:20

**accurate** 13:20 33:15 34:2 35:12 40:25 41:2 84:12 93:18 98:1,16 108:5 110:11 126:20 163:15 190:22 198:15,16,17 201:5, 25 202:7,8

**accurately** 10:1

**acquire** 61:2

**acquired** 60:22

**acted** 43:8

**activated** 105:5

**active** 127:16 128:3

**activity** 177:6

**actual** 153:19

**add** 139:17

**addition** 14:15 25:17 60:1 64:13 79:22 100:15 139:18

**address** 6:6 98:17,20 129:9 175:5,6 179:24 180:1 194:7, 8 200:18,20

**addressed** 11:3

**adjourned** 224:16

**administrator** 39:25 40:2,10,13,16,17,22

**admonishes** 71:2

**admonition** 109:24

**advance** 207:5

**advantage** 190:14,23

**Advertising** 79:1

**affairs** 29:15

**affect** 9:16

**affected** 45:9

**age** 207:22

**agent** 22:10 141:4,16, 18 180:18 191:2

**aggregate** 24:21,22, 24 25:16

**agree** 182:25 189:17 195:3 196:9,12 198:22,25

**agreed** 69:19

**agreement** 28:11,19 45:14 46:8,10,24 47:2 49:3,9,11 52:5 53:1,11,15 55:13 56:5 61:15,17,18 74:8,9,16,18,25 75:12 85:19 181:13, 21,22 190:4

**agreements** 47:13,14 51:25 52:2,4,15,16 54:7 56:1 65:13,17 170:2,4,5,11,12 183:8,16 184:4

**ahead** 117:16 134:7 185:20 193:3

**airport** 122:3,4

**airports** 122:4

**Alan** 122:21

**Ali** 156:21 157:1

**alive** 121:14 212:9

**ambush** 206:10,11

**amendment** 17:14,16 20:17

**amendments** 21:25 38:6,9

**America** 80:11,23,25 81:20 83:22 85:10, 11 91:15 92:1 139:13 140:21 141:18 179:11,12,13 180:6 188:19 190:14,19,24 193:18,23 197:21 198:3 211:9 221:14, 17,25 222:15

**American** 132:19 133:12,13,23 135:3, 7 136:4

**amount** 24:18 25:16 53:21 59:17 125:3 147:6 188:7 214:1,7, 9 215:18 216:1,23 217:1

**amounts** 85:24 131:12 150:7

**and/or** 104:15

**Andor** 206:2,25 211:18,25

**Angel** 171:24

**Angeles** 6:1 36:10 109:1

**Ann** 31:16 130:24

**annual** 58:21

**Annuity** 63:8 116:4

**answering** 42:2 206:17

**anybody's** 152:19,23

**anymore** 60:4 61:2 133:9 165:4 169:12

**apartment** 156:23

**apologize** 29:25 144:6 188:22

**Apparently** 109:13

**appearance** 209:17

**appearances** 6:12

**appearing** 6:18,19 13:23

**appears** 193:14 194:23,24,25 200:25

**applying** 195:4,11

**appoint** 40:1,15 41:3, 4 42:7,10

**appointed** 40:24 41:1,8,11,15 42:6 47:24 48:24 49:15 71:15 72:2

**appointing** 41:5

**appoints** 39:24 40:17

**approved** 53:23,25

**approves** 53:24

**approximately** 16:14 17:6 20:18 173:1

**approximation** 62:7

**April** 57:7 69:1 124:1 190:15,16 191:11,20 192:8

**Archstone** 26:6,10, 12,15,16,22,25 27:3, 9,10,12,14,19,20 28:3,5,8,11,13 29:1, 5,24 95:14,24 111:15,16,21,23 127:5

**area** 35:23 38:24 95:14 96:3 97:3,6,7, 8,18,21,23,25 98:1, 4,5,11,12,16,19,21, 23,24 99:2,3,4,10,16 104:3 111:24 170:7 171:12,18,22 172:1, 17 173:7,10,19 174:3,6,23 175:7,9, 11,18,21,22 176:1,5, 12 178:5 179:20 180:5,7,24 181:3,5, 14,16,24 182:4,5,13, 20 183:1 184:9,17, 24 185:6,11,13,14, 21 186:2,9,10 187:2, 13,16 188:3,6 196:6

**areas** 39:1 58:17

**argue** 183:24

**arrange** 171:18

**arranged** 165:8

**articles** 17:18 20:17 21:23 38:6,9 96:21 126:15 183:7,13,15

**ascertained** 164:14

**asks** 17:17 21:22 45:3,19 68:24 136:14 153:7

**assessor** 56:22

**asset** 76:8

**assets** 45:21 69:10, 11 75:19 76:1,15 97:8 99:5 121:8,19 124:12 125:14

**assisted** 141:4,16 180:18 191:2

**associate** 13:5 29:19 31:3

**Associates** 6:20 7:4 11:4,10,13,22 17:12 18:22 20:16 28:24 30:12,15,22 33:10 34:5 38:5,22 47:5,6, 7 81:1 82:10,20,25 83:5,8 84:22 93:8,9, 13 105:2,3 109:10 112:6 115:5,10,18, 21,22,25 116:1 117:20,21,22 120:6 138:16,20 139:4,15 142:19,22 176:22 178:1 182:11 189:10,19 192:3 200:17 201:2 205:13

**association** 96:1,2,3, 10 112:25 128:1 137:3

**assume** 10:10 91:24 92:3 111:2 125:23 137:22 215:14 223:19,20,24

**assured** 150:22

**ATM** 198:19

**attached** 7:6 10:19 12:7 80:8 81:14 83:20 110:19 139:10 140:15 156:12 174:11 178:20 188:14 190:11 192:15 194:13 197:5 211:4 216:6

**attack** 212:10,11

**attention** 128:5

**attorney** 8:1 11:25 12:23 17:14 23:25 51:3 56:21 63:17 65:15,16 76:16 171:20 185:4,5

**attorney-client** 27:18, 22 28:18

**attorneys** 38:23 54:12 65:14 112:3 113:6

**audible** 9:11

**authenticated** 57:13

**authority** 92:20

**authorized** 198:21

**avenue** 195:12

**avoid** 39:6,7 42:13,15 124:12

**aware** 65:22,25 66:1 188:15

**B**

**back** 10:4 16:23 18:11 21:10 32:4 35:7 51:17 57:23,25 76:3 80:17 81:9 82:12,13 84:9 93:3 99:19 109:21,25 110:13 122:10 125:25 131:14 140:22 142:3 145:24 147:9 148:4 156:19 162:10 171:5 192:8 201:14 202:20 213:1 215:10,12,20,21 216:10 217:6 218:12,16 222:2,4

**bad** 42:3

**balance** 150:5

**bank** 18:1,3 48:22 49:8 76:21,23,25 77:2 80:10,21,22,23, 25 81:20 83:22 84:21 85:9,11 89:6, 14 91:6,10,14,15,19,

25 92:14 94:24 98:17,20,21 123:15 129:6 139:13,17 140:21 141:18,19 147:25 148:18,20 150:19 152:12 158:17,25 159:2,11, 12 160:11 165:18 179:11,12,13,17,18 180:4,5,7,8,11 183:11 188:18 190:14,19,24 192:18,23 193:1,8, 18,22,23 197:20,21 198:3 206:21,23 211:8,9 219:9 220:15 221:14,17,25 222:15,20,23 223:19

**banking** 80:11 85:9

**bankruptcy** 98:25 124:21 216:9

**banks** 85:2 92:20 192:22

**bar** 18:10,16,25 88:16,20 156:1,7

**based** 15:13,21 79:19

**basement** 175:13,15

**basically** 32:16 39:4, 6 40:7 44:16 45:9 49:20 50:9,25 54:15, 16 56:3 59:14,15 60:4 61:5 69:13,18, 20 71:22 79:7 98:12 105:18 111:21 112:5 115:3 116:12 122:14 127:18 129:18 130:3 131:2 135:2 137:12 140:8 150:5,16 152:7 154:10 156:1, 25 157:13,17 165:6 167:12 169:11 183:11 211:25 212:7 213:25 214:23 217:4

**basis** 13:16 15:21 43:21 55:10

**Bates** 81:20 83:23 94:15 110:23 174:15 192:18 200:15 211:13

**Bay** 95:14 96:3 97:3, 6,7,8,18,21,23,25 98:1,4,5,10,12,16, 19,21,23,24 99:2,3, 4,10,16 104:3 111:24 170:7 171:12,18,22 172:1, 17 173:7,10,19 174:3,5,23 175:9,11, 18,21,22 176:1,5,12 178:5 179:20 180:5, 7,24 181:3,5,14,16, 24 182:4,5,13,20 183:1 184:9,17,24 185:6,11,13,14,21 186:2,9,10 187:2,13, 16 188:3,6 196:5

**bears** 11:16

**began** 16:25

**beginning** 6:9

**behalf** 6:18,19 7:10 12:19 37:3,7 43:9 48:15 55:15 76:1 92:13 107:11 108:19 137:20 153:11 155:22 162:14 168:2 187:13 188:8 189:22 190:2 195:13

**Beijing** 122:4

**belief** 145:6

**beneficiaries** 42:10 45:18 74:4 116:21 136:3

**beneficiary** 43:18 125:23 135:10,12, 14,15,23,24 152:13

**benefit** 59:23 117:1 169:17

**benefits** 60:13 70:10 135:19

**Berger** 96:24 100:16

**Beth** 137:5

**big** 54:14,15 69:19 95:15 112:1,5 149:20 150:8 170:8

**bigger** 55:8,12,20

**biggest** 132:10

**bill** 58:20

**billed** 55:10

**billings** 190:7

**bills** 32:18,21 78:5,6, 8,10

**binder** 47:12 94:22

**binders** 111:1

**bit** 115:13 182:19 196:9

**BK** 61:21 63:4,14 64:3 68:19 95:15 96:17,20 99:23,24 100:12,17,18 101:2, 11,16 104:3 112:7 115:7 126:15,23

**BKR** 61:21 63:4 64:3 68:19 69:5 95:16 112:10

**bogus** 215:24

**book** 37:5,6

**Bookmark** 26:17

**books** 161:9

**born** 72:22,23 73:5 123:10

**borrow** 195:13 212:16,19

**borrowed** 212:20,22, 24

**bottom** 63:11 197:24 200:7

**bought** 122:9 172:19, 24

**Boulevard** 6:7 14:10, 12,15,18 20:22 21:1, 6 50:8 120:19 173:11,20 174:24 194:7

**bounce** 150:23

**bounced** 148:19 149:24

**boys** 95:15 157:1

**Boyz** 112:1,5 170:8

**Bradley** 6:14

**branch** 91:17,21,25 92:4,6 147:6 223:7

**break** 23:9,12 50:15 51:13,24 92:24 108:22 109:25 111:7 155:4 170:25 171:9

**bring** 44:16

**BRK** 104:4

**broader** 100:21

**broker** 22:14,16 23:9, 22,23,25 24:2,4 76:9

**brother** 48:20,24

**brother-in-law** 207:8

**brothers** 156:21 158:3

**brought** 35:16,22

**Buchalter** 43:23 44:2 47:3 65:14

**bucks** 162:11

**building** 21:4 97:9 98:7 122:3 123:5 172:6 175:9

**buildings** 123:4,5,7

**bulk** 62:18 124:16

**burning** 25:8,10,13, 15

**business** 6:6 35:10, 14,19,21,22 36:9,12 38:21 55:3,5,24 60:5 61:1 64:4 72:7 75:16 84:4 98:10 127:21, 23 129:4,7,8,10,18, 23 130:4 171:15,16, 17 188:19 189:1,24, 25 190:23 193:20 198:3

**businesses** 129:21

**busy** 74:2

**buts** 223:9

**buy** 64:6

**buyer** 154:15

**buying** 73:9 74:21

**BW** 61:21 63:5 68:19 69:6 101:18 104:4 112:11

**bylaws** 21:23 37:13, 14,15,18,21,22,23 38:2,3,8

## C

**C-CORPORATION** 99:4

**California** 6:1,7 12:3 18:9 24:12 27:16 40:22 48:21 49:16, 18 76:23 109:1 127:18 129:5 139:15 221:3

**call** 23:22,25 29:10, 13 34:9 73:2,3,4,10 95:5 133:4 135:7 141:24,25 148:25 202:12,14 206:10 213:6 221:17,25 222:18

**called** 17:12 24:15 65:22 93:7 148:24

**calling** 222:15

**Calls** 159:3

**capable** 72:5

**capacity** 43:9

**capital** 32:22 61:15, 18 62:17,21,25 64:19,21 65:6,12,19, 22 66:24,25 100:25 130:2

**capitalization** 31:24 32:25

**capitalized** 21:9,13, 16,17 32:2,8,9,17

**card** 138:5,6,9,19 139:2 175:25 176:4, 16,17 178:17 188:19 189:3 194:25 195:1, 5 196:1,10,13,17,24 198:3,20 201:1,5 202:6,11,12 204:13, 24

**cardholder** 138:6

**cards** 138:1,4,11,13 177:21,25 178:14,25 179:4 195:12 196:20 198:21 201:9,10 203:5

**care** 57:23 58:1 210:17

**carefully** 68:18

**Carrier** 78:19

**carriers** 132:7

**case** 8:11 39:8 40:24 43:11 47:2 49:7 50:1,10 53:14 73:18, 19 76:4 87:16,17,19, 22 93:17 94:1 166:18

**caseloads** 39:9

**cases** 31:2,22 39:10, 11 41:2 55:8,16 73:20 112:2

**Categories** 130:20

**category** 21:22 22:6 25:24 26:3 68:13 95:4 96:8 97:13 99:20 100:23 101:12 102:3,25 103:15 105:25 106:11 108:13 109:15 110:9 111:9 120:21 126:14 129:25 130:17 131:10 132:2 136:7, 20,21 137:1,4,23 138:1 139:5 170:6, 12,15 183:4,15

**CATLR** 220:17 221:19

**caution** 27:17

**ceased** 64:4 127:21

**century** 17:8

**certified** 57:12

**cetera** 52:9 108:20 183:18

**Chaim** 137:6

**chance** 156:16 185:16

**chances** 145:3

**change** 9:13 17:10 88:23 89:1,6 90:15 103:23

**changed** 17:5 30:6 88:16,17,20 90:5,14 105:22

**changing** 83:4 92:13 156:2 181:8

**Chapter** 6:15

**characterize** 38:21

**charge** 53:23 74:16 189:13 202:13,15

**charged** 56:8

**charges** 176:22,25 178:3 195:22 201:24 202:3

**Charitable** 63:8,9 68:22 102:21 104:22,24 105:9 115:11,16 116:3 120:21 121:7,19

**Chase** 85:3 174:17 176:1 195:1 201:2,6 202:7,11,14

**Chatsworth** 24:3,13, 15 25:20

**check** 50:1,18 51:6 91:7,10 145:15 148:18 149:23 150:17 156:17,25 157:5,14,15,17 158:15 160:1,13 161:6 162:2,5 163:22 167:13,16 168:6,10,20,25 211:18 213:5,14 214:6,16,25 220:13

**checking** 81:24 84:4 141:5,9 180:19 185:24 190:14,23 191:2 193:19

**checks** 148:16 150:23,25 151:1 152:8,9 158:2 160:22 166:20 211:16

**child** 40:18 126:9

**children** 45:22 56:12 72:24 73:10 74:15 116:22 117:2 125:22,23 136:3 152:8 162:9,11,20

**China** 105:12,16,19 121:24

**Chinese** 105:17,18

**choose** 111:3

**Cienega** 14:18

**City** 24:10

**Civil** 6:5

**claim** 24:23 25:18 216:3,8

**clarification** 17:17 45:3,19 68:24 112:20 136:14 153:7

**clarify** 111:7

**clarity** 87:25

**clear** 20:6 41:24 67:17 109:16 154:8 167:11 187:11

**cleared** 163:22

**client** 26:25 28:10,13 29:1,5,24 41:2,4,5 43:9 50:4,5 52:8,22 53:5 54:1 55:7 56:4, 5 57:6 58:21 86:8,17 87:1,5,13,15,21 88:8 89:1 151:3,5 152:13 153:12,20 154:11 155:17,22 157:9,16 159:20,24 160:15 161:7,11,18 163:4, 24 164:4,24 165:11 166:24,25 168:2,4,5, 13,15,16,19,23 169:17,19 170:2,4 187:20 188:1,4,9 192:11 200:1,3

**client's** 79:13 86:11 88:9 153:8 161:5,14 166:5

**clientele** 51:1

**clients** 35:17 49:19, 20,21,22 50:21 51:4, 10 52:22 54:18,20 55:23 56:2,24 57:1 58:6,20 76:1 79:8 88:9 140:11 151:21 152:17,25 153:6,14 154:11 157:6,8,10 158:17 160:18,24 163:23 169:6,9,10, 20,23,24 196:19

**clients'** 79:15 140:11

**close** 40:6 66:8 91:25 92:1 153:20 208:14 215:20

**closed** 57:7,8 100:18 104:8 112:4

**clue** 191:22

**Cogan** 94:9

**collect** 55:15

**collected** 68:10 75:24

**collecting** 75:17

**Collectively** 183:7

**College** 137:8

**comfortable** 8:17,23

**commencement** 109:8

**comment** 9:15

**commercial** 159:5

**commingled** 165:13, 19

**commonly** 11:19,21

**communications** 27:19

**community** 51:1

**companies** 25:5 134:11 179:4

**company** 22:22 24:4, 14 95:15 97:3,6,9, 19,22,23,25 98:2,4, 6,11,12,17,20,23,24 99:3,4,11,16 104:3 111:24 145:15 167:9,14,17 170:8 171:12 173:7 174:6, 24 175:12 176:5,12 179:9,21 180:5,25 181:3,6,14,16,25 182:4,5,20 183:1 184:9,18 185:6,12, 13,14 196:6 202:12

**compensation** 43:22 52:7

**complex** 56:17

**complicated** 49:7 71:19

**compound** 96:13

**computer** 50:7,20 51:10 57:1,3 58:8

**concerned** 22:21 70:21 150:24,25

**conclusion** 15:14 159:4 173:8

**conduit** 214:20

**confirm** 76:9 108:17 204:10

**confirmation** 76:7 210:19

**conflict** 50:6,18

**conflicts** 50:1 51:6

**confusion** 204:16

**connect** 47:9

**connection** 207:9

**consecutive** 84:2

**construe** 183:20,23

**contact** 23:8 29:5 133:22 136:4

**contested** 39:18

**contingency** 60:24 87:15,16 125:2 154:24,25 155:3

**continuance** 7:2

**continue** 60:23 101:25 114:18 192:21

**contribution** 32:22

**control** 22:14 23:19, 21 31:25 33:7 113:20 116:8 118:21,23 139:1 158:14 187:2 194:2 203:16

**controlled** 34:13 35:10,13 85:25 176:15

**controller** 75:13

**convenience** 160:15 218:14

**convenient** 65:8,9

**converted** 91:23

**convicted** 18:7

**copies** 23:10 132:16

**copy** 7:4 23:23 58:5, 6,8,9,10 109:10

110:7,20 132:12,14 135:8,11

**corner** 174:16 179:22 197:25 200:17 201:21

**coronavirus** 57:7 112:4

**corporate** 92:12

**corporation** 32:10 33:10,12 34:25 188:9

**corporations** 107:15, 17

**correct** 15:22,23 16:17 19:15,18,23, 24 20:23 21:8 22:15 23:6,7 27:9 30:12 31:1,3 32:3 33:1,2,5, 12 36:10 41:3,9,12 42:17,19 44:8,22 46:20 48:2,4,5 51:11 52:14 53:1,12 54:5 55:22 56:19 58:22 59:24 60:8,14 62:12, 13 64:20 65:21 70:11,14 71:1 74:12 76:2,17 77:11,14 78:2,24 79:16 82:8 85:22 86:14,15 87:10 88:13,22 89:18,24,25 90:7 91:13 92:7,16,18 94:3,11 97:1 98:19 99:13,17 100:13,17 105:24 106:2 107:3, 12 108:8,16,21 113:3,12,19,23 114:11,16 116:25 117:3 118:23 122:19 125:5 127:3,6,7,22 129:9 130:5,16 131:8,20,22 132:13 133:25 134:16 137:25 139:3,6 140:12 141:13,14 142:20,23 143:12,20 145:10 146:4,5,8,10 149:7,12 151:19 154:23 155:10,14 158:7,8,18,19 161:13,19 162:7 163:10,11 164:25 165:25 166:15,17 167:2 168:8 171:14 173:9 177:4 178:18 179:19 180:1,13,25 181:3 184:23 187:19,21,25 188:2 189:2,22 190:3,20 191:25 193:20 194:3,4 198:3 199:2, 6 200:24 201:11 207:5,11 213:4,7,8, 10 217:10 218:12 221:15 222:22 224:8

**correction** 6:21

**corrections** 9:6

**correctly** 7:18 52:25 58:19 64:16 180:23

**cost** 25:15 77:3,5,6,7, 12,21,22 80:20 84:12,13,19 139:19

**costs** 77:23,24

**couch** 208:4

**counsel** 18:24 23:8 26:24 87:25 92:23 96:12 103:10 109:10 110:6 111:6 129:1 136:17 144:1 146:15,19 148:24 156:13 170:13 177:8 180:15 183:12 188:15 191:15 192:21 197:6 207:12 219:21 221:7 224:12

**Counsels** 6:11

**counter** 146:17 147:3,7,16 213:19, 22

**County** 57:24

**couple** 10:4 186:17

**court** 6:21 7:21 8:19 9:2 39:22,24 40:2, 15,17 51:21 53:18, 20,23,24,25 76:5,7,9 77:7,23,24 79:11 110:3 115:14 162:19 209:17

**court's** 76:12

**cover** 102:2 148:21 149:10

**coverage** 23:3 24:17, 18 25:2

**created** 188:25

**creating** 56:18

**credibility** 9:16

**credit** 54:20,22 55:1 138:1,4,5,9,10,13,19 139:1 146:17 147:3, 7 175:25 176:4,16, 17 177:21,25 178:14,17,24,25 179:3 188:19 189:3 194:25 195:1,5,11 196:1,10,13,17,19, 24 201:1,5,9,10 202:6,11 203:5 204:13,24 206:5 213:19,22

**creditor** 158:24

**creditors** 40:4

**credits** 147:17

**cross-references** 50:20

**crucial** 150:10

**cumulatively** 180:20

**current** 18:21

**custodian** 37:7 205:8

**custody** 22:13 33:7 203:14

**custom** 53:9,10 144:19 147:24 148:2,3 159:19 221:24 222:12,14

**Cutler** 16:3,5,7,12,15, 19,20,22,25 17:3,4, 6,10,16,25 18:4 21:14 29:23 82:14, 23 102:18 103:24,25 104:21 115:2,8,9

**cutting** 208:14

## D

**D.C.** 112:3

**date** 20:19 57:10 69:2 90:4,22 94:1 164:22, 23 167:17 173:5 198:8 201:21 208:10,12 209:13, 14,19 214:24,25 224:13

**dated** 65:18 68:25 121:8 124:1 140:17 157:11 188:20,21 192:18

**dates** 209:21

**David** 96:24 100:16

**Dawson** 29:23

**day** 9:3 150:11 160:13 167:13 168:6,7,11,18 214:16

**days** 160:11 214:21

**DBA** 82:11 89:9,20

**deadline** 208:11

**deal** 65:18 69:12,20, 23 129:20 135:2

**dealing** 105:17

**death** 59:23 60:12 70:10 135:19 136:8

**debit** 198:19,20

**deceased** 162:19

**December** 210:2,15 215:5

**decided** 105:18

**decisions** 29:18

**deduction** 56:14 125:12,15 126:1,4

**deed** 56:22

**deeds** 56:13

**deem** 9:6

**defend** 25:16 47:6

**define** 95:14

**delivered** 127:8 175:4,20

**denominated** 88:5

**denominations** 80:1, 2

**depends** 41:17 54:9 136:1 161:16

**deposit** 79:12 85:19 86:17,22,23 87:12, 14 143:12 144:2 146:24,25 147:1,25 153:18 154:13,15 157:24 163:17 198:19 213:21 214:6,13,18,23

**deposited** 85:14,16, 17 86:4,8 87:2 143:14 147:6 152:18 157:3,19,21,25 162:2 163:25 166:6 183:10,18 186:2 213:14,18,24 214:22

**depositing** 86:2 144:10 161:18 165:12 180:24

**deposition** 6:8,16,22 8:6,24 10:14 109:9 110:1 111:3 126:13 224:15

**deposits** 86:1 169:24 180:22 213:21

**derived** 196:17

**design** 160:14

**designate** 52:5

**designated** 7:3 8:4 12:19 13:13 47:24 78:22 83:24 98:9,10, 16 167:4

**designation** 81:23

**desired** 150:21

**desperately** 207:7

**determination** 13:18

**determine** 13:12

**determined** 13:16 27:22

**Development** 95:15 97:3,6,8,9,19,22,23, 25 98:2,4,6,11,12, 17,19,23,24 99:2,3, 4,10,16 104:3 111:24 170:7 171:12,18 172:2,18 173:7,10,19 174:3,6, 23 175:12,23 176:1, 5 179:20 180:5,25 181:3,5,14,16,24 182:4,5,20 183:1 184:9,17,24 185:6, 12,13,14 186:2 187:13 188:4 196:6

**die** 217:10

**died** 64:9 68:10 69:14 70:3 156:22 162:21 212:9,11 217:11

**difference** 34:19 93:8 117:4 159:11,15

**differences** 6:23

**differently** 176:3 183:20

**difficult** 218:15

**digest** 177:9

**digit** 82:6

**digits** 80:12 81:3 139:16 190:15

**diligent** 94:15

**directed** 15:17 117:5 126:20,23

**direction** 124:6,8

**directly** 75:7 93:20 133:12 143:25 144:10,21

**director** 34:9,12,14, 15,20,22,24 35:1,9, 13 85:8 150:21 187:5 205:12 222:13

**directors** 22:5

**disagree** 223:15 224:5

**disclose** 27:18

**discuss** 50:9 75:13

**discussed** 15:2 111:16

**discussion** 13:22

**discussions** 44:3

**dismissed** 19:12,14

**dispute** 199:3

**dissolved** 17:3,4

**distinction** 80:2,4

**distribute** 156:25 169:5

**distributed** 129:8 143:24 144:20 158:2 161:10

**distributing** 163:2

**distributions** 73:8

**divorces** 115:3

**divulge** 134:11

**Doctor** 106:15 112:16 113:11

**doctorate** 36:4

**doctors** 102:4,6,8,10 106:13,14,18,19,25 107:1,13,14,15 108:3,4,11,12,19 111:14 112:12,14, 15,22,23,24 113:15, 17,18 114:1,2,3,4 193:17,22 194:2,18 195:2,5,15,19,24 196:5 197:13,19 198:5,15 199:20,23, 25 200:2,11

**document** 12:13,21, 22 52:8,18 65:18 80:15 83:17 124:18 126:14 140:21,24 141:11 143:22 144:18 164:7,19 177:9 182:23 187:8 189:8 190:17 194:17 198:2 200:25 202:18

205:20

**documents** 10:13 12:10 14:1,4 21:20 22:12,25 23:18 26:2 31:23,25 47:12 56:18 84:3 93:17,18, 20,25 94:6,16,21 95:5,12,20 103:3,5 110:7,8,16 111:9 126:12,16 128:7,10, 11 130:17,23 131:1, 4 136:21,23,24 137:22,24 165:2,3,5 183:1,5 184:16 204:8 205:6,15

**dollars** 74:16 154:15

**donate** 156:14

**donated** 123:4,5

**donations** 137:16,19, 21

**dormant** 99:23,25

**dots** 47:9

**draft** 117:6

**drafting** 85:18

**draw** 212:12

**due** 149:20 150:11

**duly** 7:11

**durable** 56:21

**Dus** 16:23

**duties** 31:21 34:22,23

**dying** 69:24

**E**

**e-mail** 23:10 207:23 210:21

**earlier** 82:18 105:21 143:21 164:13 181:7 201:8 214:21

**earn** 87:18 166:14

**earned** 44:4,5,8,10 85:13,18 86:5,9 87:3,6,12 88:10 155:6,7 188:8

**earns** 166:6

**earthly** 108:14

**easily** 222:15

**easy** 35:8

**economy** 84:4

**education** 137:7

**effect** 136:8

**effectuated** 221:16

**EK** 114:20

**EKLK** 68:19 114:19, 21

**electronically** 183:9, 17

**electronics** 132:18

**else's** 31:25 152:20 153:3

**employee** 105:1

**employees** 54:21,24 77:18

**end** 9:3 70:12 101:20 192:24 202:21

**ending** 151:9

**enter** 55:4

**entities** 26:2 48:10 61:20 62:23 63:3,6, 7,10,13,15,19,20,21, 25 64:2,11,13 65:3, 24 66:5 67:24 68:15 69:5 70:16 95:4,5, 14,16,24 96:1,8,9 97:13 100:5,22 101:12,23 102:2,25 103:17 104:16,18,19 105:20,25 106:8,11, 17,18 107:5,8,11,14, 18 108:3,5,6,7,13, 15,20 109:16,17 111:12 113:1,8,22, 24 114:8,13 116:1,8, 11,13 126:17,19,21 127:9,11,16,17,21 128:1,2,8,11,13 129:4,19,25 130:3,9 136:7 137:1,4,17 151:22 170:6,12,14, 20 183:6,7,13 184:5 195:12 196:4

**entitled** 43:15 44:18 86:13 217:5,6,8

**entity** 6:19 11:7,23 17:11 26:6,12 30:7 64:22 65:22 93:7,11 96:24 97:14 99:20 115:19 118:9 120:24 125:10 187:2 193:18 194:17,21 195:4

**Eric** 185:8,9,10,11

**Erica** 114:20

**Ernst** 24:3

**errors** 22:4 23:3 110:11

**escrow** 153:19,22,24, 25 154:11,12 169:25 170:1

**establish** 89:14 193:22

**established** 30:7 89:23 90:2 192:10 193:25 197:21

**establishing** 180:4

**establishment** 21:24

**estate** 26:16,19 39:2, 5,6 40:3,6 41:9,10, 12 48:12,24 54:3,8, 9,10,11,12,16,17,23 55:3,5,24 56:13,18 58:16 71:8,25 73:21 74:21 124:7,11 152:20,22 153:11,14 158:10 162:16 172:3,4

**estates** 40:25

**estimate** 30:14,18

**event** 125:2

**evict** 182:14

**Evicting** 28:9

**evidence** 31:23 32:9, 24 91:22 143:23 191:7 200:25 204:23 221:10

**exact** 20:19 173:4,5

**exam** 6:22 10:17

**examination** 7:3,14 11:3 15:1,8 164:14

**examined** 7:11

**Excellent** 171:11

**exception** 94:23

**Excuse** 26:24 199:17

**execute** 28:10 49:3 52:15 53:1,10,15 54:7 55:4 61:14,16 89:15 92:13 205:24 212:18

**executed** 45:15 55:13 61:17 91:10

**execution** 158:25

**executor** 39:25 40:1 48:24 49:14,15

**exhibit** 7:1,5 10:16,

18,23,25 11:2 12:6, 7,8,21 14:1 15:1,9 21:19 25:25 46:20 63:11 80:6,7,10,25 81:12,13,20 82:9,21 83:11,12,18,19,22 84:6 90:9 93:14 95:3,9 103:15 108:13 110:16,18 111:8 130:20 132:2 139:8,9,13 140:13, 14 141:1 142:11,13 145:6 146:20 149:9 156:10,11,16 159:18 161:23 163:12,17,20 174:9,10,15 176:3 177:24 178:4,12,19, 21 179:6,8,20 180:15 184:7 185:23 188:12,13,18 189:8, 17 190:10,13,14 192:14,17 193:13 194:10,12 197:1,2,3, 12,17,19,25 200:14, 15 201:12 202:19 205:20 206:4,5 211:2,3,8 212:13 213:5,17 216:2,5,8, 10,13,15 218:8,22, 23 219:9 221:10 223:16 224:6

**exhibits** 111:3 197:4

**exist** 23:4 70:24 112:17 120:10,11 126:16

**existed** 28:18

**existence** 16:15 17:1 18:1,5 20:4,12,14,25 28:24 30:2,12,15,17, 23 33:21 34:6 38:6 60:21,22 69:10 82:23 89:10 138:8 176:4

**existing** 17:16

**exists** 114:4

**expect** 28:19 149:25

**expectancies** 62:20

**expecting** 64:9

**expensive** 200:13

**experts** 54:14,15

**explain** 39:14 46:16 129:16 133:16,18 144:20 168:9 177:7 185:17 186:17 187:9 202:2 213:24

**explains** 187:16 205:16

**explanation** 75:10 178:3

**extra** 76:16 156:13

**extraordinary** 53:24

**extremely** 218:15

## F

**facilitated** 178:24

**facilitating** 179:3

**fact** 14:4 147:4 149:2 204:18

**facts** 9:25

**fair** 10:11 18:3 29:15 30:3 33:8 34:9,12,16 35:9 42:8 45:2,4,6, 10 46:25 47:1 138:25 176:10 203:1,2,4 204:4 205:22,23

**fairly** 149:14

**familiar** 11:7 12:13 26:6,13 80:15 81:4 106:10 108:9,10 140:21,23 179:21 190:17 194:21 195:22

**familiarity** 105:22

**family** 72:11 82:11,12 89:9,21 102:14 115:1,3,4

**Fargo** 85:6

**farther** 189:13

**fax** 23:10

**February** 188:22 201:23

**Federal** 6:4

**fee** 43:16 44:4,5,8,18, 19,20 49:6 53:19,22 54:11,19,23,25 55:18,19 56:1,3,7 71:12 76:16 87:23 154:24 155:3 170:11 188:10

**feel** 171:9 207:9

**feeling** 212:2

**fees** 32:17 44:1 53:17 71:11,12,13 85:13, 18 86:5,9,10,12,13 87:12,19 154:25 166:5,14 178:14 196:10

**Feldman** 130:25 143:17,18 145:3,4 161:24 163:13

**fellow** 67:10 206:1

**felony** 18:7

**fiduciary** 34:22,23

**figure** 182:8,13 214:13

**figuring** 74:2

**file** 28:13 39:19 40:5 49:1,18 184:8,24 192:11

**filed** 19:8 40:8 48:23 49:13 98:24 156:1 216:8

**files** 39:18

**final** 65:17

**finance** 117:24

**Financing** 105:5 117:23 118:3,6 188:20,25 189:4,7, 18,22,23 190:2,5,8, 24 191:9,14,21 192:6,11

**find** 28:16 133:24 216:16

**finds** 121:12

**fine** 46:14 60:10 62:1, 5 66:18 75:5,8 92:25 100:7 103:9 104:10, 13 107:22,25 111:2, 20 117:16,21 121:5 122:15 129:17 133:20 134:5 136:13,18 138:22 146:14 147:11 148:10 162:25 167:22 186:24 195:8 205:7,9,14 206:14, 16 210:20,23 218:9, 17 219:2 223:10

**finish** 46:13 50:11,14 60:9 107:21 125:7 207:14

**finished** 60:18 73:21 92:23 101:21

**finishes** 17:21

**firm** 8:4 11:10,16 12:19,22,25 13:4,6, 12 14:9,11,14,20 15:22,25 16:2 17:11

18:22 19:4,9,12,13, 14,17,20,22 20:1,4, 8,12,13,16,21,24,25 21:3,6,9,24 22:5 23:4 24:19 25:3,16, 22 26:1,9 27:13 28:2,4,7,10,14,20,23 29:12,16,20 30:1,5, 15 31:5,9,11,17,19, 24 32:2,8,16,22,24, 25 33:17,20,21,23 34:7,10,13,17 35:10, 14,17 36:9,14,18 37:1,2,3,8,11,14,15 38:1,4,10 39:16 40:9 41:5,6,16,18 42:7, 10,14,22,25 43:3,6, 7,11,15,21,23 44:2, 6,11,12,15,17 45:2, 4,6,9,15,16 46:2,5,8, 25 47:3,23 49:1,3,19 50:19,20,21,24 51:7 52:1,5,6,12,15,18, 19,20 54:7,17 55:2, 6,11,13,15,21,23,25 56:8,23 57:7,18,25 58:17,19,23,25 59:3, 4,9,12,14,15,19,20 60:1,2,4,6,23 61:6, 11,14,16,19 62:10, 15,21 63:6,20,23 64:14 68:2 70:16,24 71:6,13,25 72:1,15, 21,23 74:10 75:16, 22,23 76:14,18,25 77:17,18 78:6,12,14, 15,23 79:17 82:25 84:7 85:1,5,8,13,18 86:6,9,21 87:12 88:10,23,24 89:10 92:13,19,21 94:1,9, 10,12,16 96:2,9 97:4,15,18,19,21,24 98:3,9,14,16,21 101:5,14 102:5,7,9, 11,13,15,19 103:4, 18 104:2,15,17,22, 25 105:2,10 106:1,3, 4,6,16 107:7,10 108:18 111:22,25 112:1,25 113:4,6,7 118:5,16,19 119:15, 17,20,22 126:17,20, 22,24 127:1,10,24 128:4,9,10 129:9 130:13,14,19 131:9 136:6,9,25 137:20, 21 138:2,4,5,7,8,10, 13,15 139:1,18 141:12 142:19,21 143:1,23 144:5,19 145:7,12,14,17,19 146:2,7 149:11,15 150:3,21 151:21 152:10 153:13,23 155:6,22 157:13 158:1,5,6,11,13,14, 15,17,24 159:1,2,8 162:3,13 163:8,9,14, 25 164:3,19 166:6, 13,25 167:3,6 168:22,23 169:9,21, 22 170:6,19 171:13 172:5 173:20 174:4, 5 175:5,11,13,17,19, 21 176:7,11 177:1,3, 22 178:13,16,23 179:2,9,14,17,24 180:11,23 181:2,5, 14,15 182:17,20 183:11 184:5,25 185:3,10,15,22 186:12,13 187:4,8, 13,15,23 188:4,6,8 189:21,24 190:1,7, 20 191:8,13,21 192:7,11 193:19 194:8 195:18,25 196:3,6,8,14 200:20 201:6,9,24,25 202:3, 7 203:6 204:13,23 205:16,18,21,24 206:1,5,9,22,24 207:1 212:22,25 213:6,9,11,13 214:19 215:8,10 217:22,23,25 218:21 220:15 221:11,18,21 222:1,13,14,16,24 224:7

**firm's** 14:7 32:3,5 46:11 53:9 54:4 56:1 65:1 74:9 86:13 119:25 143:19 151:16 155:13 157:8,9,10 161:8 196:16 214:14 219:8

**firms** 32:24 55:12,16 79:25 85:9 86:16

**five-minute** 50:15

**flat** 53:19 54:11,19,23 56:1,3,7

**floor** 175:14 194:8

**FLP** 6:17

**focus** 62:2 107:23

**focusing** 30:1 46:2 75:4

**foreclosed** 97:10 172:13,14

**foreclosure** 172:15

**foreign** 48:22 49:7

**forget** 207:22 212:14

**forgetful** 207:22

**form** 9:14 56:22

**formalities** 57:19 92:12

**format** 80:16 140:23

**formation** 100:16

**formed** 30:7 120:24

**forward** 93:20 142:17 196:13

**forwarding** 192:6

**found** 28:20

**foundation** 68:19 114:19,21,23,24,25

**founding** 13:8 29:14

**Fourth** 215:3

**frame** 83:12 161:16 211:11

**franchise** 127:19

**Franco** 45:18,20

**Frank** 19:8 47:4,5,15 73:25

**frequently** 92:5

**fresh** 181:11

**Friday** 209:24

**Frimmer** 54:13 55:9

**front** 93:14 156:19

**full** 27:10,11

**full-time** 45:8 72:18

**functioning** 102:20

**fund** 66:1,2 67:4,7,12, 19,20 68:3 69:8 105:7,8 118:9,11,14, 15,21,22 119:4,5 144:21 151:3 169:19 187:20 188:1

**funds** 72:9 124:25 145:2 151:5,10,12, 16 155:17 156:3,6 157:16,19 158:4 159:20 160:15 161:6,18 163:4,24 164:5 165:11 166:25 168:5,23

## G

**G-A-N-A-H-L** 171:24

**G-E-N-A-U-E-R** 122:24,25

**Ganahl** 171:24

**gave** 30:18 93:18 135:1,2 155:17 162:5 168:15,19 185:21 208:11,13 210:22 211:11 212:5,14

**Gedolah** 137:9

**Genauer** 122:21,22, 24

**general** 58:23 59:3,5, 10,12 77:2,12 78:3, 4,5 79:17,24 80:19 81:7 82:4,6 83:7,15 84:16 85:20 86:22 87:24 88:12,15 89:4, 7 90:9 132:20 133:12,13,23 135:3, 7 136:4 139:19 141:6 142:9 143:19 148:12 149:11 151:16 157:22 161:7 163:14 164:10,13,15 165:10 166:10 192:2 204:12

**generate** 55:21 58:17,20

**Genevieve** 130:24

**Gestetner** 206:2,6 207:1,10,15 211:18, 25 212:16,19 213:1, 9,11,13 214:17 215:7 217:8,14 218:1,2

**Gestetner's** 215:21

**gestures** 9:12

**get all** 70:2

**gift** 215:13,14

**give** 8:22 28:4 41:24 45:21 54:24 58:5 66:20 68:9 75:9 94:6 135:25 177:8 206:8 208:10,21 209:19 210:18 213:1 218:14

**giving** 45:11 87:4 212:3

**GMR** 63:7 102:16 104:5 115:6

**Goldfinger** 120:13,14

**good** 7:16,17 51:12 71:4 92:10 117:9 167:16 168:10 209:16 210:9

**government** 105:18

**grab** 93:14 170:9

**grandchild** 72:22,23 73:5

**grandchildren** 72:24 73:10 74:15 137:10, 14

**grandson** 73:5

**grant** 56:22

**great** 72:22 73:5 121:22 122:2

**group** 6:17 61:15,18 62:17,21 64:19,21 65:7,12,20,23 66:24, 25 102:4 106:13,19 108:3,11,20 110:6 111:14 112:12,22 113:15 114:1 115:2, 4 193:17,23 194:2 197:14,19 198:6,15 199:21,24 200:1,2, 11

**groups** 106:21,22,25

**guess** 17:4 78:22 111:8 144:15,16 184:7 201:14

**Gulian** 200:8

**gun** 63:2

**guy** 96:16

**guys** 119:19

## H

**H-O-L-L-E-Y** 156:24

**Hahn** 47:6

**Hampton** 116:21 124:5

**hand** 9:12 47:3 110:13 200:16

**handed** 109:9 110:6

**handle** 40:3 51:4 53:14 54:16

**handled** 170:1

**handles** 31:22

**handling** 155:22

**handwriting** 198:18 199:4,7,9,16

**handwritten** 199:15

**happen** 168:13

**happened** 28:21 38:5 83:10 91:7,8,22 117:25 118:3,4 186:18

**happening** 99:24 116:12 127:20

**hard** 58:9

**harder** 160:1

**Hawthorne** 6:7

**he'll** 209:1

**head** 212:8

**heading** 12:10

**health** 56:21

**heard** 26:8 106:18,21

**heart** 212:10

**Hebrew** 123:3,7

**hedge** 124:25

**heirs** 40:18

**held** 123:18,21 124:2, 9,10,11 129:6 158:23 183:11

**helpful** 136:16 186:23

**hereto** 7:6 10:19 80:8 81:14 83:20 110:19 139:10 140:15 156:12 174:11 178:20 188:14 190:11 192:15 194:13 197:5 211:4 216:6

**high** 137:9,10 210:8

**higher** 137:7

**Highland** 173:14,22, 24,25 174:1 182:6

**hired** 47:6 106:6 112:3 156:24

**hit** 84:16,17

**hold** 69:10 125:14 152:4 158:4 160:11 163:9 203:9,11 221:6

**holding** 156:3

**holds** 125:17,20

**holidays** 210:25

**Holley** 156:24 168:9

**hope** 210:21 224:11

**hourly** 55:7,10

**house** 56:12 79:9

**houses** 73:9 156:23

**Hungarian** 123:10,12

**Hungary** 123:11

**hungry** 109:13

**husband** 56:11 162:4,19,21

**hypothetical** 191:16

**I**

**idea** 28:4 66:14 107:13 108:5,7,14 117:9,23,25 118:4 121:22 145:22 186:15 192:6,9 196:18 200:9 221:5, 20

**identification** 7:5 10:18 80:7 81:13 83:19 110:18 139:9 140:14 156:11 174:10 178:19 188:13 190:10 192:14 194:12 197:5 211:3 216:5

**identified** 103:17 136:7 193:7 217:13

**identify** 139:12 194:16

**identifying** 74:20

**immediately** 158:3

**important** 9:11

**inception** 99:16 149:15

**incident** 18:11 159:22,23,25 222:11

**includes** 162:10

**including** 21:24 70:16 183:9

**income** 55:21 158:11 196:16 205:17,19 206:9

**incompetent** 73:3

**incorporate** 17:11 118:13 122:5

**incorporated** 11:4,23 26:22 27:4 34:5 63:15,16 99:12,13 100:12 101:14 118:17 128:23 171:19,22

**incorporation** 17:18 20:18 33:16 38:7,10 96:21 126:15 183:8, 15

**incorporations** 21:23

**increased** 212:12

**increases** 214:2

**incur** 202:13

**incurred** 201:24 213:10,12

**Indicating** 95:19

**individual** 8:3 15:14 21:3 35:16 83:3 92:19 130:8 187:12

**individually** 19:10 20:8 62:9,16 63:15 64:22 97:5

**individuals** 57:22 69:15 105:17 125:1 171:23

**information** 109:19 128:23 134:12,24 183:9,17 185:3

**Inglewood** 14:19,21

**inhibit** 9:25

**initial** 32:21,25 56:5

**inserted** 156:6

**instance** 18:18 71:15

**instances** 56:16 71:24 72:1 76:14 87:11

**instruct** 9:12

**insurance** 22:4,9,22 23:20 24:3,15,19 25:4,6,7,20 43:15, 16,25 59:18,22 60:3, 5,12,20 62:10,17,23, 24 64:4,19 65:2 68:16 69:11 73:23, 25 79:2,3 109:10 110:10 114:22 115:12,17 119:3 124:9,10,13 129:20, 22 130:1,18 134:11, 23 135:11,18 143:7, 10 145:9,15 146:3, 10 167:9,14,17 202:16 207:6 212:1, 3,6,21

**interest** 34:7 62:16, 23 64:18 65:1 67:13, 15,16 68:2,6,15 69:15 70:7 96:25 97:4,6,15,16 106:1, 3,22,24 113:2,10 114:10,15 118:20 215:24 217:4,5,9,16

**interests** 60:7

**internal** 161:8

**interrogatory** 183:14

**interrupted** 42:2

**interview** 56:6

**invest** 61:3 146:7 212:6,20

**invested** 72:8 130:19 131:13 211:25 212:9 215:19,22,23,24 218:2,3,7

**investigation** 18:21

**investing** 62:11 145:17,19 146:3,10

**investment** 60:7 143:7 212:7

**investments** 128:14

**investor** 70:1,25

**investors** 64:8,11 69:13,19 70:5,21 112:8 128:3

**invests** 60:3

**invoice** 182:16,18

**involve** 103:2,18

**involved** 42:14,22 66:16,24 67:3,5,6,9 73:20 103:25 128:14 136:9 146:3 157:13

**involvement** 105:22 114:13 118:14

**IOLTA** 79:16,18,20, 22,25 80:5 81:6,8 83:9 88:16,17,21 89:19 131:24 139:15,21 140:7,8 142:14 151:8,11,24 154:20,21 155:3,7, 18 156:3 157:20 160:2,4,8,9,10

**irrelevant** 32:8

**irrespective** 177:24

**IRS** 119:12

**isolated** 159:22,23,25

**Israel** 137:8 157:1,2 159:24 160:2 168:11,12 177:19

**Israeli** 125:20

**issuance** 198:21

**issue** 43:14 121:17 139:1 158:15 190:7 215:6

**issued** 46:19 119:21 138:1 163:7 182:16, 18 195:1 203:5 213:15

**issues** 40:2 42:16

**issuing** 215:13

**items** 150:8

J

**Jacob** 122:21

**January** 139:14 151:7 177:18 181:4,9,11 188:22 198:9,10 201:22 211:9 212:4 214:7,24 215:1,2,4 219:5,22,23,25 220:4,6,7,20,21,22, 24 221:2 222:2,11

**Jeff** 6:14

**Jewish** 51:1

**job** 72:18

**jogs** 177:15

**John** 24:3

**Jonathan** 133:4

**Jones** 57:10

**judge** 54:1

**judgment** 19:23 20:3

**judgments** 20:4

**Judith** 45:18,20

**jump** 197:16

**jumped** 63:2

**June** 65:18 69:23 125:17 126:5

**jurisdiction** 12:4

**jurisdictions** 12:2

**jurist** 36:4

K

**K-1** 67:24,25 119:6,7, 11

**K-U-R-Z-N-E-R** 200:6

**kick** 105:19

**kids** 135:24 137:7,8, 10,13

**kind** 21:19 65:3 74:15 141:22 159:18

**kinds** 73:9

**Klein** 6:8,9,18,19 7:3, 9,16,19,21 11:4,10, 12,17,19,20,21,22 14:25 16:3,4,5,12, 14,17,19,20,22,25 17:3,12,16,25 18:4, 22 19:10 20:13,16 23:16 26:25 27:18 28:23 30:11,15,22 33:10 34:5 37:24,25 38:4,5,22 41:4,6,8 45:7 47:4,5,6,7 51:17 61:10,17 63:8, 9 68:21,23,25 69:1,3 81:1,18 82:10,13,19, 23,25 83:4,8,25 84:21 88:2,7 92:16 93:4,8,9,12 95:3,5, 16,25 102:18,21 103:4,14,24,25 104:21,24 105:1,2,3, 9,15 109:10,12,25 111:6 112:1,6 114:20,21 115:5,8,9, 10,11,16,18,19,20, 21,22,25 116:3 117:18,20,21 119:14 120:6,20 121:7,19 123:1,7,8,9,10,16,22 124:1,4 125:10,11, 12,13,24 126:1,3,9 134:9 136:15 138:15,19 139:3,15, 17 142:19,21 144:4 146:18 149:2 171:5 172:20 174:23 176:12,22 178:1 182:10 183:7 186:16 188:24 189:10,18 192:3 193:4,13 197:11 199:13 200:16,17 201:2 205:12 217:23 224:10,15

**knew** 53:13 168:9

**knock** 207:18

**knowledgeable** 15:15,18

**Kollel** 137:6

**Kurzner** 200:4

L

**L-E-A** 200:6

**L.A.** 120:18,19 137:9 156:23

**La** 14:18 51:1

**landlord** 97:23 98:6 111:24 182:11,12

**lapse** 59:19

**lapsed** 149:24

**lapses** 149:23

**Larchmont** 91:19,20 92:4,6

**large** 54:10,11 127:9

**larger** 55:16 80:2

**law** 6:17 8:4,19 11:10, 16,25 12:19,22,25 13:4,6,12 14:7,9,11, 14,20 15:22,25 16:2 18:21 19:4,9,11,12, 14,17,20,22 20:1,4, 8,12,13,16,24,25 21:3,6,9,24 22:5 23:4,18 24:19 25:3, 16,22 26:1,9 27:13 28:2,4,7,10,14,20,23 29:12,15,20 30:1,5, 14 31:5,9,11,17,19, 24 32:2,3,5,8,16,22, 23,24,25 33:17,20, 21,22 34:7,10,13,17 35:10,14,17 36:9,14, 18 37:1,2,3,8,10,14, 15 38:1,4,10 39:16 41:5,6,16,18 42:7, 10,14,22,25 43:3,6, 7,11,15,21,23 44:2, 6,10,12,15,17 45:2, 4,6,8,9,15,16 46:2,4, 8,11,25 47:3,23 49:1,3,19 50:18,24 51:6,21 52:1,5,6,12, 15,18,19 53:9 54:4, 7,17 55:2,6,11,13, 15,16,21,22,25 56:8, 23 57:7,18,25 58:17, 19,23,25 59:3,4,9, 12,14,15,19,20 60:1, 2,4,6,22 61:5,11,14, 16,19 62:10,15,21 63:6,20,23 64:14 65:1 68:2 70:16,24

71:6,12,25 72:1,15, 21,23 74:9,10 75:16, 22,23 76:14,18,25 77:17,18 78:6,12,13, 15,23 79:17 82:25 84:7 85:1,5,8,9,13 86:5,9,13,16,21 87:12 88:10,23,24 89:10 92:13,19,21 94:1,9,10,12,16 96:2,9 97:4,15,18, 19,21,24 98:2,9,14, 16,21 101:5,14 102:5,7,9,11,13,15, 17,18 103:4,18 104:2,15,17,22,24 105:2,10 106:1,3,6, 16 107:7,10 108:18 111:21,25 112:1,25 113:4,6,7 115:3 118:5,16,19 119:15, 17,20,21,25 126:17, 20,22,24 127:1,10, 24 128:4,8,10 129:9 130:13,14,19 131:9 136:6,9,25 137:20, 21 138:2,4,5,7,8,10, 13,15 139:1,18 141:12 142:19,21,25 143:18,23 144:5,19 145:7,12,14,17,19 146:2,7 149:11,15 150:3,21 151:16,21 152:10 153:13,23 155:6,13,22 157:8,9, 10,12 158:1,5,6,11, 13,14,15,17,24 159:1,8 161:8 162:3, 13 163:7,9,14,25 164:3,19 166:5,13, 25 167:3,6 168:22, 23 169:9,21,22 170:5,19 171:13 172:4 173:20 174:4, 5 175:5,11,13,17,19, 20 176:7,11,25 177:3,22 178:13,16, 23 179:2,9,14,17,24 180:11,23 181:2,5, 14,15 182:10,16,20 183:11 184:5,25 185:3,10,15,22 186:12,13 187:4,8, 13,15,23 188:4,6,8 189:21,24 190:1,7, 20 191:8,13,21 192:7,11 193:19 194:8 195:18,25 196:3,6,8,14,16 200:20 201:6,9,24, 25 202:3,7 203:5 204:22 205:6,16,18, 21,24 206:1,5,8,9, 21,24 207:1 212:22, 25 213:6,9,11,12 214:14,19 215:8,9 217:22,23,25 218:21 219:8 220:15 221:10,18,21 222:1, 13,14,16,24 224:7

**laws** 156:2

**lawsuit** 19:8,12,14, 16,21 20:1

**lawsuits** 19:3,6,19,25

**lawyer** 36:7 93:18 94:2,4,8,9,15 106:5 159:4,5 205:10

**lawyers** 22:5 29:22 31:5 49:17 118:17, 18

**LCG** 65:4,6 67:15,25 68:9,16 69:9,16 70:15,18 124:14,17 135:17

**Lea** 200:4

**learned** 137:6,7,13,14

**leased** 21:6 97:24

**leasing** 78:20

**leave** 110:22 193:4

**lecture** 54:24

**ledger** 58:23 59:3,6, 10,13 85:23 164:4,8, 10,12,13,15,20,21, 24 167:1,5,8,15,18 168:5,24 169:8,18 188:3,5 213:23

**ledgers** 165:10 169:9, 11,12,13,15

**LEDS** 121:23

**left** 9:3 21:15 111:1

**left-hand** 179:21

**legal** 42:16 44:1,15 82:11,12 89:9,21 95:15 102:14 112:1, 5 113:7 115:1,2,3,4 159:3 170:20 187:5 196:10

**Les** 6:18,19 7:3 8:12 11:3,10,12,17,19,21, 22 17:12 18:22 20:16 28:23 30:11, 15,22 33:10 34:5 38:5,22 41:8 47:5 81:1 82:10,19,25 83:4,7 84:21 93:8,12 105:3 109:10 115:10,18,21,25 117:21 120:6 138:15,19 139:3,15 142:19,21 176:22 177:25 181:18 182:10 189:9,18 192:3 200:16,17 201:2 205:12

**Lesley** 47:5 115:20

**Leslie** 6:8,9 7:9,18 11:20 45:7 47:4,7 61:10,17 93:8 100:1 105:1,2,3,15 107:20 112:6 114:21 115:5, 18,19,25 117:18,20, 21 119:14 123:8,12 134:9 174:23 176:11 186:21 193:2 200:17 217:23 224:15

**letter** 209:7

**letterhead** 83:23

**letters** 40:2

**levied** 159:1

**levy** 158:25

**license** 36:9,12

**licensed** 11:25 12:2, 3,24

**Lieberman** 6:17 7:7 8:12 10:21 15:15 17:19,21 18:13,24 23:8 24:5 25:10 26:17,24 27:2,17,24 30:4 32:11,15 33:24 34:14 35:3 38:18 41:21,23 42:3 45:23 46:13 50:13 51:14 59:5,8 60:9 61:23,25 62:2,4 66:17,19 67:17 71:4 75:3,6,9 79:2 87:25 88:2 92:10,23 94:18,25 95:10 96:4,11,15 99:1,6 100:1,3,9 101:24 103:6,8,10, 20 104:9,11,14,20 107:20,23 108:24 109:4,7 110:24 111:2,15,18 113:13 114:18 115:13,20,23 116:14 117:12 120:1,5 121:4 122:11,13 123:13 125:6 127:12 128:19,25 129:11,16

131:3 132:24 133:2, 15,18 134:4 136:11, 15 138:12,22 139:24 140:1 144:1,4,8,16 146:15,19,21,23 147:10,12,21 148:7, 9,24 149:5,7 151:10, 13 154:8 155:15 156:13 159:3,14 160:5,25 161:2 162:23 164:12,17 167:21 170:9,17,21, 24 171:1 174:7,12 177:8,12,14 178:6 180:15 181:17,20 183:2,5,12,22 184:13,15 185:16 186:21 188:15 191:15,19 192:21,25 193:6,8,15 194:11 195:7,9 197:6,9 198:11 199:7,10,13 201:15,17 203:2,9, 11,13,16,19 204:1,9, 20 205:1,4 206:11, 13,15,17 207:12,16 208:23 209:8,19 210:17 211:6,16,20 216:13,16,20 217:18 218:19,22,25 219:20,24 220:2,4,6, 22,24 221:1,4,6 222:3,6,8 223:9,11, 20,24 224:13

**life** 43:16,25 51:3 60:20 61:15,18,21 62:10,17,20,23,24, 25 63:4,5,7,14 64:3, 4,18,19,21 65:2,6, 12,19,22 66:24,25 68:15 69:6,11 95:15, 16 96:17,20 99:23, 24 100:12,17,18,25 101:2,11,16,18 102:16 104:3,4,5 112:7,10,11 115:6,7 124:9,10,13 126:15, 23 129:20 130:1,2, 18 134:22 135:11,18 143:7

**limited** 102:23

**limiting** 100:20

**lines** 219:20

**liquidate** 153:14

**liquidated** 153:11,16 169:17

**liquidation** 154:4

**list** 12:9 49:19,20 51:10 56:23 109:15 163:18

**listed** 15:18 26:3 95:4 111:10,13 124:21 137:1 170:12,15 183:14

**listen** 35:3 99:1,6 103:8 107:20 116:14 132:24 139:24 181:20

**Litigating** 189:22

**litigation** 43:5,12 44:13 105:5 117:23, 24 118:3,6 185:1 188:20,25 189:4,7, 18,21,23 190:2,5,8, 23 191:8,14,21 192:6,11

**live** 57:24 157:2

**lived** 51:2 126:5 157:1

**Living** 68:23,25 124:1,4

**LK** 114:21

**LKA000001** 94:17

**LLC** 61:6 63:4,5,8,14, 17 64:3 65:20,23 95:16 96:18,20 101:2,18 104:4,5 106:13,14,16,19 108:11 112:9 133:5 134:10,18,19 135:16 136:3 188:20,25 189:7

**LLCS** 69:19 126:25

**LLP** 6:18

**loan** 199:25 200:10

**local** 112:3 123:6

**located** 14:7,9,11 24:8 26:20

**locating** 131:7

**location** 14:12,21 50:8 130:14 175:11

**locations** 122:2

**Loeb** 54:13

**logically** 46:17

**long** 16:24 17:7 21:10 28:6 53:2 82:14 122:10 125:25 126:5 172:9 218:15

**longer** 61:4 70:17 91:5

**Longevity** 66:1,2 67:4,5,7,12,19,20 68:3 69:8 105:7,8 118:9,11,14,15,21, 22 119:4

**looked** 37:21 47:11 90:9 119:12 131:4 137:23

**Los** 6:1 36:10 109:1

**lose** 150:12

**losses** 59:17,21

**lost** 122:14 207:6

**lot** 61:19 68:10 72:10, 11 91:18 99:22 122:1 124:11 147:16 160:10 161:18 186:18 221:2

**loud** 186:22

**low** 62:19

**lower** 200:16 201:20

**LTDS** 105:16

**lunch** 108:25 109:12 110:1

**Lutzy** 123:9,10,12,16, 22

**M**

**M-A-C-K-E-Y** 16:11

**Mackey** 16:4,8,9,12, 14,19 20:13 29:24 37:23,25 38:4 115:9 172:19,20,21,24

**Madam** 6:21

**made** 13:18 61:11 69:12 72:10 73:8 86:1 111:6 129:20 137:19,21 152:1 189:9 204:24 206:1, 6,25

**mail** 126:19,21 127:8 167:13 175:4,18,20, 22

**mailed** 129:8

**mailing** 148:1

**mailman** 175:19

**mails** 126:23

**main** 122:23

**maintain** 24:18 36:18,

25 37:4,11 49:19 52:1 56:23 57:19 58:23 59:3,12 71:6 76:18 79:17,25 85:1, 23 132:12 143:23 164:3 167:1,5 169:9 187:9 201:10 204:23 217:22

**maintained** 25:21 84:22 98:2,5 126:17 139:18 164:24 183:10

**maintains** 24:19 38:1 52:12 77:1 205:16 217:23

**make** 8:16 9:6 20:10 27:25 29:18 35:7 47:11 60:23 64:7 69:24 70:20,21 79:9, 10 80:2 93:22 137:16 143:10 148:18 149:23 161:8 177:21,25 204:13 224:2,10

**makes** 217:25

**making** 70:24 88:7 169:13,14 195:25

**malpractice** 22:4,21 23:3 24:19 25:7 110:10

**manage** 152:19,20,23 153:3,9 156:24 195:13,14,15

**managed** 29:15 34:13,17 35:10,13 152:17

**management** 107:4 113:10 114:12

**manager** 34:20,23 133:5 134:18

**managers** 121:13

**manages** 116:10

**managing** 29:11,13 30:23,24 74:11 151:23 152:13 178:13

**Mann** 168:9

**Mansfield** 173:16,23 182:6,21

**March** 188:21 201:18 202:20 206:2,7,22, 24

**marital** 56:14 125:12, 15 126:1,4

**mark** 6:17 7:1 10:16 83:17 110:16,22 194:10 197:2,8

**marked** 7:5 10:18 80:7 81:13 83:19 110:18 139:9 140:14,24 156:11 174:10 178:19 188:13 190:10 192:14 194:12 197:4,7 200:15 211:3 216:5

**Marketing** 102:4,6,10 106:13,14,15,19,25 107:1,14,15 108:3,4, 11,19 111:14 112:12,15,16,22,24 113:15,17,18 114:1, 2,3 193:17,23 194:2, 18 195:2,5,16,19,24 196:5 197:13,19 198:5,15 199:21,24 200:1,2,11

**Mary** 31:16

**Maryland** 112:2,3,13 113:7 114:7 117:24

**massive** 72:4

**matter** 6:9 40:8 42:20 43:1 153:5 218:1

**matters** 40:23 46:8, 25 55:11,20 71:9 76:11 78:1

**meaning** 101:13 151:10,21 175:12 177:24

**means** 7:23 12:18,20 59:6 141:17 142:21 147:7 221:19

**meant** 150:16

**mechanically** 148:20

**mechanism** 150:5,22

**Media** 105:11 121:21, 22 122:5,18

**mediation** 19:11

**medical** 200:13

**medication** 9:24

**meet** 121:13,15

**meeting** 23:9 75:2 224:10

**meetings** 36:14

**member** 33:22 55:1 99:15 138:6 171:21 172:17 173:6

**member/owner** 100:15

**members** 171:23

**membership** 183:8, 16

**memorialize** 147:5

**memorializing** 219:12

**memory** 177:15 216:23

**Menachem** 123:1,7, 16,22

**Menlo** 6:25 19:8,25 43:11 44:9,13,15,16 45:8,21 46:8,24 47:2,4,5,15 48:8 71:11,20 72:3,11 73:2,3,4,6,9,18,22, 25 75:13 152:7,8

**Menlos** 19:17 43:17 44:21,24,25 45:7,12, 16 72:13,15,18 73:1 74:10,12,20,23 151:22 152:2,4,6,7, 10,11,15,24

**mention** 65:3

**mentioned** 64:2 68:14,17,19 69:5 84:15 196:5

**mentioning** 82:2

**merchant** 178:23 179:2,9

**met** 71:23 75:12

**Michael** 94:9

**Michigan** 66:1 67:4, 19 68:3 69:8 105:7 118:9,14,17,21 119:4

**Milliken** 43:24 44:2 47:2 54:14

**million** 43:25 44:20, 24 45:1 69:22 70:3, 9,10,13,14 73:24 132:23 154:14 207:11 215:18,19, 22,23 216:1 217:2,3

**minute** 37:5,6

**minutes** 36:18,20,23, 24,25 37:4,5 186:17 207:13

**misread** 188:22

**Mississippi** 172:24 173:5

**misspoke** 144:3

**misstates** 30:4 32:11 33:24

**misunderstand** 101:20 154:5

**misunderstanding** 109:18

**mixed** 186:5

**moment** 177:9

**money** 21:14 40:21 44:16 45:1 49:7 59:15 64:9 68:11 69:13 70:5,6 71:21, 22 72:8,11 73:7 79:8,11,13 86:1,4, 11,16 87:2,21 88:24 122:1 125:3 130:6, 10,11 140:8 143:18 144:10,23 145:3,4, 20 148:17,21 149:21 151:23 152:3,13,18, 19,23,25 153:3,5,8, 9,20,21,22,24 154:3, 10,11,16 155:6,7,13 157:1,3,4 158:12,13, 23 160:10,16,19 162:7 163:1,14 164:22,23 165:8,9, 14,22,24 166:2,5 167:7,9,10 168:10, 12 169:3,5 187:13, 17,23 191:13 192:6 195:6,13,14 196:4,7, 8 200:12 204:13 207:6,7 211:25 212:2,4,16,20,22,24 214:18 215:11,12,20 217:6 218:4,7 221:11,17,25 222:15,16,23 223:18 224:6

**moneys** 107:11

**monies** 55:15 79:14, 15 86:8,10,11,13 87:5,14 88:8,9,10 121:12 140:11 142:6,22,24,25 143:24 144:20 149:9 161:9,10,14 163:23 165:18 168:24 188:7 212:19

**month** 147:17 150:1 157:17 189:19 206:2 212:4,13,14 213:24 214:1

**monthly** 58:20

**months** 40:5 87:17, 18

**morning** 7:16,17 60:2

**move** 140:25 210:13 222:23

**moved** 172:24 173:5

**movers** 122:23 210:11,12

**moving** 14:8 117:18 222:16

**Mullin** 116:20,23 124:5 126:3

**multiple** 184:3

**mutual** 72:9

**Myong** 6:6

## N

**names** 112:14 123:16

**Nationwide** 102:10 106:15 107:1 112:16,24 113:18 114:3

**nature** 40:16 51:10 52:13 74:22 89:1 162:17

**necessarily** 57:21 117:6

**needed** 168:12 195:6 196:6,8 200:12 207:7

**neighborhood** 53:7, 13

**Ner** 137:7

**Network** 102:6,12 106:14,16,19,25 107:2 108:4,14 112:15,18,23 113:17 114:2,6 194:18 195:2,5,16,25 196:5

**Newman** 31:16

**Nolan** 6:13,14 7:1,15 8:15 10:16,22 15:16 17:21,24 18:15,25 19:2 23:14,15 24:7 25:14 26:18 27:1,3, 5,21 28:1 30:10 32:13,19 34:1,15,18 35:6 38:20 42:1,4 45:5 46:1,15 50:11, 16,17 51:12,16 59:11 60:11 61:13, 25 62:6 66:19,22 67:21 69:4 71:5 75:15 79:4 80:6,9 81:11,16 83:21 88:6 92:11,25 93:2 94:20 95:1,2,11,19,22 96:7,13,16,19 99:7 100:11 102:1 103:13,21 105:13 107:21 108:1,22 109:6,15,21,23 110:21,25 111:4,5 112:19 113:14 116:2,15 117:14 120:5,8,9 121:6 122:16 123:14 125:9 127:14 128:21 129:2,3,13,24 131:6 133:7,21 134:6 136:19 138:14,24 139:11 140:4,16 144:3,6,9,17 146:16, 20,22,25 147:2,13, 23 148:11 149:4,8 151:14 153:10 154:18 155:16 156:15 159:10,17 160:7 161:4 163:3 164:16,18 167:23 170:14,25 171:2,4 174:9,13,14 177:10, 17 178:8,21,22 180:16,17 181:23 183:4,6,19,23 184:1, 20 185:18 186:5,7 187:1 188:17 190:12 191:18,23 192:16,24 193:3,7,10,11,16 194:14 195:10 197:7,10 198:13 199:18 201:19 203:3,22 204:3,17, 21 205:2,5 206:18 207:14,17,19 208:13,18 209:1,3,5, 9,24 210:9,19,21,24 211:2,7,17,21 216:7, 18,22,25 217:7,21 218:20,23 219:4,22 220:8,23 221:8 222:9 223:14,21 224:1

**Nolan's** 75:4

**nonexistent** 106:23

**nonrecourse** 215:16

**Nonsecured** 213:3

**noon** 210:8

**Northrop** 54:22

**notarize** 57:25

**notarized** 57:14,15,16

**notary** 57:23

**note** 38:18 205:24 212:18 213:1,3 215:15,16,17 216:19,20

**notice** 7:2 39:20 40:4

**noticed** 91:16 126:14

**noticing** 6:13

**November** 6:1,10 94:23 109:1 209:15,16

**number** 6:7 8:12,13 21:22 22:6,13,22 25:24 68:13 74:16 81:6,21 96:8 97:13 99:20 100:23 101:12 102:3,25 103:15 106:1,11 108:13 110:10 111:9 114:21 127:8,9 130:1 133:24 136:8,20,21 137:1,4,23 138:1 139:5 141:3 156:23 192:18 212:14 215:24 216:13 218:18

**numbered** 216:14

**Nunan** 54:13

**O**

**Oaks** 180:1

**oath** 7:22,23 8:18,19 51:20 93:4 110:3 171:7 192:5

**object** 39:22 50:6

**objection** 32:12 33:24 39:18 159:3

**objections** 42:18

**objects** 39:24

**obligated** 23:17

**obligation** 213:10,12

**obtain** 109:9

**occasions** 8:9 41:18,19 42:5,21 43:2 184:3

**occupies** 129:9

**occupy** 74:19

**Occupying** 78:18,20

**occurred** 89:5

**occurs** 125:2

**October** 140:17,18 141:4 142:3,17,25 143:6 145:5 162:2

**offer** 79:9 196:19

**office** 14:18 37:20 46:11 91:25 92:1 98:13 184:8,16 202:10

**officers** 22:4

**offices** 14:7,14,21 98:2,5,10,15 101:15 182:10

**offset** 185:15

**Olson** 185:8,9,10,11

**omission** 110:11

**omissions** 22:4 23:3

**one-off** 159:19

**ongoing** 73:22

**open** 82:17 139:22,23 153:18

**opened** 82:14,17 83:10 88:15 112:2 123:15

**operate** 107:4

**operated** 150:3 173:20

**operates** 101:14

**operating** 25:3 54:18 82:7 83:14 86:5 87:8 90:5,8,11,12,13,16,18,23 91:11,23 131:18 141:6 142:18 143:19 145:7 148:12,22 149:11 150:13 151:16,18 157:25 158:6 159:21 160:3,16 163:14,25 172:5 175:12 183:8,16 192:2 207:4 213:7

**operations** 21:24 29:20 78:11,13,15,23 82:4

**opportunity** 9:5 12:16 15:7 42:7

**opposed** 19:9 137:20 148:1

**oral** 53:16

**Orange** 57:24

**order** 111:1 197:12

**original** 20:13 99:8,19 110:14

**originally** 16:4,12 37:23 90:12 102:19 132:23 133:14

**originals** 58:2,3,4,6

**originate** 35:19,21

**outstanding** 44:1

**overdraft** 148:15

149:15,25 150:4,6 220:5

**oversaw** 83:4

**overseas** 76:19

**overseeing** 71:18 162:16

**oversight** 76:12

**owe** 44:19,21 215:17

**owed** 217:1

**Owen** 13:3

**owned** 59:20 61:6 63:19,20 97:9 98:6 99:11 101:13 106:7 118:11 172:6,21 173:14 175:9

**owner** 33:20 66:4 122:17 134:15,18,21 135:22 198:15,16 199:5,12,15,20,23 200:1

**owners** 33:19 122:20 172:21

**ownership** 34:6 114:10,15 118:20,24 134:8 136:2

**owns** 26:16 66:2,3 98:23 99:2 112:13 118:10 136:3 142:22 217:17

**Oxnard** 207:25 208:6

**P**

**p.m.** 6:2 93:1 108:25 109:2 171:3 224:14

**package** 56:22

**pages** 132:4 140:18 179:20 193:15 216:10,14,17,18

**paid** 25:17 32:17 69:25 70:6 71:11 74:1 76:15 127:18 131:9 143:16,17,18 182:21 184:21 186:2,9 188:7 201:24 202:21 205:21 207:11 215:12 217:1

**panel** 40:16

**paper** 164:21

**paperwork** 89:15 91:10

**paralegals** 31:9

**parents** 53:14 156:22

**Parker** 43:24 44:1 47:2 54:14 162:1,14 163:10,12 164:22,23 165:7

**part** 54:4 66:4 71:13 106:8 112:5,8 122:17 153:17

**parties** 59:25

**partly** 44:10

**partner** 13:7,8 15:22 25:3 29:11,13,14 30:23,25 74:11 82:13 178:13

**partners** 13:10 15:24 29:12 33:18 105:15

**parts** 112:9

**party** 6:13,15 43:12 94:6 188:8 205:25

**passed** 39:21 48:20 162:4

**passes** 158:6,11

**passthrough** 158:9, 21

**past** 177:22

**Patient** 102:12 106:15 107:2 108:14 112:17 114:5

**Paul** 6:25 54:13 55:9

**pay** 44:24 70:16,17 74:1,2 77:16,23,24 135:8 144:24 145:4, 8,13 149:22 150:11 151:20,21,23,24 165:24 196:10,19,23 202:7,9,16 207:6 213:13 215:10,12

**paying** 32:21 124:23 135:14 182:7 187:4 189:18 213:9,11,12

**payment** 79:10,11 143:10,13 206:1,25 211:24 215:6 219:12

**payments** 60:23 61:11 64:7 69:24 70:4,20,22 143:21 152:1 169:13,14,15 176:21 177:22,25 178:14,17,24 179:3 180:19 189:9 195:25 196:13,17 204:7,11, 14,16,23,24 205:25 206:4,5,6 217:25

**payout** 143:7,9

**payroll** 77:8,9,13,15, 16,17,18 80:20 83:24 84:5,7,9,17 86:1,23 87:8,24 88:12 131:21 139:20

**pays** 78:5,6

**Pearl** 132:3 134:22

**peel** 193:4

**pending** 19:3,16,20

**penny** 74:1 152:5

**people** 51:2,4 52:23 59:24 64:9 66:11 68:10 69:14,24 106:7 196:23 217:10

**percent** 53:20,21 61:7,10 70:7 79:12 108:18 112:13 113:1 114:9 118:24 119:1 136:4

**percentage** 196:16

**perform** 27:13 55:6 58:14 74:11 107:7 113:4 118:5,19 130:3 136:6,25 167:3

**performed** 28:4,8 108:18 127:1 128:14 184:10,17

**performing** 28:3 52:7 56:24

**period** 40:5 52:17 70:22 90:19 102:23 106:9 172:8,9 181:10 205:19 208:19 214:18

**permission** 72:25 109:15

**person** 7:3 12:18 13:13,19 39:21 40:3 70:3 135:14 217:11 222:19 223:7

**person's** 39:6

**personal** 119:14 123:21 141:10,12 142:7 143:22 165:22 166:4 208:4 214:3 215:7,13 219:6,14 220:16 221:11,12,18 222:1,24 224:7

**personally** 41:8,15 48:1 71:15 72:16,17 73:13 74:19 96:9 106:10 113:9 132:14 137:16,20 145:11,13 157:8 189:6 212:24, 25

**pertain** 154:9

**pertinent** 24:17

**petition** 39:17,19,23 40:9 48:23 49:1,12, 13,18 76:11 124:21

**phone** 78:10 141:24 223:2,4

**phones** 78:16,17

**Phonetic** 16:23 122:21

**physically** 141:19,23

**pick** 208:7,9,12 209:12

**picked** 208:20

**piece** 153:16 169:16

**pile** 175:20,21

**place** 111:18 137:7 172:15 175:16

**plan** 39:6 73:21

**planing** 54:8

**planning** 39:2,5 48:12 54:3,9,16,18, 24 55:3,5,24 58:16 71:25 74:21 124:7 152:21,22

**Podell** 13:3,22 29:18, 22 31:2,6,19 35:19, 21,23 39:8 49:21 50:19 51:7 58:11 92:17 130:12,15 181:25 182:1,3

**Podell's** 13:4 31:21

**point** 27:17 30:11

43:14 83:9 88:7,14 89:4 90:15,23 112:20 172:16 183:21

**pointed** 88:3 199:13

**policies** 22:3,20 23:10,20 43:16 59:18,20,22,23 60:3,12,20 61:3,5,12,19,20 62:10,17,19,23,24 63:22,24 64:1,4,6,10,19 65:2,4 66:2,3 68:16,20,22 69:9,12,16,21,22 70:9,19,24 73:23,25 110:10 114:22,24 115:12,17 118:10,12 119:3 120:25 121:1,2,18 124:3,9,10,13,22,24 129:20,22 130:1,2,18 131:10 132:7,11,15,16,17,21 133:3 134:12 136:2 145:18,21 146:3,7,11 202:16 212:1,3,6,8,21 215:19 217:11,14

**policy** 23:23 24:1 25:2,8,11,13,15,17,20,21 52:8 58:2 60:23 70:3 109:11 132:10,18,19,23 133:6,11,23 134:23 135:8,11,12,15,18,21,22,24,25 136:8 143:7,11,17,18 145:3,9 146:10 149:23,24 150:12 161:24 163:13 215:11 217:9,12,17

**Polina** 119:24 120:14

**portal** 200:12,13

**portion** 109:8 155:4

**possession** 23:11,19 32:3,5 33:7 74:9 203:14

**pot** 70:12

**Poulter** 133:4,9 134:19

**pour-over** 56:20

**power** 56:21

**practice** 12:25 24:14 35:23 38:24 53:9,10,18 54:4 144:19 147:24 148:2,3 159:20 168:16 221:24 222:12,14

**practicing** 36:7 51:3

**pray** 137:5,13

**preemptively** 27:24

**premises** 78:20

**premium** 60:23 64:7 70:4 132:23 135:14 143:10,13,16 145:14,20 149:20 150:11,25 167:8 169:13,14,15 204:13

**premiums** 69:25 70:2,17,25 74:1,2,3 124:23 131:9 144:24 145:4,8 146:10 149:22 165:24 202:9,16,21

**preparation** 10:14

**prepare** 9:4 73:4,21

**prepared** 38:8 65:14,15 72:21,23 162:18

**present** 99:10

**presently** 12:25 14:9 116:16

**pretty** 66:7 187:11 217:1

**primarily** 38:25 53:18

**prior** 32:11 171:12 188:24 194:5

**probate** 35:22,24 38:25 39:1,7,12,13,17 40:8,9 42:11,13,15 43:5 48:15,19,23 49:5,12,18 53:17,19,20 54:2 58:16 71:9 76:4,12 78:1 87:16 124:12 153:4,12,16,17 159:5 162:16,19 182:3

**probated** 42:20 43:2

**problem** 24:1 46:18 52:20 66:21 159:24 160:4,8,9 161:3 165:15

**problems** 53:4 182:5

**Procedure** 6:5

**proceeding** 109:14

**proceedings** 7:24 8:17

**proceeds** 43:15

**process** 14:8

**produce** 22:16 23:6,18 26:2 38:12,18 94:7 96:20 120:1 132:4 202:24 203:25 204:1,7

**produced** 7:10 12:10 21:20 23:1 33:3 38:14,16,17 47:12 93:17,25 94:16 95:12 103:3 110:17 119:16 126:12 128:8 130:23 136:23 165:1 203:13

**production** 94:23 182:23

**profits** 70:8

**promissory** 205:24 212:18 213:3 215:15,16,17

**pronouncing** 7:18

**proof** 216:3,8

**properly** 15:17 32:9,17

**properties** 26:16,19 125:20 156:24 169:20,24 173:11,13,15

**property** 20:22 21:1,7 74:22 76:4 123:18,21 125:17,19 126:6 153:4,16,19 154:2,4,14 169:16 172:12 173:11,14,20,22 207:24,25 208:4

**protected** 54:1

**protection** 148:15 149:16 150:4,6 220:5

**provide** 71:25 120:5,7 163:9 181:2,5 182:11,12 190:1

**provided** 55:23 181:15

**providing** 60:1 74:21 110:10

**public** 40:22 122:2

**publish** 39:20 40:4

**pull** 109:19 148:21 150:14,15

**pulled** 149:10 150:18

**purchased** 43:25 73:23,25

**purchasing** 60:6

**purpose** 77:15,21 78:4 79:6,7 140:7 172:1 186:14 187:24 195:11 200:10 202:17,19 204:6,24

**purposes** 9:10 11:9

**Pursuant** 6:4

**put** 7:22 21:14 50:20 79:11 93:14 122:1 133:23 144:21,23 154:3,15,16,22 155:4 158:5 159:20 160:15 204:13 207:21

**putting** 160:12 163:14 165:22,24 166:1

**Q**

**quarterly** 58:20

**question** 10:6,10,23 17:22 18:13 24:5 26:11,12 27:3 29:25 34:3 35:3,5 38:1 41:23 45:24 48:6 59:2 61:25 62:2,4 66:19 68:8 75:4,7 97:12 99:1,6,9,19 100:3,6,20,21 102:22,24 103:6,7,8, 11,12,14 107:19,24 116:14 117:12,19 122:11 128:25 131:3 132:25 136:11,17 138:12,13 139:24 147:10 159:6 161:2 162:23 164:3 165:16 166:1 167:21 170:10,13,21 179:1 181:12,17,20 184:11,15 191:16 192:20 194:15 203:19 205:4 217:18 221:6 222:4 224:3

**questioning** 23:13 50:12,14

**questions** 10:3 20:7 96:12 100:25 111:8 197:17 206:15 218:8

**quicker** 160:17

**quote/unquote** 151:17

**R**

**R-A-C-H-N-I-T-Z** 61:10

**Rabbinical** 137:8

**Rachnitz** 61:7,9 63:18 64:24 65:16 67:11,13 68:20 69:12,20,21 112:10 120:25 121:2,12,13, 16,18 124:3,14 129:21 130:11 132:9,12 135:1,2 217:5

**Rachnitz's** 114:23 118:9

**Radow** 130:24

**rainbow** 70:12

**rare** 48:3

**rationale** 168:6

**reached** 60:24

**read** 9:6 176:3 180:23 183:12 185:23

**reading** 63:11

**ready** 139:12

**real** 26:16,19 56:13 74:21 76:4 123:18 124:11 153:4,11,14, 16 154:2,4 158:10 172:3,4,11

**reason** 9:19,21 38:12 42:13 46:23 77:19 107:10 128:7,22 132:19 149:18 165:1,8 167:14,17 187:6,9 195:24 202:15 223:15 224:5

**reasons** 196:14

**recall** 9:25 29:6 37:19,20 80:18 144:13 177:2,18 180:4 189:3 197:22 204:11

**receive** 10:25 152:3, 25 178:24

**received** 13:25 19:23 22:24 23:17 59:1 128:15 152:5 166:25 168:24 210:22

**receives** 58:24

**receiving** 107:11 130:8 205:17,18

**recently** 53:3 184:10, 17 197:13

**recess** 51:15 93:1 108:25 171:3

**recognize** 10:23,24 67:7 113:24 114:1,2 177:14 200:18

**recollection** 79:19 101:1 138:18 142:2, 4 184:7 201:13 202:22 204:10,15 223:3,6,8,12,13

**record** 6:12 7:1 11:2 16:6 41:24 51:18 80:10 81:17 83:22 93:3 94:14 109:5,17, 21 139:13 140:20 156:17 168:7,22,23, 24 169:18 171:5 174:15 188:18 190:13 192:17 194:16 198:2 200:15 207:21 209:4 211:8 215:9 217:22,24

**recordation** 161:8

**recording** 183:9,17

**records** 22:1,8,10 32:3,9,23 33:3,7 37:7 46:20 52:12 55:25 57:2,18,19 119:12 129:7,8,18, 19 131:7 132:8 138:3 139:6 161:9 200:13 204:22 205:8 218:1

**recourse** 216:20

**reduced** 54:25

**refer** 11:10 54:12,15 55:12 65:6 94:22

**Referal** 102:8 112:23

**reference** 97:12 146:17 148:14

**referenced** 63:14 84:12

**referencing** 56:16 63:10 80:19

**referral** 55:12,18,19 102:12 106:14,15 107:1,2 108:4,14 112:15,18 113:17 114:4,5

**referred** 55:9,20

**referring** 55:16 56:17 59:23 94:11 164:15, 19 206:19

**refers** 126:1

**reflect** 91:11 131:12 168:4

**reflecting** 175:5 184:9,16

**refresh** 216:22

**refreshed** 184:6

**regard** 15:18

**reinstated** 18:16

**relationship** 27:23 28:18 47:22 85:2,5 104:14,18,19,22,25 109:16 137:12

**relative** 40:20

**relatives** 40:21

**relying** 69:13

**remain** 88:9

**remainder** 63:8,9 68:22 102:21 104:24 105:9 115:11,16 116:3,4 120:21 121:7,19

**remained** 124:19

**remains** 104:1

**remember** 14:22 17:7 20:19 21:10,15,18 28:9 29:1,21 30:16 37:12 38:7 43:19 65:16 81:8 83:6 88:18 90:22 91:7 92:2,15 119:7 122:10 140:22 142:13 153:5 156:8 161:22 171:25 176:2,14,17 177:16 187:14 190:18 191:20 195:4 201:7 202:21 207:24 222:7,10

**remnants** 17:25 18:4

**removed** 135:3

**removing** 207:24

**render** 48:12,15,18 54:17 195:18

**rendering** 162:13 170:5

**renew** 109:24

**rent** 78:10 182:21

**rental** 158:11

**rents** 182:7,8

**repeat** 41:23 103:10 128:25

**rephrase** 10:7

**replace** 90:8

**report** 156:7

**reported** 156:9

**reporter** 6:4,21,24 7:21 9:2 17:17 45:3, 19 61:8 68:24 71:2 109:22 110:3 115:14 136:14 153:7 209:4

**reporting** 155:21

**represent** 6:14 42:8 43:12 94:14 147:4 205:25

**representation** 42:17

**representative** 46:4 150:20

**represented** 49:22 50:4 54:21

**representing** 63:17 94:10 157:12

**represents** 185:20

**request** 21:22 40:9, 12 122:8 198:20

**requested** 14:2 26:1

**requesting** 22:25

**require** 42:16

**required** 6:5

**requirements** 155:21

**researching** 189:24

**resolution** 37:10

**resolutions** 37:11,12

**resolve** 25:18

**resource** 216:18

**respect** 26:2 45:11 56:2 110:9 111:8 130:22 136:21 161:10 183:1

**response** 33:3 67:22

**responses** 9:11

**responsibility** 70:18, 20

**responsive** 22:13 110:9 137:22

**rest** 150:8

**restroom** 92:24

**result** 44:17

**retain** 31:25 41:16,18 42:22,25 43:3,6 46:8,25 128:15,17, 20,22

**retained** 43:8,11 44:13 49:1 72:15,17 185:10,11

**retainer** 28:10,19 45:14 46:10 49:3,5, 9,11 51:25 52:1,4,16 53:1,10,15 54:7 56:1,4 74:9 170:11, 22 181:13,21,22 184:3 190:4

**retention** 46:24 47:1, 13,14 52:2,8 55:7 184:4

**retire** 17:6

**retired** 17:4 33:19 120:14 212:1

**retires** 17:10

**return** 40:6 119:12, 13,14 132:22

**returns** 119:17,20,22 120:2,6,7

**revenue** 58:17,24 59:1,4 71:7 205:17, 18

**review** 9:5 10:13 15:7,11,13

**rewards** 174:17

**Richter** 116:21 124:5

**right-hand** 197:25 201:20

**Rivka** 162:1

**role** 74:19,20 107:5 113:10 114:12

**rolled** 68:15

**room** 9:14

**Rosalia** 130:25

**royalties** 75:17,24

**Rozy** 132:3,22 134:9, 22 135:8,15

**Rule** 6:22 10:17 11:3

**rules** 6:4 88:16,17,21

**run** 49:25 50:1,3,7,9, 18 51:6,9 67:10,12 174:3 202:12,14

**running** 72:6 107:13 114:13 130:14 160:23 202:15

## S


**S-H-L-O-M-O** 61:9

**safety** 150:4

**sale** 76:8 153:4

**SALEEM** 94:19 95:8

**Sam** 45:7,21 71:11,20 72:3 74:23

**Saturday** 209:24

**Savings** 54:22

**schedule** 53:19

**school** 137:9,10

**schools** 123:6

**Schweitzer** 48:20

**scope** 52:6

**search** 14:1,4 22:1,8 28:13 36:20,23,24 37:18 46:20,23 132:8 136:20 138:3

**searched** 22:9 23:1 32:23 137:23

**secretaries** 31:11,13

**securities** 75:21,22, 23

**Security** 162:2,5 163:2

**select** 65:1

**sell** 135:1 146:12 154:2 169:20,22,23 172:11

**selling** 75:19 76:8,15 154:14

**send** 23:23 145:14 153:20 154:10,11 157:14,15 160:2,3, 12 167:16 168:10 169:25 208:7,9 210:19

**sending** 145:21 168:6 191:13

**sentence** 125:7

**separate** 39:9,11 81:8 88:17 96:11 156:3 162:7

**separately** 151:15

**sequentially** 110:25

**served** 103:4

**service** 55:22 78:19 102:8 106:14 107:1 108:4 112:15,24 113:18 114:5

**services** 27:13 28:3, 5,7 48:12,15,19 52:2,6 55:6 56:24 60:2 71:8 72:1 73:12 74:11 82:11,13 89:9, 21 102:14 107:7 108:19 115:1,3,4 118:5 127:1 136:6, 25 162:14 163:8 167:4,6 170:5 178:23 179:3,10 181:2,5,14,16 182:11,13 184:5 187:6 190:2 195:18 196:23

**set** 37:23 38:3,4 49:6 53:17 56:4 64:21 70:15 88:21 89:19, 20,21,23 90:12 102:19 104:7,10 105:23 106:2,5,6 112:7 114:20 116:17,18,20,23 117:1 124:2,4 149:14 152:12 175:5 178:16,24 179:11 182:3 183:6,13 190:22 201:1 208:24 209:1,2 218:8

**setting** 89:16 106:4

**settle** 87:18

**settled** 87:19,22

**Settlements** 61:21,22 63:4,5,7,14 64:3 69:6 95:15,16 96:17, 20 99:23,24 100:12, 17,18 101:2,11,16, 18 102:16 104:3,4,5 112:7,11 115:6,7 126:15,23

**shakers** 122:23

**share** 47:11

**shareholder** 33:13, 16,22 36:14 37:10, 11,12 99:15 171:21 172:17 173:7 187:5

**shareholders** 171:23 172:20

**sharing** 98:15

**Sharp** 6:14

**sheet** 164:21

**shell** 122:9

**Shenzhen** 122:3

**Sheppard** 116:20,23 124:5 126:2

**Sherman** 180:1

**shifted** 70:18

**Shlomo** 61:7,9 65:15

**short** 214:17

**shortages** 149:10

**show** 80:6 81:11 83:17 139:8 140:13 145:6 156:10 166:23 174:9 178:11 188:12 190:13 191:7 213:17,18 216:2 220:4

**showed** 142:12 164:8,22 166:22 212:13

**showing** 84:2 142:6

**shows** 141:11 149:9 163:12,13 189:9,18 202:18 213:5 220:9, 14 223:16 224:6

**sic** 192:19

**sick** 212:2

**side** 55:3,5,24 80:12 125:23

**sidetracked** 207:20

**sign** 69:17

**signatory** 92:20 180:8,11

**signature** 197:24 198:3,8,22,24,25 199:3,6,8,11,12,14, 16

**signed** 57:11 215:15

**signer** 199:5

**signers** 198:21

**similar** 50:23 83:12 194:23

**simple** 56:11,17 58:12

**simply** 52:24

**single** 165:12

**sir** 15:5 175:2 180:16

**sit** 87:21 138:18 192:5 202:22 215:25

**sitting** 9:2 49:8

**situation** 43:7 48:7

**situations** 55:2
**slightly** 30:19
**slip** 209:9
**Slow** 115:13
**small** 54:10 150:7
**smaller** 80:1
**Smart** 96:16
**Social** 162:2,4 163:2
**sold** 75:24 76:4,5 124:25 135:1 169:16
**sole** 35:13 99:15 172:17 173:6 180:8 198:14,16 199:5,12, 15,20
**solely** 35:13
**sought** 138:1
**sound** 16:25 81:4 94:18
**sounds** 17:2 62:9 94:19
**source** 71:7
**speak** 221:4
**speaking** 133:8
**special** 207:9
**specific** 102:23 204:15
**specifically** 191:16 204:11
**speculate** 178:6 195:7
**speed** 136:13,16,17
**spell** 16:6 120:16 200:5
**spend** 100:24
**spent** 44:9 72:10
**split** 70:7 97:17,18
**spoke** 109:12
**Square** 105:11 121:21,22 122:5,18
**stamp** 81:20 110:23 174:15 192:18
**stamped** 83:23 211:13
**stamping** 94:15
**stapled** 192:23
**start** 32:22 69:24 111:15 148:7 204:17
**started** 89:10 115:8 139:22 185:1 212:3
**Starting** 169:23
**starts** 148:7
**state** 6:5,11 18:25 40:21 88:16,20 127:18 129:5 156:1
**stated** 134:15,18
**statement** 18:3 29:15 30:3 33:8,15 34:2,9, 12,16 35:9 45:10 80:11,12 88:4 98:1 111:6 138:25 139:13 149:1 161:13 174:18 176:10 188:20,21 190:15,22 192:18 193:14 194:25 202:24 203:4 204:2 205:22,23 206:24 211:8 219:9
**statements** 58:21 89:6 91:2,4 98:18, 20,22 127:24 128:4, 15,17 130:8 192:23 193:1,9 197:20 203:5,20,24,25 206:7,19,21 214:12
**States** 129:5
**stating** 135:18
**status** 133:24
**statute** 49:6
**stay** 69:9
**stayed** 90:13
**steps** 40:7
**sticker** 218:25 219:1
**stocks** 72:9
**stop** 66:17 75:3 107:20 132:24 147:10
**stopped** 60:6 102:20 109:14 127:18 165:6,7 169:14 171:15,16
**stored** 183:9,17
**straight** 165:9
**strange** 68:1
**strike** 12:16 32:6 42:5 55:4 62:7 72:13 170:3 194:24
**stroke** 72:4 73:8
**Stuart** 130:24 131:2
**stuff** 209:10
**subpoena** 10:17 11:3 14:2,5 15:9 22:3,25 23:17 26:1 33:4 46:19 94:12 110:9 119:21 202:25
**subpoenaed** 119:19, 21
**substantive** 9:14
**subtle** 6:23
**sue** 50:5 182:14
**sued** 19:22 47:4,5,15
53:3 159:8
**suggest** 205:20
**Suite** 179:24
**summary** 174:17
**sums** 183:10,17 205:21
**super** 207:22
**supervision** 31:3,7
**supposed** 36:24 74:1 125:3
**Susan** 6:6
**suspended** 18:9 36:12
**suspension** 18:19
**suspensions** 18:19
**Swiss** 48:22 49:8
**switched** 25:5
**sworn** 7:11
**synagogue** 53:6,13 137:5
**synagogues** 123:6

## T

**T-S-I-K-M-A-N** 120:17
**tagged** 207:24
**takes** 158:14
**taking** 6:15 153:5 165:11 224:14
**talk** 133:13 185:19 224:12
**talked** 73:24 105:7,8 111:7 117:20 197:13
**talking** 28:22,23 51:7, 24 66:6 75:1 135:17 143:2,3 161:16

170:7 181:11

**tallest** 122:3

**tax** 35:22,25 40:5 119:11,13,14,16,20, 22,25 120:1,5,7 139:6

**taxes** 36:1 39:7 127:19

**Ted** 172:19

**teeth** 109:19

**teller** 141:20

**telling** 46:22 204:6

**tells** 59:15

**ten** 14:23 135:23 160:11

**tenant** 182:11,12,21

**tenants** 28:9 182:6, 14,15

**term** 21:12 164:13

**terminating** 218:15

**terms** 133:8

**Terri** 54:13

**testamentary** 40:3

**testified** 7:12 28:25 30:8,17 48:1 60:2 71:8 74:5 105:21 106:20 120:23 124:2 127:4 149:2 155:18 179:16

**testify** 8:4 12:19 13:13,17,19

**testifying** 204:14

**testimony** 9:13,20,22 30:5 32:7,11 33:25 42:21 90:4 105:23 108:17 112:25 171:13 181:8 188:24 194:5 197:22 199:19,22 201:8 204:10

**Thanksgiving** 209:22

**there'd** 107:10

**thing** 38:4 49:10 73:22 105:4 112:10, 11 114:4 115:6 150:10 154:13 211:13 212:13

**things** 73:9 74:22 112:17 119:4 141:22,24 204:25 213:20

**thinks** 217:11

**third-party** 62:22

**thought** 28:25 30:18, 19 38:16 42:1 44:12 60:18 67:3 120:3 153:15 154:1 184:2 201:8 215:22 216:25

**thousand** 162:11

**three-page** 194:16

**Thursday** 6:1,10 109:1 209:15

**ties** 56:20

**till** 57:8 73:22 87:18 131:14

**time** 9:5,15 10:4 16:24 17:7 20:24 21:7,10 23:12 28:6 29:23 30:11 40:5 43:14 44:9 51:12 52:17 53:2 58:25 60:19 70:23 72:10 74:6 82:15 83:7,9,12 88:11,14 89:4 90:15, 19,23 99:10 100:24 102:23 103:20,22,24 105:11 106:9 122:10 124:12 125:25 135:7 137:15,18 145:18 146:9 147:8 149:3 161:16 172:8,9,16 173:5 181:9,10 208:19,21,24 210:7 211:11 214:18,22 215:5

**times** 8:14 75:12 104:12 121:21,22 122:5,17 150:2 154:1

**title** 13:4,6 89:8 143:1 158:6 173:19 198:5 199:4

**today** 6:16 7:24 8:4, 17 9:1,10,20,22 10:14 11:9 13:13,17, 19,23 15:2 21:20 32:7 38:13,14 46:4, 22 47:19 73:5 101:3 106:23 132:17 138:19 165:2 169:12 184:3 192:5 199:20 202:20,23 208:17,18 218:10

**told** 48:21 56:5 67:3 146:2 181:7

**top** 82:19 180:18 191:1 212:8

**topics** 15:1,8,18

**Torrance** 6:7

**total** 70:12 86:24 215:18,25 216:1

**totally** 72:4

**town** 123:4

**track** 85:23 161:9 164:4 188:7

**tracks** 58:24 59:3

**traded** 75:22,23

**Trading** 75:21

**transactions** 141:3 201:21,22 221:10

**transcript** 9:4 111:19

**transfer** 62:16,20 64:18 65:4 69:17,21 87:5 124:22 141:4, 11 144:7 155:8 180:19 187:9 191:2 221:17,25 222:15

**transferred** 61:6 62:24 64:10 68:20 69:9,16 87:24 88:3, 11,24 114:22,24 120:24 124:3,14,16, 20 130:2 132:11 134:8,25 142:3,5 183:10 185:14 186:12 187:12 191:8,21 220:15 224:6

**transferring** 221:11

**tremendous** 59:17

**trial** 9:15

**TROSZAK** 110:20 146:24 186:4 208:16,19 209:2,13, 15,18,20,25 210:3,5, 7,11,14

**true** 45:17 98:11 213:21

**trust** 6:25 41:13,14, 16 42:6,11,13,18 53:18 56:11,14,17, 18,19,20 57:10,12, 16 58:12 63:8 68:23, 25 69:1,3 71:18 72:2,9,21,23 73:4, 15,17 74:19 77:2,12 79:5,6,7,12,14,17, 21,23,24 80:1,20

81:1,5 82:10,20 83:7,13 84:3,16 85:19,21 86:9,17 87:1,5,13,15 88:5,8 89:2,11,14,16,20,22, 24 90:2,5,16 91:5,23 95:25 104:22 105:9 115:11 117:6,9 124:1,4 125:10,11, 12,13,15,21,24 126:2,3,10 130:24, 25 131:12,16,17,23, 25 134:9 139:15,19 140:9,24 141:12 142:6,8,10,14,15,17, 24 143:12,15 144:21 148:21,25 149:1,3 151:3,5,10,12,17,24 152:4,8 153:1,4 154:16 155:17,22 156:5,6,7 157:16 160:15 161:5,7 162:18 163:4,9,24 166:25 168:23 169:19 182:3 185:24 187:20 188:1 191:24 212:19 213:6 222:1 224:7

**trustee** 6:15 7:10 22:25 40:24 41:1,3, 7,9,11,15 42:6 43:1, 4,8 44:5,8,14 45:18 47:24,25 48:1,3,7,10 71:10,16,18,20,21 72:2,8 73:16,17,19 74:20,24 116:6,7,10, 19 125:21 126:9 134:9,12,14,20,22 135:3,4,6,12,13,18 151:23 157:10 167:4 196:22,23

**trustee's** 44:19,20 71:11,12,13

**trusts** 72:19 73:7 74:3,14 116:24 156:6

**Tsikman** 120:13,14

**Tuesday** 210:3,4

**turn** 17:8 54:25

**turned** 91:11 105:16 185:4,5

**Twenty** 8:13

**type** 9:24 11:12 25:21 28:7 44:18 52:16 58:11 61:14 78:8 164:4 183:14

**types** 129:6

**typical** 40:8 56:7

**typically** 41:16 78:9

**U**

**Uh-huh** 76:6 186:19

**umbrella** 25:21

**uncertain** 30:8

**uncle** 49:14

**unclear** 30:5

**uncontested** 39:20

**underneath** 31:6 198:19

**understand** 7:23 8:20 9:8,17 10:5,6,8 11:11,14,15 13:25 20:9 21:12 22:23 23:16 25:10,12 34:3, 19,24 35:4 46:7 47:8,16,22 51:22 52:10,25 58:19 59:5 64:16 65:10 86:4 89:11,22 93:5 102:22 103:15 108:2 110:4 117:4 120:8 129:1 145:25 146:1 148:25 155:15 158:22 159:11,15 167:24 171:7 183:19 184:6,11 204:16

**understanding** 110:8 130:19

**understood** 10:11 22:24 49:24 102:24

**union** 55:1

**unions** 54:21

**unique** 73:18 89:15

**United** 129:5

**Unitrust** 63:9 68:22 104:24 115:16 116:4 120:21 121:7,19

**units** 27:15

**unsigned** 58:10

**unsuccessful** 131:7

**unsure** 197:20

**unusual** 48:7 196:9, 12,15

**upper** 179:21

**utilize** 50:24 190:19

**utilized** 52:18,19 177:21

**V**

**Vago** 19:21 20:1,3 48:10,23 49:13

**Vagos** 19:22 48:9,13, 16,18,21 49:4,6 151:22 152:2,3,5,24

**Vagos'** 48:20

**Valley** 24:11

**varies** 74:3

**Ventura** 14:10,12,15 20:21,25 21:6 50:8 97:9,24 126:22 172:6 173:11,20 174:24 175:6 194:7

**version** 8:23

**Vicken** 200:7

**VIP** 55:23

**virtue** 20:17 28:19

**visiting** 177:19

**W**

**wait** 17:19 117:12 125:6 161:2 208:23 223:22

**waiting** 99:8 130:5

**walk** 91:17 141:19 147:4,25 211:12 222:20

**walked** 37:20 92:5 141:23 147:5 220:14

**Wallmark** 122:21

**wanted** 27:25 45:21 57:22 71:23 111:7 135:10 158:25 160:14,18 168:13 187:24 215:9

**Washington** 112:3

**website** 133:23

**week** 135:9 209:22 210:1

**weeks** 135:9 208:13, 16,18,20,24 210:22

**well-being** 29:20

**Wells** 85:6

**Wendriger** 156:21,22 163:16,17,18 167:20

168:8

**Wendrigers** 156:20 157:6,12 163:13

**whatchamacallit** 210:16 219:7

**when's** 30:14

**wife** 40:20 56:12 72:5 112:12 113:1 114:9, 20 162:20,21

**Wilshire** 120:19

**Winters** 44:25

**wire** 143:9,14,15 167:12,13,16 168:17,20

**wired** 145:2,3,4

**wires** 167:24

**withdrawal** 186:9 220:3,14 221:21

**withdrawals** 148:5,6 218:18

**withdrawing** 196:4

**witnesses** 9:13

**won** 47:7

**words** 43:24 64:10 158:10 175:19 199:14

**work** 31:2 39:8 44:15 45:8 47:23 52:21 53:24 58:11,14 105:12 111:22 113:5,7,8 118:16,19 128:13 170:20 171:13 181:24 182:1,2,19 184:9,17, 21 189:21

**worked** 31:6 39:10 45:7

**world** 39:21

**worth** 43:25 69:22 176:25

**worthless** 58:10

**write** 152:9 160:1 199:12 210:16

**writing** 160:22 217:19

**written** 148:16 150:17 170:11,22 198:17 213:6 214:17

**wrong** 142:10,12

**wrote** 57:6 152:8 179:7

Y

**Yakov** 156:22 157:1

**year** 30:19 36:6,17 56:25 57:2 59:4 75:12 127:19 150:1 156:2 161:20 173:1 184:22 186:17,18 214:13

**years** 8:10 10:4 14:20,23 22:22 24:4 25:5,6 28:21,22 29:3 32:4 36:7,8 44:9 49:23 51:3 52:23 57:3,4 74:24 81:9 85:12 112:5 119:13 123:11 125:25 126:7,8 145:24 148:4 162:10 172:10 182:22 204:12,18, 19,20

**Yechiel** 137:6

**Yehuda** 137:6

**yes-or-no** 18:13 41:25

**Yeshiva** 137:8

**York** 24:10 49:13,15, 17 66:3 67:7,12,20 68:4 105:8 118:11, 15,18,22 119:5

**Yorkshire** 130:25 131:2

**Young** 6:25 216:17

**Yup** 111:4 210:14 220:23

Z

**Zeff** 122:21

**Zimmerman** 132:3,5, 10,22 133:6,11 134:9,22 135:8,15

**Zoë** 130:23

# EXHIBIT 3

Deposition of

**Leslie Klein**

December 19, 2023

Volume II

In re Leslie Klein

aptus. COURT REPORTING
www.aptusCR.com | 866.999.8310

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>Leslie Klein<br><br>Debtor. | No: 2:23-bk-10990-SK<br><br>VOLUME II |

RULE 2004 EXAMINATION OF

LESLIE KLEIN

LOS ANGELES, CALIFORNIA

DECEMBER 19, 2023

Reported by:
Susan Myong
CSR 13365

Job No. 10132843

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re )
)
Leslie Klein ) No: 2:23-bk-10990-SK
)
Debtor. ) VOLUME II
)
)
)
)
____________________________________)

RULE 2004 EXAMINATION OF LESLIE KLEIN, taken on behalf of Chapter 11 Trustee, at 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California, beginning at 10:11 a.m., and ending at 4:26 p.m., on Tuesday, December 19, 2023, before Susan Myong, Certified Shorthand Reporter No. 13365.

APPEARANCES OF COUNSEL:

For Leslie Klein:

FLP LAW GROUP LLP
BY: MARC LIEBERMAN, ESQ.
SAFA SALEEM, PARALEGAL
1875 Century Park East
Suite 2230
Los Angeles, California 90067
(310)284-7350
ml@flpllp.com

For Bradley D. Sharp, Chapter 11 Trustee:

PACHULSKI STANG ZIEHL & JONES LLP
BY: JEFFREY P. NOLAN, ESQ.
10100 Santa Monica Boulevard
13th Floor
Los Angeles, California 90067
(310)277-6910
jnolan@pszjlaw.com

Also Present: Nicholas R. Troszak, Development
Specialists, Inc.
Erica Vago (Remote)
Reem Bello (Remote)

# I N D E X

WITNESS: LESLIE KLEIN


| EXAMINATION BY | PAGE |
|---|---|
| MR. NOLAN | 235 |


## EXHIBITS


| NUMBER | | PAGE |
|---|---|---|
| EXHIBIT 20 | Memorandum of Understanding | 236 |
| EXHIBIT 21 | 7/12/16 letter | 245 |
| EXHIBIT 22 | List of policies | 253 |
| EXHIBIT 23 | E-mail 9/15/16 | 264 |
| EXHIBIT 24 | E-mail 5/29/19 | 269 |
| EXHIBIT 25 | 2/2019 to 3/2019 bank statement for 2108 | 286 |
| EXHIBIT 26 | 8/2019 bank statement for 2172 | 294 |
| EXHIBIT 27 | E-mail 11/13/18 | 297 |
| EXHIBIT 28 | E-mail 6/3/19 | 308 |
| EXHIBIT 29 | 1/2016 bank statement for 8122 | 313 |
| EXHIBIT 30 | 11/2016 bank statement for 8122 | 317 |
| EXHIBIT 31 | 1/2020 bank statement for 8122 | 319 |

EXHIBITS (Continued)



| NUMBER | | PAGE |
|---|---|---|
| EXHIBIT 32 | Gestetner Charitable Remainder Unitrust Renunciation of Designated Alternate Trustee | 330 |
| EXHIBIT 33 | 2018 Tax | 334 |
| EXHIBIT 34 | 2019 Tax | 338 |
| EXHIBIT 35 | 2020 Form 8879-C | 343 |
| EXHIBIT 36 | 7/2023 bank statement for 9404 | 345 |
| EXHIBIT 37 | 1/2019 bank statement for 9404 | 347 |
| EXHIBIT 38 | 3/2023 to 4/2023 bank statement for 8530 | 350 |
| EXHIBIT 39 | 6/2020 bank statement for 9404 | 359 |

Los Angeles, California; Tuesday, December 19, 2023
10:10 a.m. - 4:26 p.m.

THE REPORTER: Pursuant to the Federal Rules of Civil Procedure, I am required to state the following: My name is Susan Myong. My business address is 21143 Hawthorne Boulevard, Number 323, Torrance, California 90503. This is Volume II of the Rule 2004 Examination of Leslie Klein in the matter of in re Leslie Klein, beginning at 10:11 a.m., on Tuesday, December 19, 2023. For Volume I, we were on the record for an estimated 4 hours 39 minutes.

Counsels, will you please state your appearances for the record.

MR. NOLAN: Yes. Jeff Nolan appearing on behalf of the plaintiff, Bradley D. Sharp.

MR. LIEBERMAN: Marc Lieberman of FLP Law Group LLP, along with our paralegal Safa Saleem, appearing with Les Klein, the principal of Les Klein & Associates, the examinee.

MR. NOLAN: Yep. And also present in the room is Nicholas Troszak on behalf of the trustee.

Mr. Klein, good morning.

THE REPORTER: Wait, I need to swear in --

MR. NOLAN: Oh, yes, you should.

LESLIE KLEIN,

produced as a witness by and on behalf of the trustee, and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. NOLAN:

**Q Good morning, Mr. Klein.**

A Good morning.

**Q I'm going to skip the admonitions, since we did this on the first occasion.**

**Do you recall that?**

A Yes.

**Q Right? Your testimony here today is under penalty of perjury.**

**Do you understand that?**

A Yes.

**Q You're obligated to tell the truth.**

**Do you understand that?**

A Yes.

**Q Okay. Is there any reason I can't get your best testimony today? Taking any medication, anything that would inhibit your ability to recall facts?**

A No.

**Q Okay. Did you review any documents before you**

**came here in preparation for your deposition today?**

A No.

**Q No. Okay.**

MR. NOLAN: I'm going to mark this as Exhibit 20 for the record.

(Exhibit 20 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q So, Mr. Klein, when we left off at the end of your first deposition, we were talking about the Gestetner transaction.**

**Do you recall that?**

A Yes.

**Q Okay. And you had explained to me that Mr. Gestetner's policy of life insurance that he invested in had not come to fruition. The event -- the contingency hadn't occurred yet. And so he wasn't owed all the monies that were set forth in this proof of claim.**

**Do you recall that?**

A Well, actually, one of the policies that he owned, the Peggy Holtzman policy, did pass away.

**Q When did Ms. Holtzman pass away?**

A I think in 2018.

**Q And that policy was being held by Life Capital?**

A That is correct.
**Q Right.**
**And did you subsequently true up with Life Capital over the Holtzman policy?**
A Yes. We basically told them -- demanded that we get half of the money. It was an $8 million policy. We demanded that we get $4 million.
**Q And how much approximately did you realize from Life Capital?**
A Zero.
**Q And why is that?**
A I don't know.
**Q Well, you're a smart -- you're a lawyer; right?**
A Yes.
**Q What was the explanation they gave to you for giving you zero?**
A First of all, they never told us that Mrs. Holtzman died. It was found out by Mr. Gestetner in New York that Ms. Holtzman died in 2018.
**Q Okay. Besides that, if you'd just kind of answer my question.**
A Sure.
**Q What was the reason Life Capital gave you that they were paying you zero?**
A Because they were saying that there was

interest on all of the other policies that they paid. So, therefore, before they pay any money at all, they want to get their interest.

**Q For policies other than Ms. Holtzman's.**

A That is correct.

**Q Is that the first occasion that they had that type of methodology for trueing up on a policy?**

A That is correct. Mrs. Holtzman was the first person. There were a number of policies that died after Mrs. Holtzman. But Mrs. Holtzman was the first person that died. That is correct.

**Q Right.**

**But I would normally -- was it your custom and practice that whenever an event happened, that someone would pass away on a life insurance policy, the true-up would be uniform to just that policy and the premiums that were paid just on that decedent?**

A Well, that would have been my approach. That is correct.

**Q Okay. And did Life Capital hold any money that was -- that's for your benefit?**

A I think so, yes.

**Q You think they're holding money on behalf of the Holtzman policy for --**

A Yes.

**Q -- your benefit?**
A Not for my benefit. For Mr. Gestetner's benefit. In other words as far as I'm concerned, that $4 million that didn't pay belonged to Mr. Gestetner.
**Q Okay. Has Life Capital ever sent you any correspondence documents indicating that they're holding money for the benefit of the Gestetner family or the trust or the Gestetner group --**
A No.
**Q -- on behalf of the Holtzmans?**
A No.
**Q Okay. If you look at Exhibit 20. For the record, Exhibit 20 is a multiple-page document titled Memorandum of Understanding. And it has a schedule at the end of it.**
**So this page --**
A What page are you looking at?
**Q I'm looking at the first page for memorandum of understanding.**
A Okay. Thank you.
**Q And then the second page, it's at paragraph D, says "Schedule C loans," which I believe references Schedule C, which is attached.**
A Okay.
**Q So was this document, this memorandum of**

understanding that was created sometime after
July 25, 2017, do you see that in the first paragraph
under memorandum of understanding?
A It looks like it's dated July 25, 2017.
Q Okay. So why was this document created?
A This was created for the protection of
Mr. Gestetner.
Q And did Mr. Gestetner ask for it?
A Yes.
Q And he asked you to document his interest with
Life Capital?
A He didn't ask me. He asked I think
Mr. Rechnitz. So I'm not sure.
Q Did you get into a dispute with Mr. Gestetner
about what policies he had invested in?
A Yes.
Q Okay. And there was a subsequent -- was that
before -- strike that.
Was that before or after 2017?
A That was before 2017.
Q Okay. If you would look at D, Schedule C loans
it says on page 2.
A Okay.
Q It says, "The LLC confirms the current balance
of the loans listed on Schedule C of the operating

**agreement is blank."**

A Yes.

**Q "There shall be no other loans or increases in loans added to Schedule C by or at the request of Klein or any other party."**

**Do you see that?**

A Yes.

**Q Okay. So was Mr. Gestetner asking for clarifications about loans that were taken out of assets that he thought was in his name?**

A No. He wanted to know how much his balance is, how much money he will get when these various people die.

**Q Right.**

**What were the loans issued for, the Schedule C loans?**

A There were no loans. All the money that Mr. Gestetner gave to me or to the LLC were loans to purchase or -- either premiums or policies.

**Q And when you say the LLC, are you referring to Life Capital?**

A That is correct.

**Q Okay. So Mr. Gestetner was paying premiums for policies at Life Capital Group?**

A No. Once Rechnitz purchased the policies in

2011, Rechnitz paid all the premiums.

**Q Okay.**

A The monies that Mr. Gestetner loaned or lent were the premiums between 2007 and 2011.

**Q Okay. If you look at the last page of Exhibit 20.**

**Are these loans that were pending against policies that were held by Life Capital Group?**

A Yes.

**Q And so these were -- these are individuals that were solicited to pay policy premiums?**

A I think these loans were all paid back.

**Q That's not my question.**

MR. LIEBERMAN: Listen to the question.

THE WITNESS: Okay. There's no Mr. Gestetner here. I'm looking through the list.

MR. LIEBERMAN: Just listen to the question.

MR. NOLAN: Right.

THE WITNESS: Fine. Okay. What was the question?

BY MR. NOLAN:

**Q Are these loans that were pending against the policies of insurance that were held by Life Capital Group?**

A That is correct.

Q Okay. And would these be individuals that you solicited to pay the policy premiums?
A Yes.
Q Okay. So would these be -- individuals have contributed this money prior to 2011?
A That is correct.
Q And do you know what policies -- or strike that.
Was this on one policy or more than one policy?
A More than one policy.
Q At any time, did you learn that Life Capital Group had taken loans out against the policies that they were holding that were for a reason or a rationale other than the payment of policy premiums?
A I don't think -- I don't know.
Q Meaning, did you ever believe or did you ever allege to Mr. Rechnitz or Mr. Polter that someone had taken or was trying to reimburse themselves for loans against the policies that weren't related to the payment of policy premiums?
A No.
Q Okay. What about Mr. Polter? Did Mr. Polter charge a fee for managing the life insurance policies?
A Yes.
Q And what was the arrangements for Mr. Polter's

**participation?**

A Well, I was not involved with Mr. Polter's fee because I always felt that Mr. Polter was charging unreasonable fee. The decision as to how much to pay Polter was done by Mr. Rechnitz solely.

**Q Mr. Polter is an employee of Life Capital Group?**

A Yes.

**Q And so he's charging a fee in addition to whatever Life Capital Group would charge, or is he, like, an independent contractor charging a fee as, like, a broker? Strike that.**

**What was the basis for Mr. Polter charging a fee on life policies that he managed?**

A Basically, some of the policies were transferred to a charity. And Mr. Polter was instrumental in getting appraisal of what these policies were worth. So there was a deduction taken.

**Q Deduction taken with respect to transferring a policy before an event occurred.**

A Before that event occurred.

This was unknown to me, ever. But I found this out recently.

**Q And what were the reasons that policies were being transferred prior to the contingency or the event**

**to trigger the policy?**

A For Shlomo Rechnitz to take a charitable deduction.

**Q How about you? Did you ever take a charitable deduction --**

A Never.

**Q -- and transfer any of your policies for charitable purposes?**

A Never.

**Q Okay. Let's show you 21, Exhibit 21.**

MR. LIEBERMAN: This goes to you, I think. Thank you.

(Exhibit 21 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q Go ahead and look at Exhibit 21, Mr. Klein.**

A Yes.

**Q And for the record, I'll identify it. It's got a cover letter from Les Klein & Associates Inc. dated July 2016. And it has multiple pages of documents that appear to be just the front first page of various life insurance policy purchase agreements.**

A Yes.

**Q Does this document look familiar to you?**

A Yes.

Q Is this document on your letterhead, firm letterhead?
A Yes.
Q Do you have any reason to doubt the authenticity of Exhibit 21?
A No.
Q Okay. Is Bozi Mr. Gestetner?
A Bozi is Mr. Gestetner, yes.
Q Okay. Is Exhibit 21 a letter that you authored with respect to trying to clarify to Mr. Gestetner what policies of insurance he had invested in?
A That is correct.
Q And these six policies that are -- excuse me. Strike that.
These policies that are listed in Exhibit 21, are they complete?
A Yes.
Q So Mr. Gestetner didn't have -- does not have an interest in any other policies other than that appear on Exhibit 21 based on your recollection.
A That is correct.
Q Was there ever any dispute with you and Mr. Gestetner about Exhibit 21 after it was issued?
A No.
Q Did Mr. Gestetner ever think he had paid policy

**premiums in any other policies?**

A No.

**Q So after Exhibit 21 was issued, you and Mr. Gestetner were on the same page as far as the policies that he invested in?**

A No.

**Q And why is that?**

A Because Andrew Gardner and Yvette Gardner lived till age 98. And there really was no -- very little equity in the Gardner policies. So basically, Mr. Gestetner was told that he will not get anything from the Gardner policy when Mr. and Mrs. Gardner pass away.

**Q Okay. Other than the Gardner policy, was there ever any dispute with you and Mr. Gestetner after Exhibit 21 about other policies of insurance?**

A Yes. Rozy Zimmerman was another policy that we had a dispute. Because Rozy Zimmerman was a $9 million policy. But, again, she's still alive today. And we have paid --

(Reporter asks for clarification.)

THE WITNESS: We have paid in on Rozy Zimmerman premiums of probably 5 to $6 million. So Rozy Zimmerman was also removed.

///

BY MR. NOLAN:

**Q Okay. But not including any of the policies of insurance that are in Exhibit 21, did you, subsequent to the issuance of this letter dated July 12, 2016, ever have a dispute with Mr. Gestetner about any other policies of insurance possibly being his, or he has an interest in, other than those that appear on Exhibit 21?**

A No.

**Q Okay. So Exhibit 21 is the whole universe for Mr. Gestetner.**

A That is correct.

**Q Okay. So you were kind enough to tell me Zimmerman is still alive.**

A Yes.

**Q And when did the Gardners pass away?**

A I'd say about -- Mr. Gardner passed away maybe three years ago. And Mrs. Gardner passed away about maybe two years ago.

**Q And was that policy joint when -- for it to be triggered both be a decedent --**

A That's correct.

**Q -- both would have to be --**

A Second to die, yes.

**Q Okay. Second to die.**

**And what does it mean by "return of premium**

**policy"?**

A Okay. So let's say on Zimmerman, the original premium -- the original policy was $9 million. So if Mrs. Zimmerman would die today, instead of getting $9 million you would get $14 million because we paid $5 million of premiums.

**Q So do you get all the premiums back or only premiums for a certain time frame?**

A All of the premiums from day one. Those are very good policies. American General had big financial problems.

MR. LIEBERMAN: There's no --

THE WITNESS: Yeah.

MR. LIEBERMAN: -- question pending.

THE WITNESS: Okay. I'm sorry.

BY MR. NOLAN:

**Q Right. They're a good deal for investors.**

A Yes. Yes.

You're right. Sorry.

**Q No worries.**

**Any other policies that Mr. Gestetner had that were return of premium policy?**

A Yes, Eugene Kohn.

**Q Okay. So Kohn --**

A Number 5.

**Q Yeah.**

**Are the Kohns still -- Kohns have deceased; right?**

A Just deceased recently.

**Q As of when; do you know?**

A April of 2023.

I'm not sure about six, if it's a return of premium policy. It says that it is, but I'm not sure.

MR. LIEBERMAN: There's no question. There's no question.

THE WITNESS: Okay. All right.

BY MR. NOLAN:

**Q Is Kurzner still alive?**

A Yes.

**Q Okay. So of Exhibit 21, there's two policies that are still -- or three policies that are still in effect. Kurzner --**

A Yeah.

**Q -- Zimmerman --**

A Yes.

**Q -- and -- oh, actually, that's it.**

A No, no. Eugene Kohn is in effect because that's a dispute with Rechnitz today.

**Q Okay. Has there been any determination to go to any type of tribunal or dispute with Mr. Rechnitz**

**regarding Eugene Kohn?**
A I don't know.
**Q I think is it a -- what's the -- Ventura is it called?**
A Yeah, Ventura. I mean, Cogan was talking to his lawyers. I don't know what happened there, but...
**Q And who is Cogan, Michael Cogan?**
A Michael Cogan.
**Q Michael Cogan your prior counsel?**
A My prior attorney, yes.
**Q Right.**
A Yes.
**Q Do you know if Michael Cogan made any demand on Life Capital Group?**
A Yes, he did.
**Q And did he get a response before he left?**
A No. He didn't tell me his response, no.
**Q If you go to the second page of Exhibit 21, the agreement references that -- a purchase agreement for BK Life Settlements, LLC.**
**Do you see that?**
A Yes.
**Q And who is BK Life Settlements, LLC?**
A BK Life Settlements, LLC was in existence in 2007, this is in 2009, who purchased the Gardner policy.

**Q Right.**

**Did you incorporate BK Life Settlements, LLC?**

A I don't remember.

**Q Did you have an interest in BK Life Settlements, LLC?**

A Yes.

**Q Did you own it solely and manage it solely?**

A I don't think I owned it solely, no.

**Q Was there other investors?**

A I think there were other investors, yes.

**Q And do you know who they were?**

A I remember David Berger was one investor. I don't know who else.

**Q And so did this happen that the BK Life -- or strike that.**

**Tell me what was contemplated with this life insurance purchase agreement?**

A Yes. Basically, the idea was to purchase the Gardner policy and then to sell it on the open market to hedge funds in 2011.

**Q And did that occur?**

A No.

**Q Okay.**

MR. TROSZAK: Just so you know --

MR. NOLAN: We need to go off the record a

second.

(Recess from 10:34 a.m. to 10:42 a.m.)

MR. NOLAN: Okay. We're back on the record.

BY MR. NOLAN:

**Q Mr. Klein, you're under oath still.**

A Yes.

**Q You understand that; right, sir?**

A Yes.

(Exhibit 22 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q Okay. Exhibit 22, for the record, is a two-page document. And it's, again, on your letterhead.**

**Mr. Klein, any reason to doubt the authenticity of Exhibit 22?**

A No.

**Q Is this a document that you prepared?**

A Yes.

**Q Okay. And it says the largest nine policies.**

**Who did you prepare that for?**

A I don't remember.

**Q Some of these individuals are folks that were on Exhibit 21. The Gardner's?**

A Yes.

**Q Ms. Zimmerman?**

A Yes.
Q Ms. Holtzman?
A Yes.
Q Goodkin. Do you recognize Mr. Lewis Goodkin?
A Yes.
Q Is that a policy that you believe is currently being held with Life Capital Group?
A Yes.
Q Okay. Is Mr. Goodkin alive still?
A Yes.
Q Mr. Kohn we already talked about.
He's alive? Oh, no, he died.
A No, Mr. Kohn died.
Q He died. Okay.
How about Agnes Roth?
A She's alive.
Q And that's a policy over at Life Capital Group?
A Yes.
Q And Ms. Burke, I think, passed away?
A Yes.
Q How about Mr. Grossman [sic]?
A She's alive.
Q And that also -- is it Life Capital Group?
A Yes.
Q Okay. And we talked about -- that's the same,

Mr. Kurzner?
A Yes, Mrs. Kurzner -- Mrs. Lillian Kurzner.
Q Which is the correct spelling, K-u or K-i-z-n-e-r?
A I don't know.
Q On the second page there's Faye Glatzer.
Is she alive?
A Yes.
Q That policy is at Life Capital Group?
A Yes.
Q Is that accurate, it's a million dollar policy?
A Yes.
Q Could you change the policies at all once they were issued? Could you, like, increase the policies? Was that an option?
A No.
Q How about the Hoffmans?
A They're still both alive.
Q And is that a -- what was the terminology?
A Second to die.
Q Second to die; right?
A Yes.
Q And how about the Sears?
A They're still around. Both of them are still around.

**Q And they're both second to die policies?**
A Yes.
**Q Did the law firm of Les Klein & Associates invest in any of these policy -- any of these policies before they were transferred to Life Capital Group?**
A No.
**Q How about you personally?**
A I don't know.
**Q Would you have a document that would tell you if you invested in it or Life Capital Group invested in these policies?**
A Well, Life Capital Group invested in all of these policies. Once it was 2011, all the premiums were paid by Life Capital Group.
**Q I understand that. But if you paid a policy from 2000 to 2011 and came out of pocket on the premiums, you'd want to know what that amount was; right?**
A That is correct.
**Q Right.**
**You don't -- how do you track that?**
A I have a list of all the monies that I got from investors and all the monies that I put in.
**Q Okay. And where is that list?**
A I would have to look for it. I mean, this is a

deposition of the law firm, not of me personally.
**Q I understand that. But I'm not sure whether or not you invested in these policies or Life Capital Group or the law firm invested in the policies.**
A The law firm did not ever invest in any policies.
**Q Well, that's not what you told me last time you were here. You told me the law firm did invest in policies.**
A I don't think so. The law firm did not invest in any of these policies.
**Q In any of the policies in Exhibit 22.**
A That is correct.
**Q But the law firm did invest in life insurance policies.**
A To my best recollection -- I just don't know.
**Q You don't know if the law firm ever invested in policies of insurance.**
A That is correct.
**Q Why?**
A Because we're going back to a period of 20 years plus, and there's a lot of policies.
**Q Right. And when you were here the first deposition, you told me you tracked every policy, every dime, every investor.**

**Did you not tell me that?**

A Investor. I did not track if the law firm invested in any policies. I told you that I tracked all the investors.

**Q Right.**

**The law firm wouldn't be an investor in a policy?**

A It would be an investor. So -- but I don't remember including the law firm, as to how much the law firm invested.

**Q Right. Well, you've invested in a lot of policies; right?**

A That is correct.

**Q Right. And you've had a lot of investors in these policies; correct?**

A That is correct.

**Q You don't leave it to chance and your memory who invested and when they invested and how much they invested; correct?**

A That is correct.

**Q All right. So what document do you maintain that tracks all of this?**

A I know how much every investor invested in which policies.

MR. NOLAN: Okay. I'll move to strike that as

nonresponsive.
MR. LIEBERMAN: Listen to the question.
THE WITNESS: Okay.
BY MR. NOLAN:
**Q What document do you maintain that tracks the investors and the investments in the life insurance policies?**
A Well, I have a document that shows how much each investor invested in let's say these 12 policies.
**Q Right. Why don't you want to share that document or the identity of that document with me?**
A I have no problem sharing the identity of that document. The law firm doesn't have that document. That's a document that I have.
**Q Well, why wouldn't the law firm have a copy of that document?**
A Because the law firm wasn't involved in the insurance policies.
**Q Well, you told me before that you did and paid some of the policy premiums out of the law firm because you didn't want people to think that they were gifts; right?**
A Yes. Some of the premiums were paid from the law firm. That is correct.
**Q Right. So why wouldn't the law firm have**

**copies of policies that it's making payments on?**

A That's just not how I did it. I didn't do it through the law firm. I made the copies. I mean, I know exactly how much I paid for all the premiums.

MR. LIEBERMAN: He's talking about documents.

BY MR. NOLAN:

**Q I'm sure you do.**

A Yeah.

**Q I just -- I'm not sure I understand why you won't tell me what that document is in here today.**

**Am I being that ambiguous and poor of a question in a deposition? Can you tell me what the document is that you maintain on these policies of insurance?**

A Well, I have a document that shows how much money I paid on every policy and who the investors are on every policy. I have that.

**Q Right. What document is that? What's it called? What would you term -- what's the terminology you would use to describe that to your lawyer?**

A Okay. Terminology would be all premiums that I paid on all the policies between 2007 and 2011. That would be the document.

**Q Right. Is it a spreadsheet?**

A It's a document like this. It's -- basically

it lists the policy and it lists how much money I paid on each of these policies.

**Q Right. Do you know what Excel is, an Excel spreadsheet?**

A It's a list.

**Q Right.**

A It's not Excel.

**Q Do you understand what an Excel format is?**

A Yes, I do.

**Q Do you use Excel formats?**

A No.

**Q Okay. So most of the documents you draft are in, like, Microsoft Word?**

A Well, for example, I would say Andrew Gardner --

MR. LIEBERMAN: No. Listen to his question.

THE WITNESS: No?

MR. LIEBERMAN: Listen to his question.

THE WITNESS: Okay. Fine.

BY MR. NOLAN:

**Q Yeah. I'm just talking about --**

A Okay.

**Q Don't make this harder.**

A Okay. Fine.

**Q When you want to keep track of things --**

A Right.
**Q -- you put it -- enter it into a computer?**
A I don't know how computer savvy I was in 2007, 2008.
MR. LIEBERMAN: No, no. Listen to his question.
THE WITNESS: The answer is no.
BY MR. NOLAN:
**Q So you have, like, an old fashion green ledger book like my dad used to have where he'd track my student loans and how much I paid?**
A Yes.
**Q Okay. So you have the -- I forget what it's called. But you have, like, a physical binder that has lined paper in it, and you use that to track the policies and the investments.**
A That is correct.
**Q Okay. And where do you keep that document?**
A I'm not sure.
**Q Come on, Mr. Klein. Don't -- I don't want to bring you back here on another day. I just want you to answer my questions. And I'll be polite about it.**
**Where is the document?**
A I have to find it.
**Q Okay. Where would you go look?**

A I would look in my house somewhere.
**Q Okay. On June Street?**
A On June Street.
**Q Okay. But you wouldn't look at the law firm.**
A No.
**Q Would you ever use any of the law firm records to corroborate the information that was in this -- we'll call it a binder?**
A No.
**Q Okay. Can I call this document that you track all the policies of insurance and the contributions, can I call that the life insurance binder?**
A I don't know if it's a binder. It's just papers. I mean, it's just sheets, like these sheets.
**Q Yeah. But we talked about it.**
**It's in a binder; right? It's a book.**
A Not sure if it's a book. I think it's in a folder. I haven't look at this for quite a bit of time.
**Q Really?**
A Really.
**Q Really? You have tens of millions of dollars at stake on these policies.**
A Yes.
**Q Right? And you don't look at the binder regularly?**

A No. I basically have not looked at the binder for the last ten years.

**Q Last ten years.**

**Okay. Let's look at Exhibit 23.**

MR. NOLAN: Oh, I'm sorry. Give it to the court reporter first.

THE WITNESS: Thank you.

(Exhibit 23 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q So Exhibit 23, for the record, while you look at it, Mr. Klein, is an e-mail. It's -- again, it looks like it's on your letterhead. And whenever you're ready, my first question is to be just whether or not this document appears to be a record off of your law firm and if it's authentic.**

A Yes.

**Q Okay. Tell me what Exhibit 23 is to you.**

A This is basically a letter that I wrote to Isi Morsel, who is the son-in-law of Mr. Gestetner, as to original funds that I received from him, from Mr. Gestetner, and the interest that they were supposed to earn from Rechnitz and from me from 2005 to 2016.

**Q Okay. What did you prepare Exhibit 23 from?**

A Well, basically, I looked at the original

amounts that Mr. Gestetner gave me. And I computed interest, which was the interest that -- the agreement I made with Rechnitz. This was done in 2016. And the interest on those funds were 12 percent.

**Q No. I get how -- your methodology.**

A Yeah.

**Q But what document did you utilize to prepare Exhibit 23? Did you use the binder?**

A No. I used the contract with Rechnitz.

**Q You used the amended operating agreement?**

A Yes. From Rechnitz in 2011. That is correct.

**Q Okay. And how would you calculate what the premiums were that were paid prior to 2011?**

A Well, actually, I thought the total premiums paid were 3 million 8. But Mr. Gestetner, who was my brother-in-law who I was very close with, said that it was 4 million 2.

So instead of fighting with him over -- you know, between 3-8 or 4-2, I said, okay. I'm going to use the number of 4-2.

**Q And Exhibit 23 is just you -- or strike that.**

**Nobody's passed away at this time.**

A That is correct.

**Q Right?**

**So he hasn't earned any interest in 2007 or in**

**2008 or in 2009; correct?**
A That is correct.
For him to earn any interest, people would have to pass away. And I was distributing him money.
**Q So Exhibit 23 is -- you're essentially estimating for him what he's owed?**
A Exhibit 23 is basically an accounting of what he's owed when the people pass away, assuming that I get any money from Rechnitz.
**Q Okay. And as you go down here, it says, "Earned interest in 2012, less distribution."**
A Right.
**Q What distribution had you made?**
A In 2012, I made a distribution of $120,000.
**Q And did you make those payments or did the law firm make the payments?**
A The law firm made the payments.
**Q What about 2013 and 2014? Were those payments by you or the law firm?**
A The law firm.
**Q Were they made out of the client trust fund account?**
A It was made out from the general account.
**Q That's the operating account?**
A That is correct.

**Q And did you update the binder that you keep at your house somewhere after you made these distributions?**

A Well, I kept this letter to show that basically when these various people die, how much money he would get, assuming that I would get money from Rechnitz. But I never got any money from Rechnitz.

**Q But you don't make a journal entry in your binder that's at home when you cut a check to Mr. Gestetner's family? You didn't record the payment, the month?**

A Well, this was the same amount every month, $10,000 a month.

**Q Okay. But I'd like you to answer my question.**

A Okay.

**Q Did you -- you're an accountant; correct?**

A Yes.

**Q You wouldn't maintain a ledger that tracked the flow of funds out to Mr. Gestetner's payment or to -- on his behalf?**

A I know every penny I paid to Gestetner.

MR. LIEBERMAN: Listen to --

THE WITNESS: The answer is no.

MR. LIEBERMAN: -- His question.

BY MR. NOLAN:

**Q Okay. But you've already told me that you**

**wouldn't rely on just your memory; right?**
A I would rely on my memory.
**Q So for all these policy premiums, you rely only on your memory.**
A Well, today -- I mean, it's -- I have to rely on my memory because all these promise -- premiums, insurance companies give me a printout as to what I paid in.
**Q Right. You take that at face value?**
A Yes.
**Q Okay. But you do maintain documents on these life insurance policies because you've already told me about the binder that you keep at the house somewhere.**
A I do keep a binder. But all these insurance policies, I know exactly how much I paid in. I know exactly how much Rechnitz paid in. And I know exactly how much I should get. I know exactly how much he should get.
**Q And I understand that you --**
A And it's a very simple accounting.
**Q Well, it's not. It's not simple because you're paying out of multiple accounts to Mr. Gestetner; right?**
A No. I'm not paying out multiple accounts to Mr. Gestetner.
**Q Did you ever pay Mr. Gestetner out of your**

**checking account?**

A My personal account?

**Q Your personal checking account.**

A No, never.

**Q You paid him out of the operating account of the law firm; right?**

A That is correct.

**Q Okay. What about out of the IOLTA account? Did you ever pay Mr. Gestetner out of the IOLTA account?**

A No.

**Q Did you ever pay Mr. Gestetner out of any of the credit card accounts?**

A No.

(Exhibit 24 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q All right. Exhibit 24. So Exhibit 24, for the record, while you look at this document, Mr. Klein, is on your letterhead. It's a single-page document.**

**And my first question to you is: Does this document appear to be a true and accurate copy of a document that was issued out of the law offices of Les Klein & Associates?**

A It does.

**Q Okay. The document, for the record, is dated**

**May 29, 2019. It's to Jonathan Polter and it's from Les Klein & Associates.**

**Do you see that?**

A Yes.

**Q And it's regarding Life Capital Group, LLC?**

A Yes.

**Q Okay. When it comes from Les Klein & Associates, is that you?**

A This was me. Yes.

**Q Okay. Could it ever be from anybody other than you if it was issued out of Life Capital Group to Mr. Polter or Life Capital Group?**

A Yes, it could. But this is me.

**Q Okay. Who else could it be issued from?**

A It could be Owen Podell. I don't know who else worked for me in 2019. But I think in 2019, it was just either me or Owen Podell.

**Q This document is in regards to the dispute you have with Life Capital Group; is that accurate?**

A That is accurate.

**Q Did the Gestetners ever record any type of instrument that transferred your 50 percent interest of Life Capital to the Gestetners?**

A No.

**Q Okay. Did they try to do that?**

A I don't know. The Gestetners were represented by an attorney by the name of Naftali Leshkowitz.

**Q Right. But I'm asking you: Did the Gestetners ever secure any interest in Life Capital Group that you're aware of for your 50 percent percentage of interest in Life Capital Group?**

A I'm not sure. I mean, they had a conversation with Mr. Polter and Mr. Rechnitz. And I don't know what their conversation was with Mr. Rechnitz and Mr. Polter. But I was on a very close relationship with Mr. Gestetner. He's my brother-in-law.

**Q Do you currently have a 50 percent interest in Life Capital Group, LLC?**

A I think so, yes.

**Q Okay. Four paragraphs or three paragraphs down it says SY -- SYRTR Foundation.**

A Yes.

**Q What does that stand for?**

A Shlomo Yehuda Rechnitz and Tamar Rechnitz Foundation.

**Q Okay. So that is the same Mr. Rechnitz that's the other --**

A 50 percent partner.

**Q In Life Capital Group.**

A That is correct.

Q Okay. Let me finish the question though, if you can, because --
A Sure.
Q -- you're going to have to read this deposition.
A Okay.
Q And it's going to be brutal if we --
A Sorry.
Q -- keep talking over each other.
A Sorry.
Q Okay. So the third paragraph says -- so you're telling Mr. Polter that he failed to give you an accounting from 2011 to 2019.
Do you see that?
A Yes.
Q It also says, "You failed to tell me about the management fees"; correct?
A That is correct.
Q And it says, "You failed to tell me about the management fees charged to Life Capital Group, LLC and SYRTR Foundation, in which I have an equitable interest."
Do you see that?
A Yes.
Q What are you referring to by "I have an

**equitable interest"?**

A Well, I transferred the Holtzman policy to SYRTR Foundation. And Holtzman died in 2018. SYRTR Foundation got $8 million, and I got zip and Mr. Gestetner got zip.

**Q Why did you transfer the Holtzman policy of insurance to SYRTR Foundation?**

A Because we were friends. The reason that I made this deal with Shlomo Rechnitz is because in 2011, I worked for him.

**Q And what did you work -- in what capacity?**

A I was his lawyer.

**Q On -- generally or on a specific task?**

A I don't remember exactly what I did for him, but I worked for him.

**Q Can you give me some understanding of how you worked for him? Were you employed by one of his companies?**

A Well, I did a lot of things for him.

My main job was he purchased a -- he went into a new business, retirement homes and various entities. And my job was to set up his employees and set up systems.

**Q What type of systems?**

A Accounting systems.

**Q Are you talking about manual accounting systems or computer accounting systems?**

A I don't remember it was computers. This goes back to 2010, 2009. I worked for him for about a year and a half.

**Q But do you have the technical ability to set up, you know, computer systems to track employees and --**

A No. He had --

**Q -- accounts?**

A -- computer experts. I was just working with their -- with his experts.

**Q Okay. So you were giving direction to the computer folks on what they needed to set up for --**

A Right.

**Q -- these employees' accounts?**

A And their employee accounts, how to bill Medicare and Medicaid and all kinds of technical things.

**Q Okay. Did Mr. Rechnitz employ the law firm of Les Klein & Associates or was he employing you individually?**

A Employing me individually.

**Q Any other business that you did with Mr. Rechnitz other than Life Capital Group in this 1-1/2-year stint with assisting the retirement homes?**

A No.

**Q That's the basis of your friendship?**

A Well, friendship for a long time. We -- our kids went to school together. I've known him all my life. Knew his parents.

**Q What about any type of charitable work, foundations? Did you join with him in establishing any foundations?**

A Well, I also accomplished my own foundation, EKLK Foundation.

**Q Right. Did Mr. Rechnitz join you in that?**

A No.

**Q Did he ever contribute to it?**

A No.

**Q Okay. So based on this friendship, you transferred a $8 million policy?**

A That is correct.

**Q And how did you transfer it to him or to his foundation?**

A I guess I wrote a letter saying that...

MR. LIEBERMAN: Don't guess.

THE WITNESS: I don't know. I don't remember how I did it.

BY MR. NOLAN:

**Q Well, you could transfer it a couple ways. You could transfer the policy; right?**

A Right.

**Q You could have the policy in a holding company, like BK Life Settlements, and transfer the holding company to him?**

A No. I transferred the policy to him.

**Q But you could do that as well though; correct?**

A Yes. Yes.

**Q Okay. So you don't think you used a holding company. You think you just transferred the policy directly to his foundation.**

A That is correct.

**Q But you're not sure as you sit here today.**

A I'm not sure as I sit here today.

**Q Okay. What record would you go to, to confirm how you did it?**

A I would call the insurance company. I mean, this was a policy --

MR. LIEBERMAN: You've answered the question.

THE WITNESS: I don't remember the company. I would call the company and find out how I did it.

BY MR. NOLAN:

**Q Okay. What about your binder that's at home? Would there be any --**

A It wouldn't be in the binder.

**Q Would there be any notes reflecting how this**

**was effectuated in your binder?**

A No.

**Q What about the law firm? Did the law firm pay any policy premiums for Ms. Holtzman?**

A No.

**Q What about Mr. Gestetner, did he pay any policy premiums on Holtzman?**

A Yes.

**Q What years?**

A I think 2007, 2008, '09, and '10, maybe half of '11.

**Q Did he pay any for 2011?**

A Maybe half a year, yes.

**Q What document do you have that would tell me what years Mr. Gestetner contributed on that policy prior to it being transferred to LCG?**

A I'm not sure what documents I would have.

**Q Now, the bottom of this paragraph, it references that you're saying that half of the policy premiums should have been distributed to your foundation.**

**Do you see that?**

A Yes.

**Q Is that EKLK Foundation?**

A That is correct.

**Q And why would EKLK be getting any of the policy premiums for the Holtzman policy?**

A Because EKLK owned 50 percent of the Holtzman policy. This was not part of Life Capital, LLC. This was in his foundation and my foundation; 50 percent by his foundation, 50 percent by my foundation.

**Q But we already covered that the Holtzman policy was a policy that was transferred to Life Capital Group; correct?**

A No, no, no. That is not correct.

**Q So Exhibit 21 and 22 that references the Holtzman policy and those policies going to Life Capital Group is inaccurate?**

A That is correct.

**Q And is it inaccurate because you just misremembered it --**

A Yes.

**Q -- or because it was always disputed between you and Life Capital Group?**

A No. It's very clear the Holtzman policy was not transferred to Life Capital Group. And I would have to contact the insurance company. And the insurance company would verify that the Holtzman policy was owned 50 percent by EKLK, 50 percent by SYRTR Foundation. And EKLK transferred their 50 percent to SYRTR Foundation.

**Q Did EKLK ever pay any of the policy premiums --**
A Yes.
**Q -- for the Holtzman policy?**
A Yes.
**Q And would have EKLK Foundation paid those out of the Les Klein & Associates law firm account?**
A I don't remember.
**Q Well, what document would you go to refresh your recollection?**
A I would call the insurance company on the Holtzman policy. It's Alliance. That's the name of the insurance company. I would go to Alliance and find out all the premiums that were paid on the Holtzman policy between 2007, from the time of the inception, till 2011. At the time that -- I didn't even know who made the payments after 2011. I think maybe it was made by Torah Masuah (Phonetic). I just don't know.
**Q Right. But the insurance company is going to give you a list of the policy premiums that were paid each year; right?**
A That is correct.
**Q Would they be giving you a list of who paid it?**
A I don't know.
**Q Well, what doc- --**
A My guess is yes, but I don't know.

**Q What document would you look at to determine whether or not -- what specific entity wrote the check on the policy premium for the Holtzman?**

A I would contact Alliance and --

MR. LIEBERMAN: Just answer the question, if you can.

THE WITNESS: I can't --

BY MR. NOLAN:

**Q What document?**

A I can't tell you -- answer the question.

**Q You don't know as you sit here today.**

A I don't know as I sit here.

**Q Right. But you know everything about every policy premium and when it was paid and who paid it.**

A That is correct. Between 2007 and June of 2011, I paid every policy premium on this Alliance policy.

**Q For the Holtzman policy.**

A For the Holtzman policy.

**Q Okay. What account did you pay it out of?**

A That I can't tell you.

**Q But you know everything about every fact and every policy and who paid it.**

A That is correct.

**Q But you don't know right here today.**

A That is correct.
**Q Did EKLK own any portion of the SYRTR Foundation?**
A No.
**Q So everything that was sent to the SYRTR Foundation was a charitable gift.**
A No. It wasn't a charitable gift. It was a -- it wasn't a gift either. It was a deal that EKLK Foundation made with SYRTR Foundation that EKLK Foundation paid the premiums between 2007 and 2011.
From 2011, I thought SYRTR Foundation will pay all the premiums. And then when Mrs. Holtzman dies in 2018, 50 percent of the money goes to EKLK, 50 percent of the money goes to SYRTR. End of story.
**Q Understood.**
**Did SYRTR Foundation and EKLK Foundation enter into any type of agreement or operating agreement for this transaction?**
A No. It was a handshake deal.
**Q Handshake between you and Mr. Rechnitz.**
A That is correct.
**Q Any other deals that you did with Mr. Rechnitz besides the Holtzman policy that were based on a handshake?**
A Yes. There were actually three policies that

EKLK owned that were based on handshake. One was the Holtzman policy, one was the Roth policy, and one was the Goodkin policy.

**Q So can you spell Roth?**

A Roth is R-o-t-h, Agnes Roth.

**Q All right. And how about the second one?**

A Goodkin, G-o-o-d-k-i-n.

**Q Okay. And this is the same Goodkin and Roth that were on Exhibit 22?**

A That's correct.

**Q And am I correct to understand at some point in time, you decided with Mr. Rechnitz to transfer your interest or any interest that you had in those two policies to the SYRTR Foundation?**

A That is correct.

**Q And why did you do that?**

A Because we were friends. And he said that he would like me to do that. And I trusted him. And that's why I did that.

**Q Did you expect any consideration back from Mr. Rechnitz for transferring the policies?**

A I expected when these three people died, I would get 50 percent of the proceeds. That was the deal.

**Q And they're both alive; correct?**

A Two are alive. Not Holtzman. Holtzman is dead.

**Q Right. But Roth and Goodkin are alive.**

A Yes.

**Q And do you think you're going to get 50 percent of the proceeds of those policies when they pass away?**

A Well, the deal is -- I think he revised the deal. That was the deal. Yes. That's correct.

But I don't think I'm going to get that. Because Mr. Rechnitz wants to do the same deal on those three policies that he did on the other policies. And the deal on the other policies is that when they -- let's say like Goodkin -- let's say -- let's make it on Holtzman. Holtzman passed away and there's $8 million. So what Rechnitz is saying is that from that $8 million, he would get his premiums that he paid plus 12 percent interest. Then I would get all the premiums I paid plus 12 percent interest. And then we will split it 50/50. That was not the original deal. But I'm willing to go with that deal.

**Q Yeah. But when the person passed away in the end of 2017 -- I forgot who it was --**

A Holtzman.

**Q Holtzman.**

A It was '18.

**Q '18. Mr. Rechnitz went ahead and caught himself up on the premium payments for additional policies besides Holtzman; right?**

A That is correct.

**Q Did he catch himself up on policy proceeds for Goodkin or Roth?**

A I assume so. I have no idea. That accounting -- I never got an accounting from him. Actually, technically, the person who's supposed to give the accounting is Polter, not Rechnitz.

Rechnitz keeps on saying he's too busy with his old-age homes. And he has become a very, very rich person with a lot of issues.

MR. LIEBERMAN: Okay. Just answer the question.

Counsel, we've been going for a little over an hour now. If we could take five- or ten-minute break, we probably should.

MR. NOLAN: Yeah. That's fine. Great.

We're going to go off the record, folks on the telephone.

(Recess from 11:20 a.m. to 11:27 a.m.)

MR. NOLAN: We're back on the record.

BY MR. NOLAN:

**Q Mr. Klein, you're under oath.**

Do you understand that, sir?
A Yes.
Q Okay. What other policies of insurance does EKLK have an interest in at Life Capital?
A Nothing. Just those three.
Q And are there any policies outside those that are being managed or the premiums are being paid by LCG? Are there any other policies of insurance that EKLK Foundation has an interest in?
A No.
Q So what other assets does EKLK Foundation hold other than the three policies of insurance?
A No other assets.
Q And did I understand your testimony correctly that for the policies of insurance that EKLK Foundation had an interest in, the policy premiums were paid by the law firm? And when I say "law firm," I meant the law firm of Les Klein & Associates.
A I'm not sure.
Q What do you mean you're not sure?
A These premiums were paid in 2007 and 2011. And I don't know if the law firm paid all the premiums. I just don't know it.
Q Would it be correct for me -- would I understand your testimony correctly that the law firm

**has no interest in the three policies of insurance that EKLK Foundation holds?**

A That is correct.

**Q And when EKLK Foundation has an interest in these policies, is that because it has an agreement with someone that reflects the Holtzman policy and the other policies as being policies that they have an interest in?**

A Yes. The Holtzman policy was issued, it was issued to an owner. And the owner was 50 percent EKLK.

**Q Okay. So these policies on their face will show EKLK as being an interested party.**

A That is correct.

**Q And the policies should also reflect SYRTR Foundation as the other 50 percent owner; correct?**

A That is correct.

MR. NOLAN: Okay. Exhibit 25. Sorry. I wrote that for you. Your benefit.

MR. LIEBERMAN: That's okay.

(Exhibit 25 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q Okay. Whenever you get a chance, let me know. But I'm going to identify this record -- this document for the record. Exhibit 25 is a Bank of America**

statement. It's for the time frame of February 8, 2019, to March 7, 2019. It's for EKLK Foundation. And it appears to be a credit card statement.

Mr. Klein, is that an accurate reading of Exhibit 25? Is this a credit card statement?

A Yes, it is.

Q So is that accurate that EKLK Foundation maintained a credit card?

A Yes.

Q Does EKLK Foundation maintain more than one credit card or is it only one with Bank of America?

A Only one credit card.

Q Does EKLK Foundation still maintain a credit card?

A No. I think it's been closed.

Q Okay. And the holder of the credit card, would that be you?

A I'm not sure.

Q Well, did you issue a credit card for the benefit of your lawyer off of EKLK Foundation?

A No. I think maybe there was a credit card that was issued to Erica Vago. Erica Vago sent money from EKLK Foundation to her charities in Israel.

Q So you believed that Erica Vago had a credit card off of Bank of America in the name of EKLK

**Foundation.**

A She had a bank account, I know that. I'm not sure.

**Q Okay. So is the answer to my first question: As you sit here today, did anyone else other than you have a credit card that they used in the name of EKLK Foundation?**

A I don't know.

**Q You cannot recall anyone as you sit here today that had a credit card other than yourself for EKLK Foundation?**

A My answer is I just don't know.

**Q What document would you have to look at to determine the answer to that question?**

A I would have to see how many credit cards were issued by the bank to EKLK Foundation.

**Q And the address for this statement was 14245 Ventura Boulevard, Suite 301; correct?**

A That is correct.

**Q And that's the location of the law firm.**

A Yes.

**Q Right?**

**So is this another organization that you were receiving the mail at the law firm?**

A That is correct.

**Q Did anyone else manage EKLK Foundation other than yourself?**
A Yes.
**Q Who else?**
A Erica Vago.
**Q And what time frames?**
A I'm not sure.
**Q What document would you have to look at to determine when Erica Vago was also a manager of EKLK Foundation?**
A From the bank account statements for EKLK.
**Q So there's not a operative document that you would have created to reflect Ms. Vago as having some interest in EKLK Foundation; whether it's to manage it, to control it, to invest in it?**
A No.
**Q When was EKLK Foundation established?**
A I'm not sure.
**Q What document would you have to look at to determine when EKLK Foundation was established?**
A I don't know.
**Q You maintained no records -- strike that.**
**You maintained no business records for EKLK Foundation?**
A It was not done by me. It was done by an

attorney.
MR. LIEBERMAN: Listen to the question.
BY MR. NOLAN:
**Q No one on your behalf or you individually maintains records -- business records for EKLK Foundation?**
A The question is for the law firm. The answer is the law firm doesn't have any records for EKLK Foundation.
**Q I'm not trying to trick you, Mr. Klein. If you have records for EKLK Foundation or the law firm has records for EKLK Foundation, where are they?**
A The law firm has no records for EKLK Foundation because EKLK Foundation was set up by an independent counsel, not by the law firm.
**Q Right. I understand that.**
**So does EKLK Foundation have business records?**
A I don't know.
**Q What document would you have to look at to know whether or not EKLK Foundation has business records?**
A I would have to look at the articles of incorporation.
**Q Do they exist?**
A Sure they do.
**Q And where would they be?**

A In the offices of the attorney who set them up or the Secretary of State, the State of California.

**Q Okay. And what was Ms. Vago's title at EKLK Foundation?**

A She was a signatory on the bank account. I'm not sure what her title was.

**Q Okay. But, like, EKLK Foundation have officers and directors?**

A I don't know.

**Q Okay. If you look at Exhibit 25 on page 2, underneath Leslie Klein, there's $3,750 being paid by EKLK Foundation.**

**Do you see that?**

A Yes, I see it.

**Q Is that an accurate reading of Exhibit 25, that EKLK Foundation is paying the law firm of Les Klein & Associates $3,750 between February 8, 2019, and March 7, 2019?**

A Yes.

**Q Was the law firm performing services on behalf of EKLK Foundation?**

A I don't remember.

**Q What document would you have to look at to determine why the law firm was being paid by EKLK Foundation in February of 2019?**

A I say I don't remember. This goes back four years.
**Q I know. I'm asking about the document.**
A I don't know.
**Q Does EKLK Foundation maintain any records that would clarify why they were paying the law firm $3,750?**
A I don't remember.
**Q So you don't know any document that would exist.**
A I don't know of any document that would exist.
**Q Okay. What about the law firm records? Would the law firm maintain records showing, like, a retainer agreement with EKLK Foundation?**
A I don't know.
**Q What document would you have to look at to determine whether or not the law firm had a legal relationship with EKLK Foundation?**
A As I sit here today, I don't know.
**Q There wouldn't be any attorney-client privileged information between EKLK Foundation and the law firm of Les Klein & Associates; correct?**
A No, I wouldn't say that.
**Q Why not?**
A Because whatever there is with EKLK Foundation is privileged information that the law firm would have.

**Q Why? Why would it be privileged?**

A Because EKLK Foundation would be a client of the law firm.

**Q So are you testifying here today that EKLK Foundation is a client of the law firm?**

A Well, I don't know if the client, if -- what they did for them in 2019. But the answer is, yes, EKLK Foundation would be a client of the law firm if they paid them legal fees. Yes.

**Q Well, there's nothing that you have or no information you have of why the law firm was paid $3,750 by EKLK Foundation; is that correct?**

A That is correct.

**Q So you don't know if this was just a gift.**

A No. It wasn't a gift.

**Q Well, how do you know that?**

A It's a contribution, a charitable contribution, to a charity in Israel. Like -- Reb Meir Baal Haness. I don't know.

(Reporter asks for clarification.)

THE WITNESS: Reb, R-e-b, Meir, M-e-i-r, Baal, B-a-a-l, H-a-n-e-s-s.

BY MR. NOLAN:

**Q Did EKLK Foundation maintain a bank account?**

A Yes.

MR. NOLAN: I'll mark this as Exhibit 26.
THE REPORTER: By the way, Counsel. I need that one that has the sticker.
THE WITNESS: You got it. Oh, the sticker. There you go.
(Exhibit 26 was marked for identification and attached hereto.)
BY MR. NOLAN:
**Q Before we get to Exhibit 26, I just want to ask one last question on Exhibit 25.**
**You previously testified that at the law firm, you, Mr. Klein, could charge monies on various cards to pay the law firm; correct?**
A Yes.
**Q And so Exhibit 25 would have been you, the individual, would have been charging or paying the law firm on behalf of EKLK Foundation?**
A I'm not sure. It could have been Mrs. Vago.
**Q You think Mrs. Vago would have approved a payment from EKLK Foundation to your law firm?**
A Yes. Because the law firm would then in turn send a check to her favorite charity.
**Q And what's that based on?**
A Based on our agreement that I would send money to some of her charities. Actually, I wasn't the one

who wrote the check. She wrote the checks.

**Q She wrote the checks off the law firm account to the charity --**

A No.

**Q -- to the individuals in Israel?**

A Out of the EKLK account.

**Q Right. But Exhibit 25 shows money going from EKLK Foundation to the law firm that you run that's in your name; right? Yes or no.**

A The answer to the question is it could be that some of the checks that went to her charities went from the law firm. I don't remember.

**Q You didn't answer my question.**

A Okay.

**Q Exhibit 25 shows $3,750 being paid from the foundation to your law firm; correct?**

A That is correct.

**Q Right. Did Ms. Vago write checks off of your law firm to beneficiaries in Israel?**

A No. I wrote checks on behalf of Mrs. Vago to her charities in Israel.

**Q Right. Only you would have wrote the checks off of Les Klein & Associates.**

A Off Les Klein & Associates, only I would write the check. That is correct.

Q Okay. All right. Exhibit 26, it's a multiple page document, four pages. For the record, it's off of Bank of America. It's EKLK Foundation.

And Mr. Klein, the question, when you're ready, is, does this appear to be an accurate document, that being a bank statement, that was maintained by EKLK Foundation at Bank of America?

A That is correct.

Q Does EKLK Foundation file tax returns each year?

A Yes.

Q And who prepares those tax returns?

A The same CPA that prepares the other tax returns, Goldfinger Tsikman Accountancy Corporation.

Q If you would go to the third page. There's a reference on August 14, 2019.

And do I -- the question to you is: Do I understand this transaction that the law firm is depositing monies from its operating account 9404 --

A Uh-huh.

Q -- to the EKLK Foundation?

A Yes.

Q All right. So the law firm is moving money over to the EKLK Foundation is what Exhibit 26 references?

A Yes.

Q Okay. Do you have any understanding as you sit here today why, in Exhibit 26, the law firm is moving $2,000 to EKLK Foundation?

A As I sit here today, I have no clue.

MR. NOLAN: Okay. Exhibit 27.

(Exhibit 27 was marked for identification and attached hereto.)

BY MR. NOLAN:

Q So for the record, while you look at that, Mr. Klein, it's a two-page document. It's an e-mail from Jonathan Polter to Les Klein and Naftali Leshkowitz, which is on the first page. And then there's a chart on the second page. And the document is dated November 13, 2018.

And when you're ready, I'd like to ask you a question first down at the bottom, where the e-mail from yourself on November 13, 2018.

A Okay.

Q All right. So there's a reference there of the EKLK Foundation and Shlomo Rechnitz.

Do you see that?

A Yes.

Q Is this dispute with respect to those three policies of insurance?

A I have to read it first.

**Q Okay. Go ahead and read it.**

A Okay. I read it.

**Q Okay. What's going on with Exhibit 27? What's this dispute about?**

A Well, basically, I transferred from EKLK Foundation $17 million in policies to his -- the Shlomo Yehuda Foundation. One person just died, Barbara Holtzman. And like I said, I don't want to fight with him either, but I'm not going to allow him to steal $4 million that belongs really to the EKLK Foundation and apparently belongs to Mr. Gestetner.

He's saying that I sold him a policy, Simon Deutsch policy, which he decided to purchase. I wasn't even the owner of it. I was just a salesperson. Because it was a very good return of premium policy. It's under father of Deutsch who's married to Deborah Deutsch who's Sam Menlo's daughter. So he says that he wants $850,000 back from me. But I didn't get a dime from the $850,000. Because that went to Deborah Deutsch.

**Q And that 850,000 is a reimbursement for policy premiums paid?**

A I am not really sure it was premium -- some premium -- quite a bit of premiums are paid. But I was

just -- I go in between. He purchased the policy from Sam Menlo's daughter, Deborah Deutsch. And I was the trustee of the policy. So I signed off. But the check he wrote out to Deborah Deutsch. So, I mean, it has nothing to do with me.

**Q Okay. So let me back out of this for a second with Exhibit 27.**

A Right.

**Q So the $17 million in policies you transferred to Mr. Rechnitz, are those the three policies --**

A Yes.

**Q -- you've already testified about today?**

A Yes.

**Q Okay. And the spreadsheet that's attached, what do those policies represent? Are those policies?**

A Well, this is complicated. The miscellaneous expenses --

**Q No, I don't need you to do that. I'm just asking you. The first question is --**

A Okay. Fine.

**Q -- are those line items that are on the second page to Exhibit 27, do those represent individual policies of insurance?**

A No.

**Q Is it one policy of insurance?**

A I don't think so. I mean, I -- no.
**Q Okay. So the Holtzman policy we've talked about; right?**
A Right.
**Q That's there.**
A Right.
**Q And the Berke policy; right?**
A Right.
**Q That -- the Berke policy was one of the three that was transferred to Mr. Rechnitz's foundation?**
A No. Berke policy -- Mrs. Berke died on -- I'm not sure when. These three people died: Goldstein, Holtzman and Berke. This is people dying, the comments.
**Q Right. But the Berke policy was one of the policies Mr. Gestetner had an interest in.**
A I would have to look it up. I think you're right. I'm not sure. But I'd have to look at that exhibit, that sheet. Goldstein, didn't have an interest in. But Holtzman and Berke, I think he did.
**Q Okay. And why did you transfer 17 million in policies to Mr. Rechnitz?**
A Because the deal was -- the original deal was when these people die, like when Holtzman dies, I will get $4 million. End of story.
**Q So it wasn't just a charitable donation to his**

**foundation. You expected to get money back.**

A I didn't expect to contribute a penny to his charitable foundation.

Why would I distribute to Rechnitz charitable foundation any money?

**Q For charity. No?**

A No.

**Q That's ludicrous?**

A That's ludicrous. Why?

**Q I don't know, Mr. Klein. Let's go to the first page of Exhibit 27.**

A Okay.

**Q Where -- what is this reserve account? If you look in the middle of the document, "As I'm sure you remember your first funds allocated to you go to pay down the initial capital of 3.8 million plus any ongoing portfolio management expenses, followed by a reserve account of 2.5 million."**

**Do you see that?**

A Yeah.

**Q Explain that to me.**

A Okay.

**Q When did Mr. Rechnitz and yourself decide to set up a reserve account?**

A All right. The deal is when people die, the

families get 10 percent.
**Q And is that --**
A On every policy. That's how I wrote -- I wrote all the -- these people that I wrote the policies on are either clients or friends or relatives. So every person that I wrote a policy -- I wrote all these policies. Mr. Rechnitz didn't write any policies.
So when somebody dies -- like, let's say Mr. Kohn died now -- his family, before Rechnitz gets a dime, is supposed to get -- I'm not sure if it's 300,000 or 600,000. Because originally the policy was 3 million. But because of premium, it's now 6 million. So I'm not sure if his family is supposed to get 300,000 or 600,000.
But be that as it may, before Shlomo Rechnitz gets a dime, the Kohn people have to get 300,000.
**Q Okay. So they're first in line.**
A They're first in line.
**Q Right.**
A Mr. and Mrs. Gardner was a $10 million policy. And Mr. Gardner were my next door neighbors. And he had money. So the 3.8 million that he's talking about, I gave him a million dollars. I gave Mr. Gestetner also $2 1/2 million.
The point is Mr. Rechnitz and me have to pay

the families the money. So that $2.5 million reserve is for the families. Like, now we have Zimmerman for example.

**Q No. I -- let me just break this down.**

A Okay.

**Q So that 2.5 million reserve account --**

A Right.

**Q -- is that for more than one policy of insurance?**

A Yes. That's for all -- like, for Zimmerman, the reserve should be $1.4 million if it's a $14 million policy. There's also a question there. It was original $900,000 policy.

**Q Okay. Before we dive into the weeds on that.**

A Okay. Yeah.

**Q I thought when we started today --**

A Right.

**Q -- the custom and practice for you in purchasing these life --**

A Right.

**Q -- insurance policies is that they're all one-offs. They're all unique individual. You don't blur them with other policies of insurance. When someone passes away, you make your distribution based on whatever operating agreement there is for that**

**particular policy of insurance; correct?**
A That was the way it's supposed to be. But Mr. Rechnitz never did an account -- all these accountings are not done by Polter. These accountings are done by Rechnitz. And then --
**Q So --**
A Yeah.
**Q -- let me stop you right there.**
A Yeah.
**Q So somewhere in your business relationship --**
A Right.
**Q -- with Mr. Rechnitz, there's a change now where you're starting to -- that being Life Capital Group is starting to hold monies back out of an individual policy to pay for or to reserve for other policies of insurance that haven't hit their contingency.**
A That is correct.
**Q And when did that happen?**
A I'm not sure. Because I never -- the only accounting I ever got from Mr. Rechnitz -- I mean, Polter is just a figurehead. Polter is not a player here. From Mr. Rechnitz, I was supposed to get an accounting every quarter from Polter, from Rechnitz, whoever it was. Because I was really -- the agreement

says that he's in charge and I'm just a 50-percent partner but he's in charge.

**Q Right.**

A So I was supposed to get an accounting every quarter.

**Q Understood.**

A From 2011 to 2019.

MR. LIEBERMAN: Let him ask his question.

THE WITNESS: Fine. Okay. Go ahead.

BY MR. NOLAN:

**Q No. I understand.**

A Sorry.

**Q No. I appreciate you explaining.**

**Exhibit 27 says, "In terms of donations, please look at the legal agreement."**

**What did you understand that to mean when he e-mailed that to you?**

A Well, there is -- I was very upset that Rechnitz went and donated these three policies to Torah Masuah. Because he never told me about it. And I would have never agreed to it. So what I'm saying is that --

**Q And what is Torah Masuah?**

A Torah Masuah is a huge charity. The biggest charity in America.

**Q Okay.**

A They -- basically, part of Torah Masuah is all the day schools in America.

**Q So when you transferred your 50 percent interest from EKLK Foundation --**

A Right.

**Q -- to Mr. Rechnitz's foundation --**

A Foundation.

**Q -- you executed documents with the insurance company that showed the entire equity or ownership of that policy now was with Mr. Rechnitz.**

A That is correct.

**Q And you did that based on an understanding that you -- notwithstanding you were still going to share in the benefits of that policy --**

A Obviously. And there was no agreement. There was no writing on that deal. It was a handshake deal.

**Q Okay. In 2018 --**

A Yeah.

**Q -- is that -- in or around 2017 or 2018 that that happened or is it earlier?**

A No. It was earlier. 2011.

**Q 2011.**

A It was in 2011.

**Q So 2011, you transfer -- EKLK Foundation transferred those policies --**

A Those three policies.
**Q Okay.**
A $17 million.
**Q Okay. So on Exhibit 27, what's the legal agreement that is being referenced to? What did you understand that to be?**
A I thought it was the agreement of -- you know. But, I mean, these three policies --
MR. LIEBERMAN: Listen to the question, and just answer the question.
BY MR. NOLAN:
**Q "In terms of the donation --"**
A Answer --
**Q "-- please look at the legal agreement."**
**What legal agreement is he referring to?**
A My answer to the question is: I don't know. Because these three $17 million policies --
MR. LIEBERMAN: You've answered the question.
THE WITNESS: Fine. I don't know.
BY MR. NOLAN:
**Q What document would you have to go to, if any, to give you an idea of what the legal agreement you had with Mr. Rechnitz that Mr. Polter is referring to in Exhibit 27?**
A I mean, the only legal agreement I had with

Rechnitz is the LLC agreement.
**Q Okay. So that is your best guess is what he's referring to.**
A That is my best guess.
**Q Okay. All right. Let's go to Exhibit 28.**
(Exhibit 28 was marked for identification and attached hereto.)
MR. LIEBERMAN: Thank you.
BY MR. NOLAN:
**Q So for the record, Mr. Klein, while you're looking at this, it's a two-page document. The first page is an e-mail sent from Ms. Leshkovitz dated June 3, 2019, and it's addressed to yourself.**
A Okay.
**Q And the second page appears to be an e-mail that you sent the following day.**
A Okay.
**Q Is Exhibit 28 referencing the dispute regarding the three policies of insurance that we've been talking about that were transferred to Mr. Rechnitz's foundation or is this more of -- the entire dispute you have with Life Capital?**
A I would say -- let me read it. But I would say it's the entire dispute, but let me read it.
Okay. I got it.

**Q So the last paragraph references an agreement.**
A Right.
**Q What agreement is that?**
A Basically, Polter and Rechnitz proposed an agreement to settle with Mr. Gestetner.
**Q Okay.**
A And the agreement was that when the money comes in, we'll purchase two policies under Mrs. Marouthis. And I think these policies were $5 million each. And the premiums were supposed to be, I think, 100,000 a year. And the life expectancy was, I think, five, six years. And we used the money to -- and we'll make Mr. Gestetner the owner of these two policies, the Marouthis policies. And then he got at this time -- I don't remember how much money, but something like $2 million. So he could keep the $2 million and we would continue making payments of $18,000 a month. And he signed agreement. Bozi said he was fine with that. So this was a settlement with Gestetner.
**Q Okay. Did that settlement ever get effectuated --**
A Yes, we signed an agreement.
**Q So that was the agreement that you signed with Life Capital Group?**
A I signed it and Life Capital Group signed it,

yes.

**Q Did that settlement also include Holtzman policy proceeds?**

A No, we didn't get a penny. I mean, the reason why they did all this so they wouldn't give Gestetner or me any of the Holtzman proceeds. Maybe they were going to give, you know, the down payment for the -- I'm not sure of the Marouthis policies. But the idea was that when the next person dies, then they would fund it. But we didn't get anything. We didn't get a penny.

**Q So as far as -- if I went over to Life Capital Group and I asked to see what documents they have with respect to the transfer of the EKLK Foundation policies to Mr. Rechnitz's policies, would they have any records?**

A No, just oral agreement, handshake.

**Q And did Life Capital make the policy premiums on those three policies?**

A Yes. Well, I don't know.

**Q So there should be a business record of Life Capital Group that would show them making the policy premiums.**

A No. Because the foundation transferred the policies to the charity, to Torah Masuah. So I think the payments -- I don't know. I mean, I just don't know.

**Q Okay.**

A I think the payments were made by Torah Masuah, but I don't know.

**Q All right. Let's take a break. It's a good spot. It's 12:00 o'clock.**

MR. LIEBERMAN: Okay.

(Lunch recess 12:04 p.m.)

Los Angeles, California; Tuesday, December 19, 2023
1:06 p.m.

BY MR. NOLAN:
Q Okay. Mr. Klein, we're back on the record.
A Okay.
Q Same oath that's in place that you were sworn under oath before.
A Yes.
Q Okay. You understand that?
A Yes.
Q Okay. We talked, last time we were here together, about your Exhibit 4 or Exhibit 3, I'm sorry, which is a document, it's Bank of America bank statement. And it says Les Klein & Associates trust account.
Do you recall that discussion with me?
A Yes.
Q Okay. And I believe your testimony was that even though that that document is referred to as trust account, there came a point in time where it ceased to be a trust account and became an operating account of the law firm.
A That is correct.
Q Okay. And if I understood your testimony

**correctly, you said that was as a result of there was an IOLTA account that was created at Bank of America as well.**

A That is correct.

**Q Okay. So when you were talking previously about an IOLTA account, was it a single account?**

A Yes.

**Q Okay. And it was always a single IOLTA account that was at Bank of America.**

A That is correct.

**Q Do you have any recollection as to when that IOLTA account was created?**

A No.

**Q Okay. So let me show you -- if you could hand me back Exhibit 3.**

A Sure.

MR. NOLAN: We'll mark this next one as Exhibit 29.

(Exhibit 29 was marked for identification and attached hereto.)

MR. LIEBERMAN: Thank you.

BY MR. NOLAN:

**Q And while you look at that briefly --**

A Okay.

**Q -- I'm going to identify it for the record.**

Exhibit 29 is a Bank of America statement. It's -- on the top it says California IOLTA trust accounts, Les Klein & Associates Inc., 14245 Ventura Boulevard, Suite 301.

Do you see that?

A Yes.

Q And this document has -- it's multiple statements. It looks -- Exhibit 29 is from January 1, 2016, to March 31, 2016.

Do you see that?

A Yes.

Q Mr. Klein, is this the IOLTA account that you were referring to in your prior deposition that the law firm maintained?

A Yes.

Q And is it accurate that this IOLTA account existed, at least as of January 2016?

A Yes.

Q And this IOLTA account would be the account that you would deposit client trust funds?

A Yes.

Q All right. And you, as a lawyer, understand that client trust funds or funds that are held on behalf of clients have to be held in a separate bank account?

A That is correct.

**Q Okay. This document shows that the beginning balance, as of January 2016, was $122.**
**Do you see that?**
A Yes.
**Q Did you have any custom and practice as far as when you deposited client trust funds into the IOLTA account?**
A Any time it was the client's money.
**Q Okay. And if you're okay with it, I'm going to refer to it as an I-O-L-T-A or IOLTA account.**
**Do you understand that --**
A Yes.
**Q -- to be the same account that we're talking about in Exhibit 29?**
A Yes.
**Q Okay. So instead of saying Bank of America, I'll just say IOLTA account.**
A Fine.
**Q Okay. Did you ever transfer IOLTA account funds directly to your operating account at the law firm?**
A Yes.
**Q And on what occasions would you do that?**
A If we earned fees from this trust account -- in other words, if the case was settled and we had a

contingency fee -- we would transfer the fees when the case was settled from the IOLTA account to the operating account.

**Q Okay. And that would be for clients that your firm was representing and providing services for.**

A That is correct.

**Q Okay. What about for life insurance policies? Would you deposit life insurance policy funds that were going to be used for a client that you were the trustee or to pay policy premiums, would you deposit those into the IOLTA account?**

A No.

**Q Why not?**

A Because those funds were put into the general account.

**Q Why would you put client trust funds in the general law firm account instead of in the IOLTA account?**

A I don't remember paying any premiums from 2019 to present.

**Q Okay. Did you -- Exhibit 29 is 2016.**

A Yeah, I don't remember, you know, paying any premiums in '16.

**Q You don't recall the law firm paying any insurance policy premiums in 2016, 2017, 2018, or 2019**

**for clients?**

A I don't remember. No.

**Q Is it your testimony that the law firm should not have been paying life insurance policy premiums out of the law firm operating account?**

A No. It's not my testimony. My testimony is I don't remember that the law firm was paying premiums. But if it was paying premiums, that would be fine to pay off the operating account.

**Q And it would be fine to be paying out of the IOLTA account as well?**

A I don't think they were paid from the IOLTA account. I don't remember.

**Q So the only monies that would be deposited by the law firm in the IOLTA account would be for active clients of the firm.**

A That is correct.

**Q For monies that were given to you in trust as a trustee or as a fiduciary to pay on behalf of life insurance policy premiums, would they be reflected in the law firm's tax returns?**

A No. I don't think so.

**Q Okay. So Exhibit 30.**

(Exhibit 30 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q For the record Exhibit 30 is an IOLTA account statement for B of A for the month of November 2016.**

**Do you see that?**

A Yes.

**Q So this, again, it's the same account as the 8122 account?**

A Yes.

**Q And it has a balance of 107.48 which is six months later than Exhibit 29, roughly.**

**Do you see that?**

A Yes.

**Q So is it a safe assumption here that no monies -- no client trust funds were deposited by the law firm for the summer of 2016 into this IOLTA account?**

A Well, I would have to look at all the statements for the summer of '16. This is only one month, November. It could have been something was deposited in the summer and given out in the summer.

**Q Well, there's no deposits, no withdrawals, no checks, nothing -- right? -- on Exhibit 30.**

A This is November, one month. I don't know what happened the month before. You said summer.

**Q Right. Did you sweep the IOLTA account every month?**

MR. LIEBERMAN: What do you mean sweep, Counselor?
THE WITNESS: I don't remember.
MR. LIEBERMAN: What do you mean by sweep?
BY MR. NOLAN:
**Q Did you have a custom and practice at the law firm of sweeping the IOLTA account every month and depositing it into another account? Maybe one that has, you know, made a return, a higher interest, anything.**
A I don't know.
**Q Well, I'm not asking you if you did or not. I'm asking if you as the owner and managing partner of the law firm had a custom and practice of sweeping the IOLTA account in 2016 and depositing the funds somewhere else to earn interest or some other reason.**
A No.
MR. NOLAN: Okay. Exhibit 31.
(Exhibit 31 was marked for identification and attached hereto.)
THE WITNESS: Thank you.
BY MR. NOLAN:
**Q For the record Exhibit 31 is a bank statement for January 1, 2020, to January 31, 2020.**
**So now, Mr. Klein, I basically skipped ahead three to four years.**

A Okay.
**Q The balance is still 107.48 on Exhibit 31, which is 3 1/2, 4 years later than Exhibit 30.**
**Do you see that?**
A Yes.
**Q Same question: Was there a custom and practice to sweep the funds out of the IOLTA account at the law firm?**
A No.
**Q Do you know whether or not you were depositing client trust funds account into the IOLTA account in 2018?**
A I'm sure I was, yes.
**Q So if the law firm is making money and generating revenue, there should be funds that are going into the IOLTA account?**
A No, not if they're making money. If there's client money, client trust money, it's going into the IOLTA account.
**Q What else would you deposit into the IOLTA account other than client trust money?**
A Nothing else.
**Q All right. And the clients that you had that would deposit money into the IOLTA account, what type of clients would those be?**

A Various clients. Probate clients, personal injury clients. Whatever, you know, clients we had.
**Q What do you mean personal injury clients? You were representing personal injury matters?**
A I think we might have had some small personal injury cases, yes.
**Q Okay. So that small, like, less than 10 percent?**
A Right. I mean, this was during --
MR. LIEBERMAN: Just answer his question.
THE WITNESS: Yes.
BY MR. NOLAN:
**Q Okay. And on your client trust fund accounts that are associated with the law firm business in this time frame, would those typically be matters that are in probate in Superior Court?**
A Typically, yes.
**Q And would it include, like, retainers for people that you were drawing a will or a trust up for?**
A No. I think if we're drawing up a trust for, that would be going into the general account.
**Q Okay. So they pay you a flat fee and you deposit that --**
A That is correct.
**Q -- into the operating account.**

A That is correct.
Q So the IOLTA account then would only have like -- would it be limited to contingency cases?
A Yes. Mostly, yes.
Q Would you ever make deposits from your personal account at Chase into the IOLTA account?
A I don't think so.
Q That should not have occurred; right?
A I don't know.
Q Well, you don't know if it occurred but you'd agree with me it should not have occurred.
A Maybe I had money from a client that deposit into the Chase account. I don't know.
Q So you think there's a possibility that you had client funds deposited into your personal checking account and then you moved them into the IOLTA account?
A I mean, I don't think it should have happened. But it's possible, yes.
Q What about in a situation where a life insurance policy reached the contingency where someone passed away and those funds were realized and had to be distributed by you to -- you know, the policy. I think you talked about before the 10 percent policyholder and the type of policies you drafted as well as reimburse for the policy premiums and such, where would you --

**were there occasions where you would deposit that into the law firm account?**

A I don't remember any people that passed away that I deposited anywhere. Because nobody passed away.

**Q Okay. Was the -- after you assigned all of the life insurance policies to Life Capital Group, did the law firm maintain any other life insurance policies it invested in?**

A Yes. I think there were maybe a couple of policies. Yes.

**Q That the law firm was the -- strike that.**

**If I understand you correctly, you're saying there were a couple policies that the law firm, after 2011, would have been an investor in?**

A Well, I'm not sure. But it's possible. Because the law firm had a couple of policies that were not given to Rechnitz. I didn't want them. And those couple of policies, we basically sold to hedge funds. And so they made the premium payments.

**Q Okay. And when did you -- what's your best recollection of when those policies were sold to the hedge funds?**

A It's a very tough question. I mean, one policy, the Feldman policy, which I think was sold. I don't remember the date.

**Q And how much was that policy for?**

A The Feldman policy was sold and the benefit that we received was $3.5 million. In other words, when Mrs. Feldman dies, we will get $3.5 million. I think the policy was for $20 million. I'm not sure.

**Q So it was a policy that had a face amount of $20 million.**

A Right. It was with Lincoln.

**Q Okay. And someone else must have owned part of the Feldman policy?**

A Yes. Basically, Mermelstein owns -- when Mrs. Feldman passes away, Mermelstein will get $2.5 million and Hubert Scott will get a million.

**Q So this policy has not reached its contingency yet.**

A That's correct. She's still alive. She has breast cancer but she's still kicking.

**Q And who's the other person who's going to get the million besides --**

A Hubert Scott.

**Q Hubert Scott.**

**Okay. So that's how you got to the 3.5 million?**

A Yes. That's the amount that my investors will get when Mrs. Feldman dies, Roselio Feldman dies.

**Q Okay. And who holds the -- with the insurance company, who's listed as being the owner of the Feldman.**

A The hedge fund.

**Q And what hedge fund is that?**

A I don't remember the name. I think AA something. I don't remember the name.

**Q And are they paying the premiums on the policy?**

A Yes. They've been paying the premiums since the policy was sold to them.

**Q And when was that approximately?**

A As said, I don't remember. It was after Rechnitz. So it was after 2011.

**Q Okay. What other policies could the law firm be holding?**

A There is Mr. Kurzner, Isaac Kurzner. And on that, the benefit is a million dollars.

**Q So it's a policy with a face amount of one million?**

A No, no. The policy is more. The policy is, I think, five million and the return of premium.

**Q So it's a return of premium policy?**

A That is correct.

**Q And what do you think the law firm is entitled to recoup?**

A I think a million dollars, if I remember

correctly.
**Q So -- strike that.**
**And so is this another policy that was sold to a hedge fund?**
A This was sold to private investors, to clients who owned part of the policy. This is a $5 million policy. And I think other people owned part of it. And so the other investors purchased out the interest of the law firm.
**Q And this is after 2011?**
A This is after 2011.
**Q And what document does the law firm have to reflect who the investors are and the terms of them purchasing the law firm's interest?**
A There is a purchase agreement.
MR. NOLAN: Marc, can you make sure that's produced?
MR. LIEBERMAN: Tell me again what you'd like produced.
MR. NOLAN: The purchase agreement.
BY MR. NOLAN:
**Q Does that purchase agreement exist; right, Mr. Klein?**
A Yes. That is Isaac Kurzner.
MR. LIEBERMAN: Yes.

BY MR. NOLAN:
**Q And how -- the Feldman policy and the Kurzner policy -- or strike that.**
**Are there any other policies that you can recall --**
A Yes.
**Q -- as you sit here today?**
A Yes. There's another policy Mrs. Bittman.
**Q B-i-t-m-a-n?**
A B-i-t-t-m-a-n.
**Q Okay. And what's the face amount of that policy?**
A $8 million.
**Q And that's a policy that was in the name of the law firm at one time?**
A I think it was the name of a trust, of the Bittman irrevocable life insurance trust. I don't know if it was in the law firm's name ever.
**Q When we're saying law firm, I'm making a distinction between you personally --**
A Right.
**Q -- and the law firm.**
A I know.
**Q Okay. I just want to make sure you're aware of that.**

A So the Bittman policy was in the Bittman irrevocable life insurance trust. And the problem with the Bittman policy is that if she reaches age 100, the policy lapses. So there have been a number of investors on the Bittman policy. And people keep on selling their interest because she's like, I think, 97 or 98. It's a little risky. And we have paid them probably six, seven million as a premium on the Bittman policy.

**Q Is that a return of policy premium?**

A Yes.

**Q So I'm a little unsure of what the connection is to the law firm then if this Bittman policy is in the name of the Bittman irrevocable trust.**

A Because the Bittman irrevocable trust has Leslie Klein as trustee. So a lot of the investors have bailed out. And, I mean, right now there are, I think, three, four investment that bought everybody else out. But ultimately, if she lives till over a hundred, everybody is going to lose everything.

**Q Right. But you've testified in other matters on your deposition that the law firm invested in policies of insurance that its clients, or that other individuals that you knew, also invested in; right?**

A That's correct.

**Q So did the law firm purchase an interest in the**

**Bittman policy when others started to bail on it?**

A I'm not really sure. Because a lot of people have bailed on the Bittman policy. Over the years, a lot of people have bailed.

**Q Right. Do you personally have an interest in the Bittman policy?**

A No. I have no interest in Bittman.

**Q And you're not sure, as you sit here today, if the law firm has an interest in the Bittman policy.**

A Well, I think somebody has an interest of a million dollars.

MR. LIEBERMAN: Listen to his question.

THE WITNESS: Yeah. Okay.

I'm not sure. I'm not sure.

BY MR. NOLAN:

**Q And when I say you, Mr. Klein, I'm meaning you or any Klein associated entity that you control like Bay Area Development, you know, your trust EKLK Foundation.**

**Do any of those entities that you control have an interest in the Bittman policy?**

A I'm not sure.

**Q What document would you need to look at to be sure?**

A There is a sale of the Bittman policy also. Sales agreement which would show --

MR. TROSZAK: Just --
THE WITNESS: -- who ultimately owns an interest in the Bittman policy when she dies. If she doesn't live to over hundred.
BY MR. NOLAN:
**Q Okay. And who underwrote the Bittman policy?**
A American General.
**Q Okay. Are there any other policies that have that provision that if you reach a hundred, they basically wipe out the investment?**
A Yeah. There is. I think all the American General's policies have that. But nobody is close to hundred. Mr. Gardner was close, but he passed away. But there's nobody close to like Bittman, like to hundred.
MR. NOLAN: This is Exhibit 32. I wrote on it so you'd know.
(Exhibit 32 was marked for identification and attached hereto.)
MR. LIEBERMAN: Thank you.
BY MR. NOLAN:
**Q While you just look at that, this is a document I didn't -- I forgot to give you in the Gestetner matter. For the record it says -- Exhibit 32 says Gestetner Charitable Remainder Unitrust.**

A Yes.
**Q And then it has a second page which is an acknowledgement.**
**So your testimony previously was you were the trustee of the Gestetner Charitable Remainder Unitrust?**
A That's correct.
**Q Was there -- and this document actually reflects Kenneth Klein on it.**
**Do you see that?**
A Kenneth Klein was not the trustee.
**Q I get that.**
MR. LIEBERMAN: No. Just listen to the question.
THE WITNESS: Okay.
BY MR. NOLAN:
**Q Yeah, I'm just asking you. Is that an error or should that say Leslie Klein, not Kenneth Klein?**
A Yeah, it's only -- I was the only trustee for the Gestetner. It's an error. Yes.
**Q Okay. Do you know why is Kenneth Klein listed as an alternate trustee?**
A It was alternate trustee. But he would only become the trustee if I would resign or if I would die. So maybe, you know, Gestetner --
MR. LIEBERMAN: Leslie, read the document

before you answer.

THE WITNESS: Yeah, the document says Leslie Klein, the trustee. And I was the only trustee. Leslie Klein has resigned as trustee.

BY MR. NOLAN:

**Q Okay. Right. And at some point in time you did resign as trustee of the Gestetner Charitable Remainder Unitrust; right?**

A Right, in 2017.

**Q Okay. For the matters that you were trustee, did you -- is it common that there would be an alternate trustee designated?**

A I don't know if it's common. But there is sometimes an alternate trustee if the client insists on it, yes.

**Q Okay. And was it your custom and practice to list your son, Kenneth Klein, as the alternate trustee in the trust that you were appointed as the trustee?**

A I didn't do anything. It was done by the client. If the client wanted their child or anybody they wanted, they could name as the alternate trustee.

**Q Okay. So in this particular document, Exhibit 32, the Gestetner would have wanted your son to be the alternate trustee?**

A That is correct.

**Q This document, Exhibit 32, is notarized.**
**Do you see that?**
A No. But I will turn the page. It's the next page. Yes.
**Q So I take it then Exhibit 32 was by design. It wasn't in error.**
**Is that a fair statement?**
A Well, I mean, it's notarized. But as far as I know, I was the only trustee. My son was never the trustee.
**Q Is that your son's signature on Exhibit 32?**
A No. That's my signature, Leslie.
MR. LIEBERMAN: No, no, no. Here.
THE WITNESS: Oh, okay.
Yes, I think that's my son's signature. Yes.
BY MR. NOLAN:
**Q Okay. And are you a notary?**
A Yes.
**Q And that's your notary stamp --**
A Yes.
**Q -- on Exhibit 32.**
A That's correct.
**Q And that's your signature at the bottom of page 2 of Exhibit 32.**
A Yes.

MR. NOLAN: Okay. All right. Exhibit 33.
(Exhibit 33 was marked for identification and attached hereto.)
BY MR. NOLAN:
**Q So for the record Exhibit 33 is the tax returns that you produced for the law firm for the year 2018, and it has a Bates stamp document at the bottom LKA -- starts with LKA 00001475.**
A Okay.
**Q And it's Klein & Cutler. That's the name of the law firm as of -- or strike that.**
**I think you testified previously Mr. Cutler is gone, but you've just filed the tax returns in the formal name of the company that existed?**
A Yes.
**Q Okay. So if you go to page 1477, it shows net operating loss of 1.9 million; is that accurate?**
A It's a carryover.
**Q Right. So that's a carryover from the year before.**
A Yes. That's correct.
**Q Okay. If you would go to 1486, Mr. Klein.**
A Okay.
**Q There are number -- item -- line item six. It says other current assets, statement two, 343,606.**

**Do you see that?**

A Yes.

**Q What would those other current assets be a reference to? And I think statement two is on page 1490.**

A Okay. It's costs that client gave us.

**Q So in 1490, for other current assets, statement two you were just -- you're reading client cost 343,606?**

A Yes.

**Q And are those -- does that reflect the client trust funds?**

A No. The costs. The client advances money in probate cases. There's filing fees. There's publication fees. There's all kind of fees in every probate case.

**Q Right. Okay. And then on statement three, it says investment in life insurance.**

A Okay.

**Q 463,523.**

**Do you see that?**

A Yes.

**Q What does that represent?**

A That represents monies that the law firm invested in insurance policies like the Kurzner policy.

**Q All right. So that's on the tax return.**

**Because it's reflecting to the government that the law firm actually has an interest in those policies?**

A That is correct.

**Q Okay. How about statement four, client trust account, 343,606? Do you see that?**

A It's a liability.

**Q It's a liability.**

A Right.

**Q You mean it's a liability for client costs?**

A It's basically -- yes, it's costs that we have taken in on cases -- of the filed probate cases that we haven't published yet, we haven't -- cost, yes.

**Q Okay. So under statement four, client trust account, that should -- 343,606 are $343,606 that the law firm took in in client trust account funds; correct?**

A I don't know if it's trust account. It's costs basically. Those are costs that the law firm pays out.

**Q Should that tie into the IOLTA account?**

A No.

**Q No?**

A No.

**Q Why not?**

A Because these are costs that the law firm is going to pay out for all the cases that it has. I mean, to publish costs $500. To file a fee, cost $600. These

are not -- these are costs.

**Q Right. But why is it under a heading client's trust account?**

A Well, that's how the accountant set up. It's client costs that we're holding and basically it's a liability. It really shouldn't say trust account. It should say cost account. It's a mistake. It's not a trust account.

**Q Okay. If you go back to 1486.**

A Okay.

**Q Line 19 says loans from shareholders $2.1 million.**

A Okay.

**Q Do you see that?**

A Yes.

**Q So that's -- the beginning of the year, there was a $2.1 million loan from shareholder, and at the end of the year it was 2.54 million.**

A Right.

**Q Okay. Is that a loan to you?**

A Well, that's just a fluff figure. I mean, that's just to balance everything out. All these losses have been carried for a number of years. And so that money is just a fluff figure. The law firm doesn't owe me anything.

Q That's a -- you're saying fluff?
A That's right.
Q Like F-l-u-f-f.
A F-l-u-f-f.
Q Okay.
A I mean, law firm owes me salary, but whatever.
Q And that's not a loan from the law firm not owing you any money.
That's you owing money to the law firm; correct?
A That is correct.
Q Right. And if you had capitalized the law firm $2.178 million, that line 19 should be zero.
A That's correct.
Q Okay. All right. I'd like you to go stay on that exhibit and just move forward to the next year, which is 2019, LKA 1510.
A I don't have '19.
Q Oh, did I not give it to you?
A No.
Q Shame on me.
(Exhibit 34 was marked for identification and attached hereto.)
BY MR. NOLAN:
Q Exhibit 34 for the record are the 2019 tax

**returns. There you go.**

A Now I got it.

**Q So if you go to 1510 for me, please.**

A Sure. Got it.

**Q So same routine. If you look at 1513, it's that same statement, statement one, two, three, and four.**

A Statement one?

**Q Yeah. If you go to LKA 1513.**

A Okay.

**Q You see the four statements that are referenced?**

A I got it. Yes, yes.

**Q Okay. So as of 2019, there's still a life insurance policy that the law firm's investing in; is that correct?**

A Yeah, same thing. It didn't change in '19 from '18. Yes.

**Q And client costs for that year were 357,000?**

A No. Beginning of the year is 357. End of the year is 52,000.

**Q Right. So at the end of the year, you should have been holding 52,000 in client trust fund accounts or --**

A No, not client. It's cost account.

**Q You've got to let me finish the question.**
A Okay. Yeah.
**Q So LKA 1513, does that reflect that there should have been a balance in the law firm account of 52,000 of client trust fund accounts?**
A No.
**Q What does that reflect?**
A Cost accounts.
**Q Right. And what does it mean cost account?**
A Same answer as I did for '18. Those are filing fees, court costs.
**Q Right. So what's the delta represent between 357 and 52,000?**
A We paid out a lot of court costs in this year.
**Q Approximately 300,000?**
A That's correct.
**Q Right. But then there's 52,000 left over; right?**
A Right.
**Q Okay. Where is that money held at the law firm?**
A Where is it held? In the general account.
**Q Why would it be in the general account? It's client --**
A Because from the general account is where we

pay out all the court costs.
Q And if you go to 1510 --
A Okay.
Q -- it says other current assets at line six.
Do you see that?
A Yes, statement two.
Q And, again, that's referring to the client cost?
A Court cost, yes.
Q Court cost.
So the funds from the clients that were utilized for court cost are listed on the tax return as an asset of the law firm.
A Well, that's not correct. Because it's listed as an asset, but there's an offset of $52,000. So it's zero.
Q Okay. So what does line six represent to you?
A Line 6 and line 18 cancel out. Line six is zero.
Q Right. I get one is an asset and one's a liability; right?
A Correct. It's zero.
Q I get that.
A Yeah.
Q But why is it listed under a law firm asset?

A I have no idea. This was done by the accountant. And I think they were consistent from 2018. Did the same thing in 2019.

**Q All right. And you're an accountant; right? You're a CPA?**

A Yes. Actually, I'm not a CPA right now. But I was a CPA. But I gave it up.

**Q You're -- right. You gave it up meaning you resigned from --**

A Yeah. There was a complaint. And instead of going to trial, I resigned. Because I never used my CPA. I never -- I got the CPA 50 years ago and I never --

MR. LIEBERMAN: Listen to the question. There's no question.

THE WITNESS: Yeah. That's fine.

BY MR. NOLAN:

**Q Okay. And now if you look at line 20, it's 2.2 million is the loan from shareholder?**

A That's the same thing as in the '18 return. They're just carrying over '18.

**Q They're just carrying over the loss.**

A That's correct.

**Q Right. Okay. Let's go to 2020.**

A Okay.

MR. LIEBERMAN: Counsel, could I ask how much longer you intend to go today?
MR. NOLAN: I probably have 20 minutes.
MR. LIEBERMAN: Okay. That's fine.
MR. NOLAN: Exhibit 35.
(Exhibit 35 was marked for identification and attached hereto.)
MR. LIEBERMAN: Thank you.
BY MR. NOLAN:
**Q So Exhibit 35, for the record, is the 2020 law firm tax returns.**
**Do you agree with me?**
A Yes.
**Q Okay. If you go to 1540, which is the statement of schedules for the tax returns.**
A Okay. 1540?
**Q Yeah, LKA 001540.**
A Okay. Thank you. All right. Got it.
**Q There's the life insurance?**
A Yes.
**Q And then at the end of the year, it's gone; correct?**
A Yeah.
**Q Okay. So what did the 463,523 represent?**
A Payment to the life insurance.

**Q Premiums paid by the law firm in the life insurance.**

A Yes.

**Q And who did the valuation of the life insurance policy that you sold to either the private investors or to the hedge fund?**

A I don't remember.

**Q Am I correct that there would have been a valuation?**

A I don't know.

**Q Is it your custom and practice that you would have allowed a policy that your firm had an interest in to be sold without a valuation?**

A Well, I knew how much money we were going to get when they passed away. As far as to what our basis was in it, yes, I would have allowed to sell at valuation, yes.

**Q Okay. And the basis and how much money you had in it, that would be a document, again, that would be the document that was at your house?**

A No, I don't think there's a document for that. It just was arrived at based on an estimate as to what we put into it.

**Q Right. But the estimate and the fees that were paid and how much the law firm put in, did the law firm**

**maintain any record on this particular life insurance policy?**

A I don't know.

**Q Okay. Do you know which one this policy was or was it more than one policy?**

A I think it was the Bittman policy, but I'm not sure.

**Q So your best guess, as you sit here today, is the Bittman policy.**

A Yes.

MR. NOLAN: Okay. Exhibit 36.

(Exhibit 36 was marked for identification and attached hereto.)

BY MR. NOLAN:

**Q So for the record Exhibit 36 is the Bank of America statement for July 21, 2023, to July 31, 2023. It's 14 pages. And it's for Les Klein & Associates trust account.**

**Do you see that?**

A Yes.

**Q So this is the 9404 account that we've talked about; right?**

A It's changed now. It's basically --

MR. LIEBERMAN: Just answer. He asked you a different question, Les. Listen to the question.

THE WITNESS: Yes. Okay.
BY MR. NOLAN:
**Q I understand. You're talking --**
A Yes.
**Q -- about change meaning it's not a trust account anymore.**
A That's correct. Yes.
**Q It's an operating account; right?**
A Yes.
**Q Okay. If you go to page 4.**
A Okay. Yes.
**Q There's July 11, 2023, Bamboo Insurance.**
A Okay.
**Q So there's a withdrawal. That appears to me that the law firm is paying Bamboo Insurance $784.40.**
A Yes.
**Q Did I read that correctly?**
A Yes.
**Q And what is that with respect to?**
A It's respect to my house on 322 New [sic] June Street.
**Q So that is a liability or homeowner's insurance for your house?**
A That's basically a salary. I didn't take a salary --

**Q I'd like you to answer the question first.**
A In July of 2023.
MR. LIEBERMAN: Les, listen to the question.
THE WITNESS: Okay.
MR. LIEBERMAN: Just respond to the question.
THE WITNESS: Fine. Okay. Go ahead.
BY MR. NOLAN:
**Q Yeah. I just want to clarify your prior answer.**
A Fine.
**Q You said the Bamboo Insurance was a payment on 322 June Street. And I'm asking you is that a payment on a homeowner's policy or liability coverage covering the house?**
A Yes. Sorry.
MR. NOLAN: Exhibit 37.
(Exhibit 37 was marked for identification and attached hereto.)
MR. LIEBERMAN: Thank you.
THE WITNESS: Thanks.
BY MR. NOLAN:
**Q So I'll identify Exhibit 37 for the record, Mr. Klein, while you just take a look at it.**
A Okay.
**Q So for the record Exhibit 37 is a Bank of**

America bank account statement. It's for the Les Klein & Associates law firm 9404 account. It's from January 1, 2019, to January 31, 2019.

Mr. Klein, the first question I'm going to ask you is: Does this document look like a document that's familiar to you for the law firm's business records?

A Yes.

Q All right. So this is the bank that took care of the banking needs of Les Klein & Associates' bank account.

A That is correct.

Q If you go to page 5 of 14. On January 24, 2019, it says phone transfer to checking account 9401, $10,000.

Do you see that?

A Yes.

Q Now, 9401 is your personal checking account; correct?

A Yes.

Q And if I understand this document correctly, this is the law firm withdrawing or transferring $10,000, and sending it to your personal checking account?

A That is correct.

Q Okay. What would be the reason in 2019 that

**the law firm would be sending you $10,000?**
A Salary.
**Q And did you take salary in 2019 of $10,000 a month?**
A No. I took salary of $2,000 a month. This is for five months.
**Q And what five months would it be for?**
A I think it was for '18. The last five months of '18.
**Q So your custom and practice is to let those five months accrue and then you'd pay yourself --**
A That is correct.
**Q -- on the debt. Okay.**
A Yes.
**Q Okay. So if you would go to 1/18, January 18th. So it's, like, two lines above it.**
A Okay. $8,000, yes.
**Q All right. So on January 18th, you transferred -- and I say you, you on behalf of the law firm, transferred $8,000 to your personal checking account.**
**Do I read that correctly?**
A That is correct.
**Q And what was the purpose of the $8,000?**
A That was four months before. Four months

before.

**Q That would be the salary for four months before?**

A That is correct.

**Q Okay. So in this five-day period, you are paying yourself nine months' worth of salary.**

A That is correct.

**Q And should I see that -- like, is that -- was that just a regular custom and practice at the law firm?**

A I mean, I really took salary when the law firm had cash. So the answer is, yes, it was the practice. Yes.

MR. NOLAN: And Exhibit 38.

(Exhibit 38 was marked for identification and attached hereto.)

MR. LIEBERMAN: Thank you.

BY MR. NOLAN:

**Q So I'll identify Exhibit 38 while you look at it, Mr. Klein.**

A Sure.

**Q For the record, Exhibit 38 is another Bank of America statement. It's March 15, 2023, to April 11, 2023. It's on the account -- personal account. Strike that.**

**It's a bank statement from Bank of America and**

it's addressed to you, Mr. Klein, at the June Street address.
Do you see that?
A Yes.
Q Okay. So this one is account number 8530.
Do you see that?
A Yes.
Q Whose account is that?
A I don't know.
Q You don't recognize a Bank of America account 8530 as being your bank account?
A No.
Q It says Leslie Klein; right?
A Yes.
Q Do you -- how many personal banking accounts do you have at Bank of America?
A I thought I had one, 9401. That's it.
Q But Exhibit 38 would seem you have at least two; right?
A Yes.
Q If you look at page 3 of 6 on Exhibit 38.
A Okay.
Q It has Social Security.
Is that -- of $6,860. Do you see that?
A Yes.

**Q So this statement then shows -- is that correct? -- that you're collecting Social Security?**

A Yes.

**Q And does that seem about the approximate amount that you collect?**

A No. That doesn't seem like the correct amount that I collect. I get, like, 3,000 something, not 6,000.

**Q Okay. So maybe that's two months?**

A Yes. It's two months. That's correct.

**Q Okay. So if I read Exhibit 38 correctly, you've got the -- you have asked the federal government to deposit your Social Security checks in the 8530 account.**

A I don't remember. But looks that way, yes.

**Q Okay. And do you currently collect your Social Security in this bank account?**

A I don't think so.

**Q And where is it deposited now?**

A I don't know.

**Q Is it deposited in the law firm account?**

A I'm not sure. I would have to check with Social Security. I mean, I thought it was deposited -- I don't know what this account is.

**Q Is the account still open at Exhibit 38?**

A I don't think so.
**Q Well, it's this year; right? 2023?**
A Yeah. But this is December and -- I don't know. I would have to check with the bank. I have to go to Bank of America and see if it's open. I don't think it is, but I don't know.
**Q Do you maintain any type of account for monthly for your cash flow?**
A No.
**Q What about the law firm? Does the law firm maintain any type of ledger that tracks the monthly cash flow?**
A No.
**Q It does not?**
A It does not.
**Q No reason to do that or --**
A No reason to do that.
**Q Okay. Let's take a break, and I'll check my notes.**
MR. LIEBERMAN: Okay.
(Recess from 2:01 p.m. to 2:09 p.m.)
BY MR. NOLAN:
**Q Okay. Mr. Klein, we're back on the record.**
**Do you understand that?**
A Yes.

**Q Okay. So I was asking you about -- when we left, about the transfers from the law firm to your personal bank account.**
**Do you remember that?**
A Yes.
**Q Other than collecting salary, should the law firm have been paying you any amounts in 2019, 2020, or 2021?**
A Just my salary basically.
**Q Right. And there wouldn't be any profit distributions; right?**
A I don't think there's a profit in 2019. I don't think so. No.
**Q No, you're carrying operating loss since 2018; right?**
A That's correct. Well, I mean, they could be paying back some of the losses. But there wasn't any operating loss. No.
MR. LIEBERMAN: Operating loss?
THE WITNESS: I mean, there wasn't operating income. I'm sorry. There's operating loss.
BY MR. NOLAN:
**Q Right. Okay.**
A Yes.
**Q So that removes that possibility.**

A Right.

**Q Okay. And you're getting salary of $2,000 a month.**

A Right.

**Q Any other reason you'd be getting money paid by the law firm in the 2018 through 2021 time frame?**

A Well, possibly to repay some of the loans that I made to the law firm.

**Q What loans did you make to the law firm?**

A I mean, whenever the law firm had needed money, I put in money to make it -- to pay the bills.

**Q So on the tax statements when we looked at loans from shareholders, is that what you're referring to?**

A Yes. I mean, for example, in '20, I paid rent to --

MR. LIEBERMAN: Les, there's no question.

THE WITNESS: Fine. Okay. Fine.

BY MR. NOLAN:

**Q What else would you have been paying for the law firm's behalf other than rent?**

A Rent was a big ticket item.

MR. LIEBERMAN: Les...

BY MR. NOLAN:

**Q Can you answer my question.**

A Yes, telephone bill.
**Q Okay. Anything else?**
A Advertising.
**Q Okay.**
A Salaries.
**Q So in 2020, the law firm was not generating enough revenue to pay its overhead?**
A That is correct.
**Q Who was rent being paid to?**
A The rent was being paid to Bay Area Development company.
**Q All right. And Bay Area Development company is the company you own; right?**
A That's correct.
**Q And you manage that company; right?**
A Yes.
**Q Anything else besides salaries, rent, telephone?**
A Legal fees.
**Q And legal fees for what case?**
A Menlo, Vago.
**Q So you were reimbursing the law firm for the legal fees it incurred to defend itself in the Menlo and Vago cases?**
A That is correct.

**Q And how much do you approximate that was in 2018?**
A 2-, $300,000.
**Q Per year or --**
A Per year.
**Q Per year.**
**So if I understand your testimony correctly, the law firm would be paying you 200- or 300,000 each year to reimburse you for coming out of pocket to pay the law firm expenses on those lawsuits.**
A Yes.
**Q Did you maintain any type of documentation, you know, for each year memorializing, you know, the legal fees that were incurred?**
A We got bills from Hahn & Hahn on the Menlo case. And Leslie Klein & Associates won the Menlo case.
**Q So Hahn & Hahn. What about the Vago case? Who defended you in the Vago case?**
A The Vago case Jeffrey Slott defended Leslie Klein & Associates in the Vago -- well, actually, that's not true. Buchalter defended the -- Leslie Klein & Associates on the Vago case and then Jeffrey Slott took over.
**Q Okay. Any other litigation other than those two cases?**

A The law firm, that's it. Those two cases only.
**Q Okay. So there -- so those were the two legal matters that you would be getting reimbursed for coming out of pocket for; right?**
A Right.
**Q Okay. What about the law firm making payments to you on behalf of any other entities that you controlled or owned, like such as Bay Area Development? Were there any other companies other than Bay Area Development that you had an interest in that the law firm was cutting checks?**
A Bay Area Development, I own. That's correct.
**Q Right. So Bay Area Development is a company that you had somebody incorporate or you operate -- and you operated.**
A Bay Area Development company, somebody else incorporated. We didn't incorporate. Leslie Klein & Associates had nothing to do with that.
**Q Right. But Bay Area Development was a company you controlled and owned.**
A That is correct.
**Q Okay. So my question is: Other than Bay Area Development in this 2018 to 2021 time frame, are there any other entities that are making or receiving monies from the law firm of Les Klein & Associates?**

A No.
**Q And that's not for legal work that they're performing. It's just they're a recipient for some reason for one...**
MR. LIEBERMAN: Or another.
MR. NOLAN: Strike that.
BY MR. NOLAN:
**Q In the 2018 to 2021 time frame, are there any other companies that you are involved in and control or own that are receiving checks from Les Klein & Associates?**
A No.
**Q Okay. Exhibit 39.**
(Exhibit 39 was marked for identification and attached hereto.)
MR. NOLAN: That to you.
MR. LIEBERMAN: Is this the last set of questions?
MR. NOLAN: Yeah.
MR. LIEBERMAN: Okay.
MR. NOLAN: Should be.
BY MR. NOLAN:
**Q Exhibit 39, for the record, is Bank of America statement. It's off of the Les Klein & Associates trust account 9404, June 1, 2020, to June 30, 2020.**

**Do you see that, Mr. Klein?**
A Yes.
**Q Any reason to disbelieve that this is not an accurate business record of Les Klein & Associates?**
A No.
**Q Okay. So on page 3, there's a bunch of deposits coming in which I just eyeballed at about $100,000.**
**Do you see those on June 2nd?**
A June 2nd. Okay.
**Q June 3rd...**
A Yeah.
**Q ...from account 4140.**
A Okay.
**Q What are those deposits associated with?**
A That is Leslie Klein & Associate has a law firm in Baltimore. And those are deposits from that law firm coming into Leslie Klein & Associates.
**Q And what's the name of the law firm?**
A Big Boyz Law.
**Q Big Boyz, can you spell that?**
A Big, B-i-g. Boyz, B-o-y-s [sic].
**Q Okay. And why is the law firm -- why is the law firm getting deposits from Big Boyz Law firm?**
A Because Big Boys Law firm started operations in

2020. And then the coronavirus hit. And the Big Boyz Law closed shop in 2020. And the law firm laid out a lot of money to advertise. They laid out 250-, $300,000 for Big Boyz Law in Maryland for cases.

**Q So the law firm of Les Klein & Associates came out of pocket $250,000 to advertise on behalf of this law firm?**

A That's correct.

**Q And did Les Klein & Associates have, like, a fee split or a retainer agreement? Why would they be advertising for another law firm?**

A Because basically they were going to have cases and it's going to be a fee split, yes. And then this other law firm, Big Boyz Law, closed up shop. All the Maryland ports closed up shop.

**Q And is there a document showing this arrangement, contractual arrangement, between Big Boyz and law firm of Les Klein & Associates?**

A I don't know if there's a contractual arrangement. But there were employees hired by Les Klein & Associates and paid by Les Klein & Associates besides the advertising.

**Q Do you have any ownership interest in Big Boyz Law firm?**

A No.

**Q Do you manage or own or control it in any way?**
A No.
**Q And who owns Big Boyz Law firm that you're aware or who owned it?**
A Well, Big Boyz Law firm has bills. It doesn't really have anything. It just -- it owes the doctors, Maryland health care, over $150,000.
**Q I know.**
**But who is Big Boyz Law firm?**
A Big Boyz Law firm is closed. It doesn't operate anymore.
MR. LIEBERMAN: No, no. That wasn't the question. Listen to the question.
THE WITNESS: Who is Big Boyz Law firm?
BY MR. NOLAN:
**Q Yeah. Who's behind Big Boyz Law firm?**
A Leslie Klein & Associates.
**Q So Leslie Klein & Associates incorporated this law firm to do work on the East Coast for it?**
A Yes.
**Q And are you the officer and director for Big Boyz Law firm?**
A Big Boyz Law firm --
MR. LIEBERMAN: Listen to the question.
THE WITNESS: No.

BY MR. NOLAN:
**Q I mean, were you at the time it existed?**
A When it was originally opened, was I the -- they were employees in Maryland. That's what --
MR. LIEBERMAN: Listen to the question.
THE WITNESS: Okay. Go ahead.
BY MR. NOLAN:
**Q Were you the officer and director of Big Boyz Law firm when it existed?**
A No.
**Q Were you the partner or shareholder of it?**
A No.
**Q So who was the owner or shareholder or partner of Big Boyz Law firm --**
A Leslie Klein & Associates.
**Q Were you a limited partner of it?**
A No.
**Q So the law firm owned 100 percent of Big Boyz Law firm when it was in existence.**
A Yes.
**Q And did the law firm ever transfer money to Big Boyz Law firm directly?**
A Yes. I don't know.
**Q It could have but you --**
A It could have and it paid all the bills and it

paid all the salaries. But I don't know if it transferred money to Big Boyz Law or just paid them straight.

**Q Okay. And who is Eli Zobdeh?**

A Eli Zobdeh is a person who has a different company called Doctors Marketing Network.

**Q Is that the same Doctors Marketing Network that you and I talked about in your first depo?**

A Yes.

MR. LIEBERMAN: Counsel, we've been going well over 7 1/2 hours. And I just wanted to know how much longer you're going to be.

MR. NOLAN: Five minutes.

MR. LIEBERMAN: Okay.

BY MR. NOLAN:

**Q Okay. Do you know who Sandra Latin is?**

A Yes.

**Q Who is Sandra Latin?**

A Sandra Latin was a tenant at 161 North Poinsettia.

**Q So when you owned 161 North Poinsettia, you leased that property out to her?**

A Yes.

**Q Did the law firm ever own North Poinsettia?**

A Actually, 161 North Poinsettia was Kenneth

Klein's house. My son's house. He owned it free and clear. I don't think the law firm ever owned --

MR. LIEBERMAN: Listen. Just answer his question.

THE WITNESS: The answer is no.

BY MR. NOLAN:

**Q So when was Ms. Latin a tenant at 161 North Poinsettia?**

A Long time.

**Q For a long time she was a tenant?**

A Long time she was a tenant.

**Q And did she pay rent to you?**

A Yes.

**Q I mean you or the law firm.**

A I think when my son transferred to me, it was transferred to Bay Area Development company.

**Q Okay. And who's William Latin?**

A William Latin was her ex-husband. She divorced him, I think. I don't know.

**Q And did you have any business dealings with William Latin?**

A No.

**Q So you never owned a company with him.**

A Never.

**Q And you never were in a joint venture with him.**

A Never.

**Q Did the law firm ever use William Latin and his services?**

A No.

MR. LIEBERMAN: Counsel, I'd like to wrap up the examination.

MR. NOLAN: Understood.

BY MR. NOLAN:

**Q Was William Latin ever a client of the law firm?**

A No.

**Q And how about you personally? Did you ever represent William Latin?**

A No.

MR. NOLAN: All right. I don't have any further questions.

MR. LIEBERMAN: Thank you.

MR. NOLAN: Mr. -- well, let's stay on the record for one thing.

Mr. Klein, did you get your other transcript from the first volume?

THE WITNESS: No.

MR. LIEBERMAN: Yeah. I didn't forward it to him. When it's done, he'll read it all together. We're waiting to get a transcript. I got -- it's some sort of

e-mail, something, but not an actual physical transcript. I can't ask him to review it on this. So we need to -- we need them to send us a real transcript.

MR. NOLAN: No, I understand that. I just thought we did a stipulation before that gave him 30 days.

MR. LIEBERMAN: From the conclusion of the examination. That's from today.

MR. NOLAN: Oh --

MR. LIEBERMAN: Or from when we get the transcript. It's from today. I mean, from when we get the transcript at the end.

MR. NOLAN: No. I'm just trying to understand.

MR. LIEBERMAN: Yeah.

MR. NOLAN: Okay. So you're saying conclusion of the deposition is conclusion of today. That's fine.

MR. LIEBERMAN: Yeah.

MR. NOLAN: So you're going to have a chance to review your deposition testimony, make all the changes that you believe are appropriate, and then sign it under penalty of perjury. Remember, I told you this when I first took your first depo, to the extent you make any changes of substance, I can comment upon it, and that could impact your credibility.

You understand that?

THE WITNESS: Yes.

MR. NOLAN: Okay. And then you'll let me know, Marc, when he signs it. And if he's made any changes, you'll provide me the errata sheet.

MR. LIEBERMAN: I will.

MR. NOLAN: Okay. We're off the record.

(Whereupon, at 4:26 p.m., the taking of the deposition of LESLIE KLEIN was adjourned.)

--oOo--

REPORTER'S CERTIFICATE

I, SUSAN MYONG, Certified Shorthand Reporter No. 13365 in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing Rule 2004 Examination was by me placed under oath to testify to the truth;

That said Rule 2004 Examination was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting through computer-aided transcription;

That said Rule 2004 Examination is a true, correct, and complete transcript of said proceedings taken to the best of my ability.

I further certify that I am not interested in the event of the action.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

WITNESS MY HAND this 2nd day of January, 2024.

SUSAN MYONG, CSR No. 13365

DECLARATION UNDER PENALTY OF PERJURY

Case Name: In re Leslie Klein

Date of Deposition: 12/19/2023

Job No.: 10132843

I, LESLIE KLEIN, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2024, at ____________________.

_________________________________

LESLIE KLEIN

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

DEPOSITION ERRATA SHEET

Case Name: In re Leslie Klein
Name of Witness: Leslie Klein
Date of Deposition: 12/19/2023
Job No.: 10132843
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

Page ______ Line ______ Reason ______

From ____________________________ to ____________________________

DEPOSITION ERRATA SHEET

Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________
Page ______ Line _______ Reason _______
From ____________________________ to ____________________________

________ Subject to the above changes, I certify that the transcript is true and correct

________ No changes have been made. I certify that the transcript is true and correct.

____________________________________
LESLIE KLEIN

### $

**$1.4** 303:11

**$10** 302:20

**$10,000** 267:12 348:14,22 349:1,3

**$100,000** 360:8

**$120,000** 266:14

**$122** 315:2

**$14** 249:5 303:11

**$150,000** 362:7

**$17** 298:7 299:9 307:3,17

**$18,000** 309:17

**$2** 302:24 309:16

**$2,000** 297:4 349:5 355:2

**$2.1** 337:12,17

**$2.178** 338:13

**$2.5** 303:1 324:13

**$20** 324:5,7

**$250,000** 361:6

**$3,750** 291:11,17 292:6 293:11 295:15

**$3.5** 324:3,4

**$300,000** 357:3 361:3

**$343,606** 336:14

**$4** 237:7 239:4 298:11 300:24

**$5** 249:5 309:9 326:6

**$500** 336:25

**$52,000** 341:15

**$6** 247:23

**$6,860** 351:24

**$600** 336:25

**$784.40** 346:15

**$8** 237:6 273:4 275:15 283:14,15 327:13

**$8,000** 349:17,20,24

**$850,000** 298:19,20

**$9** 247:18 249:3,4

**$900,000** 303:13

### -

**--ooo--** 368:10

### 0

**00001475** 334:8

**001540** 343:17

**09** 277:10

### 1

**1** 314:8 319:23 348:3 359:25

**1-1/2-year** 274:24

**1.9** 334:17

**1/18** 349:15

**1/2** 302:24 320:3 364:11

**10** 277:10 302:1 321:7 322:23

**100** 328:3 363:18

**100,000** 309:10

**107.48** 318:9 320:2

**10:10** 234:2

**10:11** 234:10

**10:34** 253:2

**10:42** 253:2

**11** 277:11 346:12 350:22

**11:20** 284:22

**11:27** 284:22

**12** 248:4 259:9 265:4 283:16,18

**12:00** 311:5

**12:04** 311:7

**13** 297:15,18

**14** 296:16 345:17 348:12

**14245** 288:17 314:3

**1477** 334:16

**1486** 334:22 337:9

**1490** 335:5,7

**15** 350:22

**1510** 338:17 339:3 341:2

**1513** 339:5,9 340:3

**1540** 343:14,16

**16** 316:23 318:17

**161** 364:19,21,25 365:7

**17** 300:20

**18** 283:25 284:1 339:18 340:10 341:18 342:20,21 349:8,9

**18th** 349:16,18

**19** 234:1,10 312:1 337:11 338:13,18 339:17

**1:06** 312:2

### 2

**2** 240:22 265:17 291:10 333:24

**2-** 357:3

**2.2** 342:19

**2.5** 301:18 303:6

**2.54** 337:18

**20** 236:5,6 239:12,13 242:6 257:21 342:18 343:3 355:15

**200-** 357:8

**2000** 256:16

**2004** 234:8

**2005** 264:23

**2007** 242:4 251:25 260:22 262:3 265:25 277:10 279:14 280:15 281:10 285:21

**2008** 262:4 266:1 277:10

**2009** 251:25 266:1 274:4

**2010** 274:4

**2011** 242:1,4 243:5 252:20 256:13,16 260:22 265:11,13 272:13 273:9 277:12 279:14,16 280:16 281:10,11 285:21 305:7 306:21,22,23, 24 323:14 325:12 326:10,11

**2012** 266:11,14

**2013** 266:18

**2014** 266:18

**2016** 245:20 248:4 264:23 265:3 314:9, 17 315:2 316:21,25 318:3,15 319:14

**2017** 240:2,4,19,20 283:22 306:19 316:25 332:9

**2018** 236:24 237:19 273:3 281:13 297:15,18 306:17,19 316:25 320:12 334:6 342:2 354:14 355:6 357:2 358:23 359:8

**2019** 270:1,16 272:13 287:1,2 291:17,18, 25 293:7 296:16 305:7 308:13 316:19,25 338:17,25 339:14 342:3 348:3, 13,25 349:3 354:7, 12

**2020** 319:23 342:24 343:10 354:7 356:6 359:25 361:1,2

**2021** 354:8 355:6 358:23 359:8

**2023** 234:1,10 250:6 312:1 345:16 346:12 347:2 350:22,23 353:2

**21** 245:10,13,16 246:5,9,15,20,23 247:3,16 248:3,7,9 250:15 251:18 253:23 278:11 345:16

**21143** 234:6

**22** 253:9,12,15 257:12 278:11 282:9

**23** 264:4,8,11,18,24 265:8,21 266:5,7

**24** 269:14,17 348:12

**25** 240:2,4 286:17,20, 25 287:5 291:10,15 294:10,15 295:7,15

**250-** 361:3

**26** 294:1,6,9 296:1,24 297:3

**27** 297:6,7 298:4 299:7,22 301:11 305:14 307:4,24

**28** 308:5,6,18

**29** 270:1 313:18,19 314:1,8 315:14 316:21 318:10

**2:01** 353:21

**2:09** 353:21

**2nd** 360:9,10

**3**

**3** 265:15 302:11 308:12 312:13 313:15 320:3 351:21 360:6

**3,000** 352:7

**3-8** 265:19

**3.5** 324:23

**3.8** 301:16 302:22

**30** 317:23,24 318:2, 21 320:3 359:25 367:5

**300,000** 302:10,13,16 340:15 357:8

**301** 288:18 314:4

**31** 314:9 319:17,18, 22,23 320:2 345:16 348:3

**32** 330:16,18,24 332:23 333:1,5,11, 21,24

**322** 346:20 347:12

**323** 234:7

**33** 334:1,2,5

**34** 338:22,25

**343,606** 334:25 335:8 336:5,14

**35** 343:5,6,10

**357** 339:20 340:13

**357,000** 339:19

**36** 345:11,12,15

**37** 347:16,17,22,25

**38** 350:13,14,18,21 351:18,21 352:11,25

**39** 234:12 359:13,14, 23

**3rd** 360:11

**4**

**4** 234:11 265:17 312:13 320:3 346:10

**4-2** 265:19,20

**4140** 360:13

**463,523** 335:19 343:24

**4:26** 234:2 368:7

**5**

**5** 247:23 249:25 348:12

**50** 270:22 271:5,12, 23 278:3,5,6,24,25 281:13 282:23 283:5 286:10,15 306:3 342:12

**50-percent** 305:1

**50/50** 283:18

**52,000** 339:21,23 340:5,13,17

**6**

**6** 302:12 341:18 351:21

**6,000** 352:8

**600,000** 302:11,14

**7**

**7** 287:2 291:17 364:11

**8**

**8** 265:15 287:1 291:17

**8122** 318:7

**850,000** 298:22

**8530** 351:5,11 352:13

**9**

**90503** 234:8

**9401** 348:13,17 351:17

**9404** 296:19 345:21 348:2 359:25

**97** 328:6

**98** 247:9 328:6

A

**a.m.** 234:2,10 253:2 284:22

**AA** 325:5

**ability** 235:23 274:6

**accomplished** 275:8

**account** 266:22,23,24 269:1,2,3,5,8,9 279:6 280:20 288:2 289:11 291:5 293:24 295:2,6 296:19 301:13,18,24 303:6 304:3 312:16,21,22 313:2,6,8,12 314:12, 16,19,24 315:7,10, 13,17,19,20,24 316:2,3,11,15,17,18 317:5,9,11,13,15 318:2,6,7,15,24 319:7,8,14 320:7,11, 16,19,21,24 321:21, 25 322:2,6,13,16 323:2 336:5,14,15, 16,18 337:3,6,7,8 339:25 340:4,9,22, 23,25 345:18,21 346:6,8 348:1,2,10, 13,17,23 349:21 350:23 351:5,8,10, 11 352:14,17,21,24, 25 353:7 354:3 359:25 360:13

**Accountancy** 296:14

**accountant** 267:15 337:4 342:2,4

**accounting** 266:7 268:20 272:13 273:25 274:1,2 284:8,10 304:21,24 305:4

**accountings** 304:4

**accounts** 268:22,23 269:12 274:9,15,16 314:2 321:13 339:23 340:5,8 351:15

**accrue** 349:11

**accurate** 255:11 269:21 270:19,20 287:4,7 291:15 296:5 314:16 334:17 360:4

**acknowledgement** 331:3

**active** 317:15

**actual** 367:1

**added** 241:4

**addition** 244:9

**additional** 284:2

**address** 234:6 288:17 351:2

**addressed** 308:13 351:1

**adjourned** 368:9

**admonitions** 235:10

**advances** 335:12

**advertise** 361:3,6

**advertising** 356:3 361:11,22

**age** 247:9 328:3

**Agnes** 254:15 282:5

**ago** 248:17,18 342:12

**agree** 322:11 343:12

**agreed** 305:21

**agreement** 241:1 251:19 252:17 265:2,10 281:17 286:5 292:13 294:24 303:25 304:25 305:15 306:15 307:5,7,14,15,22,25 308:1 309:1,3,5,7, 18,22,23 310:15 326:15,20,22 329:25 361:10

**agreements** 245:22

**ahead** 245:16 284:1 298:2 305:9 319:24 347:6 363:6

**alive** 247:19 248:13 250:13 254:9,12,16, 22 255:7,18 282:25 283:1,3 324:16

**allege** 243:17

**Alliance** 279:11,12 280:4,16

**allocated** 301:15

**allow** 298:10

**allowed** 344:12,16

**alternate** 331:21,22 332:11,14,17,21,24

**ambiguous** 260:11

**amended** 265:10

**America** 286:25 287:11,25 296:3,7 305:24 306:2 312:14 313:2,9 314:1 315:16 345:16 348:1 350:22,25 351:10,16 353:5 359:23

**American** 249:10 330:7,11

**amount** 256:17 267:11 324:6,24 325:17 327:11 352:4,6

**amounts** 265:1 354:7

**Andrew** 247:8 261:14

**Angeles** 234:1 312:1

**answer** 237:21 262:7, 22 267:13,22 280:5, 10 284:14 288:4,12, 14 290:7 293:7 295:10,13 307:10, 13,16 321:10 332:1 340:10 345:24 347:1,9 350:11 355:25 365:3,5

**answered** 276:18 307:18

**anybody** 270:10 332:20

**anymore** 346:6 362:11

**apparently** 298:12

**appear** 245:21 246:19 248:7 269:21 296:5

**appearances** 234:14

**appearing** 234:15,18

**appears** 264:15 287:3 308:15 346:14

**appointed** 332:18

**appraisal** 244:17

**appreciate** 305:13

**approach** 238:18

**appropriate** 367:20

**approved** 294:19

**approximate** 352:4 357:1

**approximately** 237:8 325:10 340:15

**April** 250:6 350:22

**Area** 329:18 356:10, 12 358:8,9,12,13,16,

19,22 365:16
**arrangement** 361:17, 20
**arrangements** 243:25
**arrived** 344:22
**articles** 290:21
**asked** 240:10,12 310:12 345:24 352:12
**asking** 241:8 271:3 292:3 299:19 319:11,12 331:16 347:12 354:1
**asks** 247:21 293:20
**asset** 341:13,15,20, 25
**assets** 241:9 285:11, 13 334:25 335:3,7 341:4
**assigned** 323:5
**assisting** 274:24
**Associate** 360:16
**associated** 321:14 329:17 360:15
**Associates** 234:19 245:19 256:3 269:23 270:2,8 274:19 279:6 285:18 291:17 292:21 295:23,24 312:15 314:3 345:17 348:2 357:16,20,22 358:18,25 359:11,24 360:4,18 361:5,9,18, 21 362:17,18 363:15
**Associates'** 348:9
**assume** 284:7
**assuming** 266:8 267:5
**assumption** 318:13
**attached** 236:7 239:23 245:14 253:10 264:9 269:15 286:21 294:7 297:8 299:14 308:7 313:20 317:25 319:19 330:19 334:3 338:23 343:7 345:13 347:18 350:15 359:15
**attorney** 251:10 271:2 290:1 291:1
**attorney-client** 292:19
**August** 296:16
**authentic** 264:16
**authenticity** 246:5 253:14
**authored** 246:9
**aware** 271:5 327:24 362:4

**B**

**B-A-A-L** 293:22
**B-I-G** 360:22
**B-I-T-M-A-N** 327:9
**B-I-T-T-M-A-N** 327:10
**B-O-Y-S** 360:22
**Baal** 293:18,21
**back** 242:12 249:7 253:3 257:21 262:21 274:4 282:20 284:23 292:1 298:19 299:6 301:1 304:14 312:5 313:15 337:9 353:23 354:17
**bail** 329:1
**bailed** 328:16 329:3,4
**balance** 240:24 241:11 315:2 318:9 320:2 337:22 340:4
**Baltimore** 360:17
**Bamboo** 346:12,15 347:11
**bank** 286:25 287:11, 25 288:2,16 289:11 291:5 293:24 296:3, 6,7 312:14 313:2,9 314:1,24 315:16 319:22 345:15 347:25 348:1,8,9 350:21,25 351:10, 11,16 352:17 353:4, 5 354:3 359:23
**banking** 348:9 351:15
**Barbara** 298:8
**based** 246:20 275:14 281:23 282:1 294:23,24 303:24 306:12 344:22
**basically** 237:5 244:15 247:10 252:18 260:25 264:1,19,25 266:7 267:3 298:6 306:1 309:4 319:24 323:18 324:11 330:10 336:10,17 337:5 345:23 346:24 354:9 361:12
**basis** 244:13 275:1 344:15,18
**Bates** 334:7
**Bay** 329:17 356:10,12 358:8,9,12,13,16,19, 22 365:16
**beginning** 234:10 315:1 337:16 339:20
**behalf** 234:16,22 235:2 238:23 239:10 267:19 290:4 291:20 294:17 295:20 314:23 317:19 349:19 355:21 358:7 361:6
**believe** 239:22 243:16 254:6 312:19 367:20
**believed** 287:24
**belonged** 239:4
**belongs** 298:11,12
**beneficiaries** 295:19
**benefit** 238:21 239:1, 2,3,7 286:18 287:20 324:2 325:16
**benefits** 306:14
**Berger** 252:12
**Berke** 300:7,9,11,13, 14,19
**best** 235:22 257:16 308:2,4 323:20 345:8
**big** 249:10 355:22 360:20,21,22,24,25 361:1,4,14,17,23 362:3,5,9,10,14,16, 21,23 363:8,14,18, 21 364:2
**biggest** 305:23
**bill** 274:16 356:1
**bills** 355:11 357:15 362:5 363:25
**binder** 262:14 263:8, 12,13,16,24 264:1 265:8 267:1,8 268:13,14 276:22,24 277:1

**bit** 263:18 298:25

**Bittman** 327:8,17 328:1,3,5,8,12,13,14 329:1,3,6,7,9,20,24 330:3,6,14 345:6,9

**BK** 251:20,23,24 252:2,4,14 276:3

**blank** 241:1

**blur** 303:23

**book** 262:10 263:16, 17

**bottom** 277:18 297:17 333:23 334:7

**bought** 328:17

**Boulevard** 234:7 288:18 314:3

**Boys** 360:25

**Boyz** 360:20,21,22,24 361:1,4,14,17,23 362:3,5,9,10,14,16, 22,23 363:8,14,18, 22 364:2

**Bozi** 246:7,8 309:18

**Bradley** 234:16

**break** 284:17 303:4 311:4 353:18

**breast** 324:17

**briefly** 313:23

**bring** 262:21

**broker** 244:12

**brother-in-law** 265:16 271:11

**brutal** 272:7

**Buchalter** 357:21

**bunch** 360:6

**Burke** 254:19

**business** 234:6 273:21 274:22 289:23 290:5,17,20 304:10 310:19 321:14 348:6 360:4 365:20

**busy** 284:11

**C**

**calculate** 265:12

**California** 234:1,7 291:2 312:1 314:2

**call** 263:8,10,12 276:16,20 279:10

**called** 251:4 260:19 262:14 364:6

**cancel** 341:18

**cancer** 324:17

**capacity** 273:11

**capital** 236:25 237:4, 9,23 238:20 239:5 240:11 241:21,24 242:8,23 243:11 244:6,10 251:14 254:7,17,23 255:9 256:5,10,12,14 257:3 270:5,11,12, 19,23 271:4,6,13,24 272:20 274:23 278:4,8,12,19,21 285:4 301:16 304:13 308:22 309:24,25 310:11,16,20 323:6

**capitalized** 338:12

**card** 269:12 287:3,5, 8,11,12,14,16,19,21, 25 288:6,10

**cards** 288:15 294:12

**care** 348:8 362:7

**carried** 337:23

**carrying** 342:21,22 354:14

**carryover** 334:18,19

**case** 315:25 316:2 335:15 356:20 357:16,17,18,19,22

**cases** 321:6 322:3 335:13 336:11,24 356:24 357:25 358:1 361:4,12

**cash** 350:11 353:8,11

**catch** 284:5

**caught** 284:1

**ceased** 312:21

**certain** 249:8

**chance** 258:17 286:23 367:18

**change** 255:13 304:12 339:17 346:5

**changed** 345:23

**changes** 367:19,23 368:3

**charge** 243:23 244:10 294:12 305:1,2

**charged** 272:20

**charging** 244:3,9,11, 13 294:16

**charitable** 245:2,4,8 275:5 281:6,7 293:17 300:25 301:3,4 330:25 331:5 332:7

**charities** 287:23 294:25 295:11,21

**charity** 244:16 293:18 294:22 295:3 301:6 305:23,24 310:23

**chart** 297:14

**Chase** 322:6,13

**check** 267:8 280:2 294:22 295:1,25 299:3 352:22 353:4, 18

**checking** 269:1,3 322:15 348:13,17,22 349:20

**checks** 295:1,2,11, 18,20,22 318:21 352:13 358:11 359:10

**child** 332:20

**Civil** 234:5

**claim** 236:19

**clarification** 247:21 293:20

**clarifications** 241:9

**clarify** 246:10 292:6 347:8

**clear** 278:20 365:2

**client** 266:21 293:2,5, 6,8 314:20,23 315:6 316:9,16 318:14 320:11,18,21 321:13 322:12,15 332:14,20 335:6,8,10,12 336:4, 9,13,15 337:5 339:19,23,25 340:5, 24 341:7 366:9

**client's** 315:8 337:2

**clients** 302:5 314:24 316:4 317:1,16 320:23,25 321:1,2,3 326:5 328:22 341:11

**close** 265:16 271:10 330:12,13,14

**closed** 287:15 361:2,

14,15 362:10
**clue** 297:5
**Coast** 362:19
**Cogan** 251:5,7,8,9,13
**collect** 352:5,7,16
**collecting** 352:2 354:6
**come** 236:16 262:20
**comes** 270:7 309:7
**coming** 357:9 358:3 360:7,18
**comment** 367:23
**comments** 300:13
**common** 332:11,13
**companies** 268:7 273:18 358:9 359:9
**company** 276:2,4,9, 16,19,20 278:22,23 279:10,12,18 306:9 325:2 334:14 356:11,12,13,15 358:13,16,19 364:6 365:16,23
**complaint** 342:10
**complete** 246:16
**complicated** 299:16
**computed** 265:1
**computer** 262:2,3 274:2,7,10,13
**computers** 274:3
**concerned** 239:3
**conclusion** 367:7,15, 16
**confirm** 276:14
**confirms** 240:24
**connection** 328:11
**consideration** 282:20
**consistent** 342:2
**contact** 278:22 280:4
**contemplated** 252:16
**contingency** 236:17 244:25 304:17 316:1 322:3,20 324:14
**continue** 309:17
**contract** 265:9
**contractor** 244:11
**contractual** 361:17, 19
**contribute** 275:12 301:2
**contributed** 243:5 277:15
**contribution** 293:17
**contributions** 263:11
**control** 289:15 329:17,19 359:9 362:1
**controlled** 358:8,20
**conversation** 271:7,9
**copies** 260:1,3
**copy** 259:15 269:21
**coronavirus** 361:1
**Corporation** 296:14
**correct** 237:1 238:5, 8,11,19 241:22 242:25 243:6 246:12,21 248:11,21 255:3 256:19 257:13,19 258:13, 15,16,19,20 259:24 262:17 265:11,23 266:1,2,25 267:15 269:7 271:25 272:17,18 275:16 276:6,11 277:25 278:9,10,14 279:21 280:15,24 281:1,21 282:10,11,15,25 283:8 284:4 285:24 286:3,13,15,16 288:18,19,25 292:21 293:12,13 294:13 295:16,17,25 296:8 304:1,18 306:11 312:24 313:4,10 314:25 316:6 317:17 321:24 322:1 324:16 325:22 328:24 331:6 332:25 333:22 334:21 336:3,15 338:10,11,14 339:16 340:16 341:14,22 342:23 343:22 344:8 346:7 348:11,18,24 349:12,23 350:4,7 352:2,6,10 354:16 356:8,14,25 358:12, 21 361:8
**correctly** 285:14,25 313:1 323:12 326:1 346:17 348:20 349:22 352:11 357:7
**correspondence** 239:6
**corroborate** 263:7
**cost** 335:8 336:12,25 337:7 339:25 340:8, 9 341:8,9,10,12
**costs** 335:6,12 336:9, 10,16,17,23,25 337:1,5 339:19 340:11,14 341:1
**counsel** 251:9 284:16 290:15 294:2 343:1 364:10 366:5
**Counselor** 319:2
**Counsels** 234:13
**couple** 275:24 323:9, 13,16,18
**court** 264:6 321:16 340:11,14 341:1,9, 10,12
**cover** 245:19
**coverage** 347:13
**covered** 278:7
**covering** 347:13
**CPA** 296:13 342:5,6, 7,12
**created** 240:1,5,6 289:13 313:2,12
**credibility** 367:24
**credit** 269:12 287:3,5, 8,11,12,13,16,19,21, 24 288:6,10,15
**current** 240:24 334:25 335:3,7 341:4
**currently** 254:6 271:12 352:16
**custom** 238:13 303:18 315:5 319:6, 13 320:6 332:16 344:11 349:10 350:9
**cut** 267:8
**Cutler** 334:10,12
**cutting** 358:11

D

**dad** 262:10
**date** 323:25
**dated** 240:4 245:19

248:4 269:25 297:15 308:12

**daughter** 298:18 299:2

**David** 252:12

**day** 249:9 262:21 306:2 308:16

**days** 367:6

**dead** 283:2

**deal** 249:17 273:9 281:8,19 282:24 283:7,8,10,12,19,20 300:22 301:25 306:16

**dealings** 365:20

**deals** 281:22

**Deborah** 298:17,20 299:2,4

**debt** 349:13

**deceased** 250:2,4

**decedent** 238:17 248:20

**December** 234:1,10 312:1 353:3

**decide** 301:23

**decided** 282:12 298:14

**decision** 244:4

**deduction** 244:18,19 245:3,5

**defend** 356:23

**defended** 357:18,19,21

**delta** 340:12

**demand** 251:13

**demanded** 237:5,7

**depo** 364:8 367:22

**deposit** 314:20 316:8,10 320:20,24 321:23 322:12 323:1 352:13

**deposited** 315:6 317:14 318:14,19 322:15 323:4 352:19,21,23

**depositing** 296:19 319:8,14 320:10

**deposition** 236:1,10 257:1,24 260:12 272:5 314:13 328:21 367:16,19 368:8

**deposits** 318:20 322:5 360:7,15,17,24

**describe** 260:20

**design** 333:5

**designated** 332:12

**determination** 250:24

**determine** 280:1 288:14 289:9,20 291:24 292:16

**Deutsch** 298:14,17,18,21 299:2,4

**Development** 329:18 356:10,12 358:8,10,12,13,16,19,23 365:16

**die** 241:13 248:23,24 249:4 255:20,21 256:1 267:4 300:23 301:25 331:23

**died** 237:18,19 238:9,11 254:12,13,14 273:3 282:22 298:8 300:11,12 302:9

**dies** 281:12 300:23

302:8 310:9 324:4,25 330:3

**different** 345:25 364:5

**dime** 257:25 298:19 302:10,16

**direction** 274:12

**directly** 276:10 315:20 363:22

**director** 362:21 363:8

**directors** 291:8

**disbelieve** 360:3

**discussion** 312:17

**dispute** 240:14 246:22 247:15,18 248:5 250:23,25 270:18 297:24 298:5 308:18,21,24

**disputed** 278:18

**distinction** 327:20

**distribute** 301:4

**distributed** 277:20 322:22

**distributing** 266:4

**distribution** 266:11,13,14 303:24

**distributions** 267:2 354:11

**dive** 303:14

**divorced** 365:18

**doc-** 279:24

**doctors** 362:6 364:6,7

**document** 239:13,25 240:5,10 245:24 246:1 253:13,17 256:9 258:21 259:5,8,11,13,14,16 260:10,13,15,18,23,25 262:18,23 263:10 264:15 265:7 269:18,19,21,22,25 270:18 277:14 279:8 280:1,9 286:24 288:13 289:8,12,19 290:19 291:23 292:3,8,10,15 296:2,5 297:11,14 301:14 307:21 308:11 312:14,20 314:7 315:1 326:12 329:22 330:22 331:7,25 332:2,22 333:1 334:7 344:19,20,21 348:5,20 361:16

**documentation** 357:12

**documents** 235:25 239:6 245:20 260:5 261:12 268:11 277:17 306:8 310:12

**dollar** 255:11

**dollars** 263:21 302:23 325:16,25 329:11

**donated** 305:19

**donation** 300:25 307:12

**donations** 305:14

**door** 302:21

**doubt** 246:4 253:14

**draft** 261:12

**drafted** 322:24

**drawing** 321:19,20

**duly** 235:3

**dying** 300:13

## E

**e-mail** 264:12 297:11, 17 308:12,15 367:1

**e-mailed** 305:17

**earlier** 306:20,21

**earn** 264:23 266:3 319:15

**earned** 265:25 266:11 315:24

**East** 362:19

**effect** 250:17,22

**effectuated** 277:1 309:21

**either** 241:19 270:17 281:8 298:10 302:5 344:5

**EKLK** 275:9 277:24 278:1,3,24,25 279:1, 5 281:2,8,9,13,16 282:1 285:4,8,11,15 286:2,4,10,12 287:2, 7,10,13,20,23,25 288:6,10,16 289:1,9, 11,14,17,20,23 290:5,8,11,12,13,14, 17,20 291:3,7,12,16, 21,24 292:5,13,17, 20,24 293:2,4,7,12, 24 294:17,20 295:6, 8 296:3,6,9,21,24 297:4,21 298:6,11 306:4,24 310:13 329:18

**Eli** 364:4,5

**employ** 274:18

**employed** 273:17

**employee** 244:6 274:16

**employees** 273:22 274:7 361:20 363:4

**employees'** 274:15

**employing** 274:19,21

**enter** 262:2 281:16

**entire** 306:9 308:21, 24

**entities** 273:21 329:19 358:7,24

**entitled** 325:23

**entity** 280:2 329:17

**entry** 267:7

**equitable** 272:21 273:1

**equity** 247:10 306:9

**Erica** 287:22,24 289:5,9

**errata** 368:4

**error** 331:16,19 333:6

**essentially** 266:5

**established** 289:17, 20

**establishing** 275:6

**estimate** 344:22,24

**estimated** 234:11

**estimating** 266:6

**Eugene** 249:23 250:22 251:1

**event** 236:16 238:14 244:20,21,25

**everybody** 328:17,19

**ex-husband** 365:18

**exactly** 260:4 268:15, 16,17 273:14

**examination** 234:8 235:6 366:6 367:8

**examined** 235:3

**examinee** 234:20

**example** 261:14 303:3 355:15

**Excel** 261:3,7,8,10

**excuse** 246:13

**executed** 306:8

**exhibit** 236:4,6 239:12,13 242:5 245:10,13,16 246:5, 9,15,20,23 247:3,16 248:3,7,9 250:15 251:18 253:9,12,15, 23 257:12 264:4,8, 11,18,24 265:8,21 266:5,7 269:14,17 278:11 282:9 286:17,20,25 287:5 291:10,15 294:1,6,9, 10,15 295:7,15 296:1,24 297:3,6,7 298:4 299:7,22 300:18 301:11 305:14 307:4,24 308:5,6,18 312:13 313:15,18,19 314:1, 8 315:14 316:21 317:23,24 318:2,10, 21 319:17,18,22 320:2,3 330:16,18, 24 332:23 333:1,5, 11,21,24 334:1,2,5 338:16,22,25 343:5, 6,10 345:11,12,15 347:16,17,22,25 350:13,14,18,21 351:18,21 352:11,25 359:13,14,23

**exist** 290:23 292:9,10 326:22

**existed** 314:17 334:14 363:2,9

**existence** 251:24 363:19

**expect** 282:20 301:2

**expectancy** 309:11

**expected** 282:22 301:1

**expenses** 299:17 301:17 357:10

**experts** 274:10,11

**Explain** 301:21

**explained** 236:14

**explaining** 305:13

**explanation** 237:15

**extent** 367:22

**eyeballed** 360:7

## F

**F-L-U-F-F** 338:3,4

**face** 268:9 286:11 324:6 325:17 327:11

**fact** 280:22

**facts** 235:23

**failed** 272:12,16,19

**fair** 333:7

**familiar** 245:24 348:6

**families** 302:1 303:1, 2

**family** 239:7 267:9 302:9,13

**far** 239:3 247:4 310:11 315:5 333:8 344:15

**fashion** 262:9

**father** 298:17

**favorite** 294:22

**Faye** 255:6

**February** 287:1 291:17,25

**federal** 234:4 352:12

**fee** 243:23 244:2,4,9, 11,14 316:1 321:22 336:25 361:10,13

**fees** 272:17,20 293:9 315:24 316:1 335:13,14 340:11 344:24 356:19,20,23 357:14

**Feldman** 323:24 324:2,4,10,12,25 325:2 327:2

**felt** 244:3

**fiduciary** 317:19

**fight** 298:9

**fighting** 265:18

**figure** 337:21,24

**figurehead** 304:22

**file** 296:9 336:25

**filed** 334:13 336:11

**filing** 335:13 340:10

**financial** 249:10

**find** 262:24 276:20 279:12

**fine** 242:19 261:19,24 284:19 299:20 305:9 307:19 309:18 315:18 317:8,10 342:16 343:4 347:6, 10 355:18 367:16

**finish** 272:1 340:1

**firm** 246:1 256:3 257:1,4,5,8,10,14,17 258:2,6,9,10 259:13, 15,17,20,24,25 260:3 263:4,6 264:16 266:16,17, 19,20 269:6 274:18 277:3 279:6 285:17, 18,22,25 288:20,24 290:7,8,11,13,15 291:16,20,24 292:6, 11,12,16,21,25 293:3,5,8,11 294:11, 13,17,20,21 295:2,8, 12,16,19 296:18,23 297:3 312:23 314:14 315:21 316:5,17,24 317:3,5,7,15,16 318:15 319:7,13 320:8,14 321:14 323:2,7,11,13,16 325:13,23 326:9,12 327:15,19,22 328:12,21,25 329:9 334:6,11 335:23 336:2,15,17,23 337:24 338:6,7,9,12 340:4,21 341:13,25 343:11 344:1,12,25 346:15 348:2,21 349:1,20 350:9,10 352:21 353:10 354:2,7 355:6,8,9,10 356:6,22 357:8,10 358:1,6,11,25 360:16,17,19,23,24, 25 361:2,5,7,11,14, 18,24 362:3,5,9,10, 14,16,19,22,23 363:9,14,18,19,21, 22 364:24 365:2,14 366:2,10

**firm's** 317:21 326:14 327:18 339:15 348:6 355:21

**first** 235:3,11 236:10 237:17 238:6,8,10 239:18 240:2 245:21 257:23 264:6,14 269:20 288:4 297:13,17 298:1 299:19 301:10,15 302:17,18 308:11 347:1 348:4 364:8 366:21 367:22

**five** 309:11 325:20 349:6,7,8,11 364:13

**five-** 284:17

**five-day** 350:5

**flat** 321:22

**flow** 267:18 353:8,12

**FLP** 234:17

**fluff** 337:21,24 338:1

**folder** 263:18

**folks** 253:22 274:13 284:20

**followed** 301:17

**following** 234:5 308:16

**follows** 235:4

**forget** 262:13

**forgot** 283:22 330:23

**formal** 334:14

**format** 261:8

**formats** 261:10

**forth** 236:18

**forward** 338:16 366:23

**found** 237:18 244:22

**foundation** 271:16,20 272:21 273:3,4,7 275:8,9,18 276:10 277:21,24 278:5,6, 24,25 279:5 281:3,6, 9,10,11,16 282:14 285:9,11,15 286:2,4, 15 287:2,7,10,13,20, 23 288:1,7,11,16 289:1,10,14,17,20, 24 290:6,9,11,12,13, 14,17,20 291:4,7,12, 16,21,25 292:5,13, 17,20,24 293:2,5,8, 12,24 294:17,20 295:8,16 296:3,7,9, 21,24 297:4,21 298:7,8,11 300:10 301:1,3,5 306:4,6,7, 24 308:20 310:13,22 329:18

**foundations** 275:6,7

**four** 271:15 292:1 296:2 319:25 328:17 336:4,13 339:7,11 349:25 350:2

**frame** 249:8 287:1 321:15 355:6 358:23 359:8

**frames** 289:6

**free** 365:1

**friends** 273:8 282:17 302:5

**friendship** 275:1,2,14

**front** 245:21

**fruition** 236:16

**fund** 266:21 310:9 321:13 325:3,4 326:4 339:23 340:5 344:6

**funds** 252:20 264:21 265:4 267:18 301:15 314:20,23 315:6,20 316:8,14,16 318:14

319:14 320:7,11,15 322:15,21 323:18,22 335:11 336:15 341:11

**further** 366:16

**G**

**G-O-O-D-K-I-N** 282:7

**Gardner** 247:8,10,12, 14 248:16,17 251:25 252:19 261:15 302:20,21 330:13

**Gardner's** 253:23

**Gardners** 248:15

**general** 249:10 266:23 316:14,17 321:21 330:7 340:22,23,25

**General's** 330:12

**generally** 273:13

**generating** 320:15 356:6

**Gestetner** 236:11 237:18 239:4,7,8 240:7,8,14 241:8,18, 23 242:3,15 246:7,8, 10,18,23,25 247:4, 11,15 248:5,10 249:21 264:20,22 265:1,15 267:20 268:22,24,25 269:9, 11 271:11 273:5 277:6,15 298:12 300:15 302:23 309:5,13,19 310:5 330:23,25 331:5,19, 24 332:7

**Gestetner's** 236:15 239:2 267:9,18

**Gestetners** 270:21,23 271:1,3 332:23

**get all** 249:7 283:17

**getting** 244:17 249:4 278:1 355:2,5 358:3 360:24

**gift** 281:6,7,8 293:14, 15

**gifts** 259:21

**give** 264:5 268:7 272:12 273:16 279:19 284:9 307:22 310:5,7 330:23 338:19

**given** 317:18 318:19 323:17

**giving** 237:16 274:12 279:22

**Glatzer** 255:6

**go** 245:16 250:24 251:18 252:25 262:25 266:10 276:14 279:8,12 283:19 284:20 294:5 296:15 298:2 299:1 301:10,15 305:9 307:21 308:5 334:16,22 337:9 338:15 339:1,3,9 341:2 342:24 343:2, 14 346:10 347:6 348:12 349:15 353:5 363:6

**goes** 245:11 274:3 281:13,14 292:1

**going** 235:10 236:4 257:21 265:19 272:4,7 278:12 279:18 283:5,9 284:16,20 286:24 295:7 298:4,10 306:13 310:6 313:25 315:9 316:9 320:15, 18 321:21 324:18 328:19 336:24 342:11 344:14 348:4 361:12,13 364:10,12 367:18

**Goldfinger** 296:14

**Goldstein** 300:12,18

**good** 234:23 235:8,9 249:10,17 298:16 311:4

**Goodkin** 254:4,9 282:3,7,8 283:3,13 284:6

**government** 336:1 352:12

**Great** 284:19

**green** 262:9

**Grossman** 254:21

**group** 234:17 239:8 241:24 242:8,24 243:12 244:7,10 251:14 254:7,17,23 255:9 256:5,10,12, 14 257:3 270:5,11, 12,19 271:4,6,13,24 272:20 274:23 278:8,13,19,21 304:14 309:24,25 310:12,20 323:6

**guess** 275:19,20 279:25 308:2,4 345:8

**H**

**H-A-N-E-S-S** 293:22

**Hahn** 357:15,17

**half** 237:6 274:5

277:10,13,19

**hand** 313:14

**handshake** 281:19, 20,24 282:1 306:16 310:15

**Haness** 293:18

**happen** 252:14 304:19

**happened** 238:14 251:6 306:20 318:23 322:17

**harder** 261:23

**Hawthorne** 234:7

**he'll** 366:24

**heading** 337:2

**health** 362:7

**hedge** 252:20 323:18, 22 325:3,4 326:4 344:6

**held** 236:25 242:8,23 254:7 314:23,24 340:20,22

**hereto** 236:7 245:14 253:10 264:9 269:15 286:21 294:7 297:8 308:7 313:20 317:25 319:19 330:19 334:3 338:23 343:7 345:13 347:18 350:15 359:15

**higher** 319:9

**hired** 361:20

**hit** 304:16 361:1

**Hoffmans** 255:17

**hold** 238:20 285:11 304:14

**holder** 287:16

**holding** 238:23 239:6 243:13 276:2,3,8 325:14 337:5 339:23

**holds** 286:2 325:1

**Holtzman** 236:22,23 237:4,18,19 238:8, 10,24 254:2 273:2,3, 6 277:4,7 278:2,3,7, 12,20,23 279:3,11, 13 280:3,18,19 281:12,23 282:2 283:1,14,23,24 284:3 286:6,9 298:9 300:2,13,19,23 310:2,6

**Holtzman's** 238:4

**Holtzmans** 239:10

**home** 267:8 276:22

**homeowner's** 346:22 347:13

**homes** 273:21 274:24 284:12

**hour** 284:17

**hours** 234:12 364:11

**house** 263:1 267:2 268:13 344:20 346:20,23 347:14 365:1

**Hubert** 324:13,20,21

**huge** 305:23

**hundred** 328:18 330:4,9,13,15

**I**

**I-O-L-T-A** 315:10

**idea** 252:18 284:7 307:22 310:8 342:1

**identification** 236:6 245:13 253:9 264:8 269:14 286:20 294:6 297:7 308:6 313:19 317:24 319:18 330:18 334:2 338:22 343:6 345:12 347:17 350:14 359:14

**identify** 245:18 286:24 313:25 347:22 350:18

**identity** 259:11,12

**II** 234:8

**impact** 367:24

**inaccurate** 278:13,15

**inception** 279:14

**include** 310:2 321:18

**including** 248:2 258:9

**income** 354:21

**incorporate** 252:2 358:14,17

**incorporated** 358:17 362:18

**incorporation** 290:22

**increase** 255:14

**increases** 241:3

**incurred** 356:23 357:14

**independent** 244:11 290:14

**indicating** 239:6

**individual** 294:16 299:22 303:22 304:15

**individually** 274:20, 21 290:4

**individuals** 242:10 243:1,4 253:22 295:5 328:23

**information** 263:7 292:20,25 293:11

**inhibit** 235:23

**initial** 301:16

**injury** 321:2,3,4,6

**insists** 332:14

**instrument** 270:22

**instrumental** 244:17

**insurance** 236:15 238:15 242:23 243:23 245:22 246:11 247:16 248:3,6 252:17 257:14,18 259:6,18 260:14 263:11,12 268:7,12,14 273:7 276:16 278:22 279:10,12,18 285:3, 8,12,15 286:1 297:25 299:23,25 303:9,21,23 304:1, 16 306:8 308:19 316:7,8,25 317:4,20 322:20 323:6,7 325:1 327:17 328:2, 22 335:17,24 339:15 343:19,25 344:2,4 345:1 346:12,15,22 347:11

**intend** 343:2

**interest** 238:1,3 240:10 246:19 248:7 252:4 264:22 265:2, 4,25 266:3,11 270:22 271:4,6,12 272:22 273:1 282:13 283:17,18 285:4,9, 16 286:1,4,7 289:14 300:15,18 306:4 319:9,15 326:8,14 328:6,25 329:5,7,9, 10,20 330:3 336:2 344:12 358:10 361:23

**interested** 286:12

**invest** 256:4 257:5,8, 10,14 289:15

**invested** 236:16 240:15 246:11 247:5 256:10,12 257:3,4, 17 258:3,10,11,18, 19,23 259:9 323:8 328:21,23 335:24

**investing** 339:15

**investment** 328:17 330:10 335:17

**investments** 259:6 262:16

**investor** 252:12 257:25 258:2,6,8,23 259:9 323:14

**investors** 249:17 252:9,10 256:23 258:4,14 259:6 260:16 324:24 326:5,8,13 328:4,15 344:5

**involved** 244:2 259:17 359:9

**IOLTA** 269:8,9 313:2, 6,8,12 314:2,12,16, 19 315:6,10,17,19 316:2,11,17 317:11, 12,15 318:2,15,24 319:7,14 320:7,11, 16,19,20,24 322:2,6, 16 336:18

**irrevocable** 327:17 328:2,13,14

**Isaac** 325:15 326:24

**Isi** 264:19

**Israel** 287:23 293:18 295:5,19,21

**issuance** 248:4

**issue** 287:19

**issued** 241:15 246:23 247:3 255:14 269:22 270:11,14 286:9,10 287:22 288:16

**issues** 284:13

**item** 334:24 355:22

**items** 299:21

J

**January** 314:8,17 315:2 319:23 348:3, 12 349:15,18

**Jeff** 234:15

**Jeffrey** 357:19,22

**job** 273:20,22

**join** 275:6,10

**joint** 248:19 365:25

**Jonathan** 270:1 297:12

**journal** 267:7

**July** 240:2,4 245:20 248:4 345:16 346:12 347:2

**June** 263:2,3 280:15 308:12 346:20 347:12 351:1 359:25 360:9,10,11

K

**K-I-Z-N-E-R** 255:4

**K-U** 255:3

**keep** 261:25 262:18 267:1 268:13,14 272:9 309:16 328:5

**keeps** 284:11

**Kenneth** 331:8,10,17, 20 332:17 364:25

**kept** 267:3

**kicking** 324:17

**kids** 275:3

**kind** 237:20 248:12 335:14

**kinds** 274:17

**Klein** 234:9,19,23 235:1,8 236:9 241:4 245:16,19 253:5,14 256:3 262:20 264:12 269:18,23 270:2,7 274:19 279:6 284:25 285:18 287:4 290:10 291:11,16 292:21 294:12 295:23,24 296:4 297:11,12 301:10 308:10 312:5,15 314:3,12 319:24 326:23 328:15 329:16,17 331:8,10,17,20 332:3,4,17 334:10, 22 345:17 347:23 348:2,4,9 350:19 351:1,13 353:23 357:16,20,21 358:17,25 359:10,24 360:1,4,16,18 361:5, 9,18,21 362:17,18 363:15 366:20 368:8

**Klein's** 365:1

**knew** 275:4 328:23 344:14

**know** 237:12 241:11 243:7,15 250:5 251:2,6,13 252:11, 13,24 255:5 256:8, 17 257:16,17 258:23 260:4 261:3 262:3 263:13 265:19 267:20 268:15,16,17 270:15 271:1,8 274:7 275:21 279:15,17,23,25 280:11,12,13,22,25 285:22,23 286:23 288:2,8,12 289:21 290:18,19 291:9 292:3,4,8,10,14,18 293:6,14,16,19 301:10 307:7,16,19 310:7,18,24,25 311:3 316:22 318:22 319:9,10 320:10 321:2 322:9,10,13, 22 327:17,23 329:18 330:17 331:20,24 332:13 333:9 336:16 344:10 345:3,4 351:9 352:20,24 353:4,6 357:13 361:19 362:8 363:23 364:1,11,16 365:19 368:2

**known** 275:3

**Kohn** 249:23,24 250:22 251:1 254:11,13 302:9,16

**Kohns** 250:2

**Kurzner** 250:13,17 255:1,2 325:15 326:24 327:2 335:24

L

**laid** 361:2,3

**lapses** 328:4

**largest** 253:19

**Latin** 364:16,18,19 365:7,17,18,21 366:2,9,13

**law** 234:17 256:3 257:1,4,5,8,10,14,17 258:2,6,9 259:13,15, 17,20,24,25 260:3 263:4,6 264:15 266:15,17,19,20 269:6,22 274:18 277:3 279:6 285:17, 22,25 288:20,24 290:7,8,11,13,15 291:16,20,24 292:6, 11,12,16,21,25 293:3,5,8,11 294:11, 13,16,20,21 295:2,8, 12,16,19 296:18,23 297:3 312:23 314:13 315:20 316:17,24 317:3,5,7,15,21 318:15 319:6,13 320:7,14 321:14 323:2,7,11,13,16 325:13,23 326:9,12, 14 327:15,18,19,22 328:12,21,25 329:9 334:6,11 335:23 336:1,15,17,23 337:24 338:6,7,9,12 339:15 340:4,20 341:13,25 343:10 344:1,25 346:15 348:2,6,21 349:1,19 350:9,10 352:21 353:10 354:2,6 355:6,8,9,10,21 356:6,22 357:8,10 358:1,6,10,25 360:16,17,19,20,23, 24,25 361:2,4,5,7, 11,14,18,24 362:3,5,

9,10,14,16,19,22,23 363:9,14,18,19,21, 22 364:2,24 365:2, 14 366:2,9

**lawsuits** 357:10

**lawyer** 237:13 260:20 273:12 287:20 314:22

**lawyers** 251:6

**LCG** 277:16 285:7

**learn** 243:11

**leased** 364:22

**leave** 258:17

**ledger** 262:9 267:17 353:11

**left** 236:9 251:16 340:17 354:2

**legal** 292:16 293:9 305:15 307:4,14,15, 22,25 356:19,20,23 357:13 358:2 359:2

**lent** 242:3

**Les** 234:19 245:19 256:3 269:22 270:1, 7 274:19 279:6 285:18 291:16 292:21 295:23,24 297:12 312:15 314:2 345:17,25 347:3 348:1,9 355:17,23 358:25 359:10,24 360:4 361:5,9,18,20, 21

**Leshkovitz** 308:12

**Leshkowitz** 271:2 297:13

**Leslie** 234:9 235:1 291:11 328:15 331:17,25 332:2,3 333:12 351:13 357:16,19,21 358:17 360:16,18 362:17,18 363:15 368:8

**let's** 245:10 249:2 259:9 264:4 283:13 301:10 302:8 308:5 311:4 342:24 353:18 366:18

**letter** 245:19 246:9 248:4 264:19 267:3 275:19

**letterhead** 246:1,2 253:13 264:13 269:19

**Lewis** 254:4

**liability** 336:6,7,9 337:6 341:21 346:22 347:13

**Lieberman** 234:17 242:14,17 245:11 249:12,14 250:9 259:2 260:5 261:16, 18 262:5 267:21,23 275:20 276:18 280:5 284:14 286:19 290:2 305:8 307:9,18 308:8 311:6 313:21 319:1,4 321:10 326:18,25 329:12 330:20 331:12,25 333:13 342:14 343:1,4,8 345:24 347:3,5,19 350:16 353:20 354:19 355:17,23 359:5,17, 20 362:12,24 363:5 364:10,14 365:3 366:5,17,23 367:7, 10,14,17 368:5

**life** 236:15,25 237:3, 9,23 238:15,20 239:5 240:11 241:21,24 242:8,23 243:11,23 244:6,10, 14 245:21 251:14, 20,23,24 252:2,4,14, 16 254:7,17,23 255:9 256:5,10,12, 14 257:3,14 259:6 263:12 268:12 270:5,11,12,19,23 271:4,6,13,24 272:20 274:23 275:4 276:3 278:4,8,12,19, 21 285:4 303:19 304:13 308:22 309:11,24,25 310:11,16,19 316:7, 8 317:4,19 322:19 323:6,7 327:17 328:2 335:17 339:14 343:19,25 344:1,4 345:1

**Lillian** 255:2

**limited** 322:3 363:16

**Lincoln** 324:8

**line** 299:21 302:17,18 334:24 337:11 338:13 341:4,17,18 342:18

**lined** 262:15

**lines** 349:16

**list** 242:16 256:22,24 261:5 279:19,22 332:17

**listed** 240:25 246:15 325:2 331:20 341:12,14,25

**listen** 242:14,17 259:2 261:16,18 262:5 267:21 290:2 307:9 329:12 331:12 342:14 345:25 347:3 362:13,24 363:5 365:3

**lists** 261:1

**litigation** 357:24

**little** 247:9 284:16 328:7,11

**live** 330:4

**lived** 247:8

**lives** 328:18

**LKA** 334:7,8 338:17 339:9 340:3 343:17

**LLC** 240:24 241:18, 20 251:20,23,24 252:2,5 270:5 271:13 272:20 278:4 308:1

**LLP** 234:18

**loan** 337:17,20 338:7 342:19

**loaned** 242:3

**loans** 239:22 240:21, 25 241:3,4,9,15,16, 17,18 242:7,12,22 243:12,18 262:11 337:11 355:7,9,13

**location** 288:20

**long** 275:2 365:9,10, 11

**longer** 343:2 364:12

**look** 239:12 240:21 242:5 245:16,24 256:25 262:25 263:1,4,18,24 264:4, 11 269:18 280:1 288:13 289:8,19 290:19,21 291:10,23 292:15 297:10 300:16,17 301:14 305:15 307:14 313:23 318:16

329:22 330:22 339:5 342:18 347:23 348:5 350:18 351:21

**looked** 264:1,25 355:12

**looking** 239:17,18 242:16 308:11

**looks** 240:4 264:12 314:8 352:15

**Los** 234:1 312:1

**lose** 328:19

**loss** 334:17 342:22 354:14,18,19,21

**losses** 337:22 354:17

**lot** 257:22 258:11,14 273:19 284:13 328:15 329:2,4 340:14 361:3

**ludicrous** 301:8,9

**lunch** 311:7

**M**

**M-E-I-R** 293:21

**mail** 288:24

**main** 273:20

**maintain** 258:21 259:5 260:13 267:17 268:11 287:10,13 292:5,12 293:24 323:7 345:1 353:7, 11 357:12

**maintained** 287:8 289:22,23 296:6 314:14

**maintains** 290:5

**making** 260:1 309:17 310:20 320:14,17

327:19 358:6,24

**manage** 252:7 289:1, 14 356:15 362:1

**managed** 244:14 285:7

**management** 272:17, 20 301:17

**manager** 289:9

**managing** 243:23 319:12

**manual** 274:1

**Marc** 234:17 326:16 368:3

**March** 287:2 291:17 314:9 350:22

**mark** 236:4 294:1 313:17

**marked** 236:6 245:13 253:9 264:8 269:14 286:20 294:6 297:7 308:6 313:19 317:24 319:18 330:18 334:2 338:22 343:6 345:12 347:17 350:14 359:14

**market** 252:19

**Marketing** 364:6,7

**Marouthis** 309:8,14 310:8

**married** 298:17

**Maryland** 361:4,15 362:7 363:4

**Masuah** 279:17 305:20,22,23 306:1 310:23 311:2

**matter** 234:9 330:24

**matters** 321:4,15 328:20 332:10 358:3

**mean** 248:25 251:5 256:25 260:3 263:14 268:5 271:7 276:16 285:20 299:4 300:1 304:21 305:16 307:8,25 310:4,24 319:1,4 321:3,9 322:17 323:23 328:16 333:8 336:9, 24 337:21 338:6 340:9 350:10 352:23 354:16,20 355:10,15 363:2 365:14 367:11

**meaning** 243:16 329:16 342:8 346:5

**meant** 285:17

**Medicaid** 274:17

**Medicare** 274:17

**medication** 235:22

**Meir** 293:18,21

**memorandum** 239:14,18,25 240:3

**memorializing** 357:13

**memory** 258:17 268:1,2,4,6

**Menlo** 356:21,23 357:15,16

**Menlo's** 298:18 299:2

**Mermelstein** 324:11, 12

**methodology** 238:7 265:5

**Michael** 251:7,8,9,13

**Microsoft** 261:13

**middle** 301:14

**million** 237:6,7 239:4 247:18,23 249:3,5,6 255:11 265:15,17

273:4 275:15 283:14,15 298:7,11 299:9 300:20,24 301:16,18 302:12, 20,22,23,24 303:1,6, 11 307:3,17 309:9, 16 324:3,4,5,7,13, 19,23 325:16,18,20, 25 326:6 327:13 328:8 329:11 334:17 337:12,17,18 338:13 342:19

**millions** 263:21

**minutes** 234:12 343:3 364:13

**miscellaneous** 299:16

**misremembered** 278:16

**mistake** 337:7

**money** 237:6 238:2, 20,23 239:7 241:12, 17 243:5 260:16 261:1 266:4,9 267:4, 5,6 281:13,14 287:22 294:24 295:7 296:23 301:1,5 302:22 303:1 309:7, 12,15 315:8 320:14, 17,18,21,24 322:12 335:12 337:24 338:8,9 340:20 344:14,18 355:5,10, 11 361:3 363:21 364:2

**monies** 236:18 242:3 256:22,23 294:12 296:19 304:14 317:14,18 318:14 335:23 358:24

**month** 267:10,11,12 309:17 318:3,18,22,

23,25 319:7 349:4,5 355:3

**monthly** 353:7,11

**months** 318:10 349:6,7,8,11,25 350:2 352:9,10

**months'** 350:6

**morning** 234:23 235:8,9

**Morsel** 264:20

**move** 258:25 338:16

**moved** 322:16

**moving** 296:23 297:3

**multiple** 245:20 268:22,23 296:1 314:7

**multiple-page** 239:13

**Myong** 234:6

N

**Naftali** 271:2 297:12

**name** 234:6 241:10 271:2 279:11 287:25 288:6 295:9 325:5,6 327:14,16,18 328:13 332:21 334:10,14 360:19

**need** 234:24 252:25 294:2 299:18 329:22 367:3

**needed** 274:13 355:10

**needs** 348:9

**neighbors** 302:21

**net** 334:16

**Network** 364:6,7

**never** 237:17 245:6,9 267:6 269:4 284:8 304:3,20 305:20,21 333:9 342:11,12,13 365:23,24,25 366:1

**new** 237:19 273:21 346:20

**Nicholas** 234:22

**nine** 253:19 350:6

**Nobody's** 265:22

**Nolan** 234:15,21,25 235:7 236:4,8 242:18,21 245:15 248:1 249:16 250:12 252:25 253:3,4,11 258:25 259:4 260:6 261:20 262:8 264:5, 10 267:24 269:16 275:23 276:21 280:8 284:19,23,24 286:17,22 290:3 293:23 294:1,8 297:6,9 305:10 307:11,20 308:9 312:4 313:17,22 318:1 319:5,17,21 321:12 326:16,20,21 327:1 329:15 330:5, 16,21 331:15 332:5 333:16 334:1,4 338:24 342:17 343:3,5,9 345:11,14 346:2 347:7,16,21 350:13,17 353:22 354:22 355:19,24 359:6,7,16,19,21,22 362:15 363:1,7 364:13,15 365:6 366:7,8,15,18 367:4, 9,13,15,18 368:2,6

**nonresponsive** 259:1

**normally** 238:13

**North** 364:19,21,24, 25 365:7

**notarized** 333:1,8

**notary** 333:17,19

**notes** 276:25 353:19

**notwithstanding** 306:13

**November** 297:15,18 318:3,18,22

**number** 234:7 238:9 249:25 265:20 328:4 334:24 337:23 351:5

O

**o'clock** 311:5

**oath** 253:5 284:25 312:7,8

**obligated** 235:18

**Obviously** 306:15

**occasion** 235:11 238:6

**occasions** 315:23 323:1

**occur** 252:21

**occurred** 236:17 244:20,21 322:8,10, 11

**officer** 362:21 363:8

**officers** 291:7

**offices** 269:22 291:1

**offset** 341:15

**oh** 234:25 250:21 254:12 264:5 294:4 333:14 338:19 367:9

**okay** 235:21,25 236:3,14 237:20 238:20 239:5,12,20, 24 240:5,17,21,23 241:8,23 242:2,5,15, 19 243:1,4,22 245:10 246:7,9 247:14 248:2,9,12, 24 249:2,15,24 250:11,15,24 252:23 253:3,12,19 254:9, 14,25 256:24 258:25 259:3 260:21 261:12,19,22,24 262:13,18,25 263:2, 4,10 264:4,18,24 265:12,19 266:10 267:13,14,25 268:11 269:8,25 270:7,10, 14,25 271:15,21 272:1,6,11 274:12, 18 275:14 276:8,14, 22 280:20 282:8 284:14 285:3 286:11,17,19,23 287:16 288:4 291:3, 7,10 292:11 295:14 296:1 297:2,6,19 298:2,3,4 299:6,14, 20 300:2,20 301:12, 22 302:17 303:5,14, 15 305:9,25 306:17 307:2,4 308:2,5,14, 17,25 309:6,20 311:1,6 312:5,6,10, 12,19,25 313:5,8,14, 24 315:1,9,16,19 316:4,7,21 317:23 319:17 320:1 321:7, 13,22 323:5,20 324:9,22 325:1,13 327:11,24 329:13 330:6,8 331:14,20 332:6,10,16,22 333:14,17 334:1,9, 16,22,23 335:6,16, 18 336:4,13 337:9, 10,13,20 338:5,15

339:10,14 340:2,20 341:3,17 342:18,24, 25 343:4,14,16,18, 24 344:18 345:4,11 346:1,10,11,13 347:4,6,24 348:25 349:13,15,17 350:5 351:5,22 352:9,11, 16 353:18,20,23 354:1,23 355:2,18 356:2,4 357:24 358:2,6,22 359:13, 20 360:6,10,14,23 363:6 364:4,14,16 365:17 367:15 368:2,6

**old** 262:9

**old-age** 284:12

**once** 241:25 255:13 256:13

**one's** 341:20

**one-offs** 303:22

**ongoing** 301:16

**open** 252:19 352:25 353:5

**opened** 363:3

**operate** 358:14 362:11

**operated** 358:15

**operating** 240:25 265:10 266:24 269:5 281:17 296:19 303:25 312:22 315:20 316:2 317:5, 9 321:25 334:17 346:8 354:14,18,19, 20,21

**operations** 360:25

**operative** 289:12

**option** 255:15

**oral** 310:15

**organization** 288:23

**original** 249:2,3 264:21,25 283:19 300:22 303:12

**originally** 302:11 363:3

**outside** 285:6

**overhead** 356:7

**owe** 337:24

**owed** 236:17 266:6,8

**Owen** 270:15,17

**owes** 338:6 362:6

**owing** 338:8,9

**owned** 236:22 252:8 278:3,23 282:1 324:9 326:6,7 358:8, 20 362:4 363:18 364:21 365:1,2,23

**owner** 286:10,15 298:15 309:13 319:12 325:2 363:13

**ownership** 306:9 361:23

**owns** 324:11 330:2 362:3

P

**p.m.** 234:2 311:7 312:2 353:21 368:7

**page** 239:16,17,18,21 240:22 242:5 245:21 247:4 251:18 255:6 291:10 296:2,15 297:13,14 299:22 301:11 308:12,15 331:2 333:3,4,23 334:16 335:4 346:10 348:12 351:21 360:6

**pages** 245:20 296:2 345:17

**paid** 238:1,17 242:1, 12 246:25 247:20,22 249:5 256:14,15 259:19,23 260:4,16, 22 261:1 262:11 265:13,15 267:20 268:7,15,16 269:5 279:5,13,19,22 280:14,16,23 281:10 283:16,17 285:7,16, 21,22 291:11,24 293:9,11 295:15 298:23,25 317:12 328:7 340:14 344:1, 25 355:5,15 356:9, 10 361:21 363:25 364:1,2

**paper** 262:15

**papers** 263:14

**paragraph** 239:21 240:2 272:11 277:18 309:1

**paragraphs** 271:15

**paralegal** 234:18

**parents** 275:4

**part** 278:4 306:1 324:9 326:6,7

**participation** 244:1

**particular** 304:1 332:22 345:1

**partner** 271:23 305:2 319:12 363:11,13,16

**party** 241:5 286:12

**pass** 236:22,23 238:15 247:12 248:15 266:4,8 283:6

**passed** 248:16,17 254:19 265:22 283:14,21 322:21 323:3,4 330:13 344:15

**passes** 303:24 324:12

**pay** 238:2 239:4 242:11 243:2 244:4 268:25 269:9,11 277:3,6,12 279:1 280:20 281:11 294:13 301:15 302:25 304:15 316:10 317:8,19 321:22 336:24 341:1 349:11 355:11 356:7 357:9 365:12

**paying** 237:24 241:23 268:22,23 291:16 292:6 294:16 316:19,22,24 317:4, 7,8,10 325:7,8 346:15 350:6 354:7, 17 355:20 357:8

**payment** 243:14,19 267:9,18 294:20 310:7 343:25 347:11,12

**payments** 260:1 266:15,16,17,18 279:16 284:2 309:17 310:24 311:2 323:19 358:6

**pays** 336:17

**Peggy** 236:22

**penalty** 235:15 367:21

**pending** 242:7,22

249:14

**penny** 267:20 301:2 310:4,10

**people** 241:12 259:21 266:3,8 267:4 282:22 300:12,13,23 301:25 302:4,16 321:19 323:3 326:7 328:5 329:2,4

**percent** 265:4 270:22 271:5,12,23 278:3,5,6,24,25 281:13 282:23 283:5,16,18 286:10,15 302:1 306:3 321:8 322:23 363:18

**percentage** 271:5

**performing** 291:20 359:3

**period** 257:21 350:5

**perjury** 235:15 367:21

**person** 238:9,10 283:21 284:9,13 298:8 302:5 310:9 324:18 364:5

**personal** 269:2,3 321:1,3,4,5 322:5,15 348:17,22 349:20 350:23 351:15 354:3

**personally** 256:7 257:1 327:20 329:5 366:12

**phone** 348:13

**Phonetic** 279:17

**physical** 262:14 367:1

**place** 312:7

**plaintiff** 234:16

**player** 304:22

**please** 234:13 305:14 307:14 339:3

**plus** 257:22 283:16,17 301:16

**pocket** 256:16 357:9 358:4 361:6

**Podell** 270:15,17

**Poinsettia** 364:20,21,24,25 365:8

**point** 282:11 302:25 312:21 332:6

**policies** 236:21 238:1,4,9 240:15 241:19,24,25 242:8,23 243:7,12,19,23 244:14,15,17,24 245:7 246:11,13,15,19 247:1,5,10,16 248:2,6 249:10,21 250:15,16 253:19 255:13,14 256:1,4,11,13 257:3,4,6,9,11,12,15,18,22 258:3,12,15,24 259:7,9,18 260:1,13,22 261:2 262:16 263:11,22 268:12,15 278:12 281:25 282:14,21 283:6,11,12 284:3 285:3,6,8,12,15 286:1,5,7,11,14 297:25 298:7 299:9,10,15,23 300:15,21 302:4,6,7 303:21,23 304:16 305:19 306:25 307:1,8,17 308:19 309:8,9,13,14 310:8,13,14,17,23 316:7 322:24 323:6,7,10,13,16,18,21 325:13 327:4 328:22 330:8,12 335:24 336:2

**policy** 236:15,22,25 237:4,6 238:7,15,16,24 242:11 243:2,9,10,14,20 244:20 245:1,22 246:25 247:12,14,17,19 248:19 249:1,3,22 250:8 251:25 252:19 254:6,17 255:9,11 256:4,15 257:24 258:7 259:20 260:16,17 261:1 268:3 273:2,6 275:15,25 276:2,5,9,17 277:4,6,15,19 278:1,2,4,7,8,12,20,23 279:1,3,11,13,19 280:3,14,16,17,18,19,23 281:23 282:2,3 284:5 285:16 286:6,9 298:13,14,16,22 299:1,3,25 300:2,7,9,11,14 302:3,6,11,20 303:8,12,13 304:1,15 306:10,14 310:3,16,20 316:8,10,25 317:4,20 322:20,22,25 323:24 324:1,2,5,6,10,14 325:7,9,17,19,21 326:3,6,7 327:2,3,8,12,14 328:1,3,4,5,8,9,12 329:1,3,6,9,20,24 330:3,6 335:24 339:15 344:5,12 345:2,4,5,6,9 347:13

**policyholder** 322:23

**polite** 262:22

**Polter** 243:17,22 244:3,5,6,13,16 270:1,12 271:8,9 272:12 284:10 297:12 304:4,22,24 307:23 309:4

**Polter's** 243:25 244:2

**poor** 260:11

**portfolio** 301:17

**portion** 281:2

**ports** 361:15

**possibility** 322:14 354:25

**possible** 322:18 323:15

**possibly** 248:6 355:7

**practice** 238:14 303:18 315:5 319:6,13 320:6 332:16 344:11 349:10 350:9,11

**premium** 248:25 249:3,22 250:8 280:3,14,16 284:2 298:16,24,25 302:12 323:19 325:20,21 328:8,9

**premiums** 238:16 241:19,23 242:1,4,11 243:2,14,20 247:1,23 249:6,7,8,9 256:13,17 259:20,23 260:4,21 265:13,14 268:3,6 277:4,7,20 278:2 279:1,13,19 281:10,12 283:16,17 285:7,16,21,22 298:23,25 309:10 310:16,21 316:10,19,23,25 317:4,7,8,20 322:25 325:7,8 344:1

**preparation** 236:1

**prepare** 253:20

264:24 265:7

**prepared** 253:17

**prepares** 296:12,13

**present** 234:21 316:20

**previously** 294:11 313:5 331:4 334:12

**principal** 234:19

**printout** 268:7

**prior** 243:5 244:25 251:9,10 265:13 277:16 314:13 347:8

**private** 326:5 344:5

**privileged** 292:20,25 293:1

**probably** 247:23 284:18 328:7 343:3

**probate** 321:1,16 335:13,15 336:11

**problem** 259:12 328:2

**problems** 249:11

**Procedure** 234:5

**proceeds** 282:23 283:6 284:5 310:3,6

**produced** 235:2 326:17,19 334:6

**profit** 354:10,12

**promise** 268:6

**proof** 236:18

**property** 364:22

**proposed** 309:4

**protection** 240:6

**provide** 368:4

**providing** 316:5

**provision** 330:9

**publication** 335:14

**publish** 336:25

**published** 336:12

**purchase** 241:19 245:22 251:19 252:17,18 298:14 309:8 326:15,20,22 328:25

**purchased** 241:25 251:25 273:20 299:1 326:8

**purchasing** 303:19 326:14

**purpose** 349:24

**purposes** 245:8

**Pursuant** 234:4

**put** 256:23 262:2 316:14,16 344:23,25 355:11

**Q**

**quarter** 304:24 305:5

**question** 237:21 242:13,14,17,20 249:14 250:9,10 259:2 260:12 261:16,18 262:6 264:14 267:13,23 269:20 272:1 276:18 280:5,10 284:15 288:4,14 290:2,7 294:10 295:10,13 296:4,17 297:17 299:19 303:12 305:8 307:9,10,16,18 320:6 321:10 323:23 329:12 331:13 340:1 342:14,15 345:25 347:1,3,5 348:4 355:17,25 358:22 362:13,24 363:5 365:4

**questions** 262:22 359:18 366:16

**quite** 263:18 298:25

**R**

**R-E-B** 293:21

**R-O-T-H** 282:5

**rationale** 243:13

**reach** 330:9

**reached** 322:20 324:14

**reaches** 328:3

**read** 272:4 298:1,2,3 308:23,24 331:25 346:17 349:22 352:11 366:24

**reading** 287:4 291:15 335:8

**ready** 264:14 296:4 297:16

**real** 367:3

**realize** 237:8

**realized** 322:21

**really** 247:9 263:19, 20,21 298:11,24 304:25 329:2 337:6 350:10 362:6

**reason** 235:21 237:23 243:13 246:4 253:14 273:8 310:4 319:15 348:25 353:16,17 355:5 359:4 360:3

**reasons** 244:24

**Reb** 293:18,21

**recall** 235:12,23 236:12,20 288:9 312:17 316:24 327:5

**received** 264:21 324:3

**receiving** 288:24 358:24 359:10

**recess** 253:2 284:22 311:7 353:21

**Rechnitz** 240:13 241:25 242:1 243:17 244:5 245:2 250:23, 25 264:23 265:3,9, 11 266:9 267:5,6 268:16 271:8,9,19, 21 273:9 274:18,23 275:10 281:20,22 282:12,21 283:10,15 284:1,10,11 297:21 299:10 300:21 301:4,23 302:7,9,15, 25 304:3,5,12,21,23, 24 305:19 306:10 307:23 308:1 309:4 323:17 325:12

**Rechnitz's** 300:10 306:6 308:20 310:14

**recipient** 359:3

**recognize** 254:4 351:10

**recollection** 246:20 257:16 279:9 313:11 323:21

**record** 234:11,14 236:5 239:13 245:18 252:25 253:3,12 264:11,15 267:9 269:18,25 270:21 276:14 284:20,23 286:24,25 296:2

297:10 308:10 310:19 312:5 313:25 318:2 319:22 330:24 334:5 338:25 343:10 345:1,15 347:22,25 350:21 353:23 359:23 360:4 366:19 368:6

**records** 263:6 289:22,23 290:5,8, 11,12,13,17,20 292:5,11,12 310:14 348:6

**recoup** 325:24

**refer** 315:10

**reference** 296:16 297:20 335:4

**referenced** 307:5 339:12

**references** 239:22 251:19 277:19 278:11 296:25 309:1

**referencing** 308:18

**referred** 312:20

**referring** 241:20 272:25 307:15,23 308:3 314:13 341:7 355:13

**reflect** 286:14 289:13 326:13 335:10 340:3,7

**reflected** 317:20

**reflecting** 276:25 336:1

**reflects** 286:6 331:8

**refresh** 279:8

**regarding** 251:1 270:5 308:18

**regards** 270:18

**regular** 350:9

**regularly** 263:25

**reimburse** 243:18 322:24 357:9

**reimbursed** 358:3

**reimbursement** 298:22

**reimbursing** 356:22

**related** 243:19

**relationship** 271:10 292:17 304:10

**relatives** 302:5

**rely** 268:1,2,3,5

**Remainder** 330:25 331:5 332:8

**remember** 252:3,12 253:21 258:9 273:14 274:3 275:21 276:19 279:7 291:22 292:1, 7 295:12 301:15 309:15 316:19,22 317:2,7,13 319:3 323:3,25 325:5,6,11, 25 344:7 352:15 354:4 367:21

**removed** 247:24

**removes** 354:25

**rent** 355:15,21,22 356:9,10,17 365:12

**repay** 355:7

**reporter** 234:4,24 247:21 264:6 293:20 294:2

**represent** 299:15,22 335:22 340:12 341:17 343:24 366:13

**represented** 271:1

**representing** 316:5 321:4

**represents** 335:23

**request** 241:4

**required** 234:5

**reserve** 301:13,17,24 303:1,6,11 304:15

**resign** 331:23 332:7

**resigned** 332:4 342:9,11

**respect** 244:19 246:10 297:24 310:13 346:19,20

**respond** 347:5

**response** 251:16,17

**result** 313:1

**retainer** 292:12 361:10

**retainers** 321:18

**retirement** 273:21 274:24

**return** 248:25 249:22 250:7 298:16 319:9 325:20,21 328:9 335:25 341:12 342:20

**returns** 296:9,12,14 317:21 334:5,13 339:1 343:11,15

**revenue** 320:15 356:7

**review** 235:25 367:2, 19

**revised** 283:7

**rich** 284:12

**right** 235:14 237:2,13 238:12 241:14 242:18 249:17,19 250:3,11 251:11 252:1 253:7 255:21 256:18,20 257:23 258:5,11,12,14,21 259:10,22,25 260:18,24 261:3,6 262:1 263:16,24 265:24 266:12 268:1,9,22 269:6,17 271:3 274:14 275:10,25 276:1 279:18,20 280:13,25 282:6 283:3 284:3 288:22 290:16 295:7,9,18,22 296:1, 23 297:20 299:8 300:3,4,6,7,8,14,17 301:25 302:19 303:7,17,20 304:8, 11 305:3 306:5 308:5 309:2 311:4 314:22 318:21,24 320:23 321:9 322:8 324:8 326:22 327:21 328:16,20,23 329:5 332:6,8,9 334:1,19 335:16,25 336:8 337:2,19 338:2,12, 15 339:22 340:9,12, 17,18,19 341:20,21 342:4,6,8,24 343:18 344:24 345:22 346:8 348:8 349:18 351:13,19 353:2 354:10,11,15,23 355:1,4 356:12,13, 15 358:4,5,13,19 366:15

**risky** 328:7

**room** 234:21

**Roselio** 324:25

**Roth** 254:15 282:2,4, 5,8 283:3 284:6

**roughly** 318:10

**routine** 339:5

**Rozy** 247:17,18,22,23

**Rule** 234:8

**Rules** 234:4

**run** 295:8

**S**

**Safa** 234:18

**safe** 318:13

**salaries** 356:5,17 364:1

**salary** 338:6 346:24, 25 349:2,3,5 350:2, 6,10 354:6,9 355:2

**sale** 329:24

**Saleem** 234:18

**Sales** 329:25

**salesperson** 298:15

**Sam** 298:18 299:2

**Sandra** 364:16,18,19

**savvy** 262:3

**saying** 237:25 275:19 277:19 283:15 284:11 298:13 305:21 315:16 323:12 327:19 338:1 367:15

**says** 239:22 240:22, 24 250:8 253:19 266:10 271:16 272:11,16,19 298:18 305:1,14 312:15 314:2 330:24 332:2 334:25 335:17 337:11 341:4 348:13 351:13

**schedule** 239:14,22, 23 240:21,25 241:4, 15

**schedules** 343:15

**school** 275:3

**schools** 306:2

**Scott** 324:13,20,21

**Sears** 255:23

**second** 239:21 248:23,24 251:18 253:1 255:6,20,21 256:1 282:6 297:14 299:6,21 308:15 331:2

**Secretary** 291:2

**secure** 271:4

**Security** 351:23 352:2,13,17,23

**see** 240:2 241:6 251:21 270:3 272:14,23 277:22 288:15 291:13,14 297:22 301:19 310:12 314:5,10 315:3 318:4,11 320:4 331:9 333:2 335:1,20 336:5 337:14 339:11 341:5 345:19 348:15 350:8 351:3,6,24 353:5 360:1,9

**sell** 252:19 344:16

**selling** 328:5

**send** 294:22,24 367:3

**sending** 348:22 349:1

**sent** 239:5 281:5 287:22 308:12,16

**separate** 314:24

**services** 291:20 316:5 366:3

**set** 236:18 273:22 274:6,13 290:14 291:1 301:24 337:4 359:17

**settle** 309:5

**settled** 315:25 316:2

**settlement** 309:19,20 310:2

**Settlements** 251:20, 23,24 252:2,5 276:3

**seven** 328:7

**Shame** 338:21

**share** 259:10 306:13

**shareholder** 337:17 342:19 363:11,13

**shareholders** 337:11 355:13

**sharing** 259:12

**Sharp** 234:16

**sheet** 300:18 368:4

**sheets** 263:14

**Shlomo** 245:2 271:19 273:9 297:21 298:7 302:15

**shop** 361:2,14,15

**show** 245:10 267:3 286:12 310:20 313:14 329:25

**showed** 306:9

**showing** 292:12 361:16

**shows** 259:8 260:15 295:7,15 315:1 334:16 352:1

**sic** 254:21 346:20 360:22

**sign** 367:20

**signatory** 291:5

**signature** 333:11,12, 15,23

**signed** 299:3 309:18, 22,23,25

**signs** 368:3

**Simon** 298:13

**simple** 268:20,21

**single** 313:6,8

**single-page** 269:19

**sir** 253:7 285:1

**sit** 276:12,13 280:11, 12 288:5,9 292:18 297:2,5 327:7 329:8 345:8

**situation** 322:19

**six** 246:13 250:7 309:11 318:9 328:7 334:24 341:4,17,18

**skip** 235:10

**skipped** 319:24

**Slott** 357:19,22

**small** 321:5,7

**smart** 237:13

**Social** 351:23 352:2, 13,16,23

**sold** 298:13 323:18, 21,24 324:2 325:9 326:3,5 344:5,13

**solely** 244:5 252:7,8

**solicited** 242:11 243:2

**somebody** 302:8 329:10 358:14,16

**son** 332:17,23 333:9 365:15

**son's** 333:11,15 365:1

**son-in-law** 264:20

**sorry** 249:15,19 264:5 272:8,10 286:17 305:12 312:13 347:15 354:21

**sort** 366:25

**specific** 273:13 280:2

**spell** 282:4 360:21

**spelling** 255:3

**split** 283:18 361:10, 13

**spot** 311:5

**spreadsheet** 260:24 261:4 299:14

**stake** 263:22

**stamp** 333:19 334:7

**stand** 271:18

**started** 303:16 329:1 360:25

**starting** 304:13,14

**starts** 334:8

**state** 234:5,13 291:2

**statement** 287:1,3,5 288:17 296:6 312:15 314:1 318:3 319:22 333:7 334:25 335:4, 7,16 336:4,13 339:6, 8 341:6 343:15 345:16 348:1 350:22,25 352:1 359:24

**statements** 289:11 314:8 318:17 339:11 355:12

**stay** 338:15 366:18

**steal** 298:10

**sticker** 294:3,4

**stint** 274:24

**stipulation** 367:5

**stop** 304:8

**story** 281:14 300:24

**straight** 364:3

**Street** 263:2,3 346:21 347:12 351:1

**strike** 240:18 243:7 244:12 246:14 252:15 258:25 265:21 289:22 323:11 326:2 327:3 334:11 350:23 359:6

**student** 262:11

**subsequent** 240:17 248:3

**subsequently** 237:3

**substance** 367:23

**Suite** 288:18 314:3

**summer** 318:15,17, 19,23

**Superior** 321:16

**supposed** 264:22 284:9 302:10,13 304:2,23 305:4 309:10

**sure** 237:22 240:13 250:7,8 257:2 260:7, 9 262:19 263:17 271:7 272:3 276:12, 13 277:17 285:19,20 287:18 288:3 289:7, 18 290:24 291:6 294:18 298:24 300:12,17 301:14 302:10,13 304:20 310:8 313:16 320:13 323:15 324:5 326:16 327:24 329:2,8,14, 21,23 339:4 345:7 350:20 352:22

**Susan** 234:6

**swear** 234:24

**sweep** 318:24 319:1, 4 320:7

**sweeping** 319:7,13

**sworn** 235:3 312:7

**SY** 271:16

**SYRTR** 271:16 272:21 273:3,7 278:24,25 281:2,5,9, 11,14,16 282:14 286:14

**systems** 273:23,24, 25 274:1,2,7

**T**

**take** 245:2,4 268:9 284:17 311:4 333:5 346:24 347:23 349:3 353:18

**taken** 241:9 243:12, 18 244:18,19 336:11

**talked** 254:11,25 263:15 300:2 312:12 322:23 345:21 364:8

**talking** 236:10 251:5 260:5 261:21 272:9 274:1 302:22 308:19 313:5 315:13 346:3

**Tamar** 271:19

**task** 273:13

**tax** 296:9,12,13 317:21 334:5,13 335:25 338:25 341:12 343:11,15 355:12

**technical** 274:6,17

**technically** 284:9

**telephone** 284:21 356:1,18

**tell** 235:18 248:12 251:17 252:16 256:9 258:1 260:10,12 264:18 272:16,19 277:14 280:10,21 326:18

**telling** 272:12

**ten** 264:2,3

**ten-minute** 284:17

**tenant** 364:19 365:7, 10,11

**tens** 263:21

**term** 260:19

**terminology** 255:19 260:19,21

**terms** 305:14 307:12 326:13

**testified** 235:4 294:11 299:12 328:20 334:12

**testifying** 293:4

**testimony** 235:14,22 285:14,25 312:19,25 317:3,6 331:4 357:7 367:19

**Thank** 239:20 245:12 264:7 308:8 313:21 319:20 330:20 343:8,18 347:19 350:16 366:17

**Thanks** 347:20

**thing** 339:17 342:3,20 366:19

**things** 261:25 273:19 274:17

**think** 236:24 238:22, 23 240:12 242:12 243:15 245:11 246:25 251:3 252:8, 10 254:19 257:10 259:21 263:17 270:16 271:14 276:8,9 277:10 279:16 283:5,7,9 287:15,21 294:19 300:1,16,19 309:9, 10,11 310:23 311:2 317:12,22 321:5,20 322:7,14,17,22 323:9,24 324:4 325:5,20,23,25 326:7 327:16 328:6, 16 329:10 330:11 333:15 334:12 335:4 342:2 344:21 345:6 349:8 352:18 353:1, 6 354:12,13 365:2, 15,19

**third** 272:11 296:15

**thought** 241:10 265:14 281:11 303:16 307:7 351:17 352:23 367:5

**three** 248:17 250:16 271:15 281:25 282:22 283:11 285:5,12 286:1 297:24 299:10 300:9,12 305:19 307:1,8,17 308:19 310:17 319:25 328:17 335:16 339:6

**ticket** 355:22

**tie** 336:18

**till** 247:9 279:14 328:18

**time** 243:11 249:8 257:7 263:18 265:22 275:2 279:14,15 282:12 287:1 289:6 309:14 312:12,21 315:8 321:15 327:15 332:6 355:6 358:23 359:8 363:2 365:9, 10,11

**title** 291:3,6

**titled** 239:13

**today** 235:14,22 236:1 247:19 249:4 250:23 260:10 268:5 276:12,13 280:11,25 288:5,9 292:18 293:4 297:3,5 299:12 303:16 327:7 329:8 343:2 345:8 367:8,11,16

**told** 237:5,17 247:11 257:7,8,24 258:3 259:19 267:25 268:12 305:20 367:21

**top** 314:2

**Torah** 279:16 305:19, 22,23 306:1 310:23 311:2

**Torrance** 234:7

**total** 265:14

**tough** 323:23

**track** 256:21 258:2 261:25 262:10,15 263:10 274:7

**tracked** 257:24 258:3 267:17

**tracks** 258:22 259:5 353:11

**transaction** 236:11 281:18 296:18

**transcript** 366:20,25 367:2,3,11,12

**transfer** 245:7 273:6 275:17,24,25 276:3 282:12 300:20 306:24 310:13 315:19 316:1 348:13 363:21

**transferred** 244:16, 25 256:5 270:22 273:2 275:15 276:5, 9 277:16 278:8,21, 25 298:6 299:9 300:10 306:3,25 308:20 310:22 349:19,20 364:2 365:15,16

**transferring** 244:19 282:21 348:21

**transfers** 354:2

**trial** 342:11

**tribunal** 250:25

**trick** 290:10

**trigger** 245:1

**triggered** 248:20

**Troszak** 234:22 252:24 330:1

**true** 237:3 269:21 357:21

**true-up** 238:15

**trueing** 238:7

**trust** 239:8 266:21 312:15,20,22 314:2, 20,23 315:6,24 316:16 317:18 318:14 320:11,18,21 321:13,19,20 327:16,17 328:2,13, 14 329:18 332:18 335:11 336:4,13,15, 16 337:3,6,8 339:23 340:5 345:18 346:5 359:24

**trusted** 282:18

**trustee** 234:22 235:2 299:3 316:9 317:19 328:15 331:5,10,18, 21,22,23 332:3,4,7, 10,12,14,17,18,21, 24 333:9,10

**truth** 235:18

**try** 270:25

**trying** 243:18 246:10 290:10 367:13

**Tsikman** 296:14

**Tuesday** 234:1,10 312:1

**turn** 294:21 333:3

**two** 248:18 250:15 282:13 283:1 309:8, 13 334:25 335:4,8 339:6 341:6 349:16 351:19 352:9,10 357:25 358:1,2

**two-page** 253:13 297:11 308:11

**type** 238:7 250:25 270:21 273:24 275:5 281:17 320:24 322:24 353:7,11 357:12

**typically** 321:15,17

U

**Uh-huh** 296:20

**ultimately** 328:18 330:2

**underneath** 291:11

**understand** 235:16,19 253:7 256:15 257:2 260:9 261:8 268:19 282:11 285:1,14,25 290:16 296:18 305:11,16 307:6 312:10 314:22 315:11 323:12 346:3 348:20 353:24 357:7 367:4,13,25

**understanding** 239:14,19 240:1,3 273:16 297:2 306:12

**understood** 281:15 305:6 312:25 366:7

**underwrote** 330:6

**uniform** 238:16

**unique** 303:22

**Unitrust** 330:25 331:5 332:8

**universe** 248:9

**unknown** 244:22

**unreasonable** 244:4

**unsure** 328:11

**update** 267:1

**upset** 305:18

**use** 260:20 261:10 262:15 263:6 265:8,20 366:2

**utilize** 265:7

**utilized** 341:12

V

**Vago** 287:22,24 289:5,9,13 294:18,19 295:18,20 356:21,24 357:17,18,19,20,22

**Vago's** 291:3

**valuation** 344:4,9,13,17

**value** 268:9

**various** 241:12 245:21 267:4 273:21 294:12 321:1

**Ventura** 251:3,5 288:18 314:3

**venture** 365:25

**verify** 278:23

**volume** 234:8,11 366:21

W

**Wait** 234:24

**waiting** 366:25

**want** 238:3 256:17 259:10,21 261:25 262:20,21 294:9 298:9 323:17 327:24 347:8

**wanted** 241:11 332:20,21,23 364:11

**wants** 283:10 298:19

**wasn't** 236:17 259:17 281:7,8 293:15 294:25 298:14 300:25 333:6 354:17,20 362:12

**way** 294:2 304:2 352:15 362:1

**ways** 275:24

**we'll** 263:7 309:8,12 313:17

**we're** 253:3 257:21 284:20,23 312:5 315:13 321:20 327:19 337:5 353:23 366:24 368:6

**we've** 284:16 300:2 308:19 345:21 364:10

**weeds** 303:14

**went** 273:20 275:3 284:1 295:11 298:20 305:19 310:11

**weren't** 243:19

**William** 365:17,18,21 366:2,9,13

**willing** 283:19

**wipe** 330:10

**withdrawal** 346:14

**withdrawals** 318:20

**withdrawing** 348:21

**witness** 235:2 242:15,19 247:22 249:13,15 250:11 259:3 261:17,19 262:7 264:7 267:22 275:21 276:19 280:7 293:21 294:4 305:9 307:19 319:3,20 321:11 329:13 330:2 331:14 332:2 333:14 342:16 346:1 347:4,6,20 354:20 355:18 362:14,25 363:6 365:5 366:22 368:1

**won** 357:16

**Word** 261:13

**words** 239:3 315:25 324:3

**work** 273:11 275:5 359:2 362:19

**worked** 270:16 273:10,15,17 274:4

**working** 274:10

**worries** 249:20

**worth** 244:18 350:6

**wouldn't** 258:6 259:15,25 263:4 267:17 268:1 276:24 292:19,22 310:5 354:10

**wrap** 366:5

**write** 295:18,24 302:7

**writing** 306:16

**wrote** 264:19 275:19 280:2 286:17 295:1,2,20,22 299:4 302:3,4,6 330:16

Y

**Yeah** 249:13 250:1,18 251:5 260:8 261:21 263:15 265:6 283:21 284:19 301:20 303:15 304:7,9 306:18 316:22 329:13 330:11 331:16,18 332:2 339:9,17 340:2 341:24 342:10,16 343:17,23 347:8 353:3 359:19 360:12 362:16 366:23 367:14,17

**year** 274:4 277:13 279:20 296:10 309:11 334:6,19 337:16,18 338:16 339:19,20,21,22 340:14 343:21 353:2 357:4,5,6,9,13

**years** 248:17,18 257:22 264:2,3 277:9,15 292:2 309:12 319:25 320:3 329:3 337:23 342:12

**Yehuda** 271:19 298:8

**Yep** 234:21

**York** 237:19

**Yvette** 247:8

**Z**

**zero** 237:10,16,24 338:13 341:16,19,22

**Zimmerman** 247:17, 18,22,23 248:13 249:2,4 250:19 253:25 303:2,10

**zip** 273:4,5

**Zobdeh** 364:4,5

# EXHIBIT 4

# Delaware



The First State

*I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "EKLK FOUNDATION" AS RECEIVED AND FILED IN THIS OFFICE.*

*THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:*

*CERTIFICATE OF INCORPORATION, FILED THE FIFTEENTH DAY OF DECEMBER, A.D. 2010, AT 11:24 O`CLOCK A.M.*

*CERTIFICATE OF REVIVAL, FILED THE TWENTY-SEVENTH DAY OF FEBRUARY, A.D. 2025, AT 2:20 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "EKLK FOUNDATION".*

C. P. Sanchez

Charuni Patibanda-Sanchez, Secretary of State

SECRETARY'S OFFICE · 1793 · DELAWARE · 1855

4913277 8100H
SR# 20264765579

Authentication: 205489701
Date: 10-21-26

You may verify this certificate online at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:24 AM 12/15/2010*
*FILED 11:24 AM 12/15/2010*
*SRV 101190391 - 4913277 FILE*

# STATE OF DELAWARE

# CERTIFICATE OF INCORPORATION

(A Non-Stock. Non-Profit Delaware Corporation)

FIRST: The name of this corporation is "EKLK Foundation".

SECOND: The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation law of Delaware. This corporation shall be a nonprofit corporation. This corporation is organized and operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provisions of any future United States Internal Revenue Law).

1. This corporation shall have and may exercise all of the rights and powers conferred upon nonprofit public benefit corporations under the laws of the State of Delaware from time to time existing. Notwithstanding any other provision of this Certificate of Incorporation. however. this corporation shall not carry on any activities not permitted to be carried on (a) by an organization exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provisions of any future United States Internal Revenue Law). or (b) by a corporation to which contributions are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 (or the corresponding future United States Internal Revenue Law).

2. No substantial part of the activities of this corporation shall consist of the carrying on of propaganda, or otherwise attempting to influence legislation. and this corporation shall not directly or indirectly participate or intervene in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office.

THIRD: This corporation shall distribute its income for each tax year at such time and in such manner as not to become subject to the tax on undistributed income imposed by Section 4942 of the Code (or the corresponding provision of any future United States Internal Revenue Law).

1. This corporation shall not engage in any act of self-dealing as defined in Section 4941(d) of the Code (or the corresponding provision of any future United States Internal Revenue Law).

2. This corporation shall not retain any excess business holdings as defined in Section 4943(c) of the Code (or the corresponding provision of any future United States Internal Revenue Law).

3. This corporation shall not make any investments in such manner as to subject it to tax under Section 4944 of the Code (or the corresponding provision of any future United States Internal Revenue Law).

4. This corporation shall not make any taxable expenditures as defined in Section 4945(d) of the Code (or the corresponding provision of any future United States Internal Revenue Law).

FOURTH: This corporation shall not have any capital stock, and shall have no members.

FIFTH: The property, assets, profits and net income of this corporation are irrevocably dedicated to charitable purposes, and no part of the property, assets, profits or net income of this corporation shall ever inure to or for the benefit of or be distributable to any director, officer or other private person, except that the corporation shall be empowered to pay reasonable and proper remuneration for services actually rendered and to make payments and distributions in furtherance of the exempt purposes for which it was formed. Upon the winding up and dissolution of this corporation, after paying or adequately providing for the debts and obligations of this corporation, the remaining assets shall be distributed to one or more nonprofit funds, foundations or corporations which are organized and operated exclusively for charitable purposes and which qualify as tax-exempt organizations under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provisions of any future United States Internal Revenue Law) engaged in activities substantially similar to those of the corporation.

SIXTH: The address of the corporation's registered office in the State of Delaware is 160 Greentree Drive, Suite 101, Dover, DE 19904, County of Kent. The name of its registered agent is National Registered Agents, Inc.

SEVENTH: The personal liability of the directors of the corporation for money damages shall be eliminated to the maximum extent allowed under Section 102(b)(7) of Chapter 1 of Title 8 of the Delaware Code.

EIGHTH: The name and mailing address of the incorporator are as follows:

Name: Leslie Klein

Mailing Address: 14245 Ventura Blvd.
Sherman Oaks, CA 91423

I, the undersigned, being the incorporator hereinabove named, for the purpose of forming a corporation pursuant to Chapter 1 of Title 8 of the Delaware Code, do make this Certificate, hereby declaring and certifying that the facts herein stated are true, and accordingly have hereunto set my hand this 17 day of December, 2010.

Leslie Klein
Incorporator

# STATE OF DELAWARE
# CERTIFICATE FOR REVIVAL OF CHARTER

The corporation organized under the laws of the State of Delaware, the charter of which was voided for failure to file a complete annual franchise tax report, now desires to procure a revival of its charter pursuant to Section 313 of the General Corporation Law of the State of Delaware, and hereby certifies as follows:

1. The name of the corporation is EKLK FOUNDATION

and, if different, the name under which the corporation was originally incorporated ______.

2. The Registered Office of the corporation in the State of Delaware is located at 1209 Orange Street (street), in the City of Wilmington, County of New Castle Zip Code 19801. The name of the Registered Agent at such address upon whom process against this Corporation may be served is NATIONAL REGISTERED AGENTS, INC.

3. The date of filing of the Corporation's original Certificate of Incorporation in Delaware was 12/15/2010.

4. The corporation desiring to be revived and so reviving its certificate of incorporation was organized under the laws of this State.

5. The corporation was duly organized and carried on the business authorized by its charter until the 01 day of March A.D. 2020, at which time its charter became inoperative and void for failure to file a complete annual franchise tax report and the certificate for revival is filed by authority of the duly elected directors of the corporation in accordance with the laws of the State of Delaware.

By: [signature]
Authorized Officer

Name: [signature] Leslie Klein President
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:20 PM 02/27/2025
FILED 02:20 PM 02/27/2025
SR 20250793787 - File Number 4913277

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| EKLK FOUNDATION | 2019 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 4913277 | 2010/12/15 | |

PRINCIPAL PLACE OF BUSINESS
6454 VAN NUYS BLVD.
VAN NUYS, CA 91401

PHONE NUMBER
(323)236-6984

REGISTERED AGENT
NATIONAL REGISTERED AGENTS, INC.
1209 ORANGE STREET
WILMINGTON DE 19801

AGENT NUMBER
9216365

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| LESLIE KLEIN | 6454 VAN NUYS BLVD. VAN NUYS, CA 91401 | PRESIDENT |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| MOTTI ZAMBROSKI | 6454 VAN NUYS BLVD. VAN NUYS, CA 91401 |
| DAVID CHAVER | 6454 VAN NUYS BLVD. VAN NUYS, CA 91401 |
| LESLIE KLEIN | 6454 VAN NUYS BLVD. VAN NUYS, CA 91401 |
| BARBARA ROTH KLEIN | 6454 VAN NUYS BLVD. VAN NUYS, CA 91401 |

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| LESLIE KLEIN<br>6454 VAN NUYS BLVD.<br>VAN NUYS, CA 91401 US | 2025/02/27 | PRESIDENT |

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| EKLK FOUNDATION | 2019 |

| FILE NUMBER |
|---|
| 4913277 |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| RICHARD KLEIN | 6454 VAN NUYS BLVD.<br>VAN NUYS, CA 91401 |

 F2-147323

F

# State of California
## Secretary of State

19

### Statement of Information
(Foreign Corporation)
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FILED**
**Secretary of State**
**State of California**
**DEC 05 2012**

FC This Space for Filing Use Only

1. **CORPORATE NAME**
EKLK FOUNDATION
14245 Ventura Blvd
Sherman Oaks, Ca. 91423-2773

2. **CALIFORNIA CORPORATE NUMBER** C3346348

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**
☒ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to **Item 13.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| Item | Address | City | State | Zip Code |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | 322 North June Street | Los Angeles | California | 90004 |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | 14245 Ventura Blvd. | Sherman Oaks | CA | 91423 |
| 6. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 4 | 14245 Ventura Blvd. | Sherman Oaks | CA | 91423 |

[redacted]

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| Officer | Name | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/ | LESLIE KLEIN | 322 North June Street | Los Angeles | CA. | 90004 |
| 8. SECRETARY | ERIKA KLEIN | 322 North June Street | Los Angeles | CA. | 90004 |
| 9. CHIEF FINANCIAL OFFICER/ | LESLIE KLEIN | 322 North June Street | Los Angeles | CA | 90004 |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 11 must be left blank.

10. NAME OF AGENT FOR SERVICE OF PROCESS
LESLIE KLEIN

11. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL — CITY — STATE — ZIP CODE
14245 Ventura Boulevard, Sherman Osks — CA — 91423

**Type of Business** FOUNDATION

12. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
FOUNDATION

13. THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|
| 1-20-2011 | LESLIE KLIEN | DIRECTOR | [signature] |

SI-350 (REV 01/2012) APPROVED BY SECRETARY OF STATE

LexisNexis

## 1 OF 1 RECORD(S)

## DESOS Company Report

**Date/Time of Results:**
10/21/2026 at 14:52

**File Number:**
4913277

**Name:**
EKLK FOUNDATION

**Kind:**
Corporation Exempt

**Residency:**
Domestic

**State of Incorp:**
DE

**Status:**
AR Delinquent, Tax Due as of 10/20/2026

**Incorp/Qualify Date:**
12/15/2010

**Foreign Incorporation Date:**

**Registered Agent:**
9216365

NATIONAL REGISTERED AGENTS, INC.

1209 ORANGE STREET

WILMINGTON, DE 19801

**Registered Agent County:**
New Castle

**Stock Co Flag:**
False

**Tax Type:**
A/R Filing Required

**Renewal Date:**

**Expiration Date:**

**Quarterly Filing?:**
False

**Last Annual Report:**
2019

**Bankruptcy Date:**

**Bankruptcy Case Number:**

**Bankruptcy Status:**

**Merged To:**

## Stock Information:

**Amendment Number:**

| Stock Seq Number | Description | Series | Class | Authorized | Par Value |
|---|---|---|---|---|---|

## Filing History (last 5 filings):

| Seq Number | Filing Year | Doc Desc | Doc Pages | Dom Pages | Doc Filing Date | Doc Filing Time | Doc Effective Date | Doc Filing Status | Co Prev Name | Merger Type |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2025 | Renewal for Void | 1 | | 02/27/2025 | 14:20 | 02/27/2025 | Archived | | |
| 2 | 2010 | Non-Stock Corporation | 2 | | 12/15/2010 | 11:24 | 12/15/2010 | Completed | | |

## Tax Info:

Tax Balance:

$299.00

| TaxYear | TotalFiling | TotalTaxes | TotalPenalty | TotalInterest | TotalOther | TotalPaid | TotalBalance |
|---|---|---|---|---|---|---|---|
| 2026 | $25.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $25.00 |
| 2025 | $25.00 | $0.00 | $200.00 | $24.00 | $0.00 | $0.00 | $249.00 |
| 2020 | $25.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $25.00 |

**Important:**The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

**Important:**This data is for informational purposes only. Certification may only be obtained through the Division of Corporations, or from a Delaware Registered Agent's office located within the State of Delaware

**Important:** This information is real time data and is subject to change at any moment

Your DPPA Permissible Use: I have no permissible use

Your Secondary DPPA Permissible Use: None

Your GLBA Permissible Use: I have no permissible use

Copyright © 2026 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

---

**End of Document**

LexisNexis

**1 OF 1 RECORD(S)**

FOR INFORMATIONAL PURPOSES ONLY

Copyright © 2026 LexisNexis

a division of Reed Elsevier Inc. All Rights Reserved.

Report Created: October 21, 2026 - Wednesday 3:09 PM

# California Secretary of State
**This data is for informational purposes only.**

## Corporate Filing 1
**Business Information**

**Filing Type:** CURRENT
**Filing Number:** 3346348
**Name:** EKLK FOUNDATION
**Name Type:** LEGAL
**Standard Business Address:** 322 N JUNE ST
LOS ANGELES, CA 90004-1042
**Original Business Address:** 322 N JUNE ST
LOS ANGELES, CA 90004
US

**Mailing Address:** 322 N JUNE ST
LOS ANGELES, CA 90004
US

**Business Type:** NONPROFIT CORPORATION - OUT OF STATE
**Status:** FORFEITED - FTB/SOS
**Status Date:** 08/11/2015
**Foreign State of Incorporation:** DELAWARE
**Place Incorporated:** CALIFORNIA
**Foreign/Domestic:** FOREIGN
**Foreign Incorporation Date:** 01/03/2011
**For Profit:** FALSE
**Manufacturer:** NO
**Partnership:** NO
**Purpose:** FOUNDATION
**Status Comment:** NOT IN GOOD STANDING WITH FTB
**Date Last Seen:** 07/22/2026

**Registered Agent**

**Name:** KLEIN, LESLIE
**Registered Agent Address Type:** REGISTERED OFFICE

## Corporate Filing 2

## Corporate Filing 2

**Business Information**

**Filing Type:** HISTORICAL
**Filing Number:** 3346348
**Name:** EKLK FOUNDATION
**Name Type:** LEGAL
**Standard Mailing Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423-2773
**Original Mailing Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423
US

**Business Type:** FOREIGN CORPORATION
**Filing Type:** STATEMENT & DESIGNATION BY FOREIGN CORPORATION
**Status:** FORFEITED
**Status Date:** 04/02/2019
**Foreign State of Incorporation:** DELAWARE
**Place Incorporated:** CALIFORNIA
**Foreign/Domestic:** FOREIGN
**Foreign Incorporation Date:** 01/03/2011
**Terms:** PERPETUAL
**For Profit:** FALSE
**Manufacturer:** NO
**Partnership:** NO
**Tax Program:** FORFEITED- FRANCHISE TAX BOARD
**Date Last Seen:** 04/05/2022

**Registered Agent**

**Name:** KLEIN, LESLIE
**Registered Agent Address Type:** REGISTERED OFFICE
**Registered Agent Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423-2773

## Corporate Filing 3

**Business Information**

**Filing Type:** HISTORICAL
**Filing Number:** 3346348
**Name:** EKLK FOUNDATION
**Name Type:** LEGAL
**Standard Business Address:** 322 N JUNE ST
LOS ANGELES, CA 90004-1042
**Original Business Address:** 322 N JUNE ST
LOS ANGELES, CA 90004
US

**Mailing Address:** 322 N JUNE ST
LOS ANGELES, CA 90004
US

**Business Type:** NONPROFIT CORPORATION - OUT OF STATE
**Status:** FORFEITED - FTB/SOS
**Status Date:** 08/11/2015
**Foreign State of Incorporation:** DELAWARE
**Place Incorporated:** CALIFORNIA
**Foreign/Domestic:** FOREIGN
**Foreign Incorporation Date:** 01/03/2011
**For Profit:** FALSE
**Manufacturer:** NO
**Partnership:** NO
**Purpose:** FOUNDATION
**Status Comment:** NOT IN GOOD STANDING WITH FTB

**Corporate Filing 3**

**Date Last Seen:** 06/03/2026

**Registered Agent**

**Name:** KLEIN, LESLIE
**Registered Agent Address Type:** REGISTERED OFFICE
**Registered Agent Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423-2773

**Corporate Filing 4**

**Business Information**

**Filing Type:** HISTORICAL
**Filing Number:** 3346348
**Name:** EKLK FOUNDATION
**Name Type:** LEGAL
**Standard Business Address:** 322 N JUNE ST
LOS ANGELES, CA 90004-1042
**Original Business Address:** 322 N JUNE ST
LOS ANGELES, CA 90004
US

**Mailing Address:** 322 N JUNE ST
LOS ANGELES, CA 90004
US

**Business Type:** NONPROFIT CORPORATION - OUT OF STATE
**Status:** FORFEITED - FTB/SOS
**Status Date:** 08/11/2015
**Foreign State of Incorporation:** DELAWARE
**Place Incorporated:** CALIFORNIA
**Foreign/Domestic:** FOREIGN
**Foreign Incorporation Date:** 01/03/2011
**For Profit:** FALSE
**Manufacturer:** NO
**Partnership:** NO
**Status Comment:** NOT IN GOOD STANDING WITH FTB
**Date Last Seen:** 03/13/2024

**Registered Agent**

**Name:** KLEIN, LESLIE
**Registered Agent Address Type:** REGISTERED OFFICE
**Registered Agent Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423-2773

**Corporate Filing 5**

**Business Information**

**Filing Type:** HISTORICAL
**Filing Number:** 3346348
**Name:** EKLK FOUNDATION
**Name Type:** LEGAL
**Standard Mailing Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423-2773
**Original Mailing Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423
US

**Business Type:** FOREIGN CORPORATION
**Filing Type:** STATEMENT & DESIGNATION BY FOREIGN CORPORATION
**Status:** FORFEITED
**Foreign State of Incorporation:** DELAWARE
**Place Incorporated:** CALIFORNIA

**Corporate Filing 5**

**Foreign/Domestic:** FOREIGN
**Foreign Incorporation Date:** 01/03/2011
**Terms:** PERPETUAL
**For Profit:** FALSE
**Manufacturer:** NO
**Partnership:** NO
**Tax Program:** NOT SUSPENDED-IN GOOD STANDING
**Date Last Seen:** 04/02/2019

**Registered Agent**

**Name:** KLEIN, LESLIE
**Registered Agent Address Type:** REGISTERED OFFICE
**Registered Agent Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423-2773

**Stock Information**

Stock

**Change In Stock:** False
**Voting Rights:** NO
**Converted:** False
**Additional Information:** NON-STOCK (NONPROFIT)

## Historical Registered Agents

| Name | Address | Contact Info |
|---|---|---|
| KLEIN, LESLIE | Type: REGISTERED OFFICE<br>14245 VENTURA BLVD<br>SHERMAN OAKS, CA 91423-2773 | |

## Officers

| Name | Date(s) | Standardized Address | Original Address |
|---|---|---|---|
| KLEIN, LESLIE<br>Title: CHIEF EXECUTIVE OFFICER<br>Contact Type: OFFICER | | Type: CONTACT<br>322 N JUNE ST<br>LOS ANGELES, CA 90004-1042 | 322 N JUNE ST<br>LOS ANGELES, CA 90004<br>US |

## Historical Contacts

| Name | Date(s) | Standardized Address | Original Address |
|---|---|---|---|
| KLEIN, LESLIE<br>Contact Type: CHIEF EXECUTIVE OFFICER | | Type: CONTACT<br>322 N JUNE ST<br>LOS ANGELES, CA 90004-1042 | 322 N JUNE ST<br>LOS ANGELES, CA 90004<br>US |

## Filing History

| Filing Date | Filing Type | Number | Description | Misc. |
|---|---|---|---|---|
| 04/02/2019 | FILING TRANSACTION DATE | | FRANCHISE TAX BOARD FORFEITURE | |
| 04/02/2019 | FORFEITURE | | FORFEITED BY FRANCHISE TAX BOARD | |
| 08/11/2015 | FILING TRANSACTION | | SECRETARY OF | |

## Filing History

| | | | |
|---|---|---|---|
| | DATE | | STATE FORFEITURE |
| 12/05/2012 | FILING | Ref No.: 0147323 | STATEMENT OF OFFICERS INFORMATION |
| 12/05/2012 | FILING | Ref No.: LBA10719512 | |

## FEIN Records

**This data is for informational purposes only.**

**TIN:** 27-427XXXX
**Company Name:** EKLK FOUNDATION
**SIC Code:** 6732
**SIC Description:** EDUCATIONAL, RELIGIOUS, ETC. TRUSTS
**Address(s):** C O LESLIE KLEIN 14245 VENTURA
SHERMAN OAKS, CA 91423
C/O LESLIE KLEIN;14245 VENTURA
SHERMAN OAKS, CA 91423
**Contact Name:** LESLIE KLEIN
**Title:** CEO

## FEIN Records

**This data is for informational purposes only.**

**TIN:** 27-427XXXX
**Company Name:** EKLK FOUNDATION
**SIC Code:** 6732
**SIC Description:** EDUCATIONAL, RELIGIOUS, ETC. TRUSTS
**Address(s):** 14245 VENTURA BLVD FL 3
SHERMAN OAKS, CA 91423
**Contact Name:** LESLIE KLEIN
**Title:** CEO

## Experian

**This data is for informational purposes only.**

### Summary

**Company Name:** EKLK FOUNDATION
**Address:** 14245 VENTURA BLVD
SHERMAN OAKS, CA 91423-2773
LOS ANGELES COUNTY
**Experian File Number:** 944999121
**File Established:** 02/01/2011

### Business Description

**Industry:** SERVICES
**SIC:** 8730 (RESEARCH AND TESTING SERVICES)

**Years in Business (ACTUAL):** OVER 10 YEARS
**Business Type:** CORPORATION
**Owner Type:** PRIVATE
**Location:** SINGLE ENTITY
**Officers:** MS LESLIE C KLEIN (PRES)

# Deed Records

**This data is for informational purposes only.**

## Buyer Information

**Original Name:** EKLK FOUNDATION (COMPANY/CORPORATION)

**Standardized Name:** EKLK FOUNDATION
**Original Address:** 1209 ORANGE STREET
WILMINGTON, DE 19801
**Standardized Address:** 1209 N ORANGE ST
WILMINGTON, DE 19801-1120
NEW CASTLE COUNTY

## Seller Information

**Original Name:** KLEIN , LESLIE (TRUSTEE/CONSERVATOR)
CREDIT TR OF SECOND AMENDED KLEIN LIV TR (LIVING TRUST)

**Standardized Name:** OF SECOND AMENDED KLEIN
KLEIN, LESLIE

## Property Information

**Original Property Address:** 322 N JUNE ST
LOS ANGELES, CA 90004-1042
LOS ANGELES COUNTY
**Standardized Property Address:** 322 N JUNE ST
LOS ANGELES, CA 90004-1042
LOS ANGELES COUNTY
**County:** LOS ANGELES
**Data Source:** B

## Legal Information

**Assessor's Parcel Number:** 5523-003-008
**Recording Date:** 02/25/2025
**Contract Date:** 02/25/2025
**Document Number:** 25-0120374
**Document Type:** GRANT DEED
**Legal Description:** LOT NUMBER: 300; TRACT: 8320; CITY/MUNI/TWNSP: LOS ANGELES; MAP: MB 98 PG 41

## Sales Information

**Sales Price Description:** DOCUMENT STATES PRICE AS "0", "NONE", "NO CONSIDERATION"

## Mortgage Information

**Mortgage Type:** PURCHASE MONEY
**Title Company:** NONE AVAILABLE

# Tax Assessor Records

**This data is for informational purposes only.**

### Estimated Roll Certification Date: 07/13/2025

### Owner Information

**Original Name:** EKLK FOUNDATION
**Standardized Name:** EKLK FOUNDATION
**Ownership Rights:** CORPORATION
**Original Address:** 1209 N ORANGE ST
WILMINGTON, DE 19801-1196

### Property Information

**Original Property Address:** 322 JUNE ST N
LOS ANGELES, CA 90004-1042
**Standardized Property Address:** 322 N JUNE ST
LOS ANGELES, CA 90004-1042
LOS ANGELES COUNTY
**Land Use:** SINGLE FAMILY RESIDENTIAL
**County:** LOS ANGELES
**Data Source:** A

### Legal Information

**Assessor's Parcel Number:** 5523-003-008
**Recording Date:** 12/14/1977
**Brief Description:** TRACT NO 8320 LOT 300
**Legal Description:** LOT NUMBER: 300; SUBDIVISION: 8320; CITY/MUNI/TWNSP: 00067; TRACT: 1923002000

### Sale Information

**Recording Date:** 12/14/1977
**Prior Recording Date:** 07/01/1977
**Sale Price:** $330,000 - SALE PRICE (FULL)
**Prior Sales Price:** $330,000
**Document Number:** 1376859

### Mortgage Information

**Mortgage Type:** CONVENTIONAL
**Loan Amount:** $245,000

### Assessment Information

**Calculated Land Value:** $304,951
**Calculated Improvement Value:** $1,011,843
**Total Calculated Value:** $1,316,794
**Assessment Year:** 2025
**Assessed Land Value:** $304,951
**Assessed Improvement Value:** $1,011,843
**Total Assessed Value:** $1,316,794
**Zoning:** LAR1

### Tax Information

**Tax Amount:** $16,634.99
**Tax Year:** 2025

### Property Characteristics

**Year Built:** 1949
**Bedrooms:** 5
**Baths:** 5
**Building Area:** 6,620 LIVING
**Site Influence:** CORNER
**Other Buildings:** TYPE UNKNOWN

**Estimated Roll Certification Date: 07/13/2025**

| | |
|---|---|
| **No. of Buildings:** | 1 |
| **School Tax District:** | 67 |
| **Heating:** | CENTRAL |
| **Land Dimensions:** | 100X130 |
| **Effective Year:** | 1949 |
| **Square Footage:** | 14,216 SF |

# Tax Assessor Records

**This data is for informational purposes only.**

**Estimated Roll Certification Date: 07/13/2024**

### Owner Information

| | |
|---|---|
| **Original Name:** | EKLK FOUNDATION |
| **Standardized Name:** | EKLK FOUNDATION |
| **Ownership Rights:** | CORPORATION |
| **Original Address:** | 1209 N ORANGE ST<br>WILMINGTON, DE 19801-1196 |

### Property Information

| | |
|---|---|
| **Original Property Address:** | 322 JUNE ST N<br>LOS ANGELES, CA 90004-1042 |
| **Standardized Property Address:** | 322 N JUNE ST<br>LOS ANGELES, CA 90004-1042<br>LOS ANGELES COUNTY |
| **Land Use:** | SINGLE FAMILY RESIDENTIAL |
| **County:** | LOS ANGELES |
| **Data Source:** | A |

### Legal Information

| | |
|---|---|
| **Assessor's Parcel Number:** | 5523-003-008 |
| **Recording Date:** | 12/14/1977 |
| **Brief Description:** | TRACT NO 8320 LOT 300 |
| **Legal Description:** | LOT NUMBER: 300; SUBDIVISION: 8320; CITY/MUNI/TWNSP: 00067; TRACT: 1923002000 |

### Sale Information

| | |
|---|---|
| **Recording Date:** | 12/14/1977 |
| **Prior Recording Date:** | 07/01/1977 |
| **Sale Price:** | $330,000 - SALE PRICE (FULL) |
| **Prior Sales Price:** | $330,000 |
| **Document Number:** | 1376859 |

### Mortgage Information

| | |
|---|---|
| **Mortgage Type:** | CONVENTIONAL |
| **Loan Amount:** | $245,000 |

### Assessment Information

| | |
|---|---|
| **Calculated Land Value:** | $298,972 |
| **Calculated Improvement Value:** | $992,003 |
| **Total Calculated Value:** | $1,290,975 |
| **Assessment Year:** | 2024 |
| **Assessed Land Value:** | $298,972 |
| **Assessed Improvement Value:** | $992,003 |
| **Total Assessed Value:** | $1,290,975 |
| **Zoning:** | LAR1 |

**Estimated Roll Certification Date: 07/13/2024**

**Tax Information**

| | |
|---|---|
| **Tax Amount:** | $16,386.88 |
| **Tax Year:** | 2024 |

**Property Characteristics**

| | |
|---|---|
| **Year Built:** | 1949 |
| **Stories:** | 2 |
| **Bedrooms:** | 5 |
| **Baths:** | 5 |
| **Total Rooms:** | 9 |
| **Fireplace:** | Y;1 |
| **Roof:** | WOOD SHAKE/SHINGLE |
| **Garage Type:** | 2 CAR(S) |
| **Pool/Spa:** | TYPE UNKNOWN |
| **Building Area:** | 6,620 LIVING |
| **Site Influence:** | CORNER |
| **Other Buildings:** | TYPE UNKNOWN |
| **No. of Buildings:** | 1 |
| **Style:** | CONTEMPORARY |
| **School Tax District:** | 67 |
| **Heating:** | CENTRAL |
| **Construction:** | FRAME |
| **Exterior Walls:** | SHINGLE SIDING |
| **Land Dimensions:** | 100X130 |
| **Effective Year:** | 1949 |
| **Square Footage:** | 14,216 SF |

## Business Registration Records

**This data is for informational purposes only.**

**Business Information**

| | |
|---|---|
| **Filing Number:** | 03346348 |
| **Company Name:** | EKLK FOUNDATION |
| **Mailing Address:** | 14245 VENTURA BLVD<br>SHERMAN OAKS, CA 91423-2773 |
| **Corporation Code:** | Secretary of State |
| **Secretary Of State Code:** | Corporation |
| **Filing Code:** | Foreign |
| **Status:** | Active |
| **Filing Date:** | 01/03/2011 |

**Business Registration Officers**

**1.**

| | |
|---|---|
| **Name:** | KLEIN, LESLIE |
| **Position:** | AGT |

## IRS 990 - Not For Profit

**This data is for informational purposes only.**

**General Information**

| | |
|---|---|
| **Company Name:** | EKLK FOUNDATION |
| **FEIN:** | 27-4273142 |
| **Address:** | 14245 VENTURA BLVD FL 3<br>SHERMAN OAKS, CA 91423-2767 |

**General Information**

**Contacts**

**Name:** KLEIN, LESLIE
**Title:** MS

Key
High Risk Indicator. These symbols may prompt you to investigate further
Moderate Risk Indicator. These symbols may prompt you to investigate further
General Information Indicator. These symbols inform you that additional information is provided
✓ The most recent telephone listing as reported by Electronic Directory Assistance

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use: I have no permissible use
Your Secondary DPPA Permissible Use: None
Your GLBA Permissible Use: I have no permissible use

Copyright © 2026 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

---

End of Document

# EXHIBIT 5

1 of 3

**Bank of America**

☑ CA ☐ ID ☐ WA

**Business Signature Card with Substitute Form W-9**

Account Number: 04184-78397
Bank Number: 0318

Account Type: ☑ DDA ☐ SAV ☐ CD

Account Title: EKLK Foundation

☐ Temporary Signature Card

Legal Designation: ☐ Individual/Sole Proprietor ☑ Corporation ☐ Partnership ☐ Association ☐ Limited Liability Company

Tax Identification Number: 274273142

By signing below, I/we acknowledge and agree that this account is and shall be governed by the terms and conditions set forth in the following documents, as amended from time to time: (1) if this account is a deposit account, the Deposit Agreement and Disclosures, the Business Schedule of Fees, and (2) if this account is a Line of Credit, the applicable Line of Credit Agreement and Disclosures. Furthermore, I/we acknowledge the receipt of these documents. By signing below, I/we acknowledge and agree that the signature(s) will serve as verification for any transactions in connection with this account, and any Line of Credit checks which I/we may sign, and as the certification (set forth below) of the taxpayer identification number to which I/we want interest reported.The Deposit Agreement includes a provision for alternative dispute resolution.

**Substitute Form W-9. Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. citizen or other U.S. person (defined in the instructions).**

**Certification Instructions:** You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. (See also IRS Instructions for Form W-9.)

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

☐ Exempt (check if applicable)

☐ **Nonresident Alien Status (if applicable). If all beneficial owners are considered Nonresident Aliens under the United States tax law, check here and complete and sign the applicable Form(s) W-8.**

| | Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|---|
| 1 | Leslie Klein | Ceo/Sec | [signature] | 010411 |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

**ATM/Deposit Check Card Request**

Provided that the account referenced above is eligible to receive automated teller machine cards and/or Check Cards, I (as authorized by the resolution and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

Signature: [signature] Title: Ceo/Sec

**Bank Information**

**Customer 1**

Name: Leslie Klein

| | ID Type | ID # | ID Issuer | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| CIP Information: | DL | P0546209 | CA | 11/10/2009 | 1/7/2015 |
| CIP Information: | CC | 1373 | Visa | 1/1/2009 | 5/1/2012 |

**Customer 2**

Name:

| | ID Type | ID # | ID Issuer | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| CIP Information: | | | | | |
| CIP Information: | | | | | |

**Customer 3**

Name:

| | ID Type | ID # | ID Issuer | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| CIP Information: | | | | | |
| CIP Information: | | | | | |

**Customer 4**

Name:

| | ID Type | ID # | ID Issuer | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| CIP Information: | | | | | |
| CIP Information: | | | | | |

**Review Information**

Business Entity/Sole Proprietorship with EIN Telephone Inquiry: No Records Ref#010411DM1315

WA/ID: For Sole Proprietors with SSN and General Partners, complete the following:

| Name: | Year: | State: |
|---|---|---|
| Name: | Year: | State: |
| Name: | Year: | State: |
| Name: | Year: | State: |

Date: 010411
Banking Center Name & Cost Center: Sherman Oaks 0418
Associate Name: Remona Bostani
Associate's Phone Number: 8184641741

90-53-2297NSBW 12-2010

# EXHIBIT 6

**BANK OF AMERICA**

BANK OF AMERICA, N.A. (THE "BANK")

# Business Signature Card with Substitute Form W-9

**Account Number:** 16410330 2172

**Account Type:** [X] Checking [ ] Savings [ ] Certificate of Deposit

**Account Title:** EKLK Foundation

**Legal Designation**

[ ] Individual Owner/Sole Proprietor/Single Member LLC [ ] C Corporation [X] S Corporation [ ] Trust/Estate

[ ] Partnership (Enter type of partnership): General, LP, LLP or LLLP _____

[ ] Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership) _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

[ ] Other (Defined in W-9 instructions) ____________________

Exemptions (codes apply only to certain entities, not individuals; see IRS instructions for Form W-9)
*(Applies to accounts maintained outside the U.S.)*

Exempt payee code (if any) ____________
Exemption from FATCA reporting code (if any) ____________

Employer Identification Number 27-4273142 (or) Social Security Number ____________

**By signing below, I/we acknowledge, agree and consent:**

- To open this account and understand this does not change or replace any existing accounts **I/we** may have with Bank of America.
- This account is and will be governed by the terms and conditions set forth in the account opening documents, including the Deposit Agreement and Disclosures and the Business Schedule of Fees and **I/we** are in receipt of these documents.
- The Bank may change these documents at any time by adding new terms, or deleting or amending existing terms. The Deposit Agreement includes a provision for alternative dispute resolution.
- The signature(s) will serve as verification for any transaction in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which **I/we** want interest reported.
- Failure to fully complete and return the signature card may impact the ability to receive full FDIC deposit insurance coverage.

[ ] **Nonresident Alien (NRA) Status:** Check this box if the account holder of this account is a non U.S. entity/person (NRA) for U.S. tax purposes. Have them complete and sign the applicable Form(s) W-8.

**Substitute Form W-9:** Certification – Under penalties of perjury, I certify that:

1. The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (Defined in the W-9 instructions); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification Instructions:** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. (Please refer to the IRS instructions for Form W-9).

**The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

| Printed Name | Title (if applicable) | Signature | Date |
|---|---|---|---|
| Leslie Klein | owner | [signature] | 8/30/2021 |
| Les Klein + Associates Inc A PR | President | [signature] | 8/30/2021 |
| EKLK Foundation | CEO | [signature] | 8/30/2021 |
| | | | |
| | | | |

00-14-9297M 11-2018
NCA

© 2018 Bank of America, N.A. All Rights Reserved

Associate Name: Amanda Jacobs
Financial Center: LARCHMONT VILLAGE

Bank Number: 318
Date: 08/30/2021

**Bank of America**

BANK OF AMERICA, N.A. (THE "BANK")

**Business Signature Card with Substitute Form W-9**

**Account Number:** 1641 0330 2172 **Bank Number:** 318

**Account Type:** ☒ DDA ☐ SAV ☐ CD

**Account Title:**

EKLK FOUNDATION

**Legal Designation:**

☐ *Individual/Sole Proprietor* ☐ *Trust/Estate* ☐ *Unincorporated Association* ☐ *C Corporation* ☒ *S Corporation*

☐ Partnership (Enter the type of partnership: General, LP, LLP or LLLP) ______

☐ Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership or M=Single Member Sole Proprietor) ____

☐ Other (Defined in W-9 instructions) ______

Social Security Number ______ (or) Employer Identification Number 27-4273142

**By signing below, I/we acknowledge and agree** that this account is and will be governed by the terms and conditions set forth in the account opening documents for my/our account, as they are amended from time to time. The account opening documents include the Deposit Agreement and Disclosures and the Business Schedule of Fees. Furthermore, **I/we acknowledge the receipt of these documents. By signing below, I/we acknowledge and agree** that the signature(s) will serve as verification for any transactions in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported. The Deposit Agreement includes a provision for alternative dispute resolution.

**Substitute Form W-9.** Certification - Under penalties of perjury, I certify that: (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to backup withholding, and (3) I am a US citizen or other US person (Defined in the W-9 instructions).

**Certification Instructions:** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. (Please refer to the IRS instructions for Form W-9).

☐ **Exempt Payee (check if applicable)**

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

☐ **Nonresident Alien Status (if applicable)** If the beneficial owner of this account is a foreign person, check here, and complete and sign the applicable Form(s) W-8.

| | Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|---|
| 1 | leslie klein | CEO | [signature] | 11/27/12 |
| 2 | Erica Vago | Treasurer | [signature] | 11/27/12 |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |

©2012 Bank of America, N.A. All Rights Reserved

NCA
00-14-9297M 08-2012

1641033021 72

☐ **Signature Card Addendum on File**

**ATM/Deposit/Debit Card Request**

Provided that the account referenced above is eligible to receive automated teller machine cards and/or Debit Cards, I (as authorized by the resolutions and/or court documents and/or other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

Authorized Signer ______________________ Title ______________________

**Review Information**

**Customer 1:**

Name Leslie Klein

ID Type: CADL ID#: P0546209 ID Issuer: CA/USA Iss. Date: 6/16/2009 Exp. Date: 01/07/2015

ID Type: Visa ID#: 2069 ID Issuer: N/A Iss. Date: N/A Exp. Date: 01/2015

**Customer 2:**

Name Erica Vago

ID Type: CADL ID#: C4820284 ID Issuer: CA/USA Iss. Date: 06/23/2010 Exp. Date: 07/10/15

ID Type: Visa ID#: 3747 ID Issuer: N/A Iss. Date: N/A Exp. Date: 10/2014

**Customer 3:**

Name ______

ID Type: ______ ID#: ______ ID Issuer: ______ Iss. Date: ______ Exp. Date: ______

ID Type: ______ ID#: ______ ID Issuer: ______ Iss. Date: ______ Exp. Date: ______

**Customer 4:**

Name ______

ID Type: ______ ID#: ______ ID Issuer: ______ Iss. Date: ______ Exp. Date: ______

ID Type: ______ ID#: ______ ID Issuer: ______ Iss. Date: ______ Exp. Date: ______

**Customer 5:**

Name ______

ID Type: ______ ID#: ______ ID Issuer: ______ Iss. Date: ______ Exp. Date: ______

ID Type: ______ ID#: ______ ID Issuer: ______ Iss. Date: ______ Exp. Date: ______

**Bank Information**

**Date** 11/27/2012

**Banking Center Name** LARCHMONT VILLAGE

**Associate's Name** STELLA PAE

***Associate's Phone Number*** *323-817-6004*

# EXHIBIT 7

Business Signature Card
with Substitute Form W-9

BANK OF AMERICA

Account Number: 325196567501

Account Type: [X] Checking [ ] Savings [ ] Certificate of Deposit

Account Title: EKLK FOUNDATION

**Legal Designation**

[ ] Individual Owner/Sole Proprietor/Single Member LLC [ ] C Corporation [X] S Corporation [ ] Trust/Estate

[ ] Partnership (Enter type of partnership): General, LP, LLP or LLLP _____

[ ] Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership) _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

[ ] Other (Defined in W-9 instructions) ____________________

Exemptions (codes apply only to certain entities, not individuals; see IRS instructions for Form W-9)
(Applies to accounts maintained outside the U.S.)

Exempt payee code (if any) ____________
Exemption from FATCA reporting code (if any) ____________

Employer Identification Number 27-4273142 (or) Social Security Number ____________

By signing below, I/we acknowledge, agree and consent:

- To open this account and understand this does not change or replace any existing accounts I/we may have with Bank of America.
- This account is and will be governed by the terms and conditions set forth in the account opening documents, including the Deposit Agreement and Disclosures and the Business Schedule of Fees and I/we are in receipt of these documents.
- The Bank may change these documents at any time by adding new terms, or deleting or amending existing terms. The Deposit Agreement includes a provision for alternative dispute resolution.
- The signature(s) will serve as verification for any transaction in connection with this account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported.
- Failure to fully complete and return the signature card may impact the ability to receive full FDIC deposit insurance coverage.

[ ] Nonresident Alien (NRA) Status: Check this box if the account holder of this account is a non U.S. entity/person (NRA) for U.S. tax purposes. Have them complete and sign the applicable Form(s) W-8.

Substitute Form W-9: Certification – Under penalties of perjury, I certify that:

1. The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (Defined in the W-9 instructions); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification Instructions: You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. (Please refer to the IRS instructions for Form W-9).

The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| Printed Name | Title (if applicable) | Signature | Date |
|---|---|---|---|
| LESLIE KLEIN | PRESIDENT | Leslie Klein | 07/03/2024 |
| | | | |
| | | | |
| | | | |
| | | | |

00-15-9297D 11-2021
NCA

Associate Name: Erika Arnsworth
Financial Center: LARCHMONT VILLAGE

Bank Number: 318
Date: 07/03/2024

**B1040 (FORM 1040) (12/24)**

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>Bradley D. Sharp, Liquidation Trustee of the Klein Creditors' Liquidation Trust | **DEFENDANTS**<br>Leslie Klein and EKLK Foundation |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>John W. Lucas (CA Bar No. 271038)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>7Telephone: 310/277-6910 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☒ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
11 U.S.C. § 105
11 U.S.C. § 541
28 U.S.C. § 2201(a)
Federal Rules of Bankruptcy Procedure § 7001(g) & (i)
Federal Rules of Bankruptcy Procedure § 7065

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☒ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

**B1040 (FORM 1040) (12/24)**

| **BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES** | | |
|---|---|---|
| NAME OF DEBTOR<br>Leslie Klein | BANKRUPTCY CASE NO.<br>2:23-bk-10990-NB | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Neil W. Bason |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>November 13, 2026 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>John W. Lucas | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.